**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **NATHANIEL KING,** | § | |
| **Plaintiff** | § | |
| | § | |
| **vs.** | § | |
| | § | |
| **DFW INTERNATIONAL AIRPORT** | § | **CIVIL ACTION NO. 4:22-cv-929** |
| **BOARD,** | § | |
| **Defendant** | § | |

<u>**APPENDIX IN SUPPORT OF P'S BRIEF OF HIS MOTION FOR SUMMARY**
**JUDGMENT**</u>

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES Plaintiff, Nathaniel King, who files this Appendix in support of its Brief

in Support of Motion for Summary Judgment.

**<u>TABLE OF CONTENTS</u>**

Exhibit A……………………………………………………………………Page 3
Exhibit B……………………………………………………………………Page 5
Exhibit C……………………………………………………………………Page 7
Exhibit D……………………………………………………………………Page 8
Exhibit E……………………………………………………………………Page 9
Exhibit F……………………………………………………………………Page 17
Exhibit G…………………………………………………………………...Page 18
Exhibit H…………………………………………………………………...Page 19
Exhibit I…………………………………………………………………….Page 20
Exhibit J……………………………………………………………………Page 41
Exhibit K…………………………………………………………………...Page 42
Exhibit L………………………………………………………...………….Page 43
Exhibit M……………………………………………………...…………….Page 44
Exhibit N…………………………………………………….....…………….Page 45
Exhibit O……………………………………………………....…………….Page 63
Exhibit P……………………………………………………...….………….Page 76
Exhibit Q……………………………………………………….….………..Page 77
Exhibit R……………………………………………………….….………..Page 78
Exhibit S……………………………………………………….....………...Page 79

1

Exhibit T…………………………………………………………Page 83
Exhibit U…………………………………………………..………..Page 86
Exhibit V…………………………………………………..…………..Page 87
Exhibit W…………………………………………………..…………..Page 88

Respectfully Submitted,

By: */s/Wes Dauphinot*
WES DAUPHINOT
Lead Attorney
State Bar No. 00793584
wes@dauphinotlawfirm.com
LAW OFFICE OF WES DAUPHINOT, P.C.
900 W. Abram Street
Arlington, Texas 76013
(817) 462-0676 telephone
(817) 704-4788 facsimile
ATTORNEY FOR PLAINTIFF


By: */s/ Hani F. Kobty*
HANI F. KOBTY
State Bar No. 24087855
hani@kobtylawfirm.com
KOBTY LAW FIRM, PLLC
900 W. Abram Street
Arlington, Texas 76013
(817) 223-0989 telephone
(817) 549-9325 facsimile
ATTORNEY FOR PLAINTIFF


## CERTIFICATE OF SERVICE

On June 14, 2023 the undersigned served a true and correct copy of the foregoing

document via the electronic case filing system (ECF) for the Northern District of Texas. The

ECF system sent a Notice of Filing to all counsel of record, which constitutes service of this

document under Rule 5(b)(2)(e) of the Federal Rules of Civil Procedure.

*/s/Wes Dauphinot*
WES DAUPHINOT

**Russell, Robin**

Wed, 15 Nov 2017 14:35:34 -0600

To: savannah.rubio@matrixos.com

Cc: Burton, John, Rossorelli, Natalie, Wilson, Renee, Rodriguez, David E, Sibley, Joseph, Sullivan,Jeffery J

RE: eComm NEW_CLAIMS_NOTICE_LOA Nathaniel King DALLAS-FORT WORTH INTL AIRPORT BOARD

---

Ms. Rubio,

Based on the restrictions noted we can accommodate Officer Nathan King modified duty request.  He will be on a 10 hour schedule from 1400-2400 Wednesday through Saturday beginning tomorrow 11/16/2017.  If you have any questions, please feel free to contact me via email or at the number below.

Respectfully,

AM Russell
972-973-4645

**From:** Savannah Rubio [mailto:Savannah.Rubio@matrixcos.com]
**Sent:** Wednesday, November 15, 2017 2:21 PM
**To:** Rossorelli, Natalie; Wilson, Renee
**Cc:** Burton, John
**Subject:** RE: eComm NEW_CLAIMS_NOTICE_LOA Nathaniel King DALLAS-FORT WORTH INTL AIRPORT BOARD

Hi Natalie,

I have received the completed modified duty work form back from the physician for your review. I will follow up by phone in a few moments to discuss if you are able to accommodate the restrictions given.

Thank you,

**Savannah Rubio**

**Integrated Claims Examiner**

**|MATRIX**
ABSENCE MANAGEMENT

A MEMBER OF THE TOKIO MARINE GROUP

**Phone:**  800-866-2301 Ext. 53165
**Email:**    Savannah.Rubio@matrixcos.com
**Web:**     www.matrixcos.com



**NOTICE:**  CONFIDENTIALITY AND PROPRIETARY INFORMATION NOTICE: This email, including attachments, is covered by the Electronic Communications Privacy Act (18 U.S.C. 2510-2521) and contains confidential information belonging to the sender which may be legally privileged.  The information is intended only for the use of the individual or entity to which it is addressed. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance of the contents of this information is strictly prohibited. If you have received this electronic transmission in error, please immediately notify the sender by return e-mail and delete this message from your computer or arrange for the return of any transmitted information.

---

**From:** Rossorelli, Natalie [mailto:nrossorelli@dfwairport.com]

EXHIBIT A                                                                    **DFW 004105**

**Sent:** Tuesday, November 14, 2017 12:49 PM
**To:** Savannah Rubio; Wilson, Renee
**Cc:** Burton, John
**Subject:** FW: eComm NEW_CLAIMS_NOTICE_LOA Nathaniel King DALLAS-FORT WORTH INTL AIRPORT BOARD

Savannah,

This employee came in and wanted to know if he is released to RTW tomorrow 11/15/17 at 2pm.
I also received an email from Shift Supervisor John Burton (below)

It should be noted that he was walking quite slow and sat/stood from sitting very slowly.
I would think the attached word form should be completed along with a copy of his job description to ensure he is safe to return to work on light duty.

Sincerely,

**Natalie Rossorelli**
Risk Analyst
Risk Management

Dallas Fort Worth International Airport
P.O. Box. 619428
DFW Airport, TX  75261-9428

E nrossorelli@dfwairport.com
T (972) 973 5657
F (972) 973 5651
www.dfwairport.com

**From:** Burton, John
**Sent:** Tuesday, November 14, 2017 1:38 PM
**To:** Rossorelli, Natalie
**Cc:** _DPS Airport Security Assistant Managers
**Subject:** Return to Work with Restrictions

Greetings Natalie,
Officer Nathan King reported to my office today stating that he is due to return to work tomorrow, Wednesday, November 15, 2017. He stated that he had been out having had surgery. He showed a return to work doctor's note with restrictions to not lift over 15lbs., no other restrictions for a period of 4 weeks.. He states that he had been in contact with Matrix. I was not aware that he was out due to the fact that he is not on my scheduled shift. I asked him to make contact with Risk prior to his return, as I am not aware if there was anything needed on your end. We can accommodate his light duty request and have an assignment for him starting tomorrow. Let me know if there is anything further needed on our end.

Thank you,

**John Burton**
Assistant Manager
Airport Security Division

Department of Public Safety

Dallas Fort Worth International Airport
P.O. Box 619428
DFW Airport, TX  75261-9428

4

EXHIBIT A

DFW 004106

**T:** 972.973.4652
jburton@dfwairport.com

---

**From:** Savannah.Rubio@matrixcos.com [mailto:Savannah.Rubio@matrixcos.com]
**Sent:** Friday, November 10, 2017 11:07 AM
**To:** Brown, Renee; Nygaard, Sharon; Rushin, Carlisa D; Rodriguez, David E; absencemgmt; _Accounting Payroll; Juren,Patrick E; Rossorelli, Natalie
**Cc:** Savannah.Rubio@matrixcos.com
**Subject:** eComm NEW_CLAIMS_NOTICE_LOA Nathaniel King DALLAS-FORT WORTH INTL AIRPORT BOARD

| eComm # 18080574 : NEW_CLAIMS_NOTICE_Leave , 11/10/2017 08:58:35 PST |
|---|

**Sent To:**

rebrown@dfwairport.com, snygaard3@dfwairport.com, crushin@dfwairport.com, drodriguez@dfwairport.com, Absencemgmt@dfwairport.com, AccountingPayroll@dfwairport.com, pjuren@dfwairport.com, nrossorelli@dfwairport.com

**eComm Information:**

Client: DALLAS-FORT WORTH INTL AIRPORT BOARD

Reply To: Savannah.Rubio@matrixcos.com

Name: King , Nathaniel

Phone Number: 1-800-866-2301  ext: 53165

Work State/Province: TX

Intake Date & Number: 11/09/2017 , # 3176665

Employee ID : 7728

Are you Exempt? : N

Department / Location : Public Safety

Supervisor's Name : RodriguezDavid E

Was the disability caused by work : N

Last Date Worked: 11/02/2017

Leave Type: FMLA SELF

Leave Start Date: 11/08/2017

Expected Leave End Date:

Expected RTW Date: 11/15/2017

Actual RTW Date:

Intermittent (Y/N): N

**Special Instructions:**

Manager Note:
This employee has confirmed their last day worked.
Manager Action:
If last day work is inaccurate or you have any questions please contact the Matrix Representative in the eComm Information section above.

| Custom Reminders from Intake: | Selected |
|---|---|
| DFW offers its employees an Employee Assistance Program (EAP) program, through Deer Oaks EAP Services which provides free professional and confidential consulting to you and your family for work and family issues, legal matters, financial issues, addiction and recovery problems, resources for seniors and childcare and any stress-related issues you may need some help with. To contact Deer Oaks EAP Services call twenty-four hours a day seven days a week at 1 (866) 327-2400,log-on eap@deeroaks.com or email www.deeroaks.com. The information shared with the EAP carrier is strictly confidential | Y |
| If you are released to return to work, you are required to provide a written Return to Work note from your physician to Matrix prior to the scheduled return to work date. If you have any work restrictions or accommodations, please contact your Matrix Integrated Claims Examiner to discuss potential Return to Work options. Failure to provide a Return to Work Notice to your supervisor on the day you return to work may result with you not being transitioned to active work status until one is provided. | Y |
| Please be aware that you may receive automated phone messages from Matrix Absence Management. These automated messages are intended to provide you with important | |

EXHIBIT A

DFW 004107

information and updates regarding your claim. If you receive one of these automated messages, there is no need to call us back unless you have questions regarding your claim or the process.

---

******* Notice ******** The information contained in this e-mail, including attachments, may contain confidential information that is intended solely for the use of the individual or entity to which it is addressed. If you are not the intended recipient, or the person responsible for delivering this message to the intended recipient, you are hereby notified that any review, dissemination, distribution, copying or other use of, or taking any action in reliance upon this information is strictly prohibited. If you have received this communication in error, please contact the sender immediately and then delete the material from your computer.

EXHIBIT A                                                                                    DFW 004108

Thompson, Rodney W
Thu, 30 Jan 2020 13:06:24 +0000
To: Boston, Chris W, Burton, John
FW: Work with Accommodations

fyi

**From:** Alderman, Carl Keith <CAlderman@dfwairport.com>
**Sent:** Thursday, January 30, 2020 3:12 AM
**To:** Thompson, Rodney W <rthompson@dfwairport.com>
**Subject:** FW: Work with Accommodations

Just so your tracking Sir.

Regards,

**Keith Alderman**
**Security Shift Supervisor**
**Airport Security Division**
**Department of Public Safety**
Dallas Fort Worth International Airport
P.O. Box 610687
DFW Airport, TX 75261
Cell: (972) 948-7207 or (972) 948-9287

---

**From:** Rossorelli, Natalie <nrossorelli@dfwairport.com>
**Sent:** Wednesday, January 29, 2020 11:56 PM
**To:** King, Nathaniel R <nking@dfwairport.com>
**Cc:** Alderman, Carl Keith <CAlderman@dfwairport.com>; Stevens, Barry C
<bstevens@dfwairport.com>
**Subject:** Re: Work with Accommodations

This is the post that has been identified by your department and risk management for your modified duty post and operationally is the open space available. At this time there will be no change made.

Thank you,
Natalie Rossorelli

---

**From:** King, Nathaniel R <nking@dfwairport.com>
**Sent:** Wednesday, January 29, 2020 10:08:57 PM
**To:** Rossorelli, Natalie <nrossorelli@dfwairport.com>
**Cc:** Alderman, Carl Keith <CAlderman@dfwairport.com>; Stevens, Barry C
<bstevens@dfwairport.com>
**Subject:** RE: Work with Accommodations

No medical reason, do I need one to ask for another spot for accommodations? I just want to be productive. I am not doing anything in the dock except sitting on a chair.

Thank you,
Nathan King

---

**From:** Rossorelli, Natalie <nrossorelli@dfwairport.com>
**Sent:** Tuesday, January 28, 2020 8:22 AM

DFW 004197

EXHIBIT B

King, Nathaniel R
Thu, 30 Jan 2020 04:08:57 +0000
To: Rossorelli, Natalie
Cc: Alderman, Carl Keith, Stevens, Barry C
RE: Work with Accommodations

---

No medical reason, do I need one to ask for another spot for accommodations? I just want to be productive. I am not doing anything in the dock except sitting on a chair.

Thank you,
Nathan King

---

**From:** Rossorelli, Natalie <nrossorelli@dfwairport.com>
**Sent:** Tuesday, January 28, 2020 8:22 AM
**To:** King, Nathaniel R <nking@dfwairport.com>
**Cc:** Alderman, Carl Keith <CAlderman@dfwairport.com>; Stevens, Barry C <bstevens@dfwairport.com>
**Subject:** RE: Work with Accommodations

Is there a medical reason you wish to move related to your current modified duty sir?

Thank you,
Natalie Rossorelli
Risk Analyst
972-973-5657
nrossorelli@dfwairport.com

---

**From:** King, Nathaniel R <nking@dfwairport.com>
**Sent:** Tuesday, January 28, 2020 1:21 AM
**To:** Rossorelli, Natalie <nrossorelli@dfwairport.com>
**Cc:** Alderman, Carl Keith <CAlderman@dfwairport.com>; King, Nathaniel R <nking@dfwairport.com>; ray_sir_6 <ray_sir_6@yahoo.com>
**Subject:** RE: Work with Accommodations

I was told that I needed to discuss with you any adjustments to my accommodations. I am currently at the E Dock and have requested an admin role even if it would require a shift change. I know these positions have been given to many other CSOs who had accommodations within the past few months. Can I be moved to one of these roles?

Thank you,
Nathan King

---

**From:** Rossorelli, Natalie <nrossorelli@dfwairport.com>
**Sent:** Thursday, January 16, 2020 9:55 AM
**To:** King, Nathaniel R <nking@dfwairport.com>
**Subject:** RE: Work with Accommodations

I really need to know from you physicians how long you need modified duty for. We need to review in the next three weeks or less. Modified Duty is a temporary assignment and we need to know to what extent your treatment plan needs it for.

Thank you,

DFW 004142

EXHIBIT B

Stevens, Barry C

Tue, 28 Jan 2020 17:28:21 +0000

To: Rossorelli, Natalie

Re: Work with Accommodations

---

I'll whistle in a sec.

Get Outlook for iOS

---

**From:** Rossorelli, Natalie <nrossorelli@dfwairport.com>
**Sent:** Tuesday, January 28, 2020 11:27:52 AM
**To:** Stevens, Barry C <bstevens@dfwairport.com>
**Subject:** RE: Work with Accommodations

Absolutely!

---

**From:** Stevens, Barry C <bstevens@dfwairport.com>
**Sent:** Tuesday, January 28, 2020 11:27 AM
**To:** Rossorelli, Natalie <nrossorelli@dfwairport.com>
**Subject:** Re: Work with Accommodations

I'm doing interviews at DFWHQ. Can I meet with you in 15-20 mins?

Get Outlook for iOS

---

**From:** Stevens, Barry C
**Sent:** Tuesday, January 28, 2020 10:29:34 AM
**To:** Rossorelli, Natalie <nrossorelli@dfwairport.com>
**Subject:** RE: Work with Accommodations

Agreed.  I believe we have historically assigned those who need modified duty to the docks for that very reason.  If we had an abundance of administrative work for him to do, I'm sure we could accommodate him in the office.  However, such is not the case.

---

**From:** Rossorelli, Natalie <nrossorelli@dfwairport.com>
**Sent:** Tuesday, January 28, 2020 10:27 AM
**To:** Stevens, Barry C <bstevens@dfwairport.com>
**Subject:** RE: Work with Accommodations

Yes I am disinclined to change a position  of modified duty if he just doesn't like it. However; if there is a reason that he medically cannot perform the duties assigned we should consider otherwise people don't get to pick and choose.
But it is my understanding this post is very sedentary and if he cannot do this he cannot do office work either and may need to go back out.

Nat

---

**From:** Stevens, Barry C <bstevens@dfwairport.com>
**Sent:** Tuesday, January 28, 2020 10:23 AM
**To:** Rossorelli, Natalie <nrossorelli@dfwairport.com>
**Subject:** RE: Work with Accommodations

Natalie,

EXHIBIT C                                        9                                    DFW 004297



# MEMO

**TO:**      **Nathaniel King**

**FROM:**    **Carl Alderman**

**DATE:**    **January 27, 2020**

**SUBJECT:** **Leave Without Pay**

As of **January 19, 2020,** Payroll records reflect you have incurred **56.01** hours of leave without pay for the 2020 fiscal year.

The Dallas/Fort Worth International Airport Board Policy Manual, Leave Without Pay Policy states, in pertinent part:

3.3 Maximum Use of Leave Without Pay
3.3.1 Leave without pay may not be granted in excess of the hours stated below:
3.3.1.1 80 hours per payroll fiscal year for regular full-time or contract full-time employees;
3.3.2 Leave without pay in excess of the …80…hours per payroll fiscal year may subject the employee to corrective action and/or termination of employment, except for family and medical leave (FML), supplemental disability pay leave (SDP), on-the-job injury (OJI), and military leave approved absences.

3.3.2.1 Approved absences due to FML, SDP, OJI, and military leave will not be counted towards leave without pay balance.
3.3.2.2 Non-approved absences under FML, SDP, OJI, and military leave will be counted towards leave without pay balance.

Please sign that you have read and understand the above Leave Without Pay Policy.

_____                    27 JAN 20
Signature                                     Date

Dallas Fort Worth
International Airport
P.O. Box 619428
DFW Airport, TX 75261-9428

EXHIBIT D                10                    **DFW 000064**

**Department of Public Safety**
Dallas Fort Worth International Airport
P.O. Box 610687
DFW Airport, TX 75261
Cell: (972) 948-7207 or (972) 948-9207

---

**From:** Carina.Rizo@matrixcos.com <Carina.Rizo@matrixcos.com>
**Sent:** Friday, January 10, 2020 6:36 PM
**To:** Carina.Rizo@matrixcos.com; Nygaard, Sharon <snygaard3@dfwairport.com>; Rushin, Carlisa D <crushin@dfwairport.com>; Brown, Renee <ReBrown@dfwairport.com>; absencemgmt <absencemgmt@dfwairport.com>; _Accounting Payroll <AccountingPayroll@dfwairport.com>; Timm.Richardson@matrixcos.com; Alderman, Carl Keith <CAlderman@dfwairport.com>
**Cc:** Carina.Rizo@matrixcos.com
**Subject:** eComm RESTRICTIONS_STD Nathaniel King DALLAS-FORT WORTH INTL AIRPORT BOARD

---

**Caution:** This email originated outside of DFW Airport. Do not click links or open attachments unless you recognize the sender and know the contents are safe. Report this email to phishing@dfwairport.com, if you believe it is suspicious.

---

| **eComm # 24741193 : RESTRICTIONS_STD , 01/10/2020 16:25:48 PST** |
|---|

**Sent To:**
Carina.Rizo@matrixcos.com, snygaard3@dfwairport.com, crushin@dfwairport.com, rebrown@dfwairport.com, Absencemgmt@dfwairport.com, AccountingPayroll@dfwairport.com, Timm.Richardson@matrixcos.com, CAlderman@dfwairport.com

**eComm Information:**

| | |
|---|---|
| Client: DALLAS-FORT WORTH INTL AIRPORT BOARD | Reply To: Carina.Rizo@matrixcos.com |
| Name: King , Nathaniel | Phone Number: 1-800-866-2301 ext: 52084 |
| Work State/Province: TX | Claim Number: 2019-11-14-0645-ASW-01 |
| Employee ID : 7728 | Intake Date & Number: 11/14/2019 , # 4004502 |
| Department / Location : Public Safety | Are you Exempt? : N |
| Last Date Worked: 11/08/2019 | Expected RTW Date: 01/10/2020 |
| Benefit Start Date: 11/16/2019 | Benefit End Date: 01/02/2020 |
| Restrictions Start Date: 01/07/2020 | Restrictions End Date: |
| Restrictions Type: Medical and Work Hour Limits | |

Restrictions Comments:
Serious Health Condition: 2 - Absence Treatment

**Comments:**

Fit for duty received stating Nathaniel may return to work on 01/07/2020 with the following restrictions: Unable to stand greater than 20 minutes per hour. No repetitive bending, squatting, or stooping. Limit walking to less than one mile per work day. Limit driving time to less than 2 hours per work day. Can this be accommodated?

**Special Instructions:**

Manager Note:
Please refer to the Restrictions listed above.
If there are any questions, please contact the Matrix Representative in the eComm Information section above or your DFW Airport Risk Management Representative.

---

******* Notice ******** The information contained in this e-mail, including attachments, may contain confidential information that is intended solely for the use of the individual or entity to which it is addressed. If you are not the intended recipient, or the person responsible for delivering this message to the intended recipient, you are hereby

EXHIBIT E

DFW 000167

# ADA Advantage℠

## EMPLOYEE REQUEST FOR REASONABLE ACCOMMODATION FORM

YOUR NAME:

TODAY'S DATE: 7/31/2020

YOUR EMPLOYEE ID:

EMPLOYER: DFW Airport Board

LOCATION: DFW Airport

POSITION TITLE: Civilian Security Officer

PERSONAL (NOT WORK) EMAIL ADDRESS:

PRIMARY TELEPHONE NUMBER:

SUPERVISOR NAME / DEPARTMENT HEAD: Supervisor

The Genetic Information Nondiscrimination Act of 2008 (GINA) prohibits employers and other entities covered by GINA Title II from requesting or requiring genetic information of an individual or family member of the individual, except as specifically allowed by this law. To comply with this law, we are asking that you not provide any genetic information when responding to this request for medical information. "Genetic information," as defined by GINA, includes an individual's family medical history, the results of an individual's or family member's genetic tests, the fact that an individual or an individual's family member sought or received genetic services, and genetic information of a fetus carried by an individual or an individual's family member or an embryo lawfully held by an individual or family member receiving assistive reproductive services.

**Employee Responsibility:** Once you have completed this form, please return it to **MatrixADASpecialist@matrixcos.com.** This form will be kept separate from your personnel file and as a confidential medical record. Medical information will be kept confidential and not disclosed except to your employer's Human Resources Department personnel as needed to determine reasonable accommodation and, otherwise, as required or permitted by law. Please email **MatrixADASpecialist@matrixcos.com** if you need assistance in completing this form.

## 1. Limitations.

Please describe the limitations you are experiencing that result from your medical condition, and how those limitations are specifically preventing or negatively impacting your ability to perform the essential functions and/or meet performance and attendance requirements of your job.

1. Unable to operate / ride in a vehicle > 2hrs due to required safe sitting position. Prevents: Doing constant vehicle patrols/rover.
2. Unable to repeatedly stand up from a seated position. Prevents: Standing for all face-to-face interactions. 3. Unable to repeatedly bend, squat, or stoop. Prevents: Inspecting items / bags on a table while standing.
4. Unable to repeatedly lift / carry over 70lbs. Prevents: Moving of heavy items.
5. Unable to walk >45min. Prevents: Doing constant terminal patrols. 6. Unable to stand >20min. Prevents: Standing at posts.
7. Unable to use stairs over 25 steps. Prevents: using stairs to ascend / descend over 2 stories.

(continued)

**RELIANCE STANDARD**
A MEMBER OF THE TOKIO MARINE GROUP

**MATRIX**
ABSENCE MANAGEMENT
A MEMBER OF THE TOKIO MARINE GROUP

PLAINTIFF BATES 0031

# ADA Advantage™

## EMPLOYEE REQUEST FOR REASONABLE ACCOMMODATION FORM

(continued)

### 2. Reasonable Accommodation(s) Requested:

Please check any and all of the below, if applicable, and explain.

☑ Ergonomic (chair, keyboard, mouse, etc.): No stools. Chairs must have back support.

☐ Facility (workstation, parking, etc.)

☐ Break time adjustment

☐ Work schedule/location adjustment

☐ Leave of absence, full or part-time or reduced schedule – Please contact Matrix at 888-477-5110 to request a leave of absence.

☑ Other (explain):

Adjusted physical activities:

1. 30min out of vehicle every 2hrs. 2. No sitting-to-standing >5x per 30min. 3. High tables for inspections. 4. No heavy items >5x per hour.

5. 1hr = 45min walking, 15min sitting 6. No standing over 20min per hour. 7. Use elevator, and / or stair use to once per 2hrs.

### 3. Why.

For each accommodation you have listed in response to question #1, above, describe how or why you believe that, if the accommodation is provided, it would enable you to overcome the limitations described in response to question #2 so that you could perform the essential functions and/or meet performance and attendance requirements of your job.

1 to 7: These accommodations would significantly reduce activities that cause flare-ups in my lower back and hips, which is what causes all

difficulties doing essential functions and/or meeting performance and attendance requirements.

YOUR NAME: Nathaniel R. King

PHYSICIAN NAME: Kelly Derrick

PHYSICIAN PHONE: 817-730-0000

PHYSICIAN FAX: 817-730-0814

PHYSICIAN ADDRESS: 2201 SE Loop 820, Fort Worth, TX 76119

By signing below, I attest that the information I have provided on this form is accurate, true and correct to the best of my knowledge. I understand that my employer reserves the right to verify any and all information in this request or in connection with my request. Therefore, I understand and agree that my failure to provide accurate, true and correct information may constitute grounds for denial of my request for accommodation and discipline, and my failure to provide such information in a timely manner may constitute grounds for denying or delaying my requested accommodation(s).

SIGNATURE: _____    DATE: 7/31/2020

## RELIANCE STANDARD
A MEMBER OF THE TOKIO MARINE GROUP

## MATRIX
ABSENCE MANAGEMENT
A MEMBER OF THE TOKIO MARINE GROUP

EXHIBIT E                    13

PLAINTIFF BATES 0032

## AUTHORIZATION FOR RELEASE
## AND USE OF MEDICAL INFORMATION — ADA

**To:**  All physicians and other health care professionals, hospitals, other health care institutions, insurers, medical, hospital and prepaid health plans, pharmacies, employers, group policyholders, contract holders, governmental agencies, private and/or public benefit plan administrators, and/or attorney representatives, including but not limited to covered entities and business associates under the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and the accompanying regulations:

You are authorized to provide Matrix Absence Management and any of its agents or representatives with all of my health information, referred to in this Authorization as "Medical Information," including, but not limited to, facts and particulars, reports, records, results of diagnostic tests, x-rays, statements of charges, diagnoses, treatments rendered, prognoses, estimates of disability, recommendations for further medical treatment, reports, statements, charts, notations, correspondence, photographs, videos, digital images, or films relating to my medical condition, care, treatment, or evaluations.

> **IMPORTANT NOTICE:** The Genetic Information Nondiscrimination Act of 2008 ("GINA") prohibits employers and other entities covered by GINA Title II from requesting or requiring genetic information of employees or their family members. In order to comply with this law, we are asking that you not provide any genetic information when responding to this request for medical information. **"Genetic information,"** as defined by GINA, includes an individual's family medical history, the results of an individual's or family member's genetic tests, the fact that an individual or an individual's family member sought or received genetic services, and genetic information of a fetus carried by an individual or an individual's family member or an embryo lawfully held by an individual or family member receiving assistive reproductive services.

You are authorized to disclose all Medical Information to Matrix Absence Management for the purpose of evaluating, managing, and otherwise handling one or more claims that I have filed for monetary or other benefits, leave of absence, and/or accommodation pursuant to a disability plan or insurance, worker's compensation, company policy, the Americans with Disabilities Act (as amended), or other federal, state, or municipal law. Matrix Absence Management may use my Medical Information and may redisclose my Medical Information to other persons or entities for the purposes of evaluating my eligibility and/or entitlement on such claim(s).

**|MATRIX**
**|ABSENCE MANAGEMENT**
A MEMBER OF THE TOKIO MARINE GROUP

**Matrix Absence Management, Inc.**    PO. Box 13498 Philadelphia, PA 19101    Fax No.: 877-670-2892

EXHIBIT E                                            14

PLAINTIFF BATES 0033

I understand that disclosure of the above requested Medical Information may include disclosure of protected health information as defined by HIPAA and the accompanying regulations. I understand that HIPAA permits redisclosure of information by a non-covered entity such as Matrix Absence Management without further authorization and, consequently, federal and state privacy laws may no longer apply.

If my claim relates to a medical condition involving psychiatric/mental illness, drug or alcohol treatment, or treatment for the Human Immunodeficiency Virus (HIV), I understand that records regarding these conditions are protected records and it is my right not to allow access to these records. Understanding this, I wish to have these records released so that Matrix Absence Management will have a full understanding of my medical condition and claims.

I understand that I am entitled to receive a copy of this Authorization upon request.

A copy of this Authorization is as valid and effective as the original.

I am signing this Authorization voluntarily. I understand that treatment, payment, or my eligibility for benefits or other claims will not be affected if I do not sign this Authorization.

I understand that I may revoke this Authorization at any time upon written notice to the address below, but that the revocation will not affect Medical Information that has already been used or disclosed.

Notwithstanding any other provision of this document, this Authorization may terminate one year from the date signed.

Name (print): Nathaniel Ryan King

Signature: _____

Date of Birth: 05/01/1977

Social Security No.: 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

Date: 7/31/2020

**If unable to sign, an Authorized Person may sign.**

Authorized Person's Name (print): _____

Authorized Person's Signature: _____

Date: _____

Description of authority to sign on behalf of above person: _____

**MATRIX**
ABSENCE MANAGEMENT
A MEMBER OF THE TOKIO MARINE GROUP

**Matrix Absence Management, Inc.**   PO Box 13498 Philadelphia, PA 19101   Fax No.: 877-670-2892

EXHIBIT E                    15

PLAINTIFF BATES 0034

## EMPLOYEE MEDICAL CERTIFICATION FORM
## IN RESPONSE TO AN ACCOMMODATION REQUEST

| Name: | Date of Birth: | Employer: |
|---|---|---|
| Nathaniel Ryan King | 05/01/1977 | DFW Airport Board |

**A. Questions to help determine whether an employee has an ADA qualifying disability.**

For reasonable accommodation under the ADA, an employee has a disability if he or she has an impairment that substantially limits one or more major life activities or a record of such impairment. The following questions may help determine whether an employee has a disability:

| | | |
|---|---|---|
| Does the employee have a physical impairment? | Yes ☒ | No ○ |
| Does the employee have a mental impairment? | Yes ○ | No ☒ |

Answer the following question based on what limitations the employee has when his or her condition is in an active state and what limitations the employee would have if no mitigating measures were used.*

| | | |
|---|---|---|
| Does the impairment substantially limit a major life activity as compared to most people in the general population? ** | Yes ☒ | No ○ |

### If yes, what major life activity(s) (includes major bodily functions) is/are affected?

| | | | | |
|---|---|---|---|---|
| ☒ Bending | ○ Hearing | ○ Reaching | ○ Speaking | ○ Other: (describe) |
| ○ Breathing | ○ Interacting With Others | ○ Reading | ☒ Standing | |
| ☒ Caring For Self | ○ Learning | ○ Seeing | ○ Thinking | |
| ○ Concentrating | ☒ Lifting | ○ Sitting | ☒ Walking | |
| ○ Eating | ☒ Performing Manual Tasks | ○ Sleeping | ☒ Working | |

### Major bodily functions:

| | | | |
|---|---|---|---|
| ○ Bladder | ○ Digestive | ○ Lymphatic | ○ Reproductive |
| ○ Bowel | ○ Endocrine | ○ Musculoskeletal | ○ Respiratory |
| ○ Brain | ○ Genitourinary | ○ Neurological | ○ Special Sense Organs & Skin |
| ○ Cardiovascular | ○ Hemic | ○ Normal Cell Growth | ○ Other: (describe) |
| ○ Circulatory | ○ Immune | ○ Operation of an Organ | |

PLAINTIFF BATES 0035

**B. Questions to help determine whether an accommodation is needed.**

An employee with a disability is entitled to an accommodation only when the accommodation is needed because of the disability. The following questions may help determine whether the requested accommodation is needed because of the disability.

What limitation(s) is interfering with job performance or accessing a benefit of employment? *Unable to operate/ ride in a vehicle >2 hours, Unable to repeatedly stand up from a seated position, Unable to repeatedly bend, squat, or stoop, Unable to lift/carry >30 pounds, unable to walk >45 minutes, unable to stand >30 minutes, unable to use stairs greater than 25 steps.*

What job function(s) or benefits of employment is the employee having trouble performing or accessing because of the limitation(s)? *Perform Patrols*

Is the employee taking medications that could impair his/her ability to perform the Essential Functions of the job safely? *No, prescribed medications are not taken before or during work because of causing drowsiness.*

How does the employee's limitation(s) interfere with his/her ability to perform the job function(s) or access a benefit of employment? *Restricts repetition or duration of certain physical activities.*

**C. Questions to help determine effective accommodation options.**

Do you have any suggestions regarding possible accommodations that would enable the employee to perform the job? If yes, please complete the appropriate section(s) below:

❖  **IF THIS IS FOR A WORK PLACE ACCOMMODATION, COMPLETE THE FOLLOWING.**

For each possible workplace accommodation, indicate if (temporary or permanent) and if temporary include start date _____ and end date _____
*Adjust physical activities: 30 minutes out of vehicle every 2 hours. No sitting-to-standing >5x per 30 minutes, high tables for inspections, No lift heavy items >5x per hour, 1 hour >45 minutes walking, 15 minutes sitting, No standing >30 minutes/hour, Use elevator, and/or use stairs once per 2 hours.*

How would your suggestions enable the employee to perform the job? *Reduces repetition or duration of certain physical activities to a level which reduces the likelihood of flare-ups or acute exacerbation of symptoms.*

❖  **IF THIS IS FOR CONTINUOUS TIME OFF, COMPLETE THE FOLLOWING.**

Start date_____ and end date_____ (An estimate is needed in order to process request)

If this is for continuous time off, complete the following:

If the suggested accommodation is additional leave, why has this leave been extended? What is the likelihood that this employee will need additional leave, and if so, how much?

**EXHIBIT E**                    **17**

PLAINTIFF BATES 0036

❖   **IF THIS IS FOR INTERMITTENT TIME OFF, COMPLETE THE FOLLOWING.**

Will the impairment cause episodic flare-ups periodically preventing the employee from performing his/her job functions? ___No ✓Yes.

Is it medically necessary for the employee to be absent from work during the flare-ups? ___No ✓Yes.
If so, explain: Flare-ups require the use of prescription medications that can cause drowsiness.

Based upon the employee's medical history and your knowledge of the medical condition, estimate the frequency of flare-ups and the duration of related incapacity that the patient may have over the next 6 months (e.g., 1 episode every 3 months lasting 1-2 days):

Frequency: ___1___ times per ___1___ week(s) _____ month(s)

Duration: _____ hours or _1-2_ day(s) per episode

Start Date: today_____   End Date: 2021_____

**D. Other questions or comments.**

Medical Professional's Signature: Kelly Derrick DO          Date: 7/28/2020

[Print] First Name: Kelly          Last Name: Derrick

Phone: 817-730-0000          Fax: 817-730-0814

The Genetic Information Nondiscrimination Act of 2008 (GINA) prohibits employers and other entities covered by GINA Title II from requesting or requiring genetic information of an individual or family member of the individual, except as specifically allowed by this law. To comply with this law, we are asking that you not provide any genetic information when responding to this request for medical information. "Genetic information," as defined by GINA, includes an individual's family medical history, the results of an individual's or family member's genetic tests, the fact that an individual or an individual's family member sought or received genetic services, and genetic information of a fetus carried by an individual or an individual's family member or an embryo lawfully held by an individual or family member receiving assistive reproductive services.

Please return this form to: 877-670-2892                    Phone: 800-980-1006

**EXHIBIT E**                          18                    PLAINTIFF BATES 0037

Dong, Qing

Wed, 22 Jul 2020 20:45:10 +0000

To: Young, Carl W

RE: Disability Information

---

Carl,
Nathaniel King was hired on 2/8/2016. In reviewing his application, he either skipped or did not self-identify disability.

However, I do see his disclosure of disabled status dated 6/12/2018 in Employee data:



Please let me know if you have more questions.

Thanks,

**Jackie Dong, SPHR**

HRIS Manager
Human Resources

Phone:  (972) 973 1137
Email:    qdong@dfwairport.com

---

**From:** Young,Carl W <cyoung@dfwairport.com>
**Sent:** Wednesday, July 22, 2020 2:57 PM
**To:** Dong, Qing <QDong@dfwairport.com>
**Subject:** RE: Disability Information

Thanks Jackie.  The employee's name is Nathaniel King.

**Carl Young**
Senior HR Consultant
972-973-6389 (office)
214-960-9994 (mobile)

---

**From:** Dong, Qing <QDong@dfwairport.com>

DFW 002417

EXHIBIT F

Case 4:22-cv-00929-P   Document 23   Filed 06/14/23   Page 20 of 382   PageID 750

**Sent:** Tuesday, January 28, 2020 8:22 AM
**To:** King, Nathaniel R <nking@dfwairport.com>
**Cc:** Alderman, Carl Keith <CAlderman@dfwairport.com>; Stevens, Barry C <bstevens@dfwairport.com>
**Subject:** RE: Work with Accommodations


Is there a medical reason you wish to move related to your current modified duty sir?


Thank you,

Natalie Rossorelli

Risk Analyst

972-973-5657

nrossorelli@dfwairport.com

---

**From:** King, Nathaniel R <nking@dfwairport.com>
**Sent:** Tuesday, January 28, 2020 1:21 AM
**To:** Rossorelli, Natalie <nrossorelli@dfwairport.com>
**Cc:** Alderman, Carl Keith <CAlderman@dfwairport.com>; King, Nathaniel R <nking@dfwairport.com>; ray_sir_6 <ray_sir_6@yahoo.com>
**Subject:** RE: Work with Accommodations


I was told that I needed to discuss with you any adjustments to my accommodations. I am currently at the E Dock and have requested an admin role even if it would require a shift change. I know these positions have been given to many other CSOs who had accommodations within the past few months. Can I be moved to one of these roles?

Thank you,

Nathan King

---

**From:** Rossorelli, Natalie <nrossorelli@dfwairport.com>
**Sent:** Thursday, January 16, 2020 9:55 AM
**To:** King, Nathaniel R <nking@dfwairport.com>
**Subject:** RE: Work with Accommodations


I really need to know from you physicians how long you need modified duty for. We need to review in the next three weeks or less. Modified Duty is a temporary assignment and we need to know to what extent your treatment plan needs it for.


Thank you,

Natalie Rossorelli

Risk Analyst

3-5657

EXHIBIT G           20           **DFW 000382**

## eComm # 26309328 : DENY_STD , 06/18/2020 15:23:35 PST

### Sent To:

Carina.Rizo@matrixcos.com, snygaard3@dfwairport.com, crushin@dfwairport.com, rebrown@dfwairport.com, Absencemgmt@dfwairport.com, AccountingPayroll@dfwairport.com, mstrickland@dfwairport.com

### eComm Information:

Client: DALLAS-FORT WORTH INTL AIRPORT BOARD

Name: King , Nathaniel

Work State/Province: TX

Employee ID : 7728

Department / Location : Public Safety

Last Date Worked: 04/24/2020

Expected RTW Date: 06/20/2020

Denial Reason : Other

Reply To: Carina.Rizo@matrixcos.com

Phone Number: 1-800-866-2301  ext: 52084

Claim Number: 2020-04-27-0145-ASW-01

Intake Date & Number: 04/20/2020 , # 4221048

Are you Exempt? : N

Leave Start Date: 04/25/2020

Denial Date: 06/18/2020

Other Reason for Denial:

Serious Health Condition :

### Comments:

Employees Short term disability has been denied due to medical does not support disability per policy. Leave closed.

### Special Instructions:

Manager Note:

Your employee's disability request has been denied. Please refer to the comments section above for the denial reason.

Manager Action:

If your employee has taken the time away from work, is back at work and now has unapproved absences for a period of time and you would like to discuss next steps, contact your DFW Airport Human Resources Consultant.

If you have spoken with your employee, but they have not returned to work, contact the Matrix Representative in the eComm Information section above to determine next course of action.

**DALLAS-FORT WORTH INTERNATIONAL AIRPORT BOARD**

**SHORT TERM DISABILITY PLAN**

Effective Date of Plan: January 1, 2015





EXHIBIT I                    22                    DFW 001524

# DALLAS-FORT WORTH INTERNATIONAL AIRPORT BOARD

## SHORT TERM DISABILITY PLAN

### TABLE OF CONTENTS

I.    **DEFINITIONS** ...............................................................................................................1

      A.    Active Employment ...........................................................................................1
      B.    Claims Administrator ........................................................................................1
      C.    Company ............................................................................................................1
      D.    Disability ...........................................................................................................1
      E.    Earnings .............................................................................................................2
      F.    Effective Date ...................................................................................................2
      G.    Employee ...........................................................................................................2
      H.    Health Care Professional ...................................................................................2
      I.    Objective Medical Evidence .............................................................................2
      J.    Occupational Injury or Sickness .......................................................................2
      K.    Physician ...........................................................................................................2
      L.    Plan ...................................................................................................................3
      M.   Plan Administrator ............................................................................................3
      N.    Plan Year ...........................................................................................................3

II.   **PARTICIPATION** .......................................................................................................4

      A.    Eligibility for Participation ...............................................................................4
      B.    Effective Date of Participation ..........................................................................4
      C.    Cessation of Participation ..................................................................................4

III.  **ELIGIBILITY FOR BENEFITS** ................................................................................5

      A.    Elimination Period .............................................................................................5
      B.    Disability Determination ...................................................................................5
      C.    Exclusions .........................................................................................................5

IV.   **DISABILITY BENEFITS** ...........................................................................................7

      A.    Amount of Benefit .............................................................................................7
      B.    Reductions to the Amount of Benefit ...............................................................7
      C.    Acts of Third Parties. ........................................................................................8
      D.    Commencement and Duration of Benefits.........................................................8
      E.    Discontinuance and Resumption of Benefits ....................................................9
      F.    Suspension and Reinstatement of Benefits .......................................................9

EXHIBIT I                                    23                              DFW 001525

**TABLE OF CONTENTS (continued**

| | | |
|---|---|---|
| V. | **PAYMENT OF BENEFITS** | 10 |
| | A. Application for Benefits | 10 |
| | B. Time Limit for Application for Benefits | 10 |
| | C. Claim Processing | 10 |
| | D. Claim Review Procedure | 11 |
| | E. Notification of Benefit Determination Upon Review | 13 |
| | F. Medical Examinations | 14 |
| | G. Non-Alienation of Benefits | 14 |
| | H. Payment to Representative | 14 |
| | I. Payment in the Event of Death | 14 |
| VI. | **PLAN FINANCING** | 15 |
| | A. Employee Contributions | 15 |
| | B. Company Contributions | 15 |
| VII. | **ADMINISTRATION AND RESPONSIBILITY** | 16 |
| | A. Duties of the Plan Administrator | 16 |
| | B. Duties of the Claims Administrator | 16 |
| | C. Delegation of Duties | 16 |
| | D. Decisions and Rules | 17 |
| | E. Fiduciary Duties | 17 |
| | F. Liability; Indemnification | 17 |
| VIII. | **MISCELLANEOUS** | 18 |
| | A. Permanence of the Plan | 18 |
| | B. Right to Amend | 18 |
| | C. Nonguarantee of Employment | 18 |
| | D. Titles | 18 |

EXHIBIT I                24                DFW 001526

## DALLAS-FORT WORTH INTERNATIONAL AIRPORT BOARD

## SHORT TERM DISABILITY PLAN

Effective Date of Plan: January 1, 2015

## I.   DEFINITIONS

A.   *Active Employment*   "Active Employment" means performance by the Employee of the regular duties of his or her work on any day that is one of the Company's scheduled work days. A period of Active Employment will also include (i) day(s) of Time Off with Pay that have been scheduled by an Employee, and (ii) days that are not the Company's scheduled workdays, provided the Employee is in Active Employment on the preceding scheduled workday.

B.   *Claims Administrator*   "Claims Administrator" means Matrix Absence Management, Inc. a third-party claims administration company acting on behalf of Dallas-Fort Worth International Airport Board in the initial determination and administration of claims and appeals under this Plan. Matrix can be contacted by calling 1-877-202-0055 or online at www.matrixabsence.com to report a claim for benefits.

C.   *Company*   "Company" means Dallas-Fort Worth International Airport Board and any successor thereto. In addition, for the purpose of determining eligibility to participate in the Plan, "Company" also means any subsidiary of Dallas-Fort Worth International Airport Board which the officers of Dallas-Fort Worth International Airport Board in their sole discretion, authorize to participate in the Plan.

D.   *Disability*   "Disability" means any physical or mental condition arising from a non-occupational injury, illness, or pregnancy that renders an Employee incapable of performing the material duties of his or her regular job or any reasonably related job. An Employee will also be considered to have sustained a Disability if:

1.   he or she is ordered not to work by written order from a state or local health officer because he or she is infected with, or suspected of being infected with, a communicable disease; or

2.   he or she has been referred or recommended by competent medical authority to participate as a resident in either an alcohol abuse treatment program or drug abuse treatment program, or to participate in an outpatient program for the treatment of drug or alcohol abuse.

An Employee will not be considered disabled if (i) he or she is performing work of any kind for remuneration or profit unless with the prior approval of the Plan Administrator, or (ii) he or she declines alternative employment by the Company which is within the Employee's capabilities and, as determined solely by the Company, has status and compensation comparable to the Employee's previous job.

E.   *Earnings*   "Earnings" means the Employee's basic wage or salary, including commissions, on the date immediately preceding the onset of Disability. Earnings do not include bonuses, overtime or any additional forms of compensation.

F.   *Effective Date*   "Effective Date" of the Plan means January 1, 2015.

G.   *Employee*   "Employee" means a person who is an active full-time Employee of the Company regularly scheduled to work at least forty (40) hours per week.

Part-time, temporary or seasonal employees, sub-contractors or anyone similarly classified and performing services for Dallas-Fort Worth International Airport Board is not eligible to participate in the Plan.

H.   *Health Care Professional*   "Health Care Professional" means a Physician or other Health Care Professional licensed, accredited, or certified to perform specified health services consistent with State law.

I.   *Objective Medical Evidence*   "Objective Medical Evidence" means a measurable abnormality which is evidenced by one or more standard medical diagnostic procedures including laboratory tests, physical examination findings, X-rays, MRIs, EEGs, ECGs, CAT scans or similar tests that support the presence of a Disability or indicate a functional limitation. Objective Medical Evidence does not include physician's opinions based solely on the acceptance of subjective complaints (e.g. headache, fatigue, pain, nausea), age, transportation, local labor market and other non-medical factors. To be considered an abnormality, the test result must be clearly recognizable as out of the range of normal for a healthy population; the significance of the abnormality must be understood and accepted in the medical community and the abnormality must support and correlate to the disability and not be merely an incidental finding.

J.   *Occupational Injury or Illness*   "Occupational Injury or Illness" means an Injury or Illness that was caused by or aggravated by any employment for pay or profit or any Injury or Illness which the Employee alleges was caused by any employment for pay or profit.

K.   *Physician*   "Physician" means a physician, surgeon, dentist, podiatrist, osteopathic or chiropractic practitioner, or psychologist who is duly licensed and acting within the scope of his or her practice. "Psychologist" means a licensed psychologist in the state of practice, and who either (1) has at least two years clinical experience in a recognized health setting, or (2) has met the standards of the National Register of the Health Service Providers in Psychology. For the purpose of Disability related to normal pregnancy or childbirth, a midwife, nurse-midwife and a nurse practitioner duly licensed and acting within the scope of his or her practice, are physicians. The Physician may not be the Employee, a relative by blood or marriage, or a domestic partner.

L.   *Plan*    "Plan" means the Dallas-Fort Worth International Airport Board Short Term Disability Income Plan, as herein set forth and as it may be amended from time to time.

M.   *Plan Administrator*   "Plan Administrator" means the Company.

N.   *Plan Year*   "Plan Year" means the twelve (12) month period ending December 31st.

## II.     PARTICIPATION

A.     _Eligibility for Participation_   A person who is an Employee on the Effective Date of the Plan is eligible to participate on the later of 1) the Effective Date of the Plan or 2) the date on which the Employee meets six (6) months of Active Employment with the Company. A person who becomes an Employee after the Effective Date of the Plan will become eligible to participate in the Plan on the date on which the employee meets six (6) months of Active Employment with the Company.

Any Service Waiting Period will be waived if an Employee's participation in the Plan ends because he or she is no longer in an eligible class, but he or she continues to be employed by the Company and within one year becomes a member of an eligible class.

B.     _Effective Date of Participation_   An Employee becomes a Participant on the date he or she becomes eligible, provided, however, that if an Employee is not in Active Employment on the date that his or her participation would otherwise become effective, his or her participation will be deferred until the date on which he or she returns to Active Employment.

C.     _Cessation of Participation_   An Employee will automatically cease to participate on the earliest of the following:

1.     the date on which the Participant ceases to be an Employee;

2.     the date on which the Participant is placed on layoff status; or

3.     the date on which this Plan terminates.

III.    **ELIGIBILITY FOR BENEFITS**

A.    *Elimination Period*    A Participant who sustains a Disability will, subject to the provisions of the Plan, become eligible to receive benefits on his or her eighth (8th) day of Disability, provided the Participant has been examined by or is under the care of a Physician during some portion of that period.

A Participant's available sick days will be used to cover the Elimination Period, or his or her accrued Time Off with Pay, if the Participant does not have enough sick days to satisfy the Elimination Period. All of a Participant's available sick time will be used before Disability benefits will be paid. Once a Participant's sick time has been exhausted, he or she may choose to use accrued Time Off with Pay. The maximum duration for any one period of Disability is one hundred eighty (180) days from the onset of Disability.

Subsequent periods of Disability, separated by thirty (30) days of continuous Active Employment at the Participant's normal work schedule will be considered one period of Disability, unless the subsequent Disability is due to an injury or illness found by the Claims Administrator to be entirely unrelated to the cause of the previous Disability and commences after return to Active Employment with the Company for at least one (1) day.

B.    *Disability Determination*    The Claims Administrator will determine whether a Disability exists with respect to a Participant on the basis of (i) Objective Medical Evidence, (ii) a certificate from the Participant's Physician, or (iii) any such other information as the Claims Administrator, in its sole discretion, deems relevant to such determination.

Certificates from the Participant's Physician must contain (i) a diagnosis and diagnostic code prescribed in the International Classification of Diseases, or, where no diagnosis has yet been obtained, a detailed statement of symptoms, (ii) a statement of the medical facts within the Physician's knowledge, based on a physical examination and a documented medical history of the Participant by the Physician, (iii) the Physician's conclusion as to the Participant's Disability, and (iv) a statement of the Physician's opinion as to the expected duration of the Disability.

C.    *Exclusions*    No Participant will be entitled to a benefit under this Plan if:

1.    his or her Disability arises out of, relates to, is caused by or results from an intentionally self-inflicted Injury or Illness, whether sane or insane;

2.    his or her Disability arises out of, relates to, is caused by or results from an Injury or Illness to which a contributing cause was the Participant's commission or attempted commission of a felony, or the Participant's engagement in an illegal occupation;

3.     his or her Disability arises out of, relates to, is caused by or results from an Injury or Illness due to war or any act of war, declared or undeclared, insurrection, rebellion, participation in a riot, or service in the armed forces of any country or international authority;

4.     his or her Disability arises out of, relates to, is caused by or results from an Occupational Illness or Injury that is covered by Workers' Compensation or similar law, or the Participants employment for wages or profit with another Employer;

5.     his or her Disability arises out of, relates to, is caused by or results from a Disability due to elective or cosmetic surgery, unless determined to be medically necessary due to the Participant's injury or illness as determined by a Physician;

6.     his or her Disability arises out of, relates to, is caused by or results from the Participant's loss of a professional license, occupational license or certification;

7.     the Participant is incarcerated in any federal, state or municipal penal institution, jail, medical facility, hospital (public or private) or in any other place because of a criminal conviction under a federal, state or municipal law or ordinance;

8.     the Participant is not under the regular and continuous care and treatment of a Physician, unless the Claims Administrator determines that such regular and continuous care and treatment are not medically indicated given the nature of the Disability; or

9.     the period of Disability begins when the Employee is not a Participant in the Plan.

## IV. DISABILITY BENEFITS

A.   *Amount of Benefit*   Subject to reduction as hereinafter provided, and following the Elimination Period, the amount of weekly benefit for which a Participant is covered under the Plan will be based on his or her length of service in accordance with the following schedule.

| Years of Service | Percentage of Benefit |
|---|---|
| 6 months – 3 years | 40% |
| 4 years but less than 10 | 50% |
| 10 years but less than 15 | 75% |
| 15 or more | 90% |

For each day of any period of Disability for which benefits are payable and which is less than a full week, the amount of benefit payable will be $1/5^{th}$ of the amount of the weekly benefit.

B.   *Reductions to the Amount of Benefit*   The Disability benefit will be reduced by any of the following which are available to the Participant, or to the Participant's spouse or child(ren) if applicable, for the same period for which the Disability benefit is payable hereunder:

1.   primary and dependent disability or retirement benefits under the Federal Social Security Act, the Railroad Retirement Act, the Canada Pension Plan, the Quebec Pension Plan, or any other similar plan or act providing benefits due to your Disability or any similar plan or act; provided, however, that any cost-of-living increases in such benefits, effective after the initial reduction in the Plan benefit, will not serve to further reduce the Plan benefit;

2.   benefits under any plan, fund or other arrangement, by whatever name called, providing disability benefits pursuant to any compulsory benefit act or law of any government;

3.   benefits under a state-mandated disability plan or a Company plan established in lieu thereof;

4.   disability or retirement benefits under any other Company-sponsored or Company-funded plan;

5.   any amounts received because of the Employee's disability under a franchise or group insurance policy or similar plan;

6.   any available sick time or accrued Time Off with Pay;

7.   any salary continuation payments; and

8.   any work loss provision in mandatory "No-Fault" automobile insurance.

If a Participant is or might be entitled to any of the above-itemized benefits, the full Plan benefit will be paid upon receipt by the Plan or Claims Administrator of (i) evidence that the Participant has applied for such benefits and (ii) an executed agreement to reimburse the Plan, up to the amount of payments made, immediately upon receipt of such benefits.

If a Participant fails to apply for any of the above-itemized benefits to which he or she might be entitled, the Plan benefit will be reduced by the amount of the benefit which the Participant would have received had application been made. Determination of the amount of such benefit will be made by the Plan or Claims Administrator.

C.    *Acts of Third Parties*    In the event that a Participant is injured through the acts or omissions of another person or organization, benefits under the Plan will be provided only on condition that the Participant agrees in writing to the following:

1.    to reimburse the Plan, for the full amount of payments made under the terms of the Plan, immediately upon receipt of the proceeds of any settlement of, or judgment in, an action at law, arbitration, claim, or other proceeding to determine his or her rights of recovery arising out of his or her injury, net of his or her reasonable expenses in collecting such amount including reasonable attorney's fees, and net of any amounts which are allocated by terms of any judgment for the payment of unreimbursed medical expenses; he or she will execute and deliver instruments and papers and do whatever else is reasonably necessary to secure the rights of the Plan to reimbursement out of such proceeds, and he or she will do nothing to prejudice such rights;

2.    to provide the Plan with a lien against payments to be made in the future under the Plan equal to the proceeds described above, less any amount paid to the Plan by way of reimbursement; and

3.    to provide the Plan with a credit against payments to be made in the future under the Plan equal to the proceeds described above, less any amount paid to the Plan by way of reimbursement.

D.    *Commencement and Duration of Benefits*    Benefits will be payable as of the first day that a Participant becomes eligible to receive benefits and applies therefor. Thereafter, benefits will be payable until the earliest of the following:

1.    the date following twenty-six (26) weeks of Disability in a 12-month period. The 26 weeks includes up to 25 weeks of benefit payments and the 7-day Elimination Period during which a Participant must use all available sick days prior to receiving Disability benefits. Participants may choose to use their accrued Time Off with Pay once their sick days have exhausted;

2.    the date the Disability ceases to exist; or

3.    the date of the Participant's death.

E.   *Discontinuance and Resumption of Benefits*   Benefits will be discontinued on the date, as determined by the Claims Administrator, that any of the following has occurred:

1.   the Participant has refused to undergo a medical examination; failure by the Participant to undergo a scheduled medical examination following a written request by the Claims Administrator to do so will be considered a refusal;

2.   the Participant has refused to provide information requested in writing by the Claims Administrator for the purpose of determining whether the Participant is entitled to benefits under the Plan; failure to furnish such information within thirty (30) days after such information has been requested will be considered a refusal;

3.   the Participant has refused to follow or has rejected the treatment plan recommended by his or her Physician, unless the Participant disputes such treatment plan in good faith and on the advice of another Physician;

4.   the Participant is no longer under the regular and continuous care and treatment of a Physician, unless such regular and continuous care and treatment are not medically indicated, given the nature of the Disability; or

5.   the Participant has knowingly misstated or provided false information or materials to the Plan or Claims Administrator in order to receive benefits.

Benefits, which have been discontinued in accordance with the above, may resume if the reason for discontinuance ceases to apply. In no event, however, will benefits be paid for the period during which the Participant was not in compliance with the Plan unless the Claims Administrator determines that the Participant's failure to comply was due to reasonable cause.

F.   *Suspension and Reinstatement of Benefits*   Benefits will be suspended as of the date of any medical examination conducted pursuant to Section V.F. If the Claims Administrator, on the basis of the results of such examination, determines that eligibility for benefits continues, benefits will be reinstated as of the date of the medical examination.

## V.   PAYMENT OF BENEFITS

A.   *Application for Benefits*   To be entitled to any benefits under the Plan, a Participant must comply with such procedures and requirements as the Claims Administrator may have prescribed with respect to the completion and filing of an application for such benefits and submission of evidence that the Participant is entitled to such benefits. The Claims Administrator may require information with respect to the Participant's age, address, marital status, dependents, employment record, medical history and evidence that the Participant has applied for any benefits which would serve to reduce benefits under this Plan.

The Claims Administrator may require any other information reasonably relevant to a determination of whether the Participant is eligible to receive benefits and may also require written authorization to obtain:

1.   information from the Participant's Physician or Physicians with respect to his or her physical condition, diagnosis, prognosis, date of expected return to work and related matters;

2.   relevant medical records on file in any hospital, Physician's or government office; and

3.   such other records from any company having information reasonably relevant to a determination.

B.   *Time Limit for Application for Benefits*   An application for benefits must be filed no later than thirty (30) days after the date benefits may become payable under the Plan unless it is not reasonably possible for the Participant or his or her representative to do so.

If the Participant or his or her representative fails to provide the information as required above, benefits will not be paid for the period during which the Participant was not in compliance with the Plan unless the Claims Administrator determines that the Participant's failure to comply was due to reasonable cause. However, in no event will an application be accepted by the Claims Administrator if such application or certificate is filed more than six (6) months after the date benefits may become payable.

C.   *Claim Processing*   Upon receipt of the Participant's application, the Claims Administrator will make a determination as to the eligibility of the Participant for benefits. If the Claims Administrator determines that a Participant is not eligible for benefits, the Participant will be provided with written notification of the denial within forty-five (45) days after receipt of the application. The notice will be written in a style and manner calculated to be understood by the Participant. The notice of denial will set forth:

1.   the specific reason or reasons for the denial;

2.      specific references to pertinent Plan provisions on which the denial is based;

3.      a description of any additional material or information necessary for the claimant to perfect the claim and an explanation as to why such material or information is necessary; and

4.      an explanation of the Plan's claim review procedure.

D.      *Claim Review Procedure*

**First Level of Appeal**      Any Participant or the representative of a Participant whose claim has been denied will have the right to request a review of the decision made on his or her claim. Such request must:

1.      be in writing and submitted to the Claims Administrator at the following address:

Quality Review Unit
Matrix Absence Management
P. O. Box 11035
San Jose, CA 95103

2.      be filed within one hundred eighty (180) days after receipt of the written decision;

3.      set forth all of the grounds upon which the request for review is based and any facts in support thereof; and

4.      set forth any issues or comments, which the Participant deems pertinent to his or her claim.

The Participant or his or her representative may review documents pertinent to his or her claim.

Upon receipt of the request for review of the decision, the Claims Administrator will consider the written request and provide the Participant with a written decision within forty-five (45) days after receipt of the request for review. This review:

1.      shall give no weight to the initial adverse benefit determination;

2.      will be rendered *de novo,* with a review of the entire file, including any new materials and arguments submitted since the initial adverse benefit determination;

3.      will be rendered by an appropriately named individual who neither made the adverse benefit determination that is the subject of the appeal, nor is the subordinate of that individual;

4.   will be rendered in consultation with a Health Care Professional who has appropriate training and expertise in the field of medicine involved in the medical judgment, if the initial adverse benefit determination was made in consultation with a Health Care Professional and if the adverse benefit determination is based in whole or in part on a medical judgment; and

5.   will be rendered with the consultation of a Health Care Professional who was not the individual consulted during the adverse benefit determination that is the subject of the appeal, nor the subordinate of that individual, if the initial adverse benefit determination was made in consultation with a Health Care Professional.

Should additional time be required in which to review the Participant's request, the Participant will be notified on or before the date the forty-five (45) day period expires. The extension notification sent to the Participant will indicate (i) the special circumstances requiring an extension, and (ii) the date and time by which the Claims Administrator expects to render a determination on review. In no event, however, will the written decision be issued more than ninety (90) days after the request for review is received.

**Second Level of Appeal:**   Any Participant or the representative of a Participant whose appeal has been denied will have the right to request a review of the decision made on his or her claim. Such request must:

1.   be in writing and submitted to the Claims Administrator at the following address:

Quality Review Unit
Matrix Absence Management
P. O. Box 11035
San Jose, CA 95103

2.   be filed within one hundred eighty (180) days after receipt of the written decision;

3.   set forth all of the grounds upon which the request for review is based and any facts in support thereof; and

4.   set forth any issues or comments, which the Participant deems pertinent to his or her claim.

The Participant or his or her representative may review documents pertinent to his or her claim.

Upon receipt of the request for review of the decision, the Claims Administrator will consider the written request and provide the Participant with a written decision within forty-five (45) days after receipt of the request for review. This review:

1.    shall give no weight to the initial adverse benefit determination;

2.    will be rendered *de novo,* with a review of the entire file, including any new materials and arguments submitted since the initial adverse benefit determination;

3.    will be rendered by an appropriately named individual who neither made the adverse benefit determination that is the subject of the appeal, nor is the subordinate of that individual;

4.    will be rendered in consultation with a Health Care Professional who has appropriate training and expertise in the field of medicine involved in the medical judgment, if the initial adverse benefit determination was made in consultation with a Health Care Professional and if the adverse benefit determination is based in whole or in part on a medical judgment; and

5.    will be rendered with the consultation of a Health Care Professional who was not the individual consulted during the adverse benefit determination that is the subject of the appeal, nor the subordinate of that individual, if the initial adverse benefit determination was made in consultation with a Health Care Professional.

Should additional time be required in which to review the Participant's request, the Participant will be notified on or before the date the forty-five (45) day period expires. The extension notification sent to the Participant will indicate (i) the special circumstances requiring an extension, and (ii) the date and time by which the Claims Administrator expects to render a determination on review. In no event, however, will the written decision be issued more than ninety (90) days after the request for review is received. The decision of the Claims Administrator on any benefit claim will be final and conclusive upon all persons.

E.    *Notification of Benefit Determination Upon Review*    If, on review, the Claims Administrator determines that a claimant is not eligible for benefits, the claimant will be notified in writing within the time frames set forth in Section VI. D. above. The notification will be written in a manner designed to be understood by the claimant and will set forth the following:

1.    the specific reason or reasons for the denial;

2.    specific references to pertinent Plan provisions on which the denial is based;

3.    a statement that the claimant is entitled to receive, upon request, reasonable access to, and copies of, all documents, records, and other information relevant to the claim;

4.     if applicable, the rule, guideline, protocol or similar criterion on which the denial was based (or a statement that a copy of such is available, on request); and

5.     if applicable, the identity of any medical or vocational expert(s) whose advice was obtained on behalf of the Plan in connection with the adverse benefit determination, whether or not the advice was relied upon in making the determination.

F.     *Medical Examinations*    With the Company's approval, the Claims Administrator may require that a Participant applying for benefits submit to an examination by a Physician designated by the Claims Administrator, for his or her medical opinion as to whether the Participant is disabled so as to meet the eligibility requirements under the Plan for benefits. Re-examinations of a Participant receiving benefits may be directed by the Claims Administrator from time to time for the purpose of assisting the Claims Administrator in determining whether continued eligibility for such benefits exists. The fees of such Physician and the expenses of such examination will be paid by the Plan.

G.     *Non-Alienation of Benefits*    To the extent permitted by law, no benefit payable at any time under the Plan will be assignable or transferable, or subject to any lien, in whole or in part, either directly or by operation of law or otherwise, including, but not limited to, execution, levy, garnishment, attachment, pledge, bankruptcy, or in any other manner. No benefit payable under the Plan will be liable for, or be subject to, any obligation or liability of any Participant.

H.     *Payment to Representative*    In the event that a guardian, conservator, committee or other legal representative has been duly appointed for a Participant entitled to any payment under the Plan, any such payment due may be made to the legal representative making claim therefor. Any such payment so made will be in complete discharge of the liabilities of the Plan therefor, and the obligations of the Plan Administrator and the Company.

I.     *Payment In the Event of Death*    In the event of the death of the Participant any payments due under this Plan as a result of the Participant's Disability will be made to his or her beneficiary as noted in the Participant's group life insurance policy or, if no such policy exists, to the Participant's spouse. If payments cannot be made under either of the above methods, payment will be made to the Participant's estate.

## VI.    PLAN FINANCING

A.    *Participant Contributions*    Participants will not be required to make contributions to the Plan.

B.    *Company Contributions*    Disability benefit payments and such other costs as are determined necessary to properly maintain and operate the Plan will be paid out of the Company's general assets.

## VII.    ADMINISTRATION AND RESPONSIBILITY

A.    *Duties of the Plan Administrator*    The Plan Administrator will have, at its discretion, exclusive authority and responsibility for all matters in connection with the operation and administration of the Plan. Specifically, the Plan Administrator will:

1.    be responsible for the compilation and maintenance of all records necessary in connection with the Plan;

2.    decide questions relating to the eligibility of Employees to become Participants;

3.    engage such legal, actuarial, accounting and other professional and clerical services as may be necessary or proper; and

4.    interpret this instrument and make and publish such uniform and non-discriminatory rules for administration of the Plan as are not inconsistent with the provisions of this instrument.

B.    *Duties of the Claims Administrator*    The Plan Administrator has assigned a Claims Administrator, Matrix Absence Management, Inc., to provide certain administrative claims handling services. The Plan Administrator delegates to Matrix the discretionary authority to determine the validity of claims under the Plan. This delegation is subject to Plan Administrator's retention of full responsibility as a Plan Administrator for the final review of claims, and Plan Administrator has the discretionary authority to administer, construe and interpret the terms of the Plans and to make final, binding determinations concerning the availability of Plan benefits.

C.    *Delegation of Duties*    The Plan Administrator may, from time to time, delegate any of the rights, powers, and duties of the Plan Administrator (including fiduciary responsibilities) with respect to the operation and administration of the Plan to one or more committees, individuals or entities. If the Plan Administrator delegates any rights, powers or duties to any person, such person may from time to time further delegate such rights, powers and duties to any other person. If any right, power or duty is delegated to more than one person, such persons may from time to time allocate among themselves any such right, power or duty. Any allocation or delegation of fiduciary responsibilities under the Plan will be terminable upon such notice as the Plan Administrator, in its sole discretion, deems reasonable and prudent.

D.    _Decisions and Rules_   The decisions of the Plan Administrator made in good faith upon any matter within the scope of its authority will be final, but the Plan Administrator at all times in carrying out its decisions will act in a uniform and nondiscriminatory manner.

E.    _Fiduciary Duties_   In performing its duties, the Plan Administrator will act solely in the interest of the Participants:

1.    for the exclusive purpose of providing benefits to Participants and defraying reasonable expenses of administering the Plan;

2.    with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; and

3.    in accordance with the documents and instruments governing the Plan, insofar as such documents and instruments are consistent with the provisions of the Plan.

F.    _Liability; Indemnification_   The Plan Administrator will not be liable for any act, omission, determination, or construction made by itself or by its designated counsel, agents, or other employees, except for willful misconduct. Nothing herein, however, will be construed as purporting to relieve the Plan Administrator or any other fiduciary under the Plan, or any officer or director of the Company, or any agent thereof, from responsibility or liability for any responsibility, obligation, or duty imposed. The Company will indemnify and hold harmless any person to whom any fiduciary duty is delegated from and against any and all liabilities, claims, demands, costs and expenses (including attorneys' fees) arising out of an alleged breach in the performance of its fiduciary duties under the Plan, other than such liabilities, claims, demands, costs and expenses as may result from the gross negligence or willful misconduct of such person. The Company will have the right, but not the obligation, to conduct the defense of such person in any proceeding to which this Section applies.

## VIII.  MISCELLANEOUS

A.  *Permanence of the Plan*   The Company intends to continue the Plan indefinitely, but will not be under any obligation or liability whatsoever to continue to maintain the Plan for any given length of time. The Company may, in its sole discretion, terminate the Plan any time without any liability whatsoever for such action. If the Plan is terminated, the termination will not affect the rights of any Participant to claim benefits with respect to a Disability incurred prior to such termination.

B.  *Right to Amend*   The Company reserves the power and right, at any time or times to amend any or all of the provisions of the Plan to any extent and in any manner it will deem advisable.

C.  *Nonguarantee of Employment*   The adoption and maintenance of the Plan will not be considered to be a contract between the Company and any Employee. Therefore, no provision of the Plan will give any Employee the right to be retained in the employ of the Company or to interfere with the right of the Company to discharge any Employee at any time irrespective of the effect such discharge may have upon an Employee as a Participant or prospective Participant under the Plan. In addition, no provision of the Plan will be considered to give the Company the right to require any Employee to remain in its employ, or to interfere with any Employee's right to terminate his or her employment at any time.

D.  *Titles*   Titles are for reference only. In the event of a conflict between a title and the content of a Section, the content will control.

**smainka@phamharrison.com**

| | |
|---|---|
| **From:** | Petina Batchler <Petina.Batchler@matrixcos.com> |
| **Sent:** | Wednesday, September 30, 2020 7:53 AM |
| **To:** | Young, Mark W |
| **Cc:** | QA_Team@matrixcos.com; Fuze, Joanr; Carina Rizo |
| **Subject:** | 2020-04-27-0145-ASW-01 / Nathaniel King / Dallas-Fort Worth - New Appeal Received |

**Caution:** This email originated outside of DFW Airport. Do not click links or open attachments unless you recognize the sender and know the contents are safe. Report this email to phishing@dfwairport.com, if you believe it is suspicious.

Good morning,

Matrix received a new appeal request for Mr. Nathaniel King on September 21, 2020. Based on your plan language the appeal decision due date is November 5, 2020.

Please note per your agreement with Matrix you will be charged $370.00 for Matrix to review the appeal. This is outlined in the fee schedule agreement we have with you for our claim services.

The claim was denied by the Claims Team on June 18, 2020 effective April 27, 2020 due to medical information not supporting disability.

I am the appeals specialist assigned to your employee's appeal; if you have any questions please let me know. Thank you.

Best Regards,

**Petina Batchler**
**Audit and Appeals Specialist**



**MATRIX**
ABSENCE MANAGEMENT
A MEMBER OF THE TOKIO MARINE GROUP

**Phone:** 877.315.9838 x 40226
**Fax:** 1.408.361.9068
**Email:** petina.batchler@matrixcos.com
**Web:** www.matrixcos.com

**NOTICE:** CONFIDENTIALITY AND PROPRIETARY INFORMATION NOTICE: This email, including attachments, is covered by the Electronic Communications Privacy Act (18 U.S.C. 2510-2521) and contains confidential information belonging to the sender which may be legally privileged.
The information is intended only for the use of the individual or entity to which it is addressed. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance of the contents of this information is strictly prohibited.
If you have received this electronic transmission in error, please immediately notify the sender by return e-mail and delete this message from your computer or arrange for the return of any transmitted information.

EXHIBIT J                                    43                          **DFW 000274**

**smainka@phamharrison.com**

| | |
|---|---|
| **From:** | Stevens, Barry C |
| **Sent:** | Wednesday, September 30, 2020 11:57 AM |
| **To:** | Young, Mark W |
| **Subject:** | (FYSA)  Risk Management Update |

Team,

I know it has been a topic of conversation and controversy, but I wanted to fill you all in on the status of both NK and LT.

I am going to give you a summary of both in order to not violate any policy or protected information. All I ask is that you please exercise discretion and keep this information to this group.

NK: Has requested a Reasonable Accommodation (RA) and Modified Duty (MD). Had a meeting with NK, Risk, HR and Matrix, where I outlined the required job description and noted the physician provided "scope of restrictions." It was noted that his restrictions did not allow for him to perform even the basic requirements of a CSO, per his physician's direction, without creating an undue hardship on his co-workers and a RA could place him in direct violation of his restrictions and, again force his co-workers to make up for his physical deficiency. It was already noted that he had exceeded the company allowed days for MD. It was stated, "…to support an ADA claim, a person must show that he or she can either perform the essential functions of the job *without assistance* or can perform those functions with some *reasonable accommodation*. An individual who cannot make this initial showing is not qualified for protection under the ADA. Additionally, accommodating your restrictions as provided to Matrix would create a hardship on the operation of the department. It's not required that we offer specifics as to our determination of a hardship."

His ADA RA has been denied. We are now simply working through the legal process.

LT: His request for MD was denied due again to the extensiveness of his restrictions. Risk, HR and ASD will be having a meeting on 10/16, after he has exhausted all time, to discuss the future. He doesn't have enough time to qualify for anything else.

I know that this is a tiring and frustrating process. However, it is what it is and we have to work the problem in coordination with HR, Risk and Legal.

I appreciate your patience. I will forward additional information as I know it.

v/r

**Barry Stevens**
Senior Security Manager
Airport Security Division, Department of Public Safety
Dallas Fort Worth International Airport
P.O. Box 610687
DFW Airport, TX 75261-9428

T (972) 973 4662
C (817) 805-5821
Bstevens@dfwairport.com

NOTE: THIS DOCUMENT MAY CONTAIN CONFIDENTIAL AND NONPUBLIC INFORMATION. IT IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL(S) OR ENTITY(IES) NAMED ABOVE, AND OTHERS SPECIFICALLY AUTHORIZED TO RECEIVE IT. WARNING: This record contains Sensitive Security Information that is controlled under 49 CFR parts 15 and 1520. No part of this record may be disclosed to persons without a "need to know", as defined in 49 CFR parts 15 and 1520, except with the written permission of the Administrator of the Transportation Security Administration or the Secretary of Transportation. Unauthorized release may result in civil penalty or other action. For U.S. government agencies, public disclosure is governed by 5 U.S.C. 552 and 49 CFR parts 15 and 1520.If you are not the intended recipient of this document, you are notified that any review, dissemination, distribution or copying of this communication is

1

**smainka@phamharrison.com**

| | |
|---|---|
| **From:** | Young,Carl W |
| **Sent:** | Friday, September 11, 2020 5:32 PM |
| **To:** | Young, Mark W |
| **Subject:** | RE: Open DFW Positions |

I will take a look next week. Do you have good phone number I can reach him at.

**Carl Young**
Senior HR Consultant
972-973-6389 (office)
214-960-9994 (mobile)

---

**From:** Young, Mark W <myoung@dfwairport.com>
**Sent:** Friday, September 11, 2020 5:27 PM
**To:** Young,Carl W <cyoung@dfwairport.com>
**Subject:** FW: Open DFW Positions

I'm going to forward this to you as I don't know how one goes about applying for non-posted positions unless they're on the double-secret list I don't have access to.

From the ADA standpoint, no accommodation was made for his Security position or any other.

**Mark Young**
Senior Risk Analyst / Risk Management
ADA Coordinator

**W (972) 973.4600**

Dallas/Fort Worth International Airport
P. O. Box 619428
DFW Airport, TX 75261-9428

E **myoung@dfwairport.com**

**Risk Mgmt. 24/7 at 214-616-0576**

www.dfwairport.com

---

**From:** Nathan <ray_sir_6@yahoo.com>
**Sent:** Friday, September 11, 2020 9:19 AM
**To:** Young, Mark W <myoung@dfwairport.com>
**Subject:** RE: Open DFW Positions

**Caution:** This email originated outside of DFW Airport. Do not click links or open attachments unless you recognize the sender and know the contents are safe. Report this email to phishing@dfwairport.com, if you believe it is suspicious.

Mark,

EXHIBIT L    1    45    DFW 000219

**Kemp, Rosemarie W**

| | |
|---|---|
| **From:** | Young,Carl W |
| **Sent:** | Saturday, September 12, 2020 7:20 PM |
| **To:** | 'Nathan' |
| **Subject:** | RE: Open DFW Positions |

Here is a listing of open jobs. Some of them may not be posted mainly because they are in the interview process. If the people that are being interviewed are not successful they may repost the job.

I will pass your resume along for the terminal experience manager.

| Job Posting Title | Sal Plan | Grade | Job Opening ID | Division |
|---|---|---|---|---|
| Business Supplier Diversity Specialist | MPP | 04 | 1005164 | Administration & Diversity |
| Contract Administrator | MPP | 04 | 1005183 | Administration & Diversity |
| Senior Terminal Experience Manager | MPP | 06 | 1005179 | Customer Exper & Revenue Mgr |
| Terminal Experience Manager | MPP | 05 | 1005185 | Customer Exper & Revenue Mgr |
| Terminal Experience Manager | MPP | 05 | 1005186 | Customer Exper & Revenue Mgr |
| Terminal Experience Supervisor | STP | 04 | 1005176 | Customer Exper & Revenue Mgr |
| Administrative Assistant II | ASP | 02 | 1005177 | Customer Exper & Revenue Mgr |
| Parking Guest Contract Services Supervisor | STP | 04 | 1005187 | Customer Exper & Revenue Mgr |
| Integrated Operations Center (IOC) Systems Administrator | ITP | 05 | 1005182 | Finance & ITS |
| Lead Signs & Marking Technician | STP | 04 | 1005172 | Infrastructure and Development |
| Signs & Marking Technician | STP | 03 | 1005171 | Infrastructure and Development |
| Airfield Operations Agent | STP | 03 | 1005180 | Operations |
| Airfield Operations Agent | STP | 03 | 1005181 | Operations |
| Tactical Telecommunicator | STP | 03 | 1005167 | Operations |
| Tactical Telecommunicator | STP | 03 | 1005188 | Operations |

**Carl Young**
Senior HR Consultant
972-973-6389 (office)
214-960-9994 (mobile)

---

**From:** Nathan <ray_sir_6@yahoo.com>
**Sent:** Saturday, September 12, 2020 3:18 PM
**To:** Young,Carl W <cyoung@dfwairport.com>
**Subject:** Open DFW Positions

**Caution:** This email originated outside of DFW Airport. Do not click links or open attachments unless you recognize the sender and know the contents are safe. Report this email to phishing@dfwairport.com, if you believe it is suspicious.

Carl Young,
I would like to request the same information concerning all open positions at DFW. I requested reassignment under ADA when my accommodations for my current position were denied. I was told I

| Posting Title | Status Date | Disposition |
|---|---|---|
| Administrative Assistant II | 10/14/2015 | 010 Applied |
| Administrative Assistant II | 10/20/2015 | 110 Reject |
| Occupancy Management Specialist | 8/13/2015 | 010 Applied |
| Occupancy Management Specialist | 9/4/2015 | 100 Hold |
| Occupancy Management Specialist | 9/22/2015 | 110 Reject |
| Terminal Relations Coordinator | 8/13/2015 | 010 Applied |
| Terminal Relations Coordinator | 10/12/2015 | 100 Hold |
| Terminal Relations Coordinator | 11/3/2015 | 110 Reject |
| Civilian Security Officer | 8/26/2015 | 010 Applied |
| Civilian Security Officer | 9/17/2015 | 110 Reject |
| Civilian Security Officer | 11/15/2015 | 010 Applied |
| Civilian Security Officer | 11/23/2015 | 110 Reject |
| Civilian Security Officer | 11/24/2015 | 010 Applied |
| Civilian Security Officer | 12/7/2015 | 020 Reviewed |
| Civilian Security Officer | 12/8/2015 | 029 Phone Screened |
| Civilian Security Officer | 2/5/2016 | 110 Reject |
| Administrative Assistant II | 8/26/2015 | 010 Applied |
| Administrative Assistant II | 10/21/2015 | 100 Hold |
| Administrative Assistant II | 11/12/2015 | 110 Reject |
| Civilian Security Officer | 1/21/2016 | 015 Linked |
| Civilian Security Officer | 1/22/2016 | 063 Technical Interview |
| Civilian Security Officer | 1/22/2016 | 071 Offer Accepted |
| Civilian Security Officer | 1/22/2016 | 070 Offer |
| Civilian Security Officer | 2/3/2016 | 080 Ready to Hire |
| Civilian Security Officer | 2/5/2016 | 090 Hired |
| Access Control Trusted Agent | 11/15/2015 | 010 Applied |
| Access Control Trusted Agent | 11/24/2015 | 010 Applied |
| Access Control Trusted Agent | 1/8/2016 | 100 Hold |
| Access Control Trusted Agent | 1/19/2016 | 110 Reject |
| Parking Operations Communications Specialist | 11/24/2015 | 010 Applied |
| Parking Operations Communications Specialist | 12/7/2015 | 110 Reject |
| Security Shift Supervisor | 2/17/2017 | 010 Applied |
| Security Shift Supervisor | 3/10/2017 | 020 Reviewed |
| Security Shift Supervisor | 3/14/2017 | 050 Route |
| Security Shift Supervisor | 4/17/2017 | 110 Reject |
| Security Compliance Inspector | 5/19/2017 | 050 Route |
| Security Compliance Inspector | 5/19/2017 | 020 Reviewed |
| Security Compliance Inspector | 5/19/2017 | 010 Applied |
| Security Compliance Inspector | 6/6/2017 | 100 Hold |
| Security Compliance Inspector | 6/20/2017 | 110 Reject |
| Security Shift Supervisor ( Department Only) | 6/14/2017 | 010 Applied |
| Security Shift Supervisor ( Department Only) | 7/27/2017 | 110 Reject |
| Assistant Security Services Manager | 5/10/2019 | 010 Applied |
| Assistant Security Services Manager | 5/14/2019 | 020 Reviewed |

EXHIBIT M                                     47

| | | |
|---|---|---|
| Assistant Security Services Manager | 5/23/2019 | 100 Hold |
| Assistant Security Services Manager | 5/30/2019 | 068 Assessment |
| Assistant Security Services Manager | 6/27/2019 | 029 Phone Screened |
| Assistant Security Services Manager | 7/15/2019 | 110 Reject |
| Terminal Experience Manager | 1/10/2021 | 010 Applied |
| Terminal Experience Manager | 1/11/2021 | 020 Reviewed |
| Terminal Experience Manager | 1/13/2021 | 110 Reject |
| Terminal Experience Manager | 2/21/2021 | 010 Applied |
| Terminal Experience Manager | 2/23/2021 | 020 Reviewed |
| Terminal Experience Manager | 2/24/2021 | 110 Reject |
| 911 Telecommunicator | 12/27/2020 | 010 Applied |
| 911 Telecommunicator | 12/31/2020 | 020 Reviewed |
| 911 Telecommunicator | 12/31/2020 | 110 Reject |
| 911 Telecommunicator | 2/21/2021 | 010 Applied |
| 911 Telecommunicator | 2/22/2021 | 110 Reject |
| 911 Telecommunicator | 2/22/2021 | 020 Reviewed |
| Business Supplier Diversity Specialist | 1/17/2021 | 010 Applied |
| Business Supplier Diversity Specialist | 1/20/2021 | 020 Reviewed |
| Business Supplier Diversity Specialist | 1/26/2021 | 110 Reject |
| Risk Analyst (Safety) | 1/10/2021 | 010 Applied |
| Risk Analyst (Safety) | 1/12/2021 | 020 Reviewed |
| Risk Analyst (Safety) | 1/13/2021 | 110 Reject |
| Airfield Operations Agent | 12/27/2020 | 010 Applied |
| Airfield Operations Agent | 12/27/2020 | 020 Reviewed |
| Airfield Operations Agent | 12/27/2020 | 110 Reject |
| Access DFW Trusted Agent | 12/27/2020 | 010 Applied |
| Access DFW Trusted Agent | 12/27/2020 | 020 Reviewed |
| Access DFW Trusted Agent | 1/13/2021 | 110 Reject |
| Executive Vice President of Operations | 1/10/2021 | 010 Applied |
| Executive Vice President of Operations | 1/11/2021 | 020 Reviewed |
| Executive Vice President of Operations | 1/11/2021 | 110 Reject |
| Integrated Operations Center Specialist | 1/17/2021 | 010 Applied |
| Integrated Operations Center Specialist | 1/19/2021 | 020 Reviewed |
| Integrated Operations Center Specialist | 2/4/2021 | 110 Reject |
| Instrument & Controls Technician | 1/17/2021 | 010 Applied |
| Instrument & Controls Technician | 1/20/2021 | 020 Reviewed |
| Instrument & Controls Technician | 2/8/2021 | 110 Reject |
| Inventory Control Clerk | 2/21/2021 | 010 Applied |
| Inventory Control Clerk | 3/1/2021 | 020 Reviewed |
| Inventory Control Clerk | 3/4/2021 | 110 Reject |
| Terminal Experience Supervisor | 4/18/2021 | 010 Applied |
| Terminal Experience Supervisor | 4/19/2021 | 020 Reviewed |
| Terminal Experience Supervisor | 4/20/2021 | 110 Reject |
| Airfield Operations Agent | 4/18/2021 | 010 Applied |
| Airfield Operations Agent | 4/19/2021 | 020 Reviewed |
| Airfield Operations Agent | 4/26/2021 | 110 Reject |
| Security Access Supervisor | 4/18/2021 | 010 Applied |

EXHIBIT M                    48

| | | | |
|---|---|---|---|
| Security Access Supervisor | 5/4/2021 | 010 | Applied |
| Security Access Supervisor | 5/4/2021 | 020 | Reviewed |
| Security Access Supervisor | 5/5/2021 | 110 | Reject |
| Health & Wellness Coordinator | 5/30/2021 | 010 | Applied |
| Health & Wellness Coordinator | 6/1/2021 | 020 | Reviewed |
| Health & Wellness Coordinator | 6/2/2021 | 110 | Reject |
| Access DFW Trusted Agent | 5/4/2021 | 010 | Applied |
| Access DFW Trusted Agent | 5/6/2021 | 020 | Reviewed |
| Access DFW Trusted Agent | 5/14/2021 | 110 | Reject |
| Access DFW Trusted Agent | 5/17/2021 | 010 | Applied |
| Access DFW Trusted Agent | 5/18/2021 | 020 | Reviewed |
| Access DFW Trusted Agent | 5/19/2021 | 110 | Reject |
| Corporate Aviation Representative | 5/4/2021 | 010 | Applied |
| Corporate Aviation Representative | 5/5/2021 | 020 | Reviewed |
| Corporate Aviation Representative | 5/17/2021 | 010 | Applied |
| Corporate Aviation Representative | 5/17/2021 | 110 | Reject |
| Corporate Aviation Representative | 5/19/2021 | 020 | Reviewed |
| Corporate Aviation Representative | 5/23/2021 | 110 | Reject |
| Parking Guest Contract Services Supervisor | 6/20/2021 | 010 | Applied |
| Parking Guest Contract Services Supervisor | 6/22/2021 | 020 | Reviewed |
| Parking Guest Contract Services Supervisor | 6/22/2021 | 110 | Reject |
| Assistant Airfield Operations Officer | 5/17/2021 | 010 | Applied |
| Assistant Airfield Operations Officer | 5/18/2021 | 020 | Reviewed |
| Assistant Airfield Operations Officer | 5/30/2021 | 010 | Applied |
| Assistant Airfield Operations Officer | 6/11/2021 | 020 | Reviewed |
| Assistant Airfield Operations Officer | 6/11/2021 | 110 | Reject |
| Assistant Airfield Operations Officer | 6/11/2021 | 110 | Reject |
| Assistant Airfield Operations Officer | 6/20/2021 | 010 | Applied |
| Assistant Airfield Operations Officer | 6/21/2021 | 020 | Reviewed |
| Assistant Airfield Operations Officer | 6/21/2021 | 110 | Reject |
| Time & Attendance Specialist | 6/3/2021 | 010 | Applied |
| Time & Attendance Specialist | 6/8/2021 | 110 | Reject |
| Parking Operations Communications Specialist | 5/30/2021 | 010 | Applied |
| Parking Operations Communications Specialist | 6/2/2021 | 020 | Reviewed |
| Parking Operations Communications Specialist | 6/3/2021 | 110 | Reject |
| Airfield Operations Officer | 6/3/2021 | 010 | Applied |
| Airfield Operations Officer | 6/11/2021 | 020 | Reviewed |
| Airfield Operations Officer | 6/22/2021 | 110 | Reject |
| Ground Transportation Administrative Specialist | 6/3/2021 | 010 | Applied |
| Ground Transportation Administrative Specialist | 6/3/2021 | 020 | Reviewed |
| Ground Transportation Administrative Specialist | 6/3/2021 | 110 | Reject |
| Ground Transportation Administrative Specialist | 6/12/2021 | 010 | Applied |
| Ground Transportation Administrative Specialist | 6/24/2021 | 020 | Reviewed |
| Ground Transportation Administrative Specialist | 7/6/2021 | 110 | Reject |
| Police Records Management Coordinator | 6/12/2021 | 010 | Applied |
| Police Records Management Coordinator | 6/20/2021 | 010 | Applied |
| Police Records Management Coordinator | 6/23/2021 | 110 | Reject |

EXHIBIT M                              49

| | | |
|---|---|---|
| Police Records Management Coordinator | 6/24/2021 | 020 Reviewed |
| Police Records Management Coordinator | 7/5/2021 | 110 Reject |
| Talent Acquisition Sourcing Specialist | 6/12/2021 | 010 Applied |
| Talent Acquisition Sourcing Specialist | 6/14/2021 | 020 Reviewed |
| Talent Acquisition Sourcing Specialist | 6/15/2021 | 110 Reject |
| Security Officer | 9/24/2022 | 010 Applied |
| Security Officer | 10/19/2022 | 110 Reject |
| Security Officer | 10/31/2022 | 010 Applied |
| Security Officer | 11/10/2022 | 110 Reject |
| Police Records Management Coordinator | 10/31/2022 | 010 Applied |
| Police Records Management Coordinator | 11/10/2022 | 110 Reject |
| Police Records Management Coordinator | 11/10/2022 | 110 Reject |
| Security Training Supervisor | 10/31/2022 | 010 Applied |
| Security Training Supervisor | 11/10/2022 | 110 Reject |

EXHIBIT M

| Reject Reason | Hired Applicant | Hired Name |
|---|---|---|
| | 212112 | Phillips,Sherry Lynn |
| Not the Best Suited | 212112 | Phillips,Sherry Lynn |
| | 43106 | Nanga,Masikini E |
| | 43106 | Nanga,Masikini E |
| Not the Best Suited | 43106 | Nanga,Masikini E |
| | 252759 | Meloy,Kristin Marie |
| | 252759 | Meloy,Kristin Marie |
| Not the Best Suited | 252759 | Meloy,Kristin Marie |
| | 285731 | Figueroa,Carlos R. |
| Not the Best Suited | 285731 | Figueroa,Carlos R. |
| | 285731 | Figueroa,Carlos R. |
| Not the Best Suited | 285731 | Figueroa,Carlos R. |
| | 285731 | Figueroa,Carlos R. |
| | 285731 | Figueroa,Carlos R. |
| | 285731 | Figueroa,Carlos R. |
| Selected for Other Position | 285731 | Figueroa,Carlos R. |
| | 287436 | Cangolosi,Karen |
| | 287436 | Cangolosi,Karen |
| Not the Best Suited | 287436 | Cangolosi,Karen |
| | 285623 | King,Nathan R. |
| | 285623 | King,Nathan R. |
| | 285623 | King,Nathan R. |
| | 285623 | King,Nathan R. |
| | 285623 | King,Nathan R. |
| | 285623 | King,Nathan R. |
| | 42044 | Zabojnik III,Jerome C |
| | 42044 | Zabojnik III,Jerome C |
| | 42044 | Zabojnik III,Jerome C |
| Not the Best Suited | 42044 | Zabojnik III,Jerome C |
| | 289872 | Pineda,Jonas |
| Not the Best Suited | 289872 | Pineda,Jonas |
| | 304055 | Hardin,Kiamesha P |
| | 304055 | Hardin,Kiamesha P |
| | 304055 | Hardin,Kiamesha P |
| Rejected after Phone Screen | 304055 | Hardin,Kiamesha P |
| | 22482 | Wilson,Scottie L |
| | 22482 | Wilson,Scottie L |
| | 22482 | Wilson,Scottie L |
| | 22482 | Wilson,Scottie L |
| Not the Best Suited | 22482 | Wilson,Scottie L |
| | 306019 | Boston,Chris W |
| Rejected after Phone Screen | 306019 | Boston,Chris W |
| | 349116 | Thompson,Rodney W. |
| | 349116 | Thompson,Rodney W. |

EXHIBIT M                    51

|  |  |  |
|---|---|---|
|  | 349116 | Thompson,Rodney W. |
|  | 349116 | Thompson,Rodney W. |
|  | 349116 | Thompson,Rodney W. |
| Not the Best Suited | 349116 | Thompson,Rodney W. |
|  | 359516 | Klausner,Kyle L. |
|  | 359516 | Klausner,Kyle L. |
| Not the Best Suited | 359516 | Klausner,Kyle L. |
|  | 359516 | Klausner,Kyle L. |
|  | 359516 | Klausner,Kyle L. |
| Not the Best Suited | 359516 | Klausner,Kyle L. |
|  | 0 |  |
|  | 0 |  |
| Did Not Meet Min Requirements | 0 |  |
|  | 0 |  |
| Duplicate Resume | 0 |  |
|  | 0 |  |
|  | 363823 | Schwartz,Angela Maria |
|  | 363823 | Schwartz,Angela Maria |
| Not the Best Suited | 363823 | Schwartz,Angela Maria |
|  | 363298 | Ford,Meghan Desiree |
|  | 363298 | Ford,Meghan Desiree |
| Not the Best Suited | 363298 | Ford,Meghan Desiree |
|  | 364103 | Santhanam,Alexis |
|  | 364103 | Santhanam,Alexis |
| Not the Best Suited | 364103 | Santhanam,Alexis |
|  | 295131 | Birmingham,Michael J |
|  | 295131 | Birmingham,Michael J |
| Not the Best Suited | 295131 | Birmingham,Michael J |
|  | 365022 | McLaughlin,Christopher |
|  | 365022 | McLaughlin,Christopher |
| Did Not Meet Min Requirements | 365022 | McLaughlin,Christopher |
|  | 259764 | Melchor,Christopher |
|  | 259764 | Melchor,Christopher |
| Not the Best Suited | 259764 | Melchor,Christopher |
|  | 364894 | Blackwell,Blake |
|  | 364894 | Blackwell,Blake |
| Not the Best Suited | 364894 | Blackwell,Blake |
|  | 365672 | Ott III,Charles Edward |
|  | 365672 | Ott III,Charles Edward |
| Not the Best Suited | 365672 | Ott III,Charles Edward |
|  | 350267 | Lin,Ting Wei |
|  | 350267 | Lin,Ting Wei |
| Not the Best Suited | 350267 | Lin,Ting Wei |
|  | 366989 | Flatt,Sarah Elisabeth |
|  | 366989 | Flatt,Sarah Elisabeth |
| Not the Best Suited | 366989 | Flatt,Sarah Elisabeth |
|  | 322972 | Barker,Melissa J |

EXHIBIT M

52

|  |  |
|---|---|
|  | 322972 Barker,Melissa J |
|  | 322972 Barker,Melissa J |
| Did Not Meet Min Requirements | 322972 Barker,Melissa J |
|  | 353913 Smith,Shalesa M |
|  | 353913 Smith,Shalesa M |
| Not the Best Suited | 353913 Smith,Shalesa M |
|  | 242799 Escobar Diaz,Vanessa Maribel |
|  | 242799 Escobar Diaz,Vanessa Maribel |
| Did Not Meet Min Requirements | 242799 Escobar Diaz,Vanessa Maribel |
|  | 242799 Escobar Diaz,Vanessa Maribel |
|  | 242799 Escobar Diaz,Vanessa Maribel |
| Did Not Meet Min Requirements | 242799 Escobar Diaz,Vanessa Maribel |
|  | 364136 Courson,Daniel Howard |
|  | 364136 Courson,Daniel Howard |
|  | 364136 Courson,Daniel Howard |
| Not the Best Suited | 364136 Courson,Daniel Howard |
|  | 364136 Courson,Daniel Howard |
| Not the Best Suited | 364136 Courson,Daniel Howard |
|  | 362168 Al Yassen,Haider Balasm |
|  | 362168 Al Yassen,Haider Balasm |
| Not the Best Suited | 362168 Al Yassen,Haider Balasm |
|  | 371309 Keller,Thomas N |
|  | 371309 Keller,Thomas N |
|  | 371309 Keller,Thomas N |
|  | 371309 Keller,Thomas N |
| Duplicate Resume | 371309 Keller,Thomas N |
| Did Not Meet Min Requirements | 371309 Keller,Thomas N |
|  | 371309 Keller,Thomas N |
|  | 371309 Keller,Thomas N |
| Duplicate Resume | 371309 Keller,Thomas N |
|  | 263235 Ford,Darsherika L |
| Not the Best Suited | 263235 Ford,Darsherika L |
|  | 359483 Escalante,Ada A |
|  | 359483 Escalante,Ada A |
| Applicant Withdrew | 359483 Escalante,Ada A |
|  | 360938 Legarreta,Sidney F |
|  | 360938 Legarreta,Sidney F |
| Did Not Meet Min Requirements | 360938 Legarreta,Sidney F |
|  | 288352 Stewart,Candace L |
|  | 288352 Stewart,Candace L |
| Not the Best Suited | 288352 Stewart,Candace L |
|  | 288352 Stewart,Candace L |
|  | 288352 Stewart,Candace L |
| Not the Best Suited | 288352 Stewart,Candace L |
|  | 252494 White,Claudia Teresa |
|  | 252494 White,Claudia Teresa |
| Duplicate Resume | 252494 White,Claudia Teresa |

EXHIBIT M                    53

|  | | |
|---|---|---|
|  | 252494 | White,Claudia Teresa |
| Not the Best Suited | 252494 | White,Claudia Teresa |
|  | 352227 | Palmay,John Charles |
|  | 352227 | Palmay,John Charles |
| Not the Best Suited | 352227 | Palmay,John Charles |
|  | 0 | |
|  | 0 | |
|  | 0 | |
|  | 0 | |
|  | 0 | |
| Duplicate Resume | 0 | |
|  | 0 | |
|  | 298256 | Falcon II,Gregory G |
|  | 298256 | Falcon II,Gregory G |

EXHIBIT M

| Job ID | Posting Title | Opened Date | Close Date |
|--------|--------------|-------------|------------|
| 1005108 | Tactical Telecommunicator | 3/23/2020 | 9/23/2020 |
| 1005120 | Experienced Police Officer/Police Recruit | 4/10/2020 | 9/11/2020 |
| 1005139 | IOC Bridge Manager | 5/26/2020 | 10/14/2020 |
| 1005163 | Business Development Manager (Department Only) | 6/11/2020 | 9/3/2020 |
| 1005164 | Business Supplier Diversity Specialist | 6/11/2020 | 11/5/2020 |
| 1005168 | Waste/Recycling Technician | 7/21/2020 | 11/5/2020 |
| 1005171 | Signs & Marking Technician | 7/16/2020 | 9/23/2020 |
| 1005172 | Lead Signs & Marking Technician | 7/29/2020 | 9/29/2020 |
| 1005176 | Terminal Experience Supervisor | 7/22/2020 | 10/13/2020 |
| 1005177 | Administrative Assistant II | 6/23/2020 | 9/29/2020 |
| 1005178 | Vice President of Operations | 8/11/2020 | 11/18/2020 |
| 1005180 | Airfield Operations Agent | 8/14/2020 | 11/18/2020 |
| 1005182 | Integrated Operations Center (IOC) Systems Administrator | 8/10/2020 | 12/2/2020 |
| 1005183 | Contract Administrator | 7/25/2020 | 10/27/2020 |
| 1005186 | Terminal Experience Manager | 8/24/2020 | 12/2/2020 |
| 1005187 | Parking Guest Contract Services Supervisor | 8/25/2020 | 10/13/2020 |
| 1005188 | 911 Telecommunicator | 9/2/2020 | 12/1/2022 |
| 1005191 | Airfield Operations Officer (Department Only) | 9/9/2020 | 10/13/2020 |
| 1005192 | Pavement Maintenance Worker III | 9/11/2020 | 11/18/2020 |
| 1005194 | Pavement Maintenance Worker III | 9/11/2020 | 2/10/2021 |
| 1005196 | Fire Instructor Specialist (Department Only) | 9/14/2020 | 10/28/2020 |
| 1005199 | Operations Technical Training Manager | 9/9/2020 | 11/10/2020 |
| 1005200 | Fire Inspector Specialist (Department Only) | 9/15/2020 | 10/28/2020 |
| 1005203 | Fire Investigator Specialist (Department Only) | 9/12/2020 | 1/5/2021 |
| 1005205 | Business Supplier Diversity Specialist | 9/14/2020 | 3/11/2021 |
| 1005207 | Materials & Warehouse Manager | 9/15/2020 | 11/10/2020 |
| 1005208 | Police Records Management Coordinator | 9/10/2020 | 1/27/2021 |
| 1005209 | Guest Liaison | 9/17/2020 | 11/5/2020 |
| 1005210 | Guest Operations Shift Supervisor (Department Only) | 9/17/2020 | 11/25/2020 |
| 1005211 | Treasury Analyst | 9/22/2020 | 12/2/2020 |
| 1005212 | Assistant Airfield Operations Officer (Department Only) | 9/26/2020 | 11/10/2020 |
| 1005213 | Corporate Aviation Concierge | 9/24/2020 | 12/2/2020 |
| 1005214 | Customer Experience Contract Services Manager | 9/22/2020 | 12/30/2020 |
| 1005215 | Risk Analyst (Safety) | 10/1/2020 | 2/24/2021 |
| 1005216 | Emergency Management Administrator | 9/29/2020 | 4/2/2021 |
| 1005217 | Signs & Marking Technician | 9/14/2020 | 1/27/2021 |
| 1005220 | Lead Electronics Technician | 9/21/2020 | 11/30/2020 |
| 1005221 | Electronics Technician | 9/21/2020 | 12/8/2020 |
| 1005222 | Pavement Maintenance Worker III | 10/7/2020 | 12/30/2020 |
| 1005223 | Lead Automotive Technician (Department Only) | 10/8/2020 | 11/16/2020 |
| 1005224 | AVP Commercial Development | 10/20/2020 | 2/2/2021 |
| 1005225 | Police Lieutenant (Department Only) | 10/19/2020 | 12/28/2020 |
| 1005226 | Sr Contract Administrator | 10/21/2020 | 3/11/2021 |
| 1005227 | Assistant Vice President of Facilities & Systems | 10/28/2020 | 7/7/2021 |
| 1005229 | Heavy Equipment Automotive Technician | 10/15/2020 | 12/30/2020 |

EXHIBIT M

| | | | |
|---|---|---|---|
| 1005230 | Terminal Experience Supervisor | 11/5/2020 | 3/2/2021 |
| 1005231 | Warehouse Lead | 11/12/2020 | 2/2/2021 |
| 1005232 | Civilian Security Officer | 11/19/2020 | 2/9/2022 |
| 1005242 | Sr Talent & Organizational Development Manager | 11/24/2020 | 6/2/2021 |
| 1005244 | Airfield Operations Agent | 11/19/2020 | 2/24/2021 |
| 1005249 | Access DFW Trusted Agent | 12/9/2020 | 3/2/2021 |
| 1005251 | Sr IT Network Manager | 12/2/2020 | 8/10/2021 |
| 1005252 | Parking Guest Contract Services Manager (Department Only) | 12/2/2020 | 1/26/2021 |
| 1005253 | Grounds Maintenance Worker II | 12/8/2020 | 2/10/2021 |
| 1005254 | Grounds Crew Leader II | 12/8/2020 | 2/3/2021 |
| 1005259 | Integrated Operations Center Supervisor | 12/11/2020 | 3/18/2021 |
| 1005260 | Integrated Operations Center Specialist | 12/11/2020 | 4/7/2021 |

EXHIBIT M

| Closed/Cancelled | Hiring Manager |
|---|---|
| 110 Filled/Closed | Amanda Eads |
| 110 Filled/Closed | Caren Catchings |
| 110 Filled/Closed | Robert Hightower |
| 110 Filled/Closed | Tamela Burks Lee |
| 110 Filled/Closed | Suzanne Cruz-Sewell |
| 110 Filled/Closed | Phillip Widmer |
| 110 Filled/Closed | Steven Webb |
| 110 Filled/Closed | Steven Webb |
| 110 Filled/Closed | Jim Espinoza |
| 110 Filled/Closed | Donald Hobbs |
| 110 Filled/Closed | Chad Makovsky |
| 110 Filled/Closed | Brenda Weber |
| 110 Filled/Closed | Larry Wells |
| 110 Filled/Closed | Debbie Daniels |
| 110 Filled/Closed | Jim Espinoza |
| 110 Filled/Closed | Kristi Irwin |
| 120 Canceled | Tanisha Harden |
| 110 Filled/Closed | Brenda Weber |
| 110 Filled/Closed | Dennis Baldwin |
| 110 Filled/Closed | Dennis Baldwin |
| 110 Filled/Closed | John Barzyk |
| 110 Filled/Closed | Steven Tobey |
| 110 Filled/Closed | Jameson Lewis |
| 110 Filled/Closed | Alfonso Salazar |
| 110 Filled/Closed | Tamela Burks Lee |
| 110 Filled/Closed | Joanne Baca Garcia |
| 110 Filled/Closed | James McDuff |
| 110 Filled/Closed | Lee Sloan |
| 110 Filled/Closed | Robert Petersen |
| 110 Filled/Closed | James Mauldin |
| 110 Filled/Closed | Tyler Prufer |
| 110 Filled/Closed | Stephen Courtois |
| 110 Filled/Closed | Coleman Patton |
| 110 Filled/Closed | Sandra Fontenot |
| 110 Filled/Closed | Alan Black |
| 110 Filled/Closed | Steven Webb |
| 110 Filled/Closed | Oscar Barillas |
| 110 Filled/Closed | Oscar Barillas |
| 110 Filled/Closed | Dennis Baldwin |
| 110 Filled/Closed | Robert White |
| 110 Filled/Closed | John Brookby |
| 110 Filled/Closed | Jon Taylor |
| 110 Filled/Closed | Sonji Brown-Killyon |
| 110 Filled/Closed | Tammy Huddleston |
| 110 Filled/Closed | James Feagley |

EXHIBIT M                    57

| 110 Filled/Closed | Shahla Pillai |
| 110 Filled/Closed | Jeffery Crowley |
| 110 Filled/Closed | Chris Boston |
| 110 Filled/Closed | Alberto Galue |
| 110 Filled/Closed | Patrick Jackman |
| 110 Filled/Closed | Josefina Quinones |
| 110 Filled/Closed | Ali Nemati |
| 110 Filled/Closed | Allen Corry |
| 110 Filled/Closed | Robert Lowry |
| 110 Filled/Closed | Robert Lowry |
| 120 Canceled | Jerry Crimiel |
| 110 Filled/Closed | Julia Schreacke |

EXHIBIT M                    58

| DFW_HRIS_NATHAN_KING | 152 | | |
|---|---|---|---|
| Name | Applicant ID | Job Opening | JO Status |
| King,Nathan R. | 285623 | 1003040 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1003040 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1003052 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1003052 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1003052 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1003056 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1003056 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1003056 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1003062 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1003062 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1003062 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1003062 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1003062 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1003062 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1003062 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1003075 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1003075 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1003075 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1003111 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1003111 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1003111 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1003111 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1003111 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1003111 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1003157 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1003157 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1003157 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1003157 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1003166 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1003166 | 110 Filled/Closed |
| King,Nathaniel R | 293814 | 1003537 | 110 Filled/Closed |
| King,Nathaniel R | 293814 | 1003537 | 110 Filled/Closed |
| King,Nathaniel R | 293814 | 1003537 | 110 Filled/Closed |
| King,Nathaniel R | 293814 | 1003537 | 110 Filled/Closed |
| King,Nathaniel R | 293814 | 1003882 | 110 Filled/Closed |
| King,Nathaniel R | 293814 | 1003882 | 110 Filled/Closed |
| King,Nathaniel R | 293814 | 1003882 | 110 Filled/Closed |
| King,Nathaniel R | 293814 | 1003882 | 110 Filled/Closed |
| King,Nathaniel R | 293814 | 1003882 | 110 Filled/Closed |
| King,Nathaniel R | 293814 | 1003908 | 110 Filled/Closed |
| King,Nathaniel R | 293814 | 1003908 | 110 Filled/Closed |
| King,Nathaniel R | 293814 | 1004728 | 110 Filled/Closed |
| King,Nathaniel R | 293814 | 1004728 | 110 Filled/Closed |

EXHIBIT M                    59

| King,Nathaniel R | 293814 | 1004728 | 110 Filled/Closed |
| King,Nathaniel R | 293814 | 1004728 | 110 Filled/Closed |
| King,Nathaniel R | 293814 | 1004728 | 110 Filled/Closed |
| King,Nathaniel R | 293814 | 1004728 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005185 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005185 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005185 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005185 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005185 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005185 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005188 | 120 Canceled |
| King,Nathan R. | 285623 | 1005188 | 120 Canceled |
| King,Nathan R. | 285623 | 1005188 | 120 Canceled |
| King,Nathan R. | 285623 | 1005188 | 120 Canceled |
| King,Nathan R. | 285623 | 1005188 | 120 Canceled |
| King,Nathan R. | 285623 | 1005188 | 120 Canceled |
| King,Nathan R. | 285623 | 1005205 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005205 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005205 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005215 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005215 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005215 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005244 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005244 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005244 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005249 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005249 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005249 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005258 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005258 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005258 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005260 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005260 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005260 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005267 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005267 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005267 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005284 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005284 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005284 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005326 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005326 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005326 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005331 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005331 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005331 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005333 | 110 Filled/Closed |

EXHIBIT M                    60

| | | | |
|---|---|---|---|
| King,Nathan R. | 285623 | 1005333 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005333 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005333 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005347 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005347 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005347 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005355 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005355 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005355 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005355 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005355 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005355 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005357 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005357 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005357 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005357 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005357 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005357 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005363 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005363 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005363 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005376 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005376 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005376 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005376 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005376 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005376 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005376 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005376 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005388 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005388 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005396 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005396 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005396 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005412 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005412 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005412 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005424 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005424 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005424 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005424 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005424 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005424 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005467 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005467 | 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005467 | 110 Filled/Closed |

EXHIBIT M                          61

| King,Nathan R. | 285623 | 1005467 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005467 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005478 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005478 110 Filled/Closed |
| King,Nathan R. | 285623 | 1005478 110 Filled/Closed |
| King,Nathan R. | 285623 | 1006539 010 Open |
| King,Nathan R. | 285623 | 1006539 010 Open |
| King,Nathan R. | 285623 | 1006539 010 Open |
| King,Nathan R. | 285623 | 1006539 010 Open |
| King,Nathan R. | 285623 | 1006646 010 Open |
| King,Nathan R. | 285623 | 1006646 010 Open |
| King,Nathan R. | 285623 | 1006646 010 Open |
| King,Nathan R. | 285623 | 1006669 110 Filled/Closed |
| King,Nathan R. | 285623 | 1006669 110 Filled/Closed |

EXHIBIT M                    62



**Sent:** Thursday, November 10, 2022 at 11:14 AM
**From:** "Bailey,Derrick" <dbailey@dfwairport.com>
**To:** "n.r.king@mail.com" <n.r.king@mail.com>
**Subject:** DFW Airport - Eligibility Status

Good Morning Nathan,

I see that you have applied for a few positions  I wanted to make you aware that at this time, you are not eligible to be rehired at the airport. We certainly appreciate your interest.

Kindly,

**Derrick Bailey**

Talent Acqui  ition Speciali  t

Human Resources Department

Department of Public Safety Headquarter   Dalla   Fort Worth International Airport

P.O. Box 619428

3600 South 20th Avenue

2400 Aviation Drive

DFW Airport, TX 75261-9428


WE'RE HIRING!

Office (972) 973-3313

DFW International Airport | Official Website (dfwairport.com)



******* Notice ******** The information contained in this e-mail, including attachments, may contain confidential information that is intended solely for the use of the individual or entity to which it is addressed. If you are not the intended recipient, or the person responsible for delivering this message to the intended recipient, you are hereby notified that any review, dissemination, distribution, copying or other use of, or taking any action in reliance upon this information is strictly prohibited. If you have received this communication in error, please contact the sender immediately and then delete the material from your computer.

# PEER REVIEW- for Appeal

Appeal

Claimant Name:  Nathaniel King
Claim Number:  2020-04-27-0145-ASW-01
Date of Birth:   05/01/1977
Date of Disability:  04/27/2020
Occupation:  Civilian Security Officer
Page count:  168

DX:  Low Back Pain

This Peer Review to be reviewed by:  Orthopedic

Upon your review of all Clinical records please answer the following questions; please review for the dates of 04/27/2020 through present.

Please identify all diagnoses which are referenced in clinical records, in descending order beginning with Primary Diagnoses.
Please identify all treating providers and their credentials, along with their professional area of focus and include the following:
- List all treatments (including: office visits, diagnostic evaluations and medications) for those conditions.
- Describe any deficits (physical or psychological) related to those conditions identified in the medical/clinical records and in conjunction with your discussion with the treating provider(s) (if applicable);
    1. Do the clinical records support the deficits noted? (physical or cognitive functional deficits);
    2. Please discuss either way and include your clinical rationale for duration.
    3. Does the available information support a condition that would prevent the 04/27/2020 through present? If so, for how long?

Do any of the prescribed medications noted in the medical records either on an individual basis or on altogether basis impact functional capabilities that would affect work ability. Please consider any medication changes noted in the medical records for the period of 04/27/2020 through present.

Attending Physician contacts List:  Note min of 3 attempts to contact is required.

| Name | Phone | Specialty | State |
|------|-------|-----------|-------|
| Dr. Kelly Derrick | 817-730-0000 | PCP | TX |



Reliable Review Services

| | |
|---|---|
| Date: | 10/20/2020 |
| To: | Petina Batchler |
| | Matrix Absence Management |
| Re: | RRS ID: 56232 |

| | |
|---|---|
| Claimant: | Nathaniel King |
| Claim #: | 2020-04-27-0145-ASW-01 |
| Line of Business: | Disability |
| Review Type: | STD |
| Review Level: | Appeal |

Advisory Report

## Clinical History

This review is from an orthopedic perspective. The claimant is a 43 year old male with a reported diagnosis of low back pain. The claimant is employed as a Civilian Security Office. The job description reviewed indicates that the claimant must sit for extended periods of time, walk for extended periods of time, use keyboard devices and computer monitor, and be able to drive and to climb into and out of vehicles for searches. The date of disability was reported to be 04/27/2020. The time period under review is from 04/27/2020 through present.

There are multiple notes for stress management counseling, which are outside the scope of this review.

There are multiple records and messages from the VA hospital, which are difficult to follow. An Account Summary list dates and time of visits and cancelled visits.

A telephone message request indicated the claimant needed a letter stating that office visits have been canceled due to Covid-19 precautions. It was noted that the claimant's short -term disability was denied because he is not undergoing treatment and he is considered on an unauthorized absence. This was followed by multiple messages requesting specific description of impairment/disability and time off work.

On 12/06/2019, a Pain Management note by Dr. Matthew Bourneuf/ Dr. Nenna Nwazota (Attending Anesthesiologist) noted the claimant presented for a planned procedure of bilateral L4-5 transforaminal epidural steroid injections.

On 01/02/2020, Herndon Richardson PA-C (Pain Management) noted the claimant was seen for follow-up of low back pain with right lower extremity pain. Most recently the claimant had bilateral L4-5 transforaminal ESI's with continued significant pain. The examination showed pain with full extension of the lumbar spine with tenderness to palpation of the left lumbar spine. There was bilateral sacroiliac

Claimant Name: Nathaniel King                                                                                    RRS ID: 56232

EXHIBIT O                    66                    DFW 001620



joint tenderness.  Slight weakness right foot dorsiflexion.  The claimant was diagnosed with chronic low back pain and right lower extremity pain secondary to degenerative disc disease and degenerative facet disease.  The provider suggest a trial of bilateral L3-S1 medial branch nerve blocks.

On 01/10/2020, office visit notes by Dr. Kelly Derrick (Family Medicine) noted the claimant presented for a routine visit for chronic care management. The claimant was requesting to have forms completed for his employer for work place accommodations for limitations due to chronic low back, joint, and foot pain.

On 01/17/2020, office notes by Dr. Jim Sheng/Dr. Amr Hegazi stated the claimant presented for a planned procedure, bilateral L3-S1 medial branch nerve blocks.

On 03/04/2020, Luis Ortiz, RN (Pain Management)/Dr. Amr Hegazi (Anesthesiologist) noted the claimant had prior procedures including: bilateral lumbar L3, 4, 5 and S1 medial branch blocks on 01/17/2020, and lumbar ESI on 12/06/2019.  The provider noted the claimant called the clinic to schedule a procedure.

On 03/18/2020, office notes by Dr. Kelly Derrick noted the claimant was being seen for chronic care. The provider noted the claimant is being treated in pain management.  The physical exam showed no recordedabnormalities.Theclaimant'sproblemsincludedhyperlipidemia,kneepain,chestpain, migraines, right hip pain, burns, low back pain, flat feet, bursitis, depression/PTSD, and cough. Treatment for the back and hip pain continued with medications.

On 05/12/2020, a Health Care Provider Medical Certification form by Dr. Kelly Derrick noted the claimant was being treated for low back pain.  The provider indicated the claimant has had cortisone injections, massage therapy, medications, as well as physical therapy. The claimant continues to have antalgic gait with restricted range of motion of the lumbosacral spine. The claimant has chronic pain sitting or standing and pain which limits all movement of the lumbar spine. The provider noted the claimant was unable to work as of 04/27/2020. The anticipated returned to work date was 06/01/2020.

On 06/05/2020, a Work Status Note by Dr. Kelly Derrick stated the claimant was able to work with modifications beginning 06/01/2020.  Diagnoses included spinal stenosis lumbar region, chronic low back pain, lumbar radiculopathy, pes planus, gait abnormality, and right hip pain.  Restrictions included unable to stand for greater than 20 minutes per hour.  No repetitive bending, squatting or stooping.  No walking greater than 1 mile per work day.  No driving greater than 2 hours per work day.  Prognosis was uncertain.

On 06/05/2020, a letter by Dr. Kelly Derrick stated the claimant has multiple medical conditions and it was noted that treatments have been rescheduled or canceled due to current Covid-19 precautions.

On 07/02/2020, Dr. Joseph Hamati (Pain Management) noted the claimant stated that the bilateral L3-S1 medial branch nerve block in 01/2020 was only mildly affected for two days, but the chronic low back pain returned.  It was noted that an MRI scan of the lumbar spine has shown a broad-based disc protrusion at L3-4 with degenerative changes also at L4-5 and L5-S1 with no central canal stenosis and



only minimal left neural foraminal stenosis.  The provider planned to repeat bilateral L3-S1 medial branch nerve blocks.

On 09/21/2020, there are emergency room records regarding an evaluation for left fourth toe pain. The claimant reported he accidentally kicked a table leg.

There are illegibly copied notes apparently indicating that the claimant's place of employment cannot accommodate work restrictions.

## Provider Contact Log

| Date/time of call | Spoke to | Outcome/message |
|---|---|---|
| 10/12/2020 3:00 PM CDT | Voicemail | I called the office of Dr. Kelly Derrick and my call was answered by an automated system stating that I have called "outside of normal business hours", despite the fact that I was calling at 3:00 PM central time. I was then given an option to leave a message.  I left a voicemail message on an unnamed office voicemail requesting a return phone call from the provider regarding the claimant's disability status/work restrictions/limitations. My contact information was provided. |
| 10/13/2020 11:01 AM CDT | Receptionist, Nina | I called the office of Dr. Kelly Derrick and my call was answered by an automated system stating that all agents were busy.  The message stated that I was caller number 11 and estimated wait time was 5 minutes.  I was on hold for multiple minutes.  I was then able to speak with the Receptionist, Nina. She took my information and stated that she would send the message on to the provider.  I requested a return phone call regarding the claimant's disability status/work restrictions/limitations. My contact information was provided. |
| 10/15/2020 10:17 AM CDT | Receptionist, Charmaine | I called the office of Dr. Kelly Derrick at the phone number provided.  This time the call was answered by the receptionist, Charmaine.  She stated the provider was busy.  I left a detailed message requesting a return phone call from the provider regarding the claimant's disability status/work restrictions/limitations. My contact information was provided. |

## Questions and Reviewer's Response

Claimant Name: Nathaniel King                                                                                 RRS ID: 56232



1. **Upon your review of all Clinical records please answer the following questions; please review for the dates of 04/27/2020 through present.**

**Please identify all diagnoses which are referenced in clinical records, in descending order beginning with Primary Diagnoses.**

According to the submitted notes and from an orthopedic perspective only, the claimant has chronic low back pain as a result of the following diagnoses:
Degenerative disc disease lumbar spine.
Lumbar spondylosis.
Lumbar radiculopathy.

There are some added diagnoses related to pes planus, bursitis, and right hip pain (which probably is related to the claimant's chronic low back pain).

2. **Please identify all treating providers and their credentials, along with their professional area of focus and include the following:**

Dr. Kelly Derrick, PCP.
Luis Ortiz, RN, Richardson, PA-C, and Dr. Joseph Hamati from pain management and has also been seen by Dr. Amr Hegazi, Anesthesiologist.

3. **List all treatments (including: office visits, diagnostic evaluations and medications) for those conditions.**

The submitted documentation indicates the claimant has been followed for low back pain. The documentation is difficult to follow, but it appears that the claimant has primarily been seen by his family doctor and by pain management.  When seen by pain management on 01/02/2020, the claimant complained of low back pain radiating into the right lower extremity and it was noted that epidural steroid injections had provided only minimal relief of pain.  Examination showed pain with full extension of the lumbar spine, bilateral sacroiliac joint tenderness, and slight weakness right foot dorsiflexion.  He was diagnosed with degenerative disc disease and degenerative facet disease and a trial of medial branch nerve blocks was suggested.

It was noted in March 2020 that the claimant was being seen by his PCP for chronic care/pain management, but no physical examination abnormalities were recorded.  He was diagnosed with hyperlipidemia, knee pain, chest pain, migraines, right hip pain, burns, low back pain, pes planus, bursitis, depression/PTSD, and a cough.  He continued treatment for the back and hip pain with medication. Pain management notes from March 2020 indicate that the claimant had previously had



lumbar epidural spinal injections on 12/06/2019 and bilateral L3, 4, 5 and S1 medial branch blocks on 01/17/2020.

When seen by the PCP on 06/05/2020, it was noted that the claimant was allowed to return to work with modifications as of 06/01/2020 with restrictions regarding standing, walking, repetitive bending, squatting, stooping, and driving.  At that time it was noted that the claimant had not had any significant pain management treatment since March because of Covid-9 restrictions.

The claimant was seen again by pain management on 07/02/2020 where it was noted that an MRI scan of his lumbar spine has shown a broad-based disc protrusion at L3-4 with degenerative changes also noted at L4-5 and L5-S1. There was no central canal stenosis and only minimal left neural foraminal stenosis.  The provider suggested repeating L3-S1 medial branch nerve blocks. There are no further clinical notes regarding the claimant's low back pain submitted since the visit of 07/02/2020.

**4. Describe any deficits (physical or psychological) related to those conditions identified in the medical/clinical records and in conjunction with your discussion with the treating provider(s) (if applicable);**

According to the submitted notes the claimant has bilateral sacroiliac joint tenderness, mild limitation of the lumbar spine, and some indication of weakness of right foot dorsiflexion. These deficits would result in chronic, long-term work restrictions and limitations. Restrictions and limitations as of 04/27/2020 through present include:

No sitting greater than 2 hours at a time or for 6 hours in an 8 hour workday with ability to change positions or to stand 5 minutes out of every hour.
No standing greater than 1 hour at a time or for 2 hours in an 8 hour workday.
No walking greater than one half hour at a time or for a total of 2 hours in an 8 hour workday.
No bend/stoop/twist/turn/squat/crouch/kneel.
No work or reach below waist level.
Only occasional work or reach above shoulder level.
Unrestricted reaching at desk level.
Unrestricted use of upper extremities and hands while in a sedentary position.
No lift/carry/push/pull greater than 20 pounds occasionally or 10 pounds frequently.
No ladder climbing, balancing or working at heights.
No driving greater than 1 hour at a time or for a total of 2 hours in an 8 hour workday.

**5.  Do the clinical records support the deficits noted? (physical or cognitive functional deficits);**



The clinical records are sufficient to provide objective information and imaging information that would support the claimant's complaints of low back pain with right leg radiculopathy.

**6. Please discuss either way and include your clinical rationale for duration.**

The clinical records are sufficient to provide objective information and imaging information that would support the claimant's complaints of low back pain with right leg radiculopathy.

According to the submitted notes the claimant has bilateral sacroiliac joint tenderness, mild limitation of the lumbar spine, and some indication of weakness of right foot dorsiflexion. These deficits would result in work restrictions and limitations as noted above during the time period under review.

**7. Does the available information support a condition that would prevent the employee from performing the duties of his job/occupation as of 04/27/2020 through present? If so, for how long?**

The available information does support a condition that would prevent the claimant from performing the duties of his job/occupation as described as of 04/27/2020 through present.

The available information is sufficient to support the fact that the claimant has significant low back pain with right leg radiculopathy from 04/27/2020 through present.

**8. Do any of the prescribed medications noted in the medical records either on an individual basis or on altogether basis impact functional capabilities that would affect work ability. Please consider any medication changes noted in the medical records for the period of 04/27/2020 through present.**

The submitted documentation does not discuss any prescribed medications that may have an effect on the claimant's functional capabilities from 04/27/2020 through present.

## Assessment/Rationale

This review is from an orthopedic perspective. The time period under review is from 04/27/2020 through present.

The submitted documentation indicates the claimant is a 43 year old male who has been followed for low back pain. The documentation is difficult to follow, but it appears that he has primarily been seen by his family doctor and by pain management. When seen by pain management on 01/02/2020 the claimant complained of low back pain radiating into the right lower extremity and it was noted that epidural steroid injections had provided only minimal relief of pain.  Examination showed pain with full extension of the lumbar spine, bilateral sacroiliac joint tenderness, and slight weakness right foot

Claimant Name: Nathaniel King                                                                                          RRS ID: 56232



dorsiflexion.  He was diagnosed with degenerative disc disease and degenerative facet disease and a trial of medial branch nerve blocks was suggested.

It was noted in March 2020 that the claimant was being seen by his PCP for chronic care/pain management, but no physical examination abnormalities were recorded. He was diagnosed with hyperlipidemia, knee pain, chest pain, migraines, right hip pain, burns, low back pain, pes planus, bursitis, depression/PTSD and a cough.  He continued treatment for back and hip pain with medications. Pain management notes from March 2020 indicate that the claimant had previously had lumbar epidural spinal injection on 12/06/2019 and bilateral L3, 4, 5 and S1 medial branch blocks on 01/17/2020.

When seen by the PCP on 06/05/2020, it was noted that the claimant was allowed to return to work with modifications as of 06/01/2020 with restrictions regarding standing, walking, repetitive bending, squatting, stooping, and driving.  At that time it was noted that the claimant had not had any significant pain management treatment since March because of Covid-19 restrictions.

The claimant was seen again by pain management on 07/02/2020 where it was noted that an MRI scan of his lumbar spine has shown a broad-based disc protrusion at L3-4 with degenerative changes also noted at L4-5 and L5-S1. There was no central canal stenosis and only minimal left neural foraminal stenosis.  The provider suggested repeating L3-S1 medial branch nerve blocks. There are no further clinical notes regarding the claimant's low back pain submitted since the visit of 07/02/2020.

The claimant is employed as a Civilian Security Office. The job description reviewed indicates that the claimant must sit for extended periods of time, walk for extended periods of time, use keyboard devices and computer monitor, and be able to drive and to climb into and out of vehicles for searches. According to the submitted notes the claimant has bilateral sacroiliac joint tenderness, mild limitation of the lumbar spine, and some indication of weakness of right foot dorsiflexion. These deficits would result in chronic, long-term work restrictions and limitations as noted above which would include the time period under review, from 04/27/2020 through present.

The available information does support a condition that would prevent the claimant from performing the duties of his job/occupation as described as of 04/27/2020 through present.

*The opinion above is based on the information available for review and held to a reasonable degree of clinical accuracy. I attest that I have no relationship or association with the claimant who is the subject of this independent review. I also attest that I have no substantial personal or financial relationship with the treating provider(s) and/or treatment facility(ies), I have no financial interest in the insurer or claim administrator and my opinion(s) were not influenced by compensation received for my services.*



*I hereby submit this attestation that I have complied, to the highest degree possible, with the provisions of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and the standards decreed thereunder.*



William M Sligar, M.D.
Board Certified
Orthopaedic Surgery
IN - 01029128A
KY - 20278

## Documents Sent for Review

| Document Date | Document Type | Document Source |
|---|---|---|
| Undated | Peer Review Referral Form | Client |
| Undated | Intake Form | Client |
| 05/12/2020 | Health Care Provider Medical Certification | Kelly Derrick, DO |
| 05/21/2020 | Download Request Summary | Claimant |
| 05/03/2013 | VA Vet Account Summary | VA Dallas |
| 11/21/2019 - 05/21/2020 | VA Appointments Summary | VA Dallas |
| 09/10/2007 - 05/21/2020 | VA Problem List | VA Dallas |
| 01/08/2020, 04/27/2020, 04/28/2020, 05/04/2020, 05/12/2020 | Email Correspondence | Alicia D. Tolbert, LVN |
| 01/08/2020, 02/06/2020, 03/02/2020, 03/03/2020, 04/27/2020, 04/28/2020, 05/04/2020 | Email Correspondence | Claimant |
| 04/23/2020 | Telephone Note | Cecelia R. Krogulski, RN |
| 01/12/2020, 03/18/2020 | Medication Management Note, Established Patient Note | Kelly J. Derrick, DO |
| 03/18/2020 | Health Screening Nursing Note | Alexis N. Romine, LVN |
| 03/04/2020 | Pain Management Note | Luis E. Ortiz, RN |
| 02/10/2020, 03/03/2020 | Anesthesiology Secure | Timyra Stocker, RN |



| | Message | |
|---|---|---|
| 01/21/2020 | Telephone Note | Barbara B. Robinson, RN |
| 01/18/2020 | Pain Management Post-Procedure Notes | Luis E. Ortiz, RN |
| 01/17/2020 | Nursing Discharge Notes | Beverly D. Parker-Chatmon, RN |
| 01/17/2020 | Cancellation Note | Sharon Y. Coleman, LVN |
| 01/17/2020 | Pre-Procedure Note | Tammi Key, RN |
| 01/17/2020 | Pre-Operative Reassessment | Am R. Hegazi, MD |
| 01/17/2020 | Pre-Procedure Verification Checklist | Beverly D. Parker-Chatmon, RN |
| 01/17/2020 | Pain Medicine History & Physical Notes | Jim Z. Sheng, MD |
| 01/17/2020 | Nursing Procedure Note | Michelle D. Gray, RN |
| 01/16/2020 | Nursing Telephone Note | Jolly A. Thomas, RN |
| 12/02/2019, 01/10/2020 | PACT Note | Lionel T. Pham, RN |
| 01/03/2020 | Pain Management Pre-Procedure Notes | Chase G. Culver, MD |
| 12/02/2019, 12/12/2019, 12/17/2019, 01/02/2020 | Ambulatory Care Telephone Note | Lionel T. Pham, RN |
| 01/02/2020 | Pain Medicine History & Physical Notes | Herndon Richardson, PA-C |
| 01/02/2020 | Pre-Procedure Notes | Jimmie D. Williams, RN |
| 01/02/2020 | Outpatient Check-In Note | Rebecca J. Patterson, LVN |
| 11/21/2019,12/05/2019, 12/12/2019, 12/19/2019 | PM And R Clinical Massage After Visit Summary | Cheryl Adams |
| 12/09/2019 | Nur SDP Telephone Note | Yolanda Conner |
| 12/07/2019 | Pain  Mgm T Post - Procedure Note | Luis Ortiz |
| 12/06/2019 | NUR SDP Discharge Note | Brenda Ellis |
| 12/06/2019 | Univ Prot Checklist / Pre Proceed / Time Out | Laura  Ataee |
| 12/06/2019 | Univ Prot / Checklist | Brenda Ellis |
| 12/06/20019 | Pain MGM T History And Physical | Matthew Bourneuf |
| 12/06/2019 | Nur Sdp Day Of Procedure Note | Kyesha Ryan |
| 12/06/2019 | Surg Attending Pre- Op Note | Nenna Nwazota |
| 12/05/2019 | Nur SDP Telephone Note | Jolly Thomas |
| 11/25/2019, 11/27/2019, 04/27/2020, 04/28/2020, 05/04/2020, 05/12/2020, 05/28/2020,  07/02/2020, 07/13/2020 | Primary Care Secure Messaging | Alicia Tolbert |
| 11/22/2019 | Pain Management Pre-Procedure Notes | Chase Culver |
| 05/21/2020 | VA Laboratory Results | Sharif Eusufzai |
| 05/21/2020 | VA Radiology Reports | Herndon Richardson |

Claimant Name: Nathaniel King

RRS ID: 56232



Reliable Review Services

| 12/06/2019 | Surgical Arm Fluoroscopy Procedure | Jenny Maxwell |
| 06/05/2020 | Fitness For Duty / Return To Work Release Form | Kelly Derrick. DO |
| 06/05/2020 | Correspondence | Kelly Derrick , DO |
| 04/20/2020 | Correspondence | Client |
| 10/01/2020 | Download Request Summary | VA Dallas |
| 05/03/2013 | Healthe Vet Account Summary | VA Dallas |
| 10/01/2020 | VA Appointments | VA  Dallas |
| 10/01/2020 | VA Notes | Scott Davis |
| 09/21/2020 | NUR M Education Administration Outpatient Note | Lazaro Mendoza |
| 09/21/2020 | NUR EM Emergency Dept Focused Assessment | Lazaro Mendoza |
| 09/21/2020 | NUR Emergency Dept Triage Note | Lissette Mendoza |
| 09/21/2020 | NUR Emergency Dept First Look Note | Evans Okero |
| 07/23/2020 | NUR Ambulatory Care Telephone Note | Lionel Pham |
| 07/20/2020 | Primary Care Secure Messaging | Lionel Pham |
| 07/02/2020 | Pain MGM Note | Joseph Hamati |
| 06/24/2020 | Radiology Metformin Reconciliation Note | Yolanda Jenkins |
| 06/05/2020 | Primary Care Secure Messaging | Kelly Derrick, DO |
| 06/03/2020 | NUR Ambulatory Care Telephone Note | Donna Bohannon |
| Undated | Job Description | Employer |

# CHECK REQUEST FORM

| | |
|---|---|
| Request Date: | 10/23/20 |
| Requestor Name: | Kristin Jones |
| Vendor: | Reliable Review Services |
| Payee: | Reliable Review Services |
| Address: | PO Box 492890 |
| City, State & Zip: | Redding, CA 96049 |
| Payee Phone: | not on file |

| | |
|---|---|
| Invoice Date: | 10/20/20 |
| Due Date: | ASAP     Rush?  ◉ Yes  ○ No |
| Invoice #: | 56232-1 |
| Amount: | $ 415.00 |
| Purpose of Check: | (1) peer review |

| | |
|---|---|
| Claimant Name: | Nathaniel King |
| Claim #: | 2020-04-27-0145-ASW-01     Policy Type:  STD |
| Client Name: | Dallas Fort Worth Airport |

Instructions for AP:

Coding – Finance Only:

| | |
|---|---|
| Client Bill Back (1130)?: | ◉ Yes ○ No   Full Amt:  ◉ Yes  ○ No  If No, Partial Amt $ |
| Matrix Pays (6120)?: | ○ Yes ◉ No   Full Amt:  ○ Yes  ◉ No  If No, Partial Amt $ |
| Reason: | |

| | |
|---|---|
| Approver Name: | Nancy Kvorka |
| Approver Signature: | _____   Date: |

Yellow Highlighted fields are required for all requests.
Green Highlighted fields are also required for Claimant related requests.
Blue Highlighted fields are also required for Claimant related requests coming from Bill Review.

EXHIBIT O                    76                    DFW 001630



# INVOICE

**Reliable Review Services**

**Invoice Number : 56232-1**                                          **10/20/2020 12:08 PM EDT**

Claimant: Nathaniel King
Client Claim#: 2020-04-27-0145-ASW-01
RRS Claim#: 56232-1

**Customer:** Matrix Absence Management
2421 W. Peoria Avenue Suite 200
Phoeniz, AZ 85029-4940

| Description of Services | Type of Case | Review Type | Pages | Review Level | >1 AP Contact | Units | Rate | Other Fees |
|---|---|---|---|---|---|---|---|---|
| PEER REVIEW | Disability | STD | 169 | Appeal | No | 2.25 | 415 | |

## Reviewer Details

| Reviewer(s) | Units | Fee |
|---|---|---|
| William M Sligar | Flat Rate | $415.00 |
| Additional Charges: n/a | | |
| **Total Billable Amount: n/a** | | **$415.00** |

**Please include the invoice number with your payment and mail to:**

Reliable RS
PO Box 492890,
Redding CA 96049                              **Tax Id:**  26-1114252

Mon, 12 Oct 2020 18:06:39 +0000
To: Young, Mark W
Cc: Young,Carl W, Gilbert, Catrina T, Fontenot, Sandra K, Rossorelli, Natalie, Herbert, William J
RE: Action Required: 2020-04-27-0145-ASW-01 / Nathaniel King / Dallas-Fort Worth - Short-term disability request for peer review authorization

> **Caution:** This email originated outside of DFW Airport. Do not click links or open attachments unless you recognize the sender and know the contents are safe. Report this

Thank you Mark.

Best Regards,

**Petina Batchler**
**Audit and Appeals Specialist**

**MATRIX**
ABSENCE MANAGEMENT
A MEMBER OF THE TOKIO MARINE GROUP

Phone:   877.315.9838 x  40226
Fax:     1.408.361.9068
Email:   petina.batchler@matrixcos.com
Web:     www.matrixcos.com

NOTICE:  CONFIDENTIALITY AND PROPRIETARY INFORMATION NOTICE: This email, including  attachments, is covered by the Electronic Communications Privacy Act (18 U.S.C. 2510-2521) and contains confidential information belonging to the sender which may be legally privileged.
The information is intended only for the use of the individual or entity to which it is addressed. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance of the contents of this information is strictly prohibited.
If you have received this electronic transmission in error, please immediately notify the sender by return e-mail and delete this message from your computer or arrange for the return of any transmitted information.

**From:** Young, Mark W [mailto:myoung@dfwairport.com]
**Sent:** Monday, October 12, 2020 1:41 PM
**To:** Petina Batchler <Petina.Batchler@matrixcos.com>
**Cc:** Young,Carl W <cyoung@dfwairport.com>; Gilbert, Catrina T <cgilbert@dfwairport.com>; Fontenot, Sandra K <sfontenot@dfwairport.com>; Rossorelli, Natalie <nrossorelli@dfwairport.com>; Herbert, William J <wherbert1@dfwairport.com>
**Subject:** RE: Action Required: 2020-04-27-0145-ASW-01 / Nathaniel King / Dallas-Fort Worth - Short-term disability request for peer review authorization

This message originated outside of Matrix's Network. Please use caution when opening attachments, clicking links, or responding to requests for information.

Petina:

Per our discussion, DFW approves the peer review.

**Mark Young**
Senior Risk Analyst / Risk Management
ADA Coordinator

W (972) 973.4600

Dallas/Fort Worth International Airport
P. O. Box 619428
DFW Airport, TX 75261-9428

E **myoung@dfwairport.com**
-
**Risk Mgmt. 24/7 at 214-616-0576**

www.dfwairport.com

**From:** Petina Batchler <Petina.Batchler@matrixcos.com>
**Sent:** Thursday, October 8, 2020 11:49 AM
**To:** Young, Mark W <myoung@dfwairport.com>
**Cc:** QA_Team@matrixcos.com; Fuze, Joanr <Joanr.Fuze@rsli.com>; Hooper, Tiana <Tiana.Hooper@rsli.com>
**Subject:** Action Required: 2020-04-27-0145-ASW-01 / Nathaniel King / Dallas-Fort Worth - Short-term disability request for peer review authorization

> **Caution:** This email originated outside of DFW Airport. Do not click links or open attachments unless you recognize the sender and know the contents are safe.
> Report this email to phishing@dfwairport.com, if you believe it is suspicious.

Good afternoon,

We have an update for you on Mr. Nathaniel King's appeal.  We finished obtaining all information for the above captioned short term disability appeal review.   Upon review, we are recommending proceeding with an Independent Peer Review(s) of the medical information and/or vocational information contained in the claim file.
With your approval, an Independent Peer Review will be conducted through our vendor service by a Board Certified Physician(s), who would be provided with a copy of the medical records, the job description and your employee's appeal information from the claim file.  The Peer Reviewer(s) would also contact the employee's treating physician(s) for a "Doctor to Doctor" call to gather or clarify any necessary information.  Additionally this process allows the treating physician(s) perspective on any supported disability.
The cost for the Independent Peer Review will be a charge back to your account. The billing is based on the page count of the file material, and the number of Peer and/or Vocational Reviews completed.
The current page count of information for the Peer Review is 168
We recommend a review(s) by one Peer review specialist(s).  Orthopedic
The Estimated Cost for the Peer Review process will be $415.00
Per our prior notice on September 30, 2020 the cost for Matrix to administer the appeal is $370.00.  It is billed separately from the peer review costs.
We are recommending this type of review as part of Matrix's Appeal protocols. It provides a higher level of review during an appeal process as none of Matrix's prior medical staff can review the file again in order to provide a fair and impartial appeal review for your employee.
**We respectfully request your response if in agreement to the above Peer Review process within the next two business days**

**EXHIBIT P**

**smainka@phamharrison.com**

| | |
|---|---|
| **From:** | Young,Carl W |
| **Sent:** | Friday, September 11, 2020 5:32 PM |
| **To:** | Young, Mark W |
| **Subject:** | RE: Open DFW Positions |

I will take a look next week. Do you have good phone number I can reach him at.

**Carl Young**
Senior HR Consultant
972-973-6389 (office)
214-960-9994 (mobile)

**From:** Young, Mark W <myoung@dfwairport.com>
**Sent:** Friday, September 11, 2020 5:27 PM
**To:** Young,Carl W <cyoung@dfwairport.com>
**Subject:** FW: Open DFW Positions

I'm going to forward this to you as I don't know how one goes about applying for non-posted positions unless they're on the double-secret list I don't have access to.

From the ADA standpoint, no accommodation was made for his Security position or any other.

**Mark Young**
Senior Risk Analyst / Risk Management
ADA Coordinator

**W (972) 973.4600**

Dallas/Fort Worth International Airport
P. O. Box 619428
DFW Airport, TX 75261-9428

E **myoung@dfwairport.com**

**Risk Mgmt. 24/7 at 214-616-0576**

www.dfwairport.com

**From:** Nathan <ray_sir_6@yahoo.com>
**Sent:** Friday, September 11, 2020 9:19 AM
**To:** Young, Mark W <myoung@dfwairport.com>
**Subject:** RE: Open DFW Positions

**Caution:** This email originated outside of DFW Airport. Do not click links or open attachments unless you recognize the sender and know the contents are safe. Report this email to phishing@dfwairport.com, if you believe it is suspicious.

Mark,

EXHIBIT Q                                                    DFW 000219

Thu, 5 Nov 2020 23:17:35 +0000
To: Young, Mark W, Aylor, Susan
Cc: Gilbert, Catrina T, Rossorelli, Natalie, Stevens, Barry C
RE: Nathan King STD Benefits

Thanks.

**Carl Young**
Senior HR Consultant

972-973-6389 (office)
214-960-9994 (mobile)

**From:** Young, Mark W <myoung@dfwairport.com>
**Sent:** Thursday, November 5, 2020 4:26 PM
**To:** Young,Carl W <cyoung@dfwairport.com>; Aylor, Susan <saylor@dfwairport.com>
**Cc:** Gilbert, Catrina T <cgilbert@dfwairport.com>; Rossorelli, Natalie <nrossorelli@dfwairport.com>; Stevens, Barry C <bstevens@dfwairport.com>
**Subject:** Nathan King STD Benefits

Per the information noted below along with the subsequent reversal of an initial denial of STD benefits, Nathan King reached maximum benefits of 180 days for STD on 7/16/20 and an LTD application has been provided.

Per Matrix:

|          |                                            |
|----------|--------------------------------------------|
| Re:      | Nathaniel R King                           |
| Plan No: | ASW 515583                                 |
| Claim No:| 2020-04-27-0145-ASW-01                     |
| Employer:| Dallas-Fort Worth International Airport Board |

Dear Nathaniel King:

Matrix Absence Management (Matrix) is the claims administrator for the Dallas-Fort Worth International Airport Board Short Term Disability Plan. We have received your request for review of the previous decision made on your clam. We have concluded an independent review including the additional information submitted. We have determined that the original determination should be reversed. The additional documentation and medical information provided/obtained in submission and review of your appeal request supports your inability to work as April 27, 2020 to your short-term disability maximum benefit date. You should receive correspondence from the claims department in the very near future regarding your benefits and short-term disability exhaust date.

If you have any questions, please feel free to contact me at 1-800-866-2301 ext. 40226.

Sincerely, Petina Batchler
Petina Batchler Audit and Appeals Specialist

- 1st claim in 2019/2020 Approved from 11/09/2019 to 1/12/2020 , which is 65 days /9.3 weeks. 7 day elimination was applied from 11/09/2019 to 11/15/2019. Payable dates from 11/16/2020 to 01/12/2020, which is 58 days/8.3 week

- 2nd claim in 2020 Approved from 02/19/2020 to 04/07/2020, which s 49 days / 7 weeks. 7 day elimination applied from 02/19/2020 to 02/25/2020. Payable dates from 02/26/2020 to 04/07/2020, which is 42 days / 6 weeks

- 3rd claim in 2020 approved from 05/04/2020 through 07/15/2020. (Initially denied . . . King's appeal reversed the denial) Elimination period from 04/27/2020 to 05/03/2020. Employee has reached maximum benefits for Short term disability as of 07/16/2020. Leave closed. LTD packet sent to Employee.

**Mark Young**
Senior Risk Analyst / Risk Management
ADA Coordinator

W (972) 973-4600
C  (972) 658-9870

Dallas/Fort Worth International Airport
P. O. Box 619428
DFW Airport, TX 75261-9428

E **myoung@dfwairport.com**

**Risk Mgmt. 24/7 at 214-616-0576**

www.dfwairport.com

**smainka@phamharrison.com**

| | |
|---|---|
| **From:** | Nathan <ray_sir_6@yahoo.com> |
| **Sent:** | Monday, September 28, 2020 4:30 PM |
| **To:** | Young, Mark W; Nathan Ryan King |
| **Subject:** | Re: Reasonable Accommodations Denied |

**Caution:** This email originated outside of DFW Airport. Do not click links or open attachments unless you recognize the sender and know the contents are safe. Report this email to phishing@dfwairport.com, if you believe it is suspicious.

Mr. Young,

That is not even close to what I asked for, I requested which accommodation affects which essential function of the job? The accommodations that I requested were designed to not prevent me from doing any of the essential job functions. I would like to know specifically which ones are affecting my reasonable accommodations request so I can adjust as necessary. My understanding of this process is that it is supposed to be interactive, with this in mind, I am asking for information on what DFW Airport considers to be the essential functions of the job that I can not do based on my requested accommodations.

In order to obtain a better understanding of what you are saying I need you to provide me with specific instances and not the vague answers of, "your requested accommodations impair or prevent you from doing most of the essential functions".

Which specific accommodation impairs or prevents which specific essential function(s)?

Then please explain how my requested accommodations can not be done without causing hardship on the department?

Let me help by providing a further explanation of my limitations as it was advised to me by Matrix to include all limitations, not just those relevant to CSO, on the chance that I have to request reasonable accommodation through reassignment:

My limitation for unable to operate / ride in a vehicle > 2hrs due to the required safe sitting position is not relevant to CSO because driving/riding in a vehicle for an extended period of time is not an essential function. Roving/perimeter patrols are not constant.

My limitation for no sitting-to-standing >5x per 30min for face-to-face interactions is a non-essential function. Only the portals (AHQ/ DPSHQ Security post) have face-to-face interactions that we have been instructed to stand up for. Nearly all interactions at the gates are sitting-to-standing in booth-to-walking to vehicle-to-standing while inspecting vehicle/SIDA-to-walking to scan badge, open gate, return badge-to-standing in booth-to-sitting. This is not repetitive sitting-to-standing and thus requires no accommodation. The essential functions at the portal (not in the job description) are to verify SIDA, inspect bags, and operate the EVOLVE scanner. These essential functions do not require standing to be completed, thus standing at the portals is a non-essential function.

My limitation for being unable to repeatedly bend, squat, or stoop only applies for under vehicle inspections and bag searches if done standing. Mirrors are already provided at every AOA gate to search under vehicles, so the accommodation is already present and I did not need to request it. The only thing I

requested for accommodations was to have a tall table for bag searches at the portal, and that is not even necessary due to standing for bag searches being non-essential in the first place.

My limitation for no heavy lifting is not even relevant to CSO because heavy lifting is not an essential function.

My limitation for 45/60 walking allows me to do the essential function of walking for an extended period of time.

My limitation for being unable to stand for >20min is not relevant to CSO because standing for extended periods of time is not an essential function.

My limitation for using an elevator and/or stairs every 2hrs is not relevant to CSO because climbing stairs is not an essential function. Also, all locations on DFW over 2 stories (25 steps) have elevator and/or escalator access, so this has no effect on the essential function of doing security patrols.

My limitation for no stools, chairs having a back affects sitting for extended periods of time. My requested accommodation was to have no stools, chairs must have a back.

I hope this provides you with a clearer understanding of the requested accommodations. Based on this, it is my understanding that you are refusing to accommodate me with, or claiming undue hardship for the following:
Providing a taller table for bag checks.
Providing a chair with a back.

None of my limitations or requested accommodations prevents me from carrying my fair share of the work load, and most of my requests deal only with non-essential functions or are unrelated to CSO.

Please let me know if you have any corrections you would like to make?


Thank you for your time,

Nathan King


On Monday, September 28, 2020, 9:55:46 AM CDT, Young, Mark W <myoung@dfwairport.com> wrote:


Mr. King:

To support an ADA claim, a person must show that he or she can either perform the essential functions of the job without assistance or can perform those functions with some reasonable accommodation. An individual who cannot make this initial showing is not qualified for protection under the ADA. The extent of your requested accommodations impair or prevent you from doing most of the essential functions of the job of Civilian Security Officer. At any given time, a Civilian Security Officer may be required to do some or all of these principle duties and responsibilities and exert the listed efforts (all deemed essential functions) on a given shift. Not only was it determined in your Interactive meeting that your requested accommodations prevent you from doing the essential functions of the job but implementing them would pose a hardship on the department.

PRINCIPAL DUTIES AND RESPONSIBILITIES

1. Inspects all vehicles attempting to enter through AOA gates, ensuring that each vehicle possesses a valid DFW Airport-issued AOA decal and that all individuals possess a current/valid DFW International Airport Board Security Identification Display Area

(SIDA) badge; inspects cab area of vehicles; and inspects vehicles underneath and in additional areas as necessary and appropriate.

2. Perform terminal security patrols of areas including but not limited to sterile areas, employee portals, Skylink stations, baggage claim areas, parking garages, curbside and terminal ramp areas.

3. Perform roving security patrols of areas including but not limited to AOA fence line and gates, cargo and hangar areas, airport Board buildings, and critical infrastructure sites.

4. Identify and report security violations.

5. Composes reports as deemed necessary and appropriate by DPS management.

6. Ensures that food service vehicles are locked and/or sealed, or inspected.

7. Ensures that no pedestrian traffic enters the AOA.

8. Ensures visitors to DFW Airport office buildings are authorized to be in the building.

9. Notifies DPS management of any attempts to enter the AOA, terminal sterile areas, , office buildings, or any other assigned area of surveillance without proper authorization or of any suspicious circumstances that may affect the security of the Airport premises.

10. Directs persons lost, distressed or incapacitated to the appropriate department or personnel for assistance.

11. Coordinates with Police Services and other Board departments on traffic management at terminals and emergent areas throughout the airport

12. Participates in counter-terrorism activities to include surveillance, information gathering, detection, and deterrence functions.

13. Participates in ensuring regulatory compliance of airport and tenant facilities and personnel

14. Ensure security at construction sites throughout the airport environment

15. Provides a variety of additional duties within the Department of Public Safety to include staging of assets for disaster and emergency response, special events security and support, other duties as assigned.

EFFORTS

• Works outside subject to all weather conditions.

• Climbs into, out of and searches under vehicles.

• Works in awkward positions such as kneeling, stooping or squatting.

• Uses near-visual acuity in inspecting vehicles and SIDA badges.

• Uses far-visual acuity in judging distance of moving vehicles.

• Exchanges information in person and over radio and telephone.

• Drives to locations on Airport property, including the AOA.

• Sits for extended periods of time.

• Walks for extended periods of time.

EXHIBIT S

DFW 000247

• Uses keyboard devices and a computer monitor.

• Maintain a professional appearance in accordance with DPS uniform standards

Please let me know if you have any questions.

**Mark Young**

Senior Risk Analyst / Risk Management

ADA Coordinator

**W (972) 973.4600**

DallasFort Worth International Airport

P. O. Box 619428

DFW Airport, TX 75261-9428

**E myoung@dfwairport.com**

**Risk Mgmt. 24/7 at 214-616-0576**

www.dfwairport.com



---

**From:** Nathan <ray_sir_6@yahoo.com>
**Sent:** Saturday, September 19, 2020 7:47 PM
**To:** Timm Richardson <timm.richardson@matrixcos.com>; Young, Mark W <myoung@dfwairport.com>
**Subject:** Reasonable Accommodations Denied

**Caution:** This email originated outside of DFW Airport. Do not click links or open attachments unless you recognize the sender and know the contents are safe. Report this email to phishing@dfwairport.com, if you believe it is suspicious.

I reopened a claim because I am still going thru the reassignment portion of the request.

I would like to get a list of my accommodations and which portion of the job description that they prevented me from doing, and why the proposed accommodation was denied. I have another appointment with my doctor coming up and I want to be able to discuss this with him and determine what changes, if any, we can make to my request so that I can return to work.

The teleconference only covered one line of the job requirements and was not explained in a manner that would enable me to understand completely what prevented me from performing this function with the requested accommodations, and why those accommodations were unable to be given. Getting clarification on this will enable me to better be able to request accommodations that can be met.

I included the list to save you some time, and I included what I considered the relevant portion of the job description. Please make corrections/additions where you see fit. I also attached the job description.

EXHIBIT S                    4
                             84                    DFW 000248

**To:** Stevens, Barry C <bstevens@dfwairport.com>
**Subject:** RE: Reasonable Accommodations Denied

Barry:

Thank you. Just so you know, he has now appealed his denial of short-term disability. This was denied earlier this year because the medical did not support a disability.

The appeal most likely won't be processed until next week. I'll keep you in the loop.

**Mark Young**
Senior Risk Analyst / Risk Management
ADA Coordinator

**W (972) 973.4600**

DallasFort Worth International Airport
P. O. Box 619428
DFW Airport, TX 75261-9428

**E myoung@dfwairport.com**

**Risk Mgmt. 24/7 at 214-616-0576**

www.dfwairport.com



---

**From:** Stevens, Barry C <bstevens@dfwairport.com>
**Sent:** Wednesday, September 30, 2020 10:18 AM
**To:** Young, Mark W <myoung@dfwairport.com>
**Subject:** RE: Reasonable Accommodations Denied

Mark,
That reads very well and succinct to me. You are direct and to the point. You have collected his information, as he and his medical professional provided, and overlaid it with the ASD job description. It is my opinion, and you have noted it in the communication, that his lack of ability or limitations should not/cannot impede the current operations or create additional work/hardship on his contemporaries.

Bear

---

**From:** Young, Mark W <myoung@dfwairport.com>
**Sent:** Wednesday, September 30, 2020 9:53 AM
**To:** Gilbert, Catrina T <cgilbert@dfwairport.com>; Constantine, Anne <aconstantine@dfwairport.com>
**Cc:** Young,Carl W <cyoung@dfwairport.com>; Aylor, Susan <saylor@dfwairport.com>; Stevens, Barry C <bstevens@dfwairport.com>; Rossorelli, Natalie <nrossorelli@dfwairport.com>
**Subject:** RE: Reasonable Accommodations Denied

Please see the email chain below and my response to Mr. King. In as much as he's pushing back on the Reasonable Accommodation denial and allegedly has a lawyer, I just wanted everyone in agreement before I respond.

EXHIBIT T                                    2
                                            85                           DFW 000264

_____
_____

Nathan:

Below, you'll see essential functions of the Civilian Security Officer noted in black; your restrictions as provided to Matrix are noted in red. As you can see, your restrictions either restrict or prevent your ability to perform essential functions of a Civilian Security Officer as defined by DFW Airport. As noted in my earlier email, to support an ADA claim, a person must show that he or she can either perform the essential functions of the job *without assistance* or can perform those functions with some *reasonable accommodation*. An individual who cannot make this initial showing is not qualified for protection under the ADA. Additionally, accommodating your restrictions as provided to Matrix would create a hardship on the operation of the department. It's not required that we offer specifics as to our determination of a hardship.

Pursuant to your Interactive Meeting of 8/25/20 with Senior Security Manager Barry Stevens, HRC Carl Young, ADA Specialist Timm Richardson of Matrix, and myself, we discussed in detail the scope of your restrictions and the impact on the operation of department. In response, you suggested that other officers in your proximity would perform your duties if you were unable. It was stated at that time there could be no expectation for fellow officers to assume any percentage of your responsibilities nor would it be acceptable. It was also clearly explained that the extent of your restrictions prevent you from doing essential functions of a Civilian Security officer; a reasonable accommodation under the ADA is not applicable.

You also stated, "Please let me know if you have any corrections you would like to make?" This isn't how it works. You are under the care of a medical professional. Presumably, you discussed your work responsibilities and requirements or they had a copy of your job description and developed restrictions from there. We have to rely on the medical direction of your care provider as to your physical limitations to ensure your safety and the safety of others on the job. Nobody at DFW can "make corrections" in opposition to restrictions provided by your medical provider.

I hope this clarifies the decision process on your ADA Reasonable accommodation request. If you have any questions, please let me know.

Inspects all vehicles attempting to enter through AOA gates, ensuring that each vehicle possesses a valid DFW Airport-issued AOA decal and that all individuals possess a current/valid DFW International Airport Board Security Identification Display Area (SIDA) badge; inspects cab area of vehicles; and inspects vehicles underneath and in additional areas as necessary and appropriate.
- No standing > 20 minutes per hr.
- Unable to stand > 20 minutes per hour.
- No repetitive bending, squatting, or stooping.

Perform roving security patrols of areas including but not limited to AOA fence line and gates, cargo and hangar areas, airport Board buildings, and critical infrastructure sites
- No standing > 20 minutes per hr.
- 30 minutes out of vehicle every 2 hrs.
- No sitting or standing > 5 x 30 minutes
- 45 minutes walking 15 minutes sitting.
- Unable to stand > 20 minutes per hour.
- Limit walking to less 1 mile per day.

Coordinates with Police Services and other Board departments on traffic management at terminals and emergent areas throughout the airport.
- No standing > 20 minutes per hr.
- 30 minutes out of vehicle every 2 hrs.
- No sitting or standing > 5 x 30 minutes

EXHIBIT T

DFW 000265

- 45 minutes walking 15 minutes sitting.
- Unable to stand > 20 minutes per hour.
- Limit walking to less 1 mile per day.

Provides a variety of additional duties within the Department of Public Safety to include staging of assets for disaster and emergency response, special events security and support, other duties as assigned.
- No standing > 20 minutes per hr.
- 30 minutes out of vehicle every 2 hrs.
- No sitting or standing > 5 x 30 minutes
- 45 minutes walking 15 minutes sitting.
- Unable to stand > 20 minutes per hour.
- Limit walking to less 1 mile per day.

Climbs into, out of and searches under vehicles.
- No repetitive bending, squatting, or stooping.

Works in awkward positions such as kneeling, stooping or squatting.
- No repetitive bending, squatting, or stooping.

Drives to locations on Airport property, including the AOA.
- Limit driving to less than 2 hrs. per day.

Sits for extended periods of time.
- No sitting or standing > 5 x 30 minutes.

Walks for extended periods of time.
- Limit walking to less 1 mile per day.
- 45 minutes walking 15 minutes sitting.
- Unable to stand > 20 minutes per hour.

**Mark Young**
Senior Risk Analyst / Risk Management
ADA Coordinator

**W (972) 973.4600**

Dallas/Fort Worth International Airport
P. O. Box 619428
DFW Airport, TX 75261-9428

E **myoung@dfwairport.com**

**Risk Mgmt. 24/7 at 214-616-0576**

www.dfwairport.com

---

**From:** Nathan <ray_sir_6@yahoo.com>
**Sent:** Monday, September 28, 2020 4:30 PM
**To:** Young, Mark W <myoung@dfwairport.com>; Nathan Ryan King <ray_sir_6@yahoo.com>
**Subject:** Re: Reasonable Accommodations Denied



LEGAL DEPARTMENT
(972) 973-5480
(972) 973-5481 Facsimile

June 11, 2020

Eric D. Rogers
Spielberger Law Group
4890 W. Kennedy Blvd., Suite 950
Tampa, FL 33609

Re:     Nathaniel King

Dear Mr. Rogers,

I have been asked to respond to your letter of May 22, 2020 regarding your client Nathaniel King. Your client is incorrect in his allegation that a non-disabled employee was assigned to a vacant position in the administration department 2 weeks after his request. While positions in the Airport Headquarters can be used for modified duty as needed, it is not a permanent position and all CSO's rotate among the various posts around the airport.

Before he went out to apply for short-term disability, he was being accommodated by working E Dock reviewing badges and was provided a chair. This was within his restrictions. Our policy provides for 60 days of modified duty with the possibility of an extension. 41 days into his extension, we were notified that his medical restrictions were permanent in nature with no known end.  He has applied for short-term disability and Matrix, our third-party administrator is awaiting further medical to continue his claim. If he is unable to perform the essential functions of his job, we will begin the interactive process of possible accommodation.

Regards,

*Anne M. Constantine*

Anne M. Constantine
Legal Counsel
DFW International Airport

EXHIBIT U

DFW 002142

**To:** Petina Batchler <Petina.Batchler@matrixcos.com>
**Cc:** QA_Team@matrixcos.com; Fuze, Joann <Joanr.Fuze@rsli.com>; Hooper, Tiana <Tiana.Hooper@rsli.com>; Carina Rizo <Carina.Rizo@matrixcos.com>; Gilbert, Catrina T <cgilbert@dfwairport.com>; Young,Carl W <cyoung@dfwairport.com>; Rossorelli, Natalie <nrossorelli@dfwairport.com>
**Subject:** RE: 2020-04-27-0145-ASW-01 / Nathaniel King / Dallas-Fort Worth - Appeal Overturn

This message originated outside of Matrix's Network. Please use caution when opening attachments, clicking links, or responding to requests for information.

Petina:

In as much as your decision affects DFW's STD budget, I need specific reasons as to why the initial determination was deemed incorrect (as much as you can). We entrust Matrix to thoroughly vet the medical documentation provided and make fact based decisions as to its validity at the time. I would also like to know how "additional documentation" not provided at the time of the initial determination can be applied to a past event. Also, with regard to the job description, the duties and responsibilities of a Cvilian Security Guard are vast and can change in an instant depending upon the situation at hand. What specifically in the job description makes the claim valid now?

For a variety of reasons, the optics aren't good when these are overturned. We need to have a little more justification.

**Mark Young**
Senior Risk Analyst / Risk Management
ADA Coordinator


**W (972) 973.4600**

DallasFort Worth International Airport
P. O. Box 619428
DFW Airport, TX 75261-9428

**E** **myoung@dfwairport.com**

**Risk Mgmt. 24/7 at 214-616-0576**


www.dfwairport.com



---

**From:** Petina Batchler <Petina.Batchler@matrixcos.com>
**Sent:** Wednesday, November 4, 2020 8:06 AM
**To:** Young, Mark W <myoung@dfwairport.com>
**Cc:** QA_Team@matrixcos.com; Fuze, Joann <Joanr.Fuze@rsli.com>; Hooper, Tiana <Tiana.Hooper@rsli.com>; Carina Rizo <Carina.Rizo@matrixcos.com>
**Subject:** 2020-04-27-0145-ASW-01 / Nathaniel King / Dallas-Fort Worth - Appeal Overturn

---

**Caution:** This email originated outside of DFW Airport. Do not click links or open attachments unless you recognize the sender and know the contents are safe. Report this email to phishing@dfwairport.com, if you believe it is suspicious.

EXHIBIT V          2
89          DFW 000336

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 450-2021-00745 |

| **TEXAS WORKFORCE COMMISSION CIVIL RIGHTS DIVISION** | and EEOC |
|---|---|
| *State or local Agency, if any* | |

| Name *(indicate Mr., Ms., Mrs.)*<br>**MR. NATHANIEL R KING** | Home Phone<br>**(682) 433-7169** | Year of Birth<br>**1977** |
|---|---|---|

| Street Address | City, State and ZIP Code |
|---|---|
| **7503 TWIN PARKS DR, ARLINGTON,TX 76001** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (*If more than two, list under PARTICULARS below.*)

| Name<br>**DFW AIRPORT BOARD** | No. Employees, Members<br>**501+** | Phone No.<br>**(972) 973-3610** |
|---|---|---|

| Street Address | City, State and ZIP Code |
|---|---|
| **2400 AVIATION DR, DFW AIRPORT, TX 75261** | |

| Name | No. Employees, Members | Phone No. |
|---|---|---|

| Street Address | City, State and ZIP Code |
|---|---|

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

☐ RACE ☐ COLOR ☐ SEX ☐ RELIGION ☐ NATIONAL ORIGIN
☒ RETALIATION ☐ AGE ☒ DISABILITY ☐ GENETIC INFORMATION
☐ OTHER *(Specify)*

DATE(S) DISCRIMINATION TOOK PLACE
Earliest **08-25-2020** Latest **12-11-2020**
☐ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

**PERSONAL HARM:**
**During a teleconference meeting held on or around August 25, 2021 with HR and Management, I requested a reassignment as a reasonable accommodation. Management and HR agreed to work with me to accommodate me for a reassignment. The Respondent failed in helping me to find and obtain a reassignment as promised. Every job that I applied for I was told, 'there were stronger candidates' and on December 14th I received a termination letter via mail.**

**RESPONDENTS REASON FOR ADVERSE ACTION: None**

**DISCRIMINATION STATEMENT: I believe that I was discriminated against based on disability, in violation of the Americans with Disabilities Act of 1990 as amended. I believe that I was retaliated against in violation of Section 503(a) of the Americans with Disabilities Act of 1990, as amended.**

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| **Digitally signed by Nathaniel King on 02-10-2021 02:23 PM EST** | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(*month, day, year*) |

EXHIBIT W                    90

**PRIVACY ACT STATEMENT:**  Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

**1.   FORM NUMBER/TITLE/DATE.**  EEOC Form 5, Charge of Discrimination (11/09).

**2.   AUTHORITY.**  42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117, 42 U.S.C. 2000ff-6.

**3.   PRINCIPAL PURPOSES.**  The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.

**4.   ROUTINE USES.**  This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws).  Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination.  This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions.  A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.

**5.   WHETHER DISCLOSURE IS MANDATORY; EFFECT OF NOT GIVING INFORMATION.**  Charges must be reduced to writing and should identify the charging and responding parties and the actions or policies complained of.  Without a written charge, EEOC will ordinarily not act on the complaint.  Charges under Title VII, the ADA or GINA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed.  Charges may be clarified or amplified later by amendment.  It is not mandatory that this form be used to make a charge.

### NOTICE OF RIGHT TO REQUEST SUBSTANTIAL WEIGHT REVIEW

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA.  Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements.  You will be told which agency will handle your charge.  When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter.  Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so within 15 days of your receipt of its findings.  Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

### NOTICE OF NON-RETALIATION REQUIREMENTS

Please **notify** EEOC or the state or local agency where you filed your charge **if retaliation is taken against you or others** who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge.  Under Section 704(a) of Title VII, Section 4(d) of the ADEA, Section 503(a) of the ADA and Section 207(f) of GINA, it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an

EXHIBIT W                    91

investigation, proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE NORTHERN DISTRICT OF TEXAS

3                      FORT WORTH DIVISION

4     _____

5     NATHANIEL KING,

6              Plaintiff,

7         v.                          Civil Action No.

8     DFW INTERNATIONAL AIRPORT BOARD,   4:22-CV-929-P

9              Defendant.

10    _____

11              VIDEOCONFERENCE DEPOSITION OF

12                    NATHANIEL KING

13    DATE:          Monday, March 20, 2023

14    TIME:          10:38 a.m.

15    LOCATION:      Remote Proceeding

16                   900 West Abram Street

17                   Arlington, TX 76013

18    REPORTED BY:   Kimberly Holton, Notary Public
      Job No. CS5789609

19

20

21

22

23

24

25

EXHIBIT X

Page 2

1                    A P P E A R A N C E S

2     ON BEHALF OF PLAINTIFF NATHANIEL KING:

3          WES DAUPHINOT, ESQUIRE (by videoconference)

4          Dauphinot Law Firm

5          900 West Abram Street

6          Arlington, TX 76013

7          wes@dauphinotlawfirm.com

8

9     ON BEHALF OF DEFENDANT DFW INTERNATIONAL AIRPORT

10    BOARD:

11         CAROLINE HARRISON, ESQUIRE (by videoconference)

12         Pham Harrison, LLP

13         505 Pecan Street, Suite 200

14         Fort Worth, TX 76102

15         charrison@phamharrison.com

16

17    ALSO PRESENT:

18         Kimberly M. Carlisle, Counsel for DFW Airport,

19         kcarlisle@dfwairport.com (by videoconference)

20

21

22

23

24

25

EXHIBIT X

Page 3

1                         I N D E X

2     EXAMINATION:                                    PAGE

3          By Ms. Harrison                            6

4

5                       E X H I B I T S

6     NO.            DESCRIPTION                       PAGE

7     Exhibit 1      Complaint                         28

8     Exhibit 2      Job Applications List             73

9     Exhibit 3      CSO Job Description               97

10    Exhibit 4      Response to Interrogatories       141

11    Exhibit 5      ADA Request Form                  197

12    Exhibit 6      Various Emails                    227

13    Exhibit 7      Meeting Transcript                235

14    Exhibit 8      Corrective Action Form            239

15    Exhibit 9      Rule 26 Disclosures               246

16

17                  (Exhibits attached.)

18

19

20

21

22

23

24

25

EXHIBIT X

Page 4

1                    P R O C E E D I N G S

2                    THE REPORTER:  Good morning.  My name

3       is Kimberly Holton; I am the reporter assigned by

4       Veritext to take the record of this proceeding.  We

5       are now on the record at 10:38 a.m.

6                    This is the deposition of Nathaniel

7       King taken in the matter of Nathaniel King vs. DFW

8       International Airport Board.  This is in the United

9       States District Court for the Northern District of

10      Texas, Fort Worth Division, civil action number

11      4:22-CV-929-P on March 20, 2023.

12                   The witness is located in Arlington,

13      Texas.  The reporter is located in McKinney, Texas.  I

14      am a notary authorized to take acknowledgments and

15      administer oaths in the State of Texas.

16                   Additionally, absent an objection on

17      the record before the witness is sworn, all parties

18      and the witness understand and agree that any

19      certified transcript produced from the recording of

20      this proceeding:

21                          - is intended for all uses permitted

22                          under applicable procedural and

23                          evidentiary rules and laws in the same

24                          manner as a deposition recorded by

25                          stenographic means; and

EXHIBIT X

Page 5

1          - shall constitute written stipulation

2          of such.

3          At this time will everyone in

4     attendance please identify yourself for the record,

5     beginning with counsel for the defense.

6          MS. HARRISON:  Caroline Harrison with

7     the law firm of Pham Harrison on behalf of Defendant.

8          MS. CARLISLE:  Kimberly Carlisle.

9     Legal counsel, DFW Airport.

10          MR. DAUPHINOT:  Wes Dauphinot.  Counsel

11     for Plaintiff.

12          MR. KING:  Nathaniel King, Plaintiff.

13          THE REPORTER:  Thank you.  After

14     hearing no objections, I will now swear in the

15     witness.

16          Mr. King, would you please raise your

17     right hand?

18     WHEREUPON,

19               NATHANIEL KING,

20     called as a witness, and having been first duly sworn

21     to tell the truth, the whole truth, and nothing but

22     the truth, was examined and testified as follows:

23          THE REPORTER:  Thank you.

24          Counsel, you may proceed with your

25     examination.

EXHIBIT X

Page 6

1          MS. HARRISON:  Thank you.

2                    EXAMINATION

3     BY MS. HARRISON:

4          Q    Mr. King, will you give us your full legal

5     name, please?

6          A    Nathaniel Ryan King.

7          Q    Have you ever been deposed before?

8          A    Yes.

9          Q    When was that?

10         A    2010, I believe.

11         Q    And do you remember the lawsuit that was --

12         A    It was Brice Yingli versus eBay.

13         Q    Were you a witness or a party?

14         A    I was a witness.

15         Q    Just briefly, what was that lawsuit

16    involved?

17         A    It was a class action against eBay Motors

18    specifically for overcharging on final value fees.

19    The final settlement was 30 million.

20         Q    And how were you related to that litigation?

21         A    I was the manager at Alamo Autosports, which

22    is owned by Brice Yingli.  And I'm the one who

23    discovered the discrepancy in the pricing.

24         Q    Have you ever been a witness in a trial?

25         A    No.

EXHIBIT X

Page 7

1      Q      Have you ever been a witness at a hearing?

2      A      No.

3      Q      Before I really get into the meat of the

4  questions here, I just want to go over some ground

5  rules.  I know you've been deposed before, but just to

6  remind you, I want to cover a couple of ground rules.

7  I'm going to ask that every answer you give is verbal

8  instead of a head shake or a head nod.  Can you agree

9  to that?

10     A      Yes.

11     Q      Also, I'm going to ask that you let me

12 finish my questions before you start answering.  And

13 by the same token, I'll let you finish your answer

14 before I start another question.  That way we get a

15 clear record, and the court reporter isn't trying to

16 figure out what we're saying if we're talking over

17 each other.  Can you agree to that?

18     A      Yes.

19     Q      I'm also going to ask you to speak up so

20 that the court reporter can hear you.  I'm sure she'll

21 let us know, though, if she can't hear anything that

22 is said.  I also want to ask you if you will agree

23 with me to give a response to questions that is,

24 "Yes," or "No," instead of, "Uh-huh," or "Uh-uh."

25 That way your attorney and I aren't arguing later over

EXHIBIT X

Page 8

1    what, "Uh-huh," might have meant.  Can we agree to

2    that?

3        A    Yes.

4        Q   We're here today because of the lawsuit that

5    you filed.  And this is the opportunity that the law

6    provides for defense to ask you some questions to help

7    determine the validity of your claims.  Do you

8    understand that?

9        A    Yes.

10       Q   So I'm going to ask you some questions.  And

11   I'm going to ask you to answer those questions

12   completely.  Can I get you to agree that you're going

13   to give me full and complete answers today when I ask

14   questions?

15       A    Yes.

16       Q   Just now you took an oath with the court

17   reporter.  What does that mean to you to take an oath?

18       A    It means you're going to be 100 percent

19   honest and open and true.

20       Q   And can we agree that's what you're going to

21   do here today?

22       A    Yes.

23       Q   Would you agree with me that the truth is

24   the best when it's the whole truth?

25       A    And nothing but the truth.

EXHIBIT X

Page 9

1      Q    So I take it you agree with me, then?

2      A    Yes.

3      Q    Can I get you to agree with me that if you

4    need to add something to your testimony today, that

5    you will do so, so that we make sure we get the whole

6    and complete truth on the record?

7      A    Yes.

8      Q    After the deposition is taken, you will be

9    given the opportunity to review it. Did you know

10   that?

11     A    Yes.

12     Q    And will you agree with me that you will

13   review it and make any corrections that you need to

14   make?

15     A    Yes.

16     Q    You will also be given an opportunity to

17   take breaks today.  Let me know any time you need to

18   take a break.  This isn't a test of your endurance.

19   So I'll try to take a break about every hour.  But if

20   you need a break before that, that's perfectly fine.

21   Just let me know; okay?

22     A    Yes.

23     Q    Are you taking prescription medications

24   today?

25     A    No.

EXHIBIT X

Page 10

1      Q   Have you had any prescription medications in

2   the last 24 hours?

3      A   No.

4      Q   Are you taking any substance that would

5   impair your ability to answer questions today?

6      A   No.

7      Q   One last thing.  I want to make sure that if

8   you answer a question, that means that you understood

9   the question.  If you don't understand the question,

10  will you ask me to rephrase?

11     A   Yes.

12     Q   Have you ever gone by any names other than

13  Kenneth King?

14     A   Who is Kenneth?

15     Q   I'm so sorry.  Nathaniel King.  I apologize.

16     A   Yes.  I go by Nathan as well.

17     Q   What's your date of birth?

18     A   1 May '77.

19     Q   And where were you born?

20     A   Smithville, Missouri.

21     Q   Where do you currently live?

22     A   South Fort Worth.  10509 Summer Place Lane,

23  Fort Worth, Texas 76140.

24     Q   How long have you lived there?

25     A   Just right at a year.

EXHIBIT X

Page 11

1        Q    And is it a house or an apartment?

2        A    It's a house.

3        Q    And do you own it or rent it?

4        A    Own it.

5        Q    Do you have any other residences?

6        A    No.

7        Q    Do you own any other property?

8        A    No.

9        Q    What was your prior address?

10       A    7503 Twin Parks Lane, Arlington, Texas

11 76001.

12       Q    How long did you live there?

13       A    Seven or eight years.

14       Q    And did you own or rent that?

15       A    That was -- I originally rented it and then

16 we purchased it.

17       Q    Who is your current employer?

18       A    I am not employed.

19       Q    I want to talk about your employer before

20 DFW Airport.  Who were you employed with just before

21 DFW Airport?

22       A    I worked for UPS.

23       Q    And what did you do for UPS?

24       A    I was a seasonal package sorter.

25       Q    When you say seasonal, what do you mean by

FOR READING & SIGNING ONLY

EXHIBIT X

Page 12

1    that?

2         A    I was there for the Christmas rush.

3         Q    Do you remember your dates of employment

4    there?

5         A    That would have been end of October into

6    middle of January.

7         Q    And was that October 2015 to January of

8    2016?

9         A    Negative.  That would be 2014 to 2015.

10        Q    Okay.  And then you started with the airport

11   in 2016?

12        A    It was 2015 or 2016.

13        Q    Well, I thought it was 2016, but it could

14   have been 2015.  I might be misremembering that.

15        A    I as well.

16        Q    Okay.  From the time you stopped working at

17   UPS until the time you started at the airport, did you

18   work for anyone else?

19        A    No.

20        Q    Who did you work for before UPS?

21        A    Before UPS, I was a full-time student at

22   UTA.  I did not have an employer.

23        Q    Did you get your degree from UTA?

24        A    Yes, I did.

25        Q    When did you get that degree?

Page 13

1    A    I graduated in August of 2015. So, correct,

2    it would be 2016 for employment for -- for DFW.

3    Q    What's your degree in?

4    A    Business management with a minor in criminal

5    justice and organizational communication.

6    Q    Do you know what year you started at UTA?

7    A    Either 2011 or 2012.

8    Q    And you didn't have any jobs while you were

9    going to school at UTA?

10   A    I had a break in between semesters for about

11   a year between my junior and senior year, and I was

12   working at Alamo Autosports as well. I worked there

13   twice.

14   Q    What did you do when you worked there during

15   that break from school?

16   A    I was the eBay manager as well as the

17   accounts manager as well as the shop manager.

18   Q    Was that a full-time job?

19   A    Yes.

20   Q    Before you started at UTA, when you were

21   working at Alamo Autosports, what did you do for them?

22   A    I'm sorry. Can you say the question again?

23   Q    Yeah. Before you started at UTA, when you

24   worked at Alamo Autosports, what was your position?

25   A    I already set that. The -- the eBay

*FOR READING & SIGNING ONLY*

EXHIBIT X

Page 14

1  manager, the shop manager, and the -- I can't

2  remember.  It's on the tip of my tongue.

3      Q    Oh, that's okay.  And this would have been

4  in 2012.  Is that right?  Before you went to school.

5      A    It was in the middle of going to school.

6      Q    Oh, okay.  I'm sorry.  I wanted to focus on

7  the time before you went to school.

8      A    Okay.  Before I went to school, I was also

9  at Alamo Autosports.  And then during my first two

10  years at UTA, I was working at Mouser Electronics as a

11  data entry specialist.

12      Q    Okay.

13          THE REPORTER:  What was the name of

14  that company again, sir?  I'm sorry.

15          THE WITNESS:  Mouser, mouse with an R,

16  Electronics.

17          THE REPORTER:  Thank you.

18          THE WITNESS:  No problem.

19  BY MS. HARRISON:

20      Q    So you worked at Mouser the first two years

21  of your schooling?

22      A    Correct.

23      Q    Okay.  Let me go back to Alamo Autosports.

24  When you worked at Alamo Autosports, before you went

25  to UTA, was that the same job that you did when you

Page 15

1    had the break from UTA?

2        A    Yes.

3        Q    Okay.  What did you generally do?  I know

4    you told me the title.  But what did that --

5        A    I ran the day-to-day operations of shop,

6    including supervising five to seven mechanics and

7    assigning job details every day.  I answered phones in

8    the front.  I also dealt with everything on eBay.

9    Listings, answering questions, shipping, PayPal

10   payments, basically ran everything eBay, I deal with.

11       Q    Why did you leave that job to go to school?

12       A    He had continually missed payments for my --

13   my payroll.  So after he had done that so many times

14   -- you know, he would eventually, a couple weeks

15   later, catch up.  But I couldn't, you know, at that

16   time afford, you know, I couldn't keep my house

17   payments up to date if I wouldn't get -- know I was

18   getting paid every two weeks.

19            And with my G.I. Bill, I was able to go to

20   UTA, and they gave me a monthly stipend that covered

21   everything.

22       Q    Did that monthly stipend cover some of your

23   living expenses as well?

24       A    Yes, all of it.

25       Q    Oh.  And so you also worked at Mouser for

Page 16

1    the first two years that you were at UTA.  Is that

2    right?

3         A    Correct.

4         Q    Was that a part-time job or a full-time job?

5         A    It was a full-time job.

6         Q    So 40 hours a week approximately?

7         A    Fifty.

8         Q    Oh, okay.  I know you said you were a data

9    entry clerk, but what did that involve?

10        A    I populated spreadsheets using datasheets

11   from manufacturers of electronics components.  Like,

12   semiconductors, resistors, all that kind of stuff.

13   Everything that goes on a circuit board, I had to

14   price it.  And everything that I priced is what

15   publishes on their webpage.

16        Q    Had you worked at Mouser before your time at

17   UTA?

18        A    No.

19        Q    Do you know what years you worked at Mouser?

20        A    Not off the top of my head.

21        Q    Okay.  But you think it was the first two

22   years you --

23        A    Yes --

24             THE REPORTER:  I'm sorry.  This is the

25   reporter.  Everybody is frozen.  I'm sorry, counsel.

Page 17

1    The Zoom has frozen.  Please hold on.  Okay.  Counsel,

2    the Zoom froze.  So the last thing I got was, "Do you

3    know what years you worked at Mouser," and he says,

4    "Not off the top of my head."  And then I heard you

5    say, "Okay.  But do you think it was the first two

6    years you were --" and then everything froze.

7              And now I've lost everybody.  Hold on.

8    I've lost everybody.  Going to go off the record.  The

9    time now is 10:53 a.m.  We are off the record.

10             (Off the record.)

11             THE REPORTER:  The time now is

12   10:57 a.m.  We are back on the record.

13   BY MS. HARRISON:

14        Q    Mr. King, will you tell me where you worked

15   before Mouser Electronics.

16        A    I worked at Wheels America.

17        Q    And what did you do at Wheels America?

18        A    I was a ground delivery salesman.

19        Q    Before Wheels America, where did you work?

20        A    I was in the U.S. Army.

21        Q    What years were you in the army?

22        A    From '95 to 2004.

23        Q    What did you do?  What roles did you have in

24   the U.S. Army?

25        A    I was a communication specialist, NBC

Page 18

1    specialist, and orderly clerk.

2         Q    Was the communication specialist the last

3    role you had?

4         A    It was my primary job.  The other two were

5    added to on top of it.

6         Q    What did you generally do as a communication

7    specialist?

8         A    I maintained and trained people on the

9    radios as well as troubleshooted whenever there was

10   issues, and filled out work orders for equipment that

11   needed to be repaired or replaced or equipment that

12   was faulty.

13        Q    And did you have an honorable discharge?

14        A    Yes.

15        Q    Before you went into the army, did you work

16   anywhere?

17        A    Yes.  I worked at UPS at the airport.

18        Q    Do you own any companies?

19        A    No.

20        Q    Are you presently married?

21        A    Yes.

22        Q    What is your spouse's name?

23        A    Kandice Miller.

24             THE REPORTER:  Hello?  The time now is

25   10:59 a.m.  We're off the record.

Page 19

```
 1                    (Off the record.)
 2                    THE REPORTER:   The time now is
 3      11:02 a.m.  We are back on the record.
 4      BY MS. HARRISON:
 5           Q     When did you and Ms. Miller marry?
 6           A     2015.
 7           Q     And how old is Ms. Miller?
 8           A     Thirty-five.
 9           Q     Who is her employer?
10           A     DFW International Airport.
11           Q     Do you know when she started working for the
12      airport?
13           A     2017.
14           Q     What does she do for them?
15           A     She is a compliance analyst.
16           Q     Has she been doing that the whole time that
17      she's been employed by them?
18           A     No.  She was originally hired as a CSO.
19           Q     Do you know how she got the job as a
20      compliance analyst?
21           A     She was promoted.
22           Q     Do you know when that happened?
23           A     No, not off the top of my head.
24           Q     Did she apply for that promotion?
25           A     Yes.
```

EXHIBIT X

Page 20

```
 1        Q    Have you ever been divorced?

 2        A    Yes.

 3        Q    When were you divorced?

 4        A    January 2013.

 5        Q    Who was your previous spouse?

 6        A    Theresa Hunter.

 7        Q    When did you marry Theresa Hunter?

 8        A    2004.

 9        Q    What county did your divorce take place in?

10        A    Tarrant.

11        Q    Have you been married any other times?

12        A    No.

13        Q    And do you have children?

14        A    Yes.

15        Q    How many children do you have?

16        A    Two.

17        Q    What are their names and ages?

18        A    Vanessa Elizabeth King, 17.  Kaitlyn

19   Victorian Isabella King, 8.

20        Q    Do either Vanessa or Kaitlyn live with you?

21        A    Just Kaitlyn.

22        Q    Have you ever been arrested?

23        A    Yes.

24        Q    When was that?

25        A    2001.
```

FOR READING & SIGNING ONLY

Page 21

1    Q    And what was that for?

2    A    Speeding.

3    Q    Were you convicted as a result of that

4    arrest?

5    A    No.  The charges were dropped.

6    Q    Can you tell me a little bit more about

7    that?

8    A    I was cited at 135 in a 60.  And I was

9    arrested and taken to Dallas County Jail.  And it was

10   right before my first deployment.  And I called in to

11   inform the DA that I was not going to be in the

12   country for the court date.  And she went and talked

13   to the judge and had it dismissed.

14   Q    Okay.  And were you going 135?

15   A    Yes.

16   Q    Okay.  Have you ever been convicted of a

17   felony?

18   A    No.

19   Q    Have you ever been -- let me start that

20   question over.  Other than your divorce proceeding

21   that you told me about, have you ever been a party to

22   a lawsuit other than this one?

23   A    The one with just eBay.

24   Q    You were a party to that lawsuit?

25   A    I was a witness to it.

EXHIBIT X

Page 22

1       Q     You were a witness to it.  Were you a party
2   to it?
3       A     No.
4       Q     Okay.  Do you understand what the --
5       A     It was -- it was a class action.  So
6   technically, yes, but also I wasn't -- I didn't take
7   part in it except for the deposition.
8       Q     Were you a member of the class?
9       A     Yes.
10      Q     Did you receive anything as a result of the
11  settlement?
12      A     No.
13      Q     Were you represented by an attorney in that
14  lawsuit?
15      A     Yes.
16      Q     What was the name of that attorney?
17      A     It was at the Davenport Law Firm in downtown
18  Dallas.  Keith Burgess.
19      Q     Am I remembering correctly that you told me
20  there was a settlement in that lawsuit?
21      A     Correct.
22      Q     But you didn't receive any part of it?
23      A     The settlement was divvied out based on how
24  many eBay Motors sales you had, and it had to be a sum
25  large enough for them to -- I think it had to be over

Page 23

1    $5, and the final value fee was only 7 percent of your

2    -- from your cost.  And so if it wasn't over $5, you

3    didn't get it.  I didn't sell enough on it to get a

4    refund.

5         Q    Okay.  Thank you for explaining that to me.

6         A    No problem.

7         Q    Other than that lawsuit, have you ever been

8    a party to a lawsuit?

9         A    No.

10        Q    Do you have any agreements with anyone other

11   than your attorney to pay them any portion of money

12   you recover as a result of this lawsuit?

13        A    No.

14        Q    Have you ever filed for bankruptcy?

15        A    No.

16        Q    Did you receive a high school diploma?

17        A    I have a GED.

18        Q    When did you get that GED?

19        A    '95.

20        Q    Did your wife serve in the military?

21        A    Yes.

22        Q    When did she serve in the military?

23        A    2010 to 2018, I believe.

24        Q    What branch did she serve?

25        A    She was in the army.

Page 24

1      Q    Is that how you met your wife?  In the army.

2      A    No.

3      Q    How did you find your attorney?

4      A    Just looking through the list of attorneys.

5      Q    The list of attorneys on?

6      A    Just a Google search.

7      Q    Oh, a Google search.  Okay.  When was the

8    first time you met with your attorney?

9      A    I really don't know.  I don't recall.

10     Q    How many attorneys have you had?

11     A    Three.

12     Q    In regard to this case?

13     A    Correct.

14     Q    Was your first attorney Eric Rogers at the

15   Spielberger Law Firm?

16     A    Correct.

17     Q    How did you find him?

18     A    It was on the EEOC list.

19     Q    Was that before you filed with the EEOC?

20     A    Yes.

21     Q    Did Mr. Rogers help you file with the EEOC?

22     A    No.

23     Q    Did he send a demand letter to the airport?

24     A    He sent a request letter, yes.

25     Q    A request letter, okay.  And then you got

EXHIBIT X

Page 25

1    another attorney.  Is that right?

2         A    Correct.

3         Q    Do you remember the name of that attorney?

4         A    That escapes me for some reason.  I'm --

5         Q    Was it Michael Fallings?

6         A    Yes.  Fallings -- yes.

7         Q    Okay.  And how did you find him?

8         A    Google.

9         Q    Did you meet with Mr. Fallings?

10        A    Negative.  We never met in person.

11        Q    And did he help you file with the EEOC or is

12   that something you did on your own?

13        A    Yes, he did help.

14        Q    Why did you look for a new attorney after

15   Mr. Fallings?

16             MR. DAUPHINOT:  And if it requires any

17   communications with your attorney, you don't disclose

18   that.  For instance, if the answer said, "Oh, well

19   Mr. Fallings told me he couldn't go any further on my

20   case," you don't have to talk about those answers.  Do

21   you want to confer?

22             THE WITNESS:  I want to confer with

23   you.

24             MS. HARRISON:  Do we need to take a

25   break?  See if --

EXHIBIT X

Page 26

1          MR. DAUPHINOT:  Usually if you have to

2     confer with me, it's not in front of counsel.  We take

3     a break.

4          THE WITNESS:  Can we take a break?

5          MR. DAUPHINOT:  Okay.  All right.

6          MS. HARRISON:  Okay.

7          THE REPORTER:  Okay.  The time now is

8     11:11 a.m. and we are off the record.

9          (Off the record.)

10         THE REPORTER:  The time now is

11    11:13 a.m.  We are back on the record.

12    BY MS. HARRISON:

13         Q    Mr. King, we took a brief break so that you

14    could confer with your attorney.  Are you now ready to

15    answer the question?

16         A    Yes.

17         Q    Okay.

18         A    The reason why is the remote location of his

19    offices that happen to travel up here.

20         Q    Where was his office located?

21         A    San Antonio.

22         Q    And how did you find Mr. Dauphinot?

23         A    Google as well.

24         Q    And are you also represented by Hani Kobty?

25         A    Yes.

Page 27

1     Q    Okay.  How did you find -- do you know how

2    to say his last name?  I don't want to butcher it.

3     A    Dauphinot.

4     Q    No.

5     A    The other one?

6     Q    The other one.

7     A    I don't.

8     Q    No?  Okay.  How did you find Mr. Kobty?

9     A    I didn't find him.

10     Q    Oh, okay.  Have you met with him?

11     A    No.

12     Q    Do you know when you hired Mr. Dauphinot?

13     A    Not off the top of my head.

14          MR. DAUPHINOT:  Mr. Kobty is in this

15    exact same office, 900 Abram.  He's on my contract as

16    well there.

17          MS. HARRISON:  Thank you for clarifying

18    that, Mr. Dauphinot.

19    BY MS. HARRISON:

20     Q    What did you do to prepare for your

21    deposition today?

22     A    I just read back over some of my old e-mails

23    that I had.

24     Q    Do you remember which ones?

25     A    Just basically went over just basically all

EXHIBIT X

Page 28

1    of them that have been provided for the discovery.

2          Q     All the ones that you provided to your

3    attorney?

4          A     Correct.

5          Q     Did you meet with your lawyer to prepare for

6    your deposition?

7          A     No.

8          Q     Did you review any documents other than the

9    e-mail you just referenced?

10         A     No.

11         Q     The document that was filed to start this

12   lawsuit is called the complaint.  Did you read the

13   complaint before it was filed?

14         A     Yes.

15         Q     When is the last time you think you looked

16   at it?

17         A     When I was here to review before it was

18   filed.

19         Q     Okay.  I'm going to mark the complaint as

20   Exhibit 1.  Will you take a look at that and tell me

21   if you think this is the complaint that you reviewed?

22                     (Exhibit 1 was marked for

23                     identification.)

24         A     Yes.

25         Q     And you said that you read it before it was

EXHIBIT X

Page 29

1    filed.  Is that correct?

2        A    Correct.

3        Q    And you haven't read it since then?

4        A    Correct.

5        Q    Is everything in this complaint true?

6        A    Yes.

7        Q    Okay.  Do you need a few minutes to review

8    it or --

9        A    I reviewed it before it was submitted.

10       Q    Okay.  Are there any claims that you believe

11   need to be included that are not in this document?

12       A    Not that I can think of.

13       Q    When did you decide to file a lawsuit

14   against the airport?

15       A    When I got my 90-day right to sue letter

16   from the EEOC.

17       Q    When was that?  Do you remember generally

18   when you got that letter?

19       A    August, I believe, of 2022.

20       Q    So before you got that right to sue letter,

21   you had not made a decision about whether to file a

22   lawsuit?

23       A    Correct.

24       Q    Why did you file this lawsuit?

25       A    I feel that it was needed since the right

EXHIBIT X

Page 30

1    with the -- I got the word for it.  Just to get --

2    just to get justice and to be able to correct a wrong.

3         Q    What does that mean to you in this

4    situation?  To get justice.

5         A    It means that I was discriminated against by

6    the airport and that I think that it should be

7    corrected.

8         Q    What does that mean to you?  How would it be

9    corrected, in your estimation?

10        A    I really don't know.  I really think that

11   would be up to the courts to decide.

12        Q    Okay.  Do you know what you're looking for

13   as a result of this lawsuit?  What the outcome is that

14   you're looking for?

15        A    I have not made predeterminations on that.

16        Q    You said that you were looking for justice

17   and to correct a wrong.  What do you mean by correct a

18   wrong?

19        A    That I was discriminated against and lost

20   the job that had been my dream job since I was a kid.

21        Q    Okay.  How do you believe that you were

22   discriminated against?

23        A    Because I was not properly given my rights

24   under ADA for reasonable accommodations.

25        Q    Okay.  We'll dive deeper into that

EXHIBIT X

Page 31

1    specifically a little bit later in the deposition.

2    Have you spoken with anyone in relation to this

3    litigation from whom you received a written statement?

4         A    No.

5         Q    Do you have any recorded statements related

6    to this litigation?

7         A    Yes, I do.

8         Q    Okay.  Tell me about those.  What statements

9    do you have?

10        A    I have recorded the teleconference call that

11   I did with the airport on August 25th.

12        Q    Anything else?

13        A    That's it.

14        Q    Okay.  So you have not interviewed someone

15   as a witness in this lawsuit and recorded it?

16        A    No.

17        Q    Have you spoken with any current DFW Airport

18   employees about this lawsuit?

19        A    Yes.

20        Q    Who have you spoken with?

21        A    Sam Jones and Bathyaa.

22             THE REPORTER:  I'm sorry.  I didn't

23   catch the last one, sir.

24             THE WITNESS:  Bathyaa, B-A-T-H-Y-A-A.

25             THE REPORTER:  Thank you.

```
 1                  THE WITNESS:  No problem.
 2      BY MS. HARRISON:
 3           Q     When is the last time you spoke to Sam Jones
 4      about this lawsuit?
 5           A     A month and a half ago.
 6           Q     Did he call you or did you call him?
 7           A     He returned my call.
 8           Q     So you called him and he called you back?
 9           A     Correct.
10           Q     And why did you call Mr. Jones?
11           A     Because I hadn't talked to him in a few
12      months.
13           Q     What did you talk to him about during that
14      phone call?
15           A     Everything.  Just -- it was like seven hours
16      long.
17           Q     It was a seven-hour phone call?
18           A     Yes.  Not our record, but it's close.
19           Q     What do you mean not on record?
20           A     Our record is just over eight hours.
21           Q     Oh, the record for a phone call between you
22      and Mr. Jones?
23           A     Yes.
24           Q     Okay.  Do you remember when that phone call
25      was?  What day it was.
```

Page 33

1        A       Not exactly, no.

2        Q       Approximately when was it?

3        A       A month and a half ago.  I can look on my

4    phone.  You want the exact date?

5        Q       That's okay.

6        A       Okay.

7        Q       So probably in January or do you think it

8    was maybe the beginning of February?

9        A       Beginning of February.

10       Q       Okay.  When you say you talked about

11   everything, give me some better idea, please, about

12   what you talked about.

13       A       We talked about Transformers, we talked

14   about the Ukrainian conflict, we talked about Trump,

15   we talked about girls, we talked about gay bars, when

16   we were growing up.  Just, I mean, it was just

17   everything, you know.

18       Q       What did you talk about in relation to this

19   lawsuit?

20       A       Just that I had this deposition scheduled.

21       Q       And what did he say to you about this

22   lawsuit?

23       A       He mentioned that he had been interviewed by

24   y'all.  And that was about it.

25       Q       Did he tell you what we talked about?

EXHIBIT X

Page 34

1      A    Yes, he did mention a few things.

2      Q    What did he tell you?

3      A    He said that you asked him if he was my

4      direct supervisor, which he was not.   And then he

5      asked -- you asked if he thought that I could be

6      accommodated and that he said yes.   That's -- I think

7      that's really about all.  He thought that the

8      interview was my attorney doing it.  Not the

9      airport's.  So he -- he was like, "Oh, yeah, you know,

10     I had that interview with your attorney."  I was like,

11     "When?"  So --

12     Q    Do you know if he's actually spoken to your

13     attorney?

14     A    Not that I know of.

15     Q    How many times have you talked to Sam Jones

16     about this lawsuit?

17     A    Maybe a dozen or more.

18     Q    Okay.  Do you expect to call him at trial?

19     A    Yes.  He was one of our witnesses.

20     Q    What do you expect him to testify about?

21     A    What he saw.

22     Q    And what was that?

23     A    I can't speak for him.

24     Q    He's told you what he's saw, thought, hasn't

25     he?

EXHIBIT X

Page 35

1       A    He -- he's basically said that he didn't

2  understand why the airport did what they did and that

3  they would have accommodated me.

4       Q    How has he told you that he believed the

5  airport could have accommodated you?

6       A    'Cause he was a supervisor and he has done

7  similar for other people that had less -- didn't even

8  request it under ADA and it was given to them.

9       Q    Did he tell you the names of any of those

10 people who never requested an accommodation but got an

11 accommodation?

12      A    No.

13      Q    And I'm not trying to put words in your

14 mouth.  Is that essentially what he said?  That he's

15 had people that he supervised that didn't ask for an

16 accommodation, but got an accommodation?

17      A    It's not just him.  It's many other people

18 that have gotten it not from him, but just from the

19 airport, airport security, just in general.

20      Q    Is Mr. Jones in airport security?

21      A    He was.

22      Q    But he's not told you the names of any of

23 those people that got accommodations?

24      A    I wouldn't know.  I'm terrible with names.

25 So we almost never bring up names.  It's just this one

Page 36

1    person this, that one person that.  So I'm terrible --

2    I do faces.  So you can tell me a name all day, I

3    wouldn't even know what it was.

4         Q    Okay.  But did Mr. Jones tell you any names?

5         A    No.

6         Q    He did not tell you names?

7         A    No.

8         Q    Okay.  Did he tell you a role that he

9    thought you could have been put in or that --

10        A    Yeah.  Administrative security.

11        Q    And what does an administrative security

12   person do?

13        A    They watch the cameras in the DFW HQ

14   building and the DPS building.  And they now man the

15   booth outside the DPS building.

16        Q    Is that the only position that he told you

17   about that he thought you could have been put into?

18        A    He said that they could have easily modified

19   the schedule as well to not put me at areas or to just

20   not make me stand up for every person and give me a

21   taller table as a request.

22        Q    When did he tell you that he thought you

23   could have been put in an administrative security

24   position?

25        A    While I was in the E dock in between January

Page 37

1    and April 2020.

2         Q     And did you ever talk to your supervisor

3    about putting you in an administrative security

4    position?

5         A     Yes.

6         Q     What was the name of that supervisor?

7         A     I forwarded it to Natalie Rossorelli, which

8    is my risk management right.   And I requested a

9    reassignment, it was denied.   I also requested a

10   meeting with my senior director, or my senior manager

11   at that point, and he also denied it and denied that

12   there was any openings in the administrative

13   positions.

14        Q     And what was the name of that manager that

15   you talked to?

16        A     Pear  Stevens.

17        Q     And did you talk to him or did you just have

18   an e-mail exchange?

19        A     I had -- I had a meeting with him, Natalie,

20   and the acting AVP.   I don't remember her -- Lane, I

21   think.

22        Q     What did you say?

23        A     I think her last name was Lane.

24        Q     Lane?

25        A     Yes.

EXHIBIT X

Page 38

1        Q      And she was the acting EVP of --

2        A      The acting AVP.

3        Q      AVP.

4        A      Yes.  Over ASD.

5        Q      When did you have that meeting?

6        A      February 2020.

7        Q      Where was the meeting?

8        A      In the DPS building.  In the conference --

9    in the -- one of the conference rooms.

10       Q      About how long did that meeting last?

11       A      Two hours, three hours, maybe.

12       Q      And it was Natalie, Bear  and Ms. Lane?

13       A      And Boston, assistant manager, Boston.  He

14   was just a witness.

15              THE REPORTER:  Boston, B-O-S-T-O-N?

16              THE WITNESS:  Correct.

17              THE REPORTER:  Thank you.

18   BY MS. HARRISON:

19       Q      Is that a last name or a first name?

20       A      Last name.

21       Q      Do you know Mr. Boston's first name?

22       A      Not at all.

23       Q      Who requested that meeting?

24       A      I did.

25       Q      What was discussed at that meeting?

Page 39

1      A     My request for an administrative position.

2   The complaints that some other officers were having

3   that needed to be presented to management as far as,

4   like, being unfairly scheduled at certain posts,

5   supervisors not doing their job checking on their

6   people.  And then I also requested to be a shift

7   representative so that I could be a liaison between

8   management and the officers.

9      Q     Did you discuss at that time your request to

10  be moved to an administrative security position?

11     A     Correct.

12     Q     So the topics that were discussed were your

13  request to be moved to an administrative security

14  position, your request to be a shift representative,

15  and then complaints of other officers.

16     A     Correct.

17     Q     Tell me what was said in regard to your

18  request to be moved to an administrative security

19  position.

20     A     Bear denied there was an open spot.

21     Q     Do you have any reason to believe that that

22  was inaccurate?

23     A     Yes.  We had one of our administrative

24  people who was deployed for COVID, was in D.C., and

25  they were using their backups to man his position.

EXHIBIT X

Page 40

1      Q    What was that person's name?  Do you know?

2      A    Not off the top of my head.

3      Q    Do you know if that position was posted as

4   an open position?

5      A    It was not.

6      Q    Do you know how long that person was

7   deployed?

8      A    Until January.

9      Q    Until January of 2021?

10      A    '21, correct.

11      Q    How did you know that?

12      A    Because I asked people who were there when

13   he came back.

14      Q    Who did you ask?

15      A    I don't remember off the top of my head.  I

16   called my old employees just to check up on them.  And

17   I think it came up in one of our conversations.  I

18   don't remember who it was with.

19      Q    The call with your old employees, is that

20   after you were separated?

21      A    Correct.

22      Q    Okay.  When you had the meeting in February

23   of 2020 and you were told by Bear  that there was not

24   an open position, did you have a reason to believe at

25   that time that that was inaccurate?

Page 41

1       A    Yes.

2       Q    Okay.  What was your basis for that?

3       A    That I knew he was off on orders.  They were

4   filling that position with backups.

5       Q    Okay.  How did you know that?

6       A    Because I knew him personally.  And it was

7   well-known because they put it out in the briefing

8   that so-and-so's -- we're covering down with people.

9       Q    Okay.  Did you know at that point how long

10  he was deployed?

11      A    No.

12      Q    And you don't remember his name?

13      A    I do not.  I can look it up real quick.

14      Q    Where would you look that up?

15      A    I can try and find it in my tablet

16  somewhere.

17      Q    Okay.  Maybe on a break you could look for

18  it.

19      A    Yeah.  It should be in the information that

20  I gave for the discovery that's going to be on the

21  schedule that I provided.

22      Q    On the --

23      A    I provided a copy of the schedule for A

24  shift -- or for C shift that also includes the name of

25  the officers who were in that administrative security

Page 42

1    spot.

2         Q    Is administrative security a separate job

3    title from CSO?

4         A    It is.  Also CSO is a specific position

5    where that's the only spot you work.  So it's a CSO,

6    but your -- your mission is confined to just the HQs.

7              THE REPORTER:  So your mission is

8    confined to the what?

9              THE WITNESS:  Headquarters, HQ.

10             THE REPORTER:  Okay.  I thought you

11   said HQ, sir.  I was just making sure.  Thank you.

12             THE WITNESS:  You're welcome.

13   BY MS. HARRISON:

14        Q    Is that a position that you would typically

15   rotate through as a CSO?

16        A    No.

17        Q    It's just a specific position that's

18   assigned.

19        A    Yes.

20        Q    Do you know how many people are assigned to

21   that on each shift?

22        A    There's a total of four.  Two on -- on B

23   shift, two on C shift during the normal daylight

24   hours.

25        Q    Did you ask Bear  about that specific person

Page 43

1    being deployed?

2        A    No.  I didn't specifically mention him by

3    name, but I told him I knew for a fact there was an

4    opening.  And he said he would look into it.  And then

5    he never got back to me.

6        Q    Okay.  Did you ever follow up with him about

7    that?

8        A    Yes.

9        Q    When did you follow up with him?

10        A    I e-mailed him asking about it, and he said

11    that he couldn't find it and to not e-mail people

12    about it.  Because I e-mailed him and Alderman, which

13    was my supervisor at the time, as well as Natalie

14    Rossorelli.  And he said, basically, stop e-mailing

15    people asking about this.

16        Q    Did he say that via an e-mail?

17        A    Yes.

18        Q    Do you have that e-mail still?

19        A    Yes.

20        Q    And that's something that you've produced in

21    this lawsuit?

22        A    Yes.

23        Q    How much of that February 2020 meeting was

24    devoted to talking about your request to be moved to

25    the administrative security position?

Page 44

```
 1        A     Probably about 30 minutes of it.
 2        Q     Okay.  What was said in that 30 minutes?
 3        A     I explained to him that my posting in the
 4   dock was not making very good use of my -- my skills.
 5   And I was basically putting four indentations in the
 6   concrete with my chair, and that I wanted to be more
 7   productive, and I was requesting to be moved into an
 8   administrative position where I can actually be
 9   productive and earn the money I was getting paid.
10        Q     And what did Bear say in response to that?
11        A     He said he wasn't aware that there was an
12   opening.
13        Q     Okay.  And that's when you told him that you
14   thought there was an opening because of the person who
15   was deployed?
16        A     I told him that I knew for a fact there was
17   an opening.
18        Q     Okay.  And he said he wasn't aware of that?
19        A     That he would look into it.
20        Q     Okay.  Did Natalie speak during that part of
21   the meeting?
22        A     Yes.
23        Q     What did she say?
24        A     She said that she's not sure if I could do
25   that position, because it might put me in a position
```

Page 45

1   where I make a spontaneous reaction that violates my

2   restrictions and gets me hurt and gets the -- and the

3   airport is liable for it.  And she brought up an

4   example that somebody that wasn't supposed to be

5   picking up something leaned over to pick up a ream of

6   paper in the office and pulled their back out and the

7   airport was liable for it.

8        Q    And what did you say in response to that?

9   If anything.

10       A    I said that's kind of farfetched.  But --

11       Q    Okay.  Is that all you remember her saying?

12       A    Well, she also said that they want to keep

13  me somewhere where I don't see anything, so I don't

14  react.  And if they need me, they can come and get me.

15  Because I need to be somewhere where I don't see

16  anything.

17       Q    Did you understand what she meant by that?

18       A    Yeah.  She wanted me to basically sit in the

19  closet down at the E dock.

20       Q    Were you sitting in a closet at the E dock?

21       A    It's a small break room.  But, yes, I was

22  isolated from everybody and I was down there for eight

23  hours a day doing nothing but sitting in a chair.

24       Q    Were you watching E dock at that point?

25       A    I was -- we're present in case the -- we

EXHIBIT X

Page 46

1    have contract security that runs the docks.  And if

2    they had a need for somebody, like an issue at the

3    dock, then they could come get me.  Of which, we had

4    one incident there the entire time I was there.

5         Q    Is that all you remember Natalie saying?

6         A    That was -- that was basically it, yes.

7         Q    And you said that Mr. Lane was there as

8    well?

9         A    Ms. Lane, yes.

10        Q    Ms. Lane, sorry.  And what did Ms. Lane say,

11   if anything, with regard to the request to --

12        A    I think she came in after that.  I think she

13   came in for the other portion regarding the liaison

14   and the complaints.  Because she was a new AVP and she

15   was running late so we went ahead and started.  And

16   she came in, like, right towards the end of it.

17        Q    And did Mr. Boston say anything during --

18        A    No.  Boston was there the whole time.

19   Didn't speak up really at all.

20        Q    Okay.  At that point, was there any other

21   role that you mentioned other than administrative

22   security?

23        A    No.

24        Q    All right.  Tell me what you discussed with

25   regard to asking to be a shift representative.

Page 47

1       A    It's something that I've been doing anyways.

2    Is people come to me and they have their complaints

3    and issues, and I'll bring those up to management.  So

4    a lot of people, they don't want to go and discuss

5    with management because they're intimidated or

6    whatever.  And I don't have that issue.  You know, if

7    there's a problem, I bring it to their attention

8    because it's never going to get fixed.

9          And I basically consider myself almost like

10   a union rep kind of -- kind of thing.  And that's what

11   I recommended, was that we should do it.  And Lane

12   even said at the end of the meeting that she wanted

13   that to be implemented that everybody should have a

14   representative.  That way you won't have everybody

15   come and try to make meetings.  It's just take one

16   person, that person will set up a meeting with the

17   management, they will voice their gripes, they will

18   get answers, solutions if there are some, and they get

19   to go back to the officers and explain to them we're

20   working on it.

21      Q    And is that something that happened?  That

22   you became a shift representative.

23      A    No.

24      Q    Is that an official title that was

25   available?  Shift representative.

Page 48

1      A     No.

2      Q     And are you aware of anyone else being a

3   shift representative as a result of this meeting?

4      A     No.   But there used to be a panel that we

5   had when I first started working there where it was

6   two people from every shift.   And we sat in, and it

7   was almost like a formalized board.   We had minutes

8   and call to order and all that kind of stuff where we

9   would actually be able to present new ideas for

10  correcting policy, adding policies and all that.   And

11  that lasted for about eight or nine months until the

12  -- the manager of the training department left.   And

13  he was the one that oversaw it, and they just kind of

14  just let it fall.

15     Q     Tell me what you discussed with regard to

16  complaints of other officers.

17     A     Lack of communication from managers, lack of

18  supervisors doing their job, coming by and checking on

19  officers, being available if we need assistance for

20  answering questions.   Before we fine the violation, we

21  need a supervisor to come out.   And most of the issues

22  were, you know, the supervisors and management issues.

23     Q     Is it fair to say that most of that meeting

24  was devoted to talking about those complaints of other

25  officers?

Page 49

1      A     Probably half, but yes.

2      Q     Okay.  So you told me that the meeting was

3   two to three hours.

4      A     Right.

5      Q     And you told me that about 30 minutes of it

6   was devoted to your request to be moved to the

7   administrative security position.  Is that right?

8      A     Right.

9      Q     So what else was discussed then, if only

10  half of it was complaints of the other officers?

11     A     It was Ms. Lane discussing that option with

12  the union rep and how that worked.  And, you know, how

13  -- how we could design it so that it would be

14  implemented, and what kind of policies it would be in.

15  And we basically just discussed any nuances of that,

16  and my willingness to do that.  And how she thought it

17  was a good idea that we could simplify the complaint

18  process.  And, you know, get a funnel to take care of

19  the issues.

20     Q     When you asked for this meeting, did you

21  tell Bear  what you wanted to talk about?

22     A     Yes.

23     Q     Did Natalie stay at the meeting the entire

24  time?

25     A     She left after the portion with the

Page 50

1    requested administrator position.

2         Q    And was Bear  there for the whole meeting?

3         A    Yes.

4         Q    And Mr. Boston was there for the whole

5    meeting?

6         A    Correct.

7         Q    Did you follow up with Bear  after that

8    meeting other than -- well, let me say this.  You told

9    me that you followed up with him with regard to your

10   administrative assistant position.  Did you follow up

11   with him or Ms. Lane about the shift representative?

12        A    No.

13        Q    Did you follow up with him or Ms. Lane about

14   the complaints of the other officers?

15        A    No.

16        Q    So the only thing you followed up with was

17   with regard to what he had found out about the

18   administrative security position.  Is that right?

19        A    Yes.  Because he said he was going to check

20   up on it and see if -- you know, he said he wasn't

21   aware of one and he's going to find out.  And so I

22   e-mailed him like a week later saying, "Any luck

23   finding an admin spot?"  And that's when he responded,

24   "Stop sending people e-mails on this."

25        Q    Did you ever talk to him?

Page 51

1       A    After that meeting?

2       Q    Yes.

3       A    In person, no.

4       Q    Did you know anyone who was filling in for

5  the person who was deployed who was doing the

6  administrative security position?

7       A    No.

8       Q    How did you know about that position?  That

9  it was open.  Or that he had been deployed so people

10 were filling in.

11      A    Because they would have put out that

12 briefing.

13      Q    What briefing are you talking about?

14      A    The shift briefing every morning or every

15 night, 'cause the shift starts at ten.  And so we'd

16 come in and do a shift briefing, get everybody on the

17 same page and then go.

18      Q    Was that something that was verbally told to

19 you?

20      A    Yes.

21      Q    Okay.  And what do you remember being

22 conveyed to you verbally at the shift briefing?

23      A    That one of our soldiers was called up to go

24 do duty in Washington D.C. for the COVID pandemic.

25 That's the time it was coronavirus.

Page 52

1     Q     At the time that that was told to you in the

2  shift meeting, were you informed of how long that

3  deployment was going to last?

4     A     Nobody did.   There was an opening in the

5  department.   It's the same as our actual AVP.   He was

6  deployed for the same reason.   That's why we had --

7  Ms. Lane was the acting AVP.

8     Q     You don't know anybody who filled in for

9  this person who was deployed?

10    A     No.   They were B and C shift.   I worked A

11 shift.   So I don't know very many people on the other

12 shifts, because we don't see each other.

13    Q     So you were on A shift you said?

14    A     Yes.

15    Q     Was there anyone on A shift that worked in

16 the administrative security position?

17    A     There was one.   Ms. Amanda Tregoning.   She

18 did apply for that position and get selected.   And she

19 was doing that at the time.

20    Q     All right.   So you talked to Sam Jones, you

21 think, about 12 times about this litigation?

22    A     Correct.

23    Q     How many times did you talk to Bathyaa about

24 this litigation?

25    A     Probably about the same.   He actually calls

Page 53

1   on occasion just to see how it's coming.

2        Q    When do you think is the last time you

3   talked to him?

4        A    The day after I talked to Sam Jones.

5        Q    Did you call him?

6        A    Yes.

7        Q    And why did you call him?

8        A    Because Sam Jones mentioned that he had seen

9   them at the questions -- when he was getting

10  questioned by the airport.

11       Q    And what did Bathyaa tell you about his

12  meeting with the airport?

13       A    Same thing. That they asked him -- since he

14  had been -- he owns his own company in Sri Lanka and

15  that he was a manager.  And they asked him if he

16  thought that they would accommodate me and he said

17  yes.

18       Q    Did he tell you anything else about that

19  conversation?

20       A    Just basically, you know, went over his

21  background.  And that's about it.

22       Q    Do you expect to call him to testify?

23       A    Yes.

24       Q    And what do you expect him to testify about

25  at trial?

Page 54

1     A    The same thing I just said.

2     Q    Has he agreed to testify at trial?

3     A    Yes.

4     Q    And has Mr. Jones agreed to testify?

5     A    Yes.

6     Q    Is there anyone else that you -- any other

7  current employees of DFW Airport that you've talked to

8  about this lawsuit?

9     A    Yes.

10    Q    Who else?

11    A    Rubio.  I don't know his first name.  And

12  Whillock.

13    Q    Say it again?

14    A    Whillock.  W-H-I-L-L-O-C-K.

15    Q    Is that a last name or a first name?

16    A    Last name.  Military.  We just do last

17  names.

18    Q    Anyone else that you've talked to that's a

19  current employee?

20    A    That would be it.

21    Q    Okay.  What have you talked to Rubio about

22  with regard to this lawsuit?

23    A    Just the status that, you know, I'm filing

24  with the EEOC.  And I filed to court.  We've got an

25  upcoming deposition.  Actually, I don't think I even

Page 55

1  told him that.  I know I've told him that we've filed

2  in court.  I don't think I updated him past that.

3  It's been a while since I've talked to him.

4      Q    Do you expect to call Rubio to testify at

5  trial?

6      A    No.

7      Q    When is the last time you think you talked

8  to him about the lawsuit?

9      A    Probably the day after it was filed.  So the

10  28th.

11     Q    And what have you spoken with Whillock about

12  with regard to this lawsuit?

13     A    Just went over the basics.  That he got the

14  -- April 12th is coming up, this was coming up.  That

15  I filed in court.  I hadn't talked to him in probably

16  six to eight months.  So it was just a catching up

17  with everybody.  I guess I had called just to see how

18  everybody is doing, if I still have their number and

19  if they answer.  'Cause a lot of them, they don't

20  recognize the number, 'cause they don't have me saved

21  anymore.  So --

22     Q    Do you expect to call Whillock to testify?

23     A    He had said he wanted to.  And I did put him

24  -- I did have him put on an amended witness list.

25     Q    What do you expect him to testify about?

EXHIBIT X                    147

Page 56

```
 1        A     The same as the other two.

 2        Q     Was he a supervisor of any kind?

 3        A     No.

 4        Q     So can you be a little bit more specific?

 5   Because I think when we talked about Sam Jones, you

 6   said that several pieces of what you thought he was

 7   going to testify about had to do with what he had seen

 8   other employees been given as an accommodation.

 9        A     Right.

10        Q     So can you tell me what you expect Whillock

11   to testify about since he wasn't a supervisor?

12        A     The officers, it's a small group.  And we

13   all -- you know, we all do briefings in the morning.

14   We have a good idea of what's going on and within the

15   shift and other shifts.  So it'd be the same thing.

16   We all were aware of certain people got special

17   privileges that other people weren't.  And that he

18   knew what my restrictions were, my limitations, what

19   my injuries were from, you know, my time in the army.

20              And he was the same way.  He knew that it

21   was easily something that I could do with just minor

22   accommodations.

23        Q     And was he aware of anybody else that was

24   given accommodations that you weren't?

25        A     Yes.
```

Page 57

1    Q    Who was that?

2    A    I don't have the names.  But we know -- I

3  know there was one person that they weren't put at any

4  construction gates, because they're manual gates, not

5  automated, and she wasn't strong enough to move them.

6  And they also have one person that has -- he had a DUI

7  so he's not allowed to drive Board vehicles, so they

8  don't put him on any of the vehicle patrols.

9    Q    Anybody else?

10   A    Those are the two I just know off the top of

11 my head.

12   Q    What's the woman's name that you mentioned?

13   A    I don't know the name.

14   Q    And what about the person with the DUI?

15   A    Like I said, I'm terrible with names.  I can

16 see his face.  He was on my shift, so I -- I worked

17 with him.  It's just --

18   Q    You mentioned that there were certain people

19 who got special privileges.  What special privileges

20 are you talking about?

21   A    The ones I just named.

22   Q    Just those two?  That's all you're talking

23 about.

24   A    Yes.  And also people were given the same

25 admin spot when they were on pregnancy for their time.

Page 58

1      Q     Are you talking about the administrative
2   security position that looks at cameras?
3      A     Yes.
4      Q     And people were given that when they were
5   pregnant?  Is that what you said?
6      A     Yes.
7      Q     Who was that, that was given that?
8      A     Thomas.
9      Q     That's a last name; right?
10              THE REPORTER:   Did you say Thomas?
11              THE WITNESS:   Yeah, Thomas.
12              THE REPORTER:   Thank you.
13   BY MS. HARRISON:
14      Q     And do you have any idea what Thomas'
15   restrictions were?
16      A     No.
17      Q     Did you ever talk to her about why she was
18   put in that role?
19      A     Yes.
20      Q     Okay.  What did she tell you?
21      A     She's the one that told me that I should put
22   a request to do it for the admin position.  I was at
23   Baker North with her, and she had just gotten off of
24   -- she just got back from her maternity leave.  And
25   was like, you know, "You should probably put in for

FOR READING & SIGNING ONLY

EXHIBIT X                150

Page 59

1    your admin spot."  Since that's what they let other

2    people do.

3                   MS. HARRISON:  Kimberly, can you read

4    back the question that I asked?

5                   THE REPORTER:  The last question?

6                   MS. HARRISON:  Yes, ma'am.

7                   THE REPORTER:  Yeah.  It was -- let's

8    see.  Just one second.

9                   (The reporter read the record as

10                  requested.)

11                  MS. HARRISON:  Okay.  Thank you.

12   That's what I needed.  Thank you.

13                  THE REPORTER:  Okay.

14   BY MS. HARRISON:

15        Q    Did Thomas ever tell you what her

16   restrictions were?

17        A    No.

18        Q    Are you aware of anyone else other than

19   Thomas who was put in that admin role due to

20   restrictions?

21        A    No.

22        Q    And can we agree that pregnancy is not a

23   permanent restriction?

24        A    Correct.

25        Q    You also mentioned a woman who was not able

Page 60

1    to move a gate.  Is that right?  Did you ever talk to

2    her about what her specific restrictions are?

3        A    No.  She's not -- she had no restrictions.

4    It was just a favor that the supervisor did by not

5    scheduling her there.

6        Q    How do you know that?

7        A    Because I talked to some of the supervisors

8    that told me about it.

9        Q    Okay.  What supervisors?

10       A    That would be Sol Ruder, R-U-D-E-R.  But it

11   was on a different shift.  She wasn't on my shift.  He

12   was just telling me about one of the other officers,

13   that they couldn't schedule her on the gates because

14   -- on the construction gates because she couldn't

15   physically move the gates, and they had to be manually

16   opened and closed.

17       Q    And as far as you know, she doesn't have any

18   medical restrictions --

19       A    Correct.

20       Q    -- that are the basis for that?

21       A    Correct.

22       Q    And you never talked to her about it?

23       A    Correct.

24       Q    Is Sol Ruder her supervisor?

25       A    No.  He was my supervisor.

Page 61

1    Q    And the person with the DUI -- well, no.

2    Let me talk about the woman with the gate.  So as far

3    as you know, that's the only part of her job that she

4    was allowed not to do?

5    A    Right.  She was purposely not scheduled at

6    construction gates because she said she could not

7    physically move the gates.

8    Q    As far as you know, she could do all the

9    other job duties involved in her job?

10   A    Yes.

11   Q    And do you know the name of the person who

12   had the DUI?

13   A    No.  But he was on my shift, and he was

14   never scheduled to do any of the driving because he

15   was not authorized by Board policy to drive any Board

16   vehicles with a DUI.

17   Q    And as far as you know, that's the only part

18   of his job that he was not doing?

19   A    Correct.

20   Q    Are there any former employees at the board

21   that you've talked to about this lawsuit?

22   A    No.

23   Q    Have you talked to Mr. Ruder about this

24   lawsuit?

25   A    No.

Page 62

1      Q      Has Mr. Jones or Bathyaa given you any

2   documentation related to this lawsuit?

3      A      No.

4      Q      Have you given them any documentation?

5      A      No.

6      Q      What about Rubio and Whillock?  Have they

7   given you any documentation related to this lawsuit?

8      A      No.  I'd like to make a correction.  Bathyaa

9   and Sam Jones, I did give them a copy of my request

10  for reasonable accommodations form that I submitted in

11  July.  That was the basis for the August 25th

12  conference.

13     Q      When did you give that to Sam Jones?

14     A      The same day I submitted it to the -- Tim

15  Richardson, the Matrix.

16     Q      And when did you give it to Bathyaa?

17     A      The same time.

18     Q      Did you give it to them together or

19  separately?

20     A      Separately.

21     Q      And why did you give your accommodation

22  request to Sam Jones?

23     A      So they can look over it and tell me what

24  they thought of it and if it was doable.  I had them

25  basically review it before I gave it in to Sam Jones

Page 63

1  to -- to Tim Richardson to make sure it was something

2  that was going to be able to be accommodated.

3      Q    The restrictions that were in your

4  accommodation request, weren't those things that your

5  physician had ordered?

6      A    Yes.  He consulted with me and we discussed

7  it together to determine what limitations I had.  And

8  based on my experience with the job, we made it very

9  specific and narrowminded so that it would be very

10 easy to implement.

11     Q    And when you were talking to Sam Jones --

12 well, let me -- did you talk to Sam Jones about the

13 restrictions that you were submitting as part of your

14 accommodation request?

15     A    Yes.

16     Q    Did you talk to him before your doctor wrote

17 down those restrictions?

18     A    No.  I went over it with him before -- right

19 before I submitted it.

20     Q    And what did Sam Jones tell you?  If

21 anything.

22     A    He said, "That sounds good.  It should be

23 easy to do."

24     Q    And Sam Jones was a supervisor, but not your

25 supervisor.  Do I have that right?

Page 64

1     A     Correct.  He was -- he was on the same shift

2     as me.  Sometimes he was over me, depending on what

3     day it was.  If my actual direct wasn't in, and he was

4     in.  But he wasn't my radar or supervisor.  But he was

5     also hired -- he was originally -- he was one of the

6     first 40 people that were hired when the STA was

7     created in 2002.

8         Q     Did you talk to your supervisor about the

9     restrictions?

10        A     No.

11        Q     Why did you talk to Sam Jones instead of

12    your supervisor?

13        A     'Cause I don't have the private number to my

14    supervisors.  Like Ruder, I don't have the number for.

15    And then Kai Hardin, if you call her not at work, she

16    won't answer.  And she tells you to not call her.

17    It's her personal time.  She doesn't want you to

18    bother her.

19        Q     Is Sam Jones the only person in a

20    supervisory role that you talked to about your

21    restrictions before you submitted them to Matrix?

22        A     Yes.

23        Q     And why Sam Jones?  Why not some other

24    supervisor?

25        A     Because he's the one that I could get a hold

Page 65

1     of.

2          Q    Okay.  And what about Bathyaa?  Why did you

3     submit or share your restrictions with Bathyaa before

4     you submitted them to Matrix?

5          A    'Cause he was in the second batch of new

6     hires when they -- the ASD, when they first created

7     it.  So those were two of the people that got the most

8     seniority out of the entire department.

9          Q    But explain to me how that --

10         A    Because I wanted to ensure that my requests

11    were going to be able to be accommodated because I

12    wanted to stay in my job and do it.  I loved the job.

13    This was my dream job.  And I didn't want to do

14    anything that was going to prevent me from continuing

15    to do that job.

16         Q    Was Bathyaa a supervisor?

17         A    No.

18         Q    He's a coworker.

19         A    Correct.

20         Q    And what, if anything, did he say about your

21    proposed restrictions?

22         A    He said it looks pretty simple.

23              MS. HARRISON:  I think we've been on

24    the record about an hour now.  Would you like to take

25    a break?

Page 66

1            MR. DAUPHINOT:  Yes, let's.

2            MS. HARRISON:  Okay.  Let's take a

3   break.

4            THE REPORTER:  Okay.  The time now is

5   12:02 p.m. and we are off the record.

6            (Off the record.)

7            THE REPORTER:  The time now is

8   12:15 p.m.  We are back on the record.

9   BY MS. HARRISON:

10      Q    Mr. King, have you spoken to any of your

11   friends regarding this lawsuit?

12      A    Sad to say I've named all my friends.

13      Q    Okay.

14      A    And I found the name for that officer that

15   was deployed.  His last name was Cruz, C-R-U-Z.

16      Q    Thank you.

17      A    No problem.

18      Q    So would it be correct, then, to say that

19   there are no friends of yours other than people that

20   you've named already that you expect to call as

21   witnesses?

22      A    Other than Whillock, who wanted to be

23   included.  And then supervisor Carter, current

24   employee, also mentioned that she wanted to testify as

25   well.

Page 67

1       Q    What's Carter's first name?

2       A    No idea.

3                MS. HARRISON:  I'm sorry, Kimberly.

4    What did you say?

5                THE REPORTER:  I thought I heard him

6    say the first name, but he didn't.  So you were asking

7    the question.

8                THE WITNESS:  Supervisor.

9    BY MS. HARRISON:

10      Q    Supervisor Carter.  Okay.  Was Carter your

11   supervisor?

12      A    No.

13      Q    What shift did Carter supervise?

14      A    I don't even know.  I don't know.  I didn't

15   know who she was, but she contacted my wife saying

16   that, "I know information that would be useful."  And

17   so she said she wanted to be a witness.

18      Q    Have you talked to her?

19      A    I have met her once.  That was, like, about

20   two weeks ago when I would stop by at the -- the

21   airport.

22      Q    Have you talked to her other than when you

23   met her two weeks ago?

24      A    No.

25      Q    What is it that you expect her to testify

Veritext Legal Solutions

Page 68

1    about?

2         A    She said she knows other instances of people

3    getting, you know, unfavorable treatment.  And she

4    knew that I did not and that she wanted to take part.

5         Q    Did she tell you about any of those

6    instances?

7         A    I haven't talked to her except for meeting

8    her and saying hi.

9         Q    So has she told you about those instances?

10        A    She informed my wife.  She said that she

11   knew stuff that was going on that would be relevant.

12        Q    What did she tell your wife?

13        A    That's what she told her.

14        Q    She didn't tell your wife any specific

15   names?

16        A    No.  Not that I gathered.

17        Q    So you've only talked to her one time?

18        A    Correct.

19        Q    Do you know how many times your wife has

20   talked to her?

21        A    I think she comes by and sees her in the

22   office every couple of days just to say hi and talk to

23   her.

24        Q    Do your wife and Ms. Carter have a

25   relationship outside of work?

Page 69

1          A      I think it's getting there.  Like, we're

2     supposed to be going over to their house on -- you

3     know, we're supposed to go over there on Friday for

4     the first time for me to, like, meet her family.

5     Other than that, we've never associated with her

6     outside of work.

7          Q      And it's your testimony that Carter reached

8     out to your wife?

9          A      Correct.

10         Q      Unprompted by you or your wife.

11         A      Yes.

12         Q      Okay.  Do you know when that was?

13         A      Two months ago.

14         Q      Do you know how many times your wife has

15    talked to her about this lawsuit?

16         A      No.  No idea.

17         Q      Has she provided any documentation to your

18    wife?

19         A      No.

20         Q      Do you expect to call your wife to testify?

21         A      Yes.

22         Q      What do you expect your wife to testify

23    about?

24         A      The entire situation from the beginning all

25    the way to the end.  She was part of the whole

Page 70

1    situation.  She was my other half.  She assisted me in

2    -- the whole way.

3        Q    Is she aware of anyone that she believes was

4    given an accommodation that you were not?

5        A    Yes.

6        Q    Who?

7        A    I don't know a name, but he broke his hand.

8    And he was actually assigned to her compliance

9    department to do just paperwork.

10       Q    And did his hand heal?

11       A    Yes.

12       Q    And was he moved back to his other position?

13       A    Correct.

14       Q    Anyone else that she's aware of that you

15   know of?

16       A    Not that I'm aware of.  Not that I can think

17   of, no.

18       Q    And your wife was involved in the meeting on

19   August 25th?

20       A    She was present, but she did not take part.

21       Q    So she didn't speak at all?

22       A    Not in the meeting, no.

23       Q    Is your wife a supervisor at --

24       A    She is an MP3.

25       Q    What does that mean?

Page 71

1      A    Manager, but it's below assistant manager.

2      Q    Do you know what her title is?  Is that her

3  title?

4      A    Compliance analyst.

5      Q    Does MP3 figure in her title in some way?

6      A    No, that's just the payroll coding the

7  airport uses.

8      Q    And it's your understanding that is some

9  sort of supervisory role?

10     A    Yes.  It's -- M is management position 3.

11     Q    How many people does she supervise?

12     A    She doesn't supervise any.  It's just a

13  management position without actually being a manager.

14  It's just how the airport does it.  I don't know why.

15     Q    Okay.  So she doesn't actually supervise

16  anyone?

17     A    Correct.

18     Q    Has she ever supervised anyone at the

19  airport?

20     A    No.

21     Q    Has she been involved in any accommodation

22  requests for employees at the airport?

23     A    No.

24     Q    Do you keep a journal or a diary?

25     A    No.

Page 72

1    Q    Do you have any notes that you've kept?

2    A    No.

3    Q    Do you have a calendar that you keep that

4  has meetings or dates on it related to this lawsuit?

5    A    No.

6    Q    And you don't have any handwritten notes

7  related to this lawsuit?

8    A    No.

9    Q    Have you ever filed an EEOC charge against

10  any other employers?

11    A    No.

12    Q    Do you believe that any of your prior

13  employers retaliated against you for any reason?

14    A    No.

15    Q    How did you come to work at DFW --

16         THE REPORTER:   I'm sorry.   I'm sorry.

17         MS. HARRISON:   Yeah.

18         THE REPORTER:   I got confused.   Did

19  counsel object or did I hear Mr. King's answer was no?

20         MS. HARRISON:   Mr. King's answer was

21  no.

22         THE REPORTER:   Thank you very much.   I

23  apologize.

24  BY MS. HARRISON:

25    Q    How did you come to work for DFW Airport?

Page 73

1      A     I applied on the online portal.

2      Q     Had you applied for any other jobs with DFW

3   before you got the CSO position?

4      A     Yes.

5      Q     What other types of jobs had you applied

6   for?

7      A     Numerous other jobs from parking to

8   administrative positions.  Just whatever caught my eye

9   at the time.

10     Q     I'm going to hand you what we're going to

11  mark as Exhibit 2.  This is something that you

12  produced in this lawsuit.  Do you recognize this?

13                 (Exhibit 2 was marked for

14                 identification.)

15     A     Yes.

16     Q     Tell me what this is.

17     A     This is a screenshot of my online portal for

18  job applications.

19     Q     Is this something that you -- do you think

20  this accurately reflects the jobs that you've applied

21  for at DFW Airport?

22     A     Yes.  The ones I applied for through the

23  portal.  Absolutely.  They're all saved on this.

24  Stored on their servers permanently.

25     Q     Okay.  So if we look at page 1 of this

Page 74

1    exhibit, we see that you applied in November of 2015

2    for a civilian security officer position.  Do you see

3    that?

4         A    Correct.

5         Q    And then under that, it says multiple job

6    applications.  November 24th of 2015.  Do you see

7    that?

8         A    Yes.

9         Q    Do you remember what those multiple

10   positions were that you submitted for at that point?

11        A    I do not.  But I know one of them was

12   civilian security officer again.  Because I do

13   remember that very keenly.  And that I applied for the

14   same position twice, and then I got the call.  And

15   then I was like, so I'm telling people when they apply

16   that if you don't get an answer -- if you don't get

17   called in a week, just apply for the same position

18   again.  They'll call you.

19        Q    Did you get a call after you submitted the

20   application for terminal relations coordinator?

21   That's the first job you had applied for.

22        A    No.

23        Q    What about occupancy management specialist?

24        A    No.

25        Q    And it looks like you applied for civilian

Page 75

1    security officer on August 26th of 2015.  Do you see

2    that?

3        A    Correct.

4        Q    And did you get a call related to that

5    application?

6        A    No.

7        Q    What about administrative assistant 2 in

8    public safety?  Did you get a call related to that?

9        A    No.

10        Q    What about administrative assistant 2 for

11    DFW energy, transportation, and asset management?  Did

12    you get a call related to that?

13        A    No.

14        Q    The next job you applied for was access

15    control trusted agent in the public safety department.

16    Did you get a call related to that?

17        A    No.

18        Q    And then the first civilian security officer

19    position that you applied for was on November 15th.

20    Is that correct?

21        A    Correct.

22        Q    And then you believe you applied for another

23    one in the line with multiple job applications on

24    November 24th?

25        A    Yes.

EXHIBIT X                   167

Page 76

1      Q    Do you know which position that you call in

2   relation to?

3      A    That's security officer.  I applied for the

4   exact same one, 'cause it even said, "You've already

5   applied to this.  Do you wish to continue?"  And I

6   said yes.

7      Q    Do you remember who called you in relation

8   to that application?

9      A    Mora.

10     Q    And was that a recruiter?

11     A    That was one of the hiring people for DFW.

12     Q    You don't know what that person's position

13  was?

14     A    No.

15     Q    All right.  And was that a phone interview?

16  Or what happened in that initial call?

17     A    Yes, it was a phone interview.

18     Q    And then what was your next contact related

19  to the CSO position?

20     A    I was brought in for a face-to-face

21  interview.

22     Q    Do you remember who you interviewed with?

23     A    He was the training manager.  He's no longer

24  there.  He works for one of the cargo companies on the

25  airport now, head of security.  Same one that did the

1   -- the board thing that we did. I don't recall his

2   name. But he was a fellow UTA grad. And that's

3   basically what the interview was.

4           Is like, "Hey man." He's like, "Hey,

5   alumni." Like, "What?" He's like, "Hey," blah-blah-

6   blah. You know, all we talked about was the

7   supervisor positions and that you're qualified. And

8   we never discussed the job at all. It was just a

9   friendly, "Hi, you're a UTA alumni." So --

10      Q    Did you interview with anyone else?

11      A    Yes.

12      Q    Who else did you --

13      A    I then went in with Sibley, Mojo [ph], who

14  was the AVP at the time. I know somebody that should

15  be familiar with that name. It's very infamous in

16  DFW. And we did -- did an interview with him. And

17  Sibley ended up being one of my trainers when I was in

18  the army when I went to AIT, which is the tech school

19  after basic. He was -- that was -- I was his last

20  class. So we talked about that.

21          And then Mojo [ph] went over a few parts

22  about, you know, "Why do you want to work at the

23  airport? Why is security important?" And that was

24  it. It was probably ten minutes.

25      Q    Were each of those interviews back-to-back

Page 78

1    or were they all in the same room at the same time?

2         A    They were back-to-back, different rooms.

3         Q    What was your next contact from the airport

4    after the interviews?

5         A    I was just got home and was pulling my keys

6    out to unlock the door and the phone rang and they

7    were offering me the job.

8         Q    Do you know who it was that called to offer

9    you the job?

10        A    I do not.

11        Q    And did you accept immediately?

12        A    Yes.

13        Q    Had you been applying for other jobs in this

14   August 2015 to November 2015 timeframe?

15        A    Just at the airport.

16        Q    You weren't applying to work anywhere else?

17        A    I think I was doing the -- what is it?

18   Usajobs.gov.  I was trying to work through that, but

19   it takes forever.  But, yeah, other than that, I

20   applied at the airport.

21        Q    Okay.  You mentioned earlier that the

22   airport is where you wanted to work.  Why is that?

23        A    Because I grew up at the airport.  My dad is

24   retired Delta.  And we moved down here when Delta

25   started operations when I was six months old.

Page 79

1    Basically, grew up here. I used to go -- I mean, I

2    used to go to work with my dad. And he was here when

3    they opened the new satellite. And he was head of

4    maintenance at the satellite. And I was there for the

5    opening ceremony. I was there for both expansions on

6    the Delta hangar, now Hangar 5.

7         When they doubled it, and then doubled it

8    again, I was there. We did family things -- family

9    days there at the hangar all the time. I used to come

10   to ride the old tram just for fun. Just come in the

11   middle of the night and ride it. And then I also --

12   that was my -- the old observation area, which is on

13   the south side, what they eliminated when they built

14   the runway 7 and they had to do a taxiway.

15        It was right in that corner of the taxiway

16   that comes back into the -- the bypass taxiway. And

17   it used to be gravel parking lot. And that's where I

18   would take my dates for the end of the date. We'd go

19   there and you'd see all the lights for the runways,

20   and the planes, and you'd pull into the parking lot,

21   and you'd just sit out there on the hood of the car

22   and watch the planes and look at the lights, and see

23   the police driving by. You know, before there was --

24   this was barely '90s.

25        And they'd be driving by, and I'm like, "I

1    want to do that."  I'm like 16 saying, "That's what's

2    I want to do.  That's what I want to do."  I want to

3    -- I love -- you know, I've been around aircraft my

4    whole life.  My dad, you know, being a mechanic --

5    that's what I -- you know, I've been -- you know, like

6    I said, I got the -- had to -- my last job before

7    joining the army was at the airport at UPS.  And then

8    even before that, I worked for Evergreen doing the

9    interterminal baggage transfer.

10            You know, we had to drive the bags around.

11   That was before we even had all the fancy gates now

12   where you just walked up and -- you drove up, scanned

13   your own badge and drove through.  And the contract

14   guy was just reading the magazine.  You know, it's

15   just been my dream to work there.  I've always wanted

16   to do it.  And when I got this job and I realized I'm

17   going to be doing those parameter patrols, you know,

18   and I get to drive around --

19            I mean, I flooded my Facebook with just all

20   the pictures of all the aircraft, 'cause you get to

21   drive on the AOA.  Oh, it's nice.  And then with the

22   tram being -- and I actually came here right after

23   9/11 when they were driving their reserves with the

24   rifles, riding the tram.  And I got caught talking to

25   him 'cause I was still -- I was stationed at Fort Polk

EXHIBIT X                          172

Page 81

1    in Louisiana.  And got talking to him and found out

2    the assistant -- emptied magazine, didn't have ammo.

3    I was like, wow, that's -- but your presence, it looks

4    like it.  But then they got rid of that.  So the only

5    way you could ride the Skylink is to have a ticket.

6            I don't fly very often.  I love that I live

7    here since -- you know, I left to join the military,

8    went all over the place, came back, and this is the

9    place that I love.  And so then I get to ride the

10   Skylink.  And it's just the most amazing view of the

11   aircraft.  And then I get to walk around the terminals

12   and look at the aircrafts through the windows.  I

13   mean, I got hundreds and hundreds of pictures.  I got

14   more pictures of planes than I do of my own kid.  It's

15   kind of sad.

16           But, yeah, I mean, this is just the job that

17   has been my dream since I was 16.  So -- probably even

18   before that.  But I just remember 16 going, "I want to

19   do that," watching the officer drive the fence.

20       Q    So your dad worked for Delta or he worked

21   for the airport?

22       A    He worked for Delta.

23       Q    He was a mechanic?

24       A    Correct.

25       Q    Have you ever tried to enter the police

1    force?

2        A    I considered it when I got out of the

3    military in 2004.  But it was -- they were still, you

4    know, doing some of the EMS, combination fire

5    department, all that kind of stuff.  And I was like,

6    that's a little bit excessive for me.  And so I -- I

7    applied for Beford police.  And I actually did their

8    physical evaluation, passed that, and then went and

9    got the practice test for the exam.  And I didn't

10   have --

11       Me and the desk sergeant disagreed on some

12   of the specifics on that exam that I thought the

13   answer they gave was wrong.  And they said, "No.

14   That's the right the answer."  You know it's wrong,

15   and you're supposed to get that when you do the test.

16   And it's a question where you get called into a scene

17   for breaking and entering by the homeowner.

18       You arrive on the scene and a person comes

19   between the two houses wearing a bathrobe and tells

20   you, "I'm the homeowner and I'm the one that called

21   you."  What do you do?  And the correct answer was,

22   that's the homeowner and I made contact with the

23   person who made the call.  And my answer was no, I

24   don't know who that guy is from Joe Shmoe [ph].  He

25   could -- I mean, who knows if that dude, the B&E, was

Page 83

1    not an insane person wearing a bathrobe.  From the

2    description, I don't know who that is.  I need to

3    identify him, detain him, and then make sure we know

4    who he is before I make assumptions like that.

5              And that's when I said nope.  And that's

6    when I was just like, okay, I'm not cut out for police

7    work.  Because if that's what the test is going to be,

8    I'm not going to deal with that.

9         Q    So what did you think was going to be

10   different about being a civilian security officer from

11   being a police officer?

12        A    It's complete night and day.  I mean, it's a

13   totally different aspect.  Police deal, you know, with

14   criminal offenses.  And -- and they're armed.  And,

15   you know, they -- they have a whole lot larger

16   responsibility.  And it's larger, but it's very

17   specific, whereas security is over here to the side.

18   You deal with stuff, but you know what it comes down

19   to.  You're going to call the police when, you know,

20   stuff goes bad.

21             Whereas, police, you are the person that's

22   called.  So it's just -- it's completely -- you work

23   hand in hand.  We're like eyes and ears for them.  But

24   when it comes down to dealing with what they deal

25   with, we don't have anything as close.

1      Q    So did you shift, then, your job search off

2    of being a police officer and onto being a security

3    officer?

4      A    When I got out of the military, it was after

5    I didn't manage the police officer thing, I went into

6    the wheel repair.  And that was a friend of mine from

7    an online car forum, before there was Facebook.  It

8    was where he worked.  And he was an engineer.  He

9    designed custom wheels.  And he was like, "You can

10   come drive for us," 'cause I love driving.  That's my

11   other hobby.

12         So he got me the job at Wheels America.  I

13   walked in and the whole interview was, "Do you know

14   how to drive a stick?"  "Yes, I do."  "All right.

15   You're hired.  Start today."  It's like, "Okay."

16   So --

17      Q    When you decided what you were going to get

18   your degree in at UTA, had you changed your focus,

19   then, from being a police officer and working at the

20   airport to some other career path?

21      A    My focus for the way I tailored my degree,

22   which is why I did the criminal justice minor and the

23   organizational communication, is I wanted to be a

24   civilian liaison for APD.  To work with police, but

25   not be police.  You know, 'cause they have civilian

Page 85

1    boards that do oversight on police actions and stuff

2    like that, and that's what I wanted to do.

3         Q    APD, meaning Arlington?

4         A    Arlington Police, yes.

5         Q    Okay.  And so when you got your degree, did

6    you pursue that?

7         A    Yes, but they didn't have any openings at

8    the time.  And that's when I was applying.  I applied

9    and got the seasonal at UPS.  And then I was applying

10   at USA Jobs because I had just gotten my 50 percent

11   rating disability from the VA, which gives me a bonus

12   when it comes to applying for jobs.  I was also

13   applying for the Postal Service and then I was

14   applying at the airport.

15        Q    And so that would have all been in 2015

16   after you got your degree?

17        A    Correct.

18        Q    And did you have interviews for any of those

19   other jobs that you applied for?

20        A    I interviewed numerous times for the Postal

21   Service.  And every time they said, "Hey, we're going

22   to put you in for it."  And then I never got the call

23   to come in.  And I actually interviewed at the -- the

24   sorting facility in North Fort Worth off of 35.  And

25   got interviewed three times for three different jobs

Page 86

1    by the exact same person.  And the first thing he said

2    was -- on the second one was, "Why aren't you working

3    here already?  I put you in for being hired."  It's

4    like, "I never got the call."

5           And so he's like, "Well, okay.  We don't

6    need an interview.  We already did it."  And then

7    another week, I showed up again.  He's like, "Why are

8    you not getting hired?"  I'm like, "I don't know.  I

9    have no idea."  And my mother-in-law was actually now

10   retired Postal Service.  She was an auditor.  And she

11   asked around and they were like, "We don't know why

12   he's not getting hired."

13          So it's one of those mysteries, like, I

14   don't know how I didn't get -- I mean, I go to a

15   position and they say there's three openings and two

16   people applied.  I'm like, how did I not get the job.

17   So --

18          Q    Do you remember when you began working at

19   the airport?  What day was it?

20          A    The 8th of February.  And I was --

21   originally we had to wait for the academy to start.

22   It was two weeks out.  They had just -- they were just

23   in the process of the second class, and I was going to

24   be the third class.  And I was assigned to Lowry as my

25   FTO, who is now a supervisor.  And I got to ride

Page 87

1    around with him for two weeks driving around the

2    airport and stuff.  Basically, showing me, you know,

3    what they do.

4         And then when the two weeks was up, it was

5    me, Finney, and Singer were all three hired on the

6    same date.  But I was the first one called, so I got

7    the seniority.  Then we went into the academy, and we

8    were the three.  You know, everybody else had been

9    hired after us.  And so then we did the academy.  And

10   that's where I met Boston.  Boston was hired the same

11   time as I was, around the same time.  But he was after

12   me.  And Hannah.  I bet she knows that name, too.

13   Sorry.

14        Q    How long did the academy last?

15        A    It was one month, four weeks.

16        Q    And once you were done with the academy --

17   well, let me ask you, did the academy involve mostly

18   deskwork or was there also a physical component to it?

19        A    It was mostly deskwork, but they did take us

20   out like two days where it was the tour of the

21   airport.  And, you know, you had -- the first day,

22   they went out and kind of showed you everything.  The

23   second day was, can you find it?  And I was the one

24   everybody wanted to be in the vehicle with me, 'cause

25   I knew where everything was, 'cause I basically grew

Page 88

1    up around the airport.  So they're like, "Oh, take us

2    here."  "Okay.  Let's go."

3         So everybody was like -- and so they were

4    like, "You can't tell them.  They have to know."

5    Okay.  So they'd get lost and be like, "Turn left

6    here."

7         Q    Did you have any physical limitations when

8    you started working at the airport?

9         A    Yes.

10        Q    What were they?

11        A    I had knee and hip issues, during my FTO

12   phase when I was with Carlton.  'Cause he was doing a

13   Fitbit challenge where he wanted to do -- he was doing

14   a Fitbit challenge with one of the other trainers or

15   one of the other people, can't remember her name.  But

16   she moved to customer experience, and she's one of

17   their supervisors now.  But I don't remember her name.

18        But her and Carlton were doing a Fitbit

19   challenge and this is when we were on eight-hour

20   shifts.  And we were doing 20,000 steps in a shift.

21   And I had to miss half a day and the next day because

22   my knee and my hip -- like, we were walking.  And

23   Carlton was like, "Why are you limping?"  Like, 'cause

24   my hip and my knee are about to give out.  And he was

25   like, "Well, why didn't you say something?"  I was

1   like, "I did several times." I was like, "Can we sit

2   down? Can we take the Skylink."

3         He said, "I don't take the Skylink." Like,

4   "Well, maybe I need to take the Skylink because I need

5   to have a break because you're walking me to death."

6   And I actually complained that to Burton, who was the

7   training -- one of the trainers at the time. And I

8   explained that to him. I told him, "Look, I'm a

9   disabled vet. I have bad knees, bad hip, bad back.

10  You know, and I understand that there is walking for

11  this job, but not a Fitbit Challenge 20,000 steps

12  walking. That's kind of excessive."

13        And he's like, "Okay. We'll talk to Carlton

14  about it." And then Sibley mentioned to me, "Hey, you

15  should put in for FMLA, or short-term, to get, you

16  know -- so you can have this -- you can go on leave or

17  whatever so you're not, you know, having too many

18  issues." But I hadn't been there for six months, so I

19  didn't qualify. And he actually came out when I was

20  with Alderman at Charlie -- at Charlie South or David

21  South. The vendor screening came.

22        I actually was there and then Sibley showed

23  up to tell me that himself. He's like, "Hey, we put

24  it in, but you haven't been here long enough. So, you

25  know, you can't really do anything." I was like,

Page 90

1    "Okay."

2         Q    Did you apply for that or did they apply for

3    it on your behalf?

4         A    I -- Sibley told me about it and then I said

5    okay, yeah, that's what I want to do.

6         Q    And then you actually applied for it?

7         A    No.  He -- he asked about if I qualified for

8    it.  And he contacted whoever he contacted and then he

9    came back a couple days later saying, "Yeah, you don't

10   qualify.  You haven't been here for long.  So, you

11   haven't been here for six months."

12        Q    And so you don't think that you put in an

13   application for that?

14        A    No, I did not.  I just informed him that I

15   had the issues.

16        Q    Did you at that time ask for any

17   accommodations related to those issues?

18        A    I just asked to be taken off of Carlton's,

19   which was, by that time, it was already over 'cause I

20   switched to Alderman.  So the issue was already

21   solved.

22        Q    So did you ask to be taken off or was it

23   already solved?

24        A    I asked, but they didn't have any other

25   FTOs.  And they told him, "Carlton, stop doing your

Page 91

1    Fitbit challenge," and he did.  He threw a fit.  He
2    yelled at me in the office, in D, the D terminal
3    office, for a little while.  And after that, we
4    basically weren't talking.  We were just walking
5    together.
6            And then he made it -- it was one of those,
7    "Well, I'll walk the connectors, and you could take
8    the Skylink."  I'm like, cool.  That's fine with me.
9    I'll do that.  And so I would ride the Skylink and he
10   walked the connectors.  So he can get his Fitbit
11   challenge in, and I could actually pull security on
12   the Skylink, like you're supposed to do.
13       Q    So when did you get transferred?
14       A    Each FTO was two weeks long.  So I did -- I
15   did DJ first -- well, before the academy I had Mike
16   Lowry.  And then I had the academy.  And then I had
17   DJ, and he was A shift.  Then I had Carlton, and he
18   was B shift.  And then I had Alderman, and he was C
19   shift.
20       Q    So it wasn't that you were asked to be
21   transferred, it's just that you were going through
22   this rotation of being assigned to different FTOs.
23       A    Correct.  But this was like three days in
24   when he busted my knee and my hip and I was
25   requesting, you know, something to be done about it.

Page 92

1   And their solution was, you know, let him do -- he

2   won't -- he can't drag you along for the Fitbit

3   challenge.

4        Q    Okay.  Other than the Fitbit challenge, did

5   you have any part of the job that you couldn't do as a

6   result of your knee and hip?

7        A    No.

8        Q    Can you explain to me, once you got out of

9   that training phase -- well, tell me if I have this

10  wrong.  But it sounds like you were in the academy and

11  then you went through a rotation of being assigned to

12  different FTOs.  Is that right?

13       A    Correct.

14       Q    So once that was over, then where were you

15  assigned to?

16       A    I was on A shift.

17       Q    On A shift.  And were you just a CSO on A

18  shift?

19       A    Correct.

20       Q    Okay.  And what did you do as a CSO on A

21  shift.

22       A    Walk the terminals, work gates, and do

23  vehicle patrols.

24       Q    Did you do that on your own or did you have

25  somebody else that you were typically assigned with?

Page 93

1      A     It depends on -- random assign.  Some gates

2   are solo.  The rover is solo.  If you're doing

3   perimeters, it's a two person, and you're on terminal.

4   More often than not, you're by yourself before we

5   bumped up under Mojo [ph].  We only had like 100-

6   something officers and somebody -- you know, to cover

7   all three shifts, somebody had to have like 30 or 40

8   people on shift.

9      Q     So there was 30 or 40 people on a shift you

10  said.  Is that right?

11     A     Correct.

12     Q     And it just depended on what you were

13  assigned to that day whether you were working with

14  somebody else or by yourself?

15     A     Yeah.  It's all random based on the

16  schedule.

17     Q     And in a typical week, would you do the same

18  thing every day or would it be random every day?

19     A     Every day is random.  You moved around.

20  You'd be gate one day, terminal the next day, rover

21  the next day.  You know -- you know, it was just, you

22  didn't have any say.  You didn't know.  You know, you

23  knew where you were going to be, and that's where you

24  came in.  Sometimes if somebody called off, you'd get

25  moved.  But you had to come in every day and expect to

Page 94

1    be at any one of those spots.

2         Q    And when you were working in those spots,

3    did you ever have any trouble doing your job?  Any

4    physical limitations.

5         A    Occasionally, if -- I might have.  You know,

6    I had pain while doing it, but I just pushed through.

7    And they put some really -- it didn't get to be an

8    issue to where it was something that caused problems

9    all the time and it was something that made me have to

10   go home and just dope myself up on pain meds.  I'd

11   probably miss the next day because I couldn't get out

12   of bed.  Was not until they added the portals.

13        Q    The portals?

14        A    The portals, which is the screening for

15   employees.  And that's where they added bag checks and

16   person checks and everything else basically like they

17   do for TSA.  And that's where I started having issues

18   is because they were having us constantly stand up and

19   sit down.  Every time anybody walked up, you had to

20   stand up because it looks professional.  You got to

21   stand up.  While you're doing that over and over and

22   over again that whole day or the whole night, you

23   know, it started -- it would start bothering my hips.

24             I mean, there were days that I had to have

25   people help me get up to get out to my car.  And

Page 95

1    that's why I was requesting that I could remain seated

2    for face-to-face interactions at the portal.

3         Q    Okay.  We'll get to your accommodation

4    requests a little bit later.

5         A    Okay.

6         Q    But when do you believe it was that the

7    portals were added?

8         A    The very day that it was released in the

9    press that the FBI had arrested a bunch of American

10   Airlines and other employees for smuggling drugs

11   through the portals.

12        Q    Do you remember when that was?

13        A    I do not, but I could Google it.

14        Q    Do you remember what year it was?

15        A    It's like 2018.

16        Q    And so would the employee portals be

17   something that you were assigned to randomly, it just

18   depended on what you were assigned to that day?

19        A    That was added to the -- to the list, just

20   like the other three.

21        Q    So it was not necessarily something you did

22   every day, it was just one of those tasks that you

23   might be assigned to.  How often do you think you

24   worked the employee portals?

25        A    Twice a week.  Just like about the same as

Page 96

1     the other positions.

2          Q     How long were your shifts?

3          A     They were eight hours, and then they got

4     changed to ten hours.

5          Q     When did they get changed to ten hours?

6          A     And there was a period in there where they

7     actually had it separated between gates and terminals.

8     And at that point, I was on gates.  And everybody --

9     so you knew you were gate.  And then there was a

10    terminal section.  They all did the terminals.  And

11    that was before the portals.  When the portals hit,

12    they didn't have the manpower to keep us divided, so

13    they put us all together so they could put people at

14    the -- everyone at the portals.

15         Q     If you were assigned to something on a

16    particular shift, would you continue to do that task?

17    Like if you were assigned to the portals that day,

18    would you stay on portals?

19         A     Yes.

20         Q     Okay.  So if you were assigned to perimeter,

21    then you would typically stay on perimeter that day.

22         A     Correct.

23         Q     And is that how it worked for all the CSOs?

24         A     Yes.

25         Q     And that was your only role at DFW Airport;

Page 97

1    right?  Was being a CSO.

2         A    Correct.

3         Q    I'm going to hand you what we're going to

4    mark as Exhibit 3.  This is the description for

5    civilian security officer.  Have you seen this before?

6                    (Exhibit 3 was marked for

7                     identification.)

8         A    Absolutely.

9         Q    Did you see this before you were hired?

10        A    No.

11        Q    Did you see it when you were hired?

12        A    No.

13        Q    When do you think the first time is that you

14    saw this?

15        A    Probably just bored on the computer looking

16    through stuff on the computer and going, hey, job

17    descriptions, and started reading stuff.

18        Q    When you read this, was there anything that

19    you recall thinking that you couldn't do?

20        A    No.

21        Q    Do you think this is an accurate

22    representation of what a civilian security officer

23    does at DFW?

24        A    For the portals mostly.  But, of course, it

25    has the -- it has whatever else is -- "Provide a

Page 98

1    variety of additional duties within the Department of

2    Public safety to include staging of assets -- special

3    events security, and other duties as assigned," is a

4    catchall phrase.  So basically, it means everything.

5         Q    Right.  And that's number 15 under principal

6    duties and responsibilities.

7         A    Correct.  And that's where the portals would

8    come in because they didn't have a policy for almost a

9    year and a half.

10        Q    If you look at the section that starts on

11   the first page of Exhibit 3 that says principal duties

12   and responsibilities, does that look like what your

13   principal duties and responsibilities were, other than

14   what you just mentioned?

15        A    Yeah.

16        Q    I want to look at number 1.  This says,

17   "Inspects all vehicles attempting to enter through

18   AOA," and AOA being air operations areas, is that

19   right?

20        A    Yeah.  Aircraft operations area.

21        Q    Okay.  "Ensuring that each vehicle possesses

22   a valid DFW Airport-based AOA decal and that all

23   individuals possess a current/valid DFW International

24   Airport Board Security Identification Display Area,

25   SIDA badge, inspect cab area of vehicles, and inspects

Page 99

1    vehicles underneath and in additional areas as

2    necessary and appropriate."  Is that something that

3    you did as a CSO?

4        A    Absolutely.

5        Q    Okay.  How often would you do that?

6        A    I mean, depends on what case you're at.

7    Sometimes you'd be at five vehicles a night, if you're,

8    you know, at Southwest freight.  And then other times

9    if you're at Charlie South before they -- somebody

10   crashed into it, you would get 100 vehicles.  So --

11       Q    And so is this one of those things that you

12   would only do when you were assigned on that shift to

13   do vehicle inspections?

14       A    It was if you're assigned to the -- assigned

15   to the gate, you would do that.  Or it depends.  If it

16   was a two-man gate, somebody would take the badge and

17   -- and check the badge, scan the badge, and then do

18   the interior search.  And then the other person would

19   do the walkaround, confirm the stickers in front and

20   rear, and make sure there's no -- no suspicious

21   looking items underneath or in the back of the

22   vehicle.

23       Q    How would you physically do an interior

24   search?  Can you walk me through that?

25       A    You would look through the windows as you

Page 100

1    walk around.  And if you were checking the ID, you

2    just look in and check the cab where the two front

3    people are.  And then if you're on the walkaround,

4    then you would just walk around while looking in

5    through the vehicle.  And then while you're walking,

6    you would lean over, or you would use the mirrors that

7    -- provided to check underneath for the underneath the

8    vehicle.

9         Q    So the way that you did an interior search

10   was just to look in the vehicle?

11        A    Yes.  We were doing an inspection, not a

12   search.  So we don't open anything.  We visually

13   check.

14        Q    Okay.  And the person that was doing the

15   perimeter of the vehicle, how was that different?

16        A    The perimeter, we'd do the walkaround and be

17   looking in the vehicle as well.  You don't open

18   anything, 'cause that would be considered a search.

19   We're not authorized to do a search legally.  We have

20   to do an inspection.  So we can visually look.  And if

21   we see anything that's out of place or whatever, we

22   can be like, hey, what's that?  And then we can

23   determine if that's going to deny entry or not.

24        Q    And when you were looking underneath the

25   vehicle, how would you accomplish that?

Page 101

1    A    Step back from it and lean down just a

2    little bit -- like this.  As long as you're about six

3    to eight feet back, you can see clearly under the

4    vehicle.

5    Q    So you didn't have to get down on your hands

6    and knees?

7    A    Oh, no.  If it was an issue, then they also

8    had the mirrors on the sticks you could slide up

9    underneath.

10    Q    When you were stationed at a gate, is there

11    somewhere where you sat down?

12    A    Yes.  Every -- had a booth.  And typically

13    the booth had a computer in it as well, so you could

14    access escort lists or whatever and also watch

15    YouTube.

16    Q    Also watch YouTube you said?

17    A    Yes.

18    Q    Okay.  So you would inspect each vehicle

19    that came in if you were on the gate.  Is that right?

20    A    Yes.

21    Q    And how did you verify that the individual

22    had proper credentials?

23    A    You would do a face visualization

24    verification by looking at the -- the ID on the

25    picture on the side badge, confirming with the driver.

Page 102

1    And my test was always you did the spacing between the

2    eyes and the nose frame, and that's a pretty easy way

3    to identify if that's the correct person.  And then

4    you would turn around, scan it.  If it scanned green,

5    you're good.

6            If it scanned red, then you would call up --

7    you call up operations, and they would confirm if the

8    badge was good or no good.  Because sometimes you get

9    a red because the side of the badge the magnet itself

10   is faulty.  And so you would still have access, but it

11   wouldn't scan green.  And then at that point, after

12   you get it cleared, say you can go through the gate

13   and give him back his badge.

14       Q     And how frequently would you be assigned to

15   a gate in a week?

16       A     One or two times a week.

17       Q     What else besides vehicle inspections would

18   you do when you were working a gate?

19       A     We also had vendor screening, which is where

20   you had the larger trucks coming through and you had

21   to actually climb up into the back and visually make

22   sure there's no open boxes with -- 'cause all the

23   boxes that come through vendor screening are supposed

24   to be sealed.  And no open boxes or any other people

25   hiding in the back or illicit cargo, anything like

Page 103

1   that.  You look through from the back end of the

2   truck, and you do your best to try to visualize, see

3   what's in there.

4        Q    So you open the back of the truck?

5        A    They did.

6        Q    The vendor did?

7        A    Yes.  And they all had lift gates.  So we'd

8   just ride the lift gate up, and then go, okay.

9        Q    And then you walk into the truck and look?

10       A    No.  Typically, the load was all the way to

11  -- to the edge.  So you couldn't actually go in.  You

12  would just stay on the lift gate, and you'd shine your

13  flashlight in, and then do your best to see if there's

14  anything in there.  And that was all you could do.

15       Q    Were there times when there was more than

16  just the cargo at the end of the truck?

17       A    No.  I never had any -- any violations that

18  had to deal with the cargo at all.

19       Q    Okay.  And did you also inspect underneath

20  the trucks?

21       A    Yes.

22       Q    And would that be done the same way that you

23  described earlier?

24       A    Exactly.  Well, they're even easier because

25  they're all 18-wheelers and the -- the bottom of the

Page 104

1    truck is about waist high and, you know, higher.

2    So --

3         Q    And did you also inspect the cab of the

4    truck?

5         A    Yes.  And those we actually would climb into

6    the truck and then open up the glovebox, you know,

7    like that.

8         Q    Okay.  How often would you inspect a truck

9    when you were working on a gate?

10        A    You mean like vendor screening?

11        Q    Vendor screening, yes.

12        A    That was not a very common -- I mean, you

13   get that maybe once every week or -- every two or

14   three weeks.  So -- because it's one gate out of the

15   eight, nine gates that we manned, plus you had

16   terminals.  So, I mean, you could get everything

17   rotated.  And you didn't get Davis South very often.

18        Q    Davis South?

19        A    Yes, that's the vendor screening gate.

20        Q    And what you just described, the way that

21   you inspected the vendor trucks, is that something

22   that all the CSOs would do?

23        A    Yes.

24        Q    And do you think that that's the same

25   frequency for everyone?  You only get assigned to

Page 105

1    Davis South every few weeks?

2        A    Right.

3        Q    When you were assigned to Davis South, how

4    often would you have trucks coming through?  Vendor

5    trucks.

6        A    The first 45 minutes we'd typically have

7    anywhere from 10 to 15 trucks coming through, not all

8    of them semis.  A lot of them were like the little

9    itty bitty -- like the smallest U-Hauls you can get,

10   like would come through.  But then we get about 10 to

11   15 depending on the day of the week.  And then after

12   that, you would get -- trying to remember.  We'd have

13   one vehicle that would come in around like three or

14   four o'clock and that was it.

15       Q    How many people would usually be assigned to

16   that gate on Davis?

17       A    It's a two-man post absolutely.

18       Q    Okay.  And when you were assigned to Davis

19   South, would you have one person that was doing the

20   perimeter of the vehicle inspection and one person

21   that was doing the cab inspection or did that vary per

22   shift?

23       A    It varied.  But generally what would happen

24   is one person would get the IDs, verify them, hand

25   them to the other guy to do the scan, climb into the

Page 106

1    cab when the crew members -- when the driver and the

2    passenger got out.  And they would come around, they

3    would stand in the middle of the island away from the

4    vehicle.  And then the one officer would watch them

5    while the other officer did the cab, and then would

6    get around and walk around the back.

7         And then you would rotate.  Like, "Hey, I

8    want to do the -- I want to do the cab."  "Okay."

9    Whatever.

10        Q    Would it ever happen that one person would

11   never have to get into the cab?

12        A    If they didn't want to, no.

13        Q    Okay.  Did you ever ask the other officer

14   that you were working with to -- did you ever say,

15   "Hey, I don't want to get in the cab today"?

16        A    No.  Absolutely not.

17        Q    Okay.  I want to look at Exhibit 3 again.

18   Number 2 says, "Perform terminal security patrols of

19   areas including but not limited to sterile areas,

20   employee portals, Skylink stations, baggage claim

21   areas, parking garages, curbside and terminal ramp

22   areas."  Do you see that?

23        A    Yeah.

24        Q    Is that something that you would be assigned

25   to do on a specific shift or is that something that

1    would be more spread across all the different shift

2    that you might be on?

3        A    All shifts perform and -- but if it's a

4    specific task, you can get perimeter, is what they

5    call it.  And you would just track the perimeter, the

6    fence line, inside, outside, making sure that all the

7    gates had chains on them.  That fences weren't

8    damaged, they weren't leaning over, there weren't

9    holes cut in them, the barbed wire was in-tact.

10       Q    Is that perhaps more number 3 what you're

11   describing now?

12       A    No.

13       Q    No?  Okay.

14       A    Well, it could.  But typically the rover was

15   the person that went from gate to gate to gate to

16   gate.  And basically bathroom breaks, do you need

17   something to eat, do you need to go take the vehicle

18   to go to the terminal because you need to do

19   something, or whatever.  It was just basically you

20   rove around, and you were just -- you were the gopher.

21       Q    Okay.  So terminal security patrol.  What

22   would you do when you're doing terminal security

23   patrol?  Or is that not a specific task?

24       A    No.  No.  You're right.  You're right.  The

25   terminal security is not the vehicle.  I'm sorry.  I

EXHIBIT X                    199

Page 108

1    got that confused.  That's for when you're inside the

2    terminal and you're just walking both sterile and

3    secure side.  And you just -- you would walk, you

4    would check -- for my shift, because the gates were

5    closed, you would have to check each door to make sure

6    it was locked so they couldn't gain access to the

7    aircraft that were parked on the -- on the segway.

8           And then you'd walk and just make sure

9    people weren't leaving their bags unattended,

10   answering questions, basically interacting with the

11   customers, you know, the passengers, whenever you

12   wanted to or whenever they wanted to.  Just -- it was

13   basically a courtesy patrol.  Just walk around seeing

14   how you're doing and then checking doors, make sure

15   they're locked.  And then you'd go to the outside and

16   you'd just basically walk and look for anything

17   suspicious.  You know, eyes and ears for the police.

18        Q    So would you pretty much just walk the

19   entire shift when you were doing that?

20        A    It was walk as far as you feel like it, sit

21   for as long as you want.  When you're not -- you know,

22   when you're done, sit and walk somewhere.  So -- and I

23   could walk from one -- I could do an entire sweep of

24   one side from the other in less than 45 minutes.  And

25   it's about a mile.  They're a half-mile long, but

Page 109

1    they're half-circles.  So it's almost a full mile from

2    one end to the other.

3        Q    What might happen that would make that

4    longer than 45 minutes?

5        A    If I had stopped by a customer or had an

6    unattended bag that I had to call in, which means you

7    basically stop and sit down and just watch the bag and

8    see, you know -- first you'd ask, "Anybody know whose

9    bag this is?"  And if everybody is like, "Oh, no.  I

10   have no idea," then you would call PD on the radio,

11   and you would sit down and just watch the bag and tell

12   people, "Stay away from the bag.  We don't know what's

13   up with that."  And that was it.

14             And then basically, you know, you would stop

15   and talk to a couple of the passengers on numerous

16   occasions that would just sit down and talk to them.

17   I mean, they're there when I -- too.  So --

18        Q    And then it says employee portals on number

19   2; right?  Is that the employee portal that we were

20   talking about earlier in your deposition?

21        A    Yes.

22        Q    What would you do when you were stationed at

23   an employee portal?

24        A    Originally we weren't doing employee

25   portals.  But when they added the portals, they did --

Page 110

1    you would basically do bag searches, ID checks, and

2    then we had installed scanners that were like not

3    quite X-ray machines, but you'd walk through and they

4    detect any -- any metal items or any large items.

5    That would mean you do like a pat down.  And you'd

6    have to do the back of your hands and stuff like that.

7            Sort of -- it was similar like TSA, but it

8    was for the employees.  And it was -- it depends on

9    what --

10           THE REPORTER:  I'm sorry.  This is the

11   reporter.  The audio has frozen.  I'm going to take us

12   off the record.  The time now is 1:06 p.m. and we're

13   off the record.

14           (Off the record.)

15           THE REPORTER:  The time now is

16   1:10 p.m.  We are back on the record.

17   BY MS. HARRISON:

18       Q    All right.  Mr. King, I believe before we

19   lost connection you were talking about what you would

20   do when you were assigned to an employee portal.  And

21   so I think that you were saying also that you would

22   potentially have to pat employees down.

23       A    Yes.

24       Q    Okay.  And it's essentially like a TSA

25   screening area, but for employees.  Is that right?

Page 111

1      A     Correct.

2      Q     So would you have to lift bags?

3      A     Typically they were -- we were given,

4  originally when we first started, it was nothing but

5  chairs.  So they'd provide us with holding metal

6  chair, and we had to search bags on that.  And then

7  they eventually got the same carts like TSA uses for

8  their random portal checks as well.  And they would --

9  you know, they come through the portal and then they

10 put the bag down on the -- the rolling table in front

11 of you.  And then you --

12          I would say, I would have them open it and

13 say, "Hey, unzip that.  Okay.  Open this."  And then I

14 would, you know, do it, look in, and if I couldn't see

15 the bottom, then I would have them, "Hey, pull this

16 out for me.  And pull this out for me."  I didn't want

17 to touch their stuff.  I'm not going to stick my hands

18 in there because we already -- we had one person

19 actually got stuck by a needle.  It was a sewing

20 needle, but they still got stuck by a needle.

21          And that's when they were like, okay, nobody

22 put your hands in bags.  And, you know, so we did that

23 with every pocket.  Opened everything and made sure

24 everything that they're bringing was authorized to be

25 bringing into security.  And then I'd have them put

Page 112

1    everything back in and zip it back up.

2         Q    Okay.  And was that the same when you were

3    in sterile areas?

4         A    Yeah.  That was in a sterile side.  Because

5    at that point -- we did it on the sterile side because

6    at that point they violated the -- violated the FAA

7    regulations when they carried in an unauthorized item

8    into the sterile side.  They can't say, "Well, I

9    didn't mean to," because, you know, you're already too

10   late and you're already across the line.  So at that

11   point, we would call police and they would be escorted

12   out.

13        And they would get -- they could be anywhere

14   from, you know, depending on the severity of it, they

15   could be arrested, charged, lose their privileges,

16   you'd lose the badge, it depends.  I mean, you would

17   have people bringing in guns that forgot they were in

18   their bag.  So --

19        Q    What did you do in order to restrain a

20   person while you waited for police?

21        A    We were not allowed to lay hands on anybody.

22        Q    Okay.  Did you ever have anyone run?

23        A    You follow them.  And you have your radio.

24   You keep advised with the MCR.  That's who you call.

25   That's the acronym, but that's the master control

Page 113

1    room.  That's where all the cameras are for the

2    airport.  And you'd be on the radio with them.  "Hey,

3    they're now passing, you know, heading south terminal

4    D going past gate 32."

5         Q    And when that happened, was the person

6    running, were they walking?

7         A    Some would run, some would walk.  I only had

8    one that walked.  I didn't have one that ran.  But

9    that was the only time I ran into anybody doing it.

10   So --

11        Q    And you stay with them until the police show

12   up?

13        A    You just keep following them until the

14   police show up or until the MCR says, "I got them on

15   camera.  I'm following them.  You're good."  And then

16   at that point they can direct police to show what part

17   they're going to come out of.  Because there's only

18   limited access and exit points from the airport.

19   So --

20        Q    So that could have happened at any time that

21   you were working an employee portal?

22        A    Correct.

23        Q    It just happened once, as far as you

24   remember.

25        A    Yes.

1      Q     Did it happen with other CSOs where they had

2    to chase after someone?

3      A     Well, you wouldn't chase.  You'd just walk.

4    I mean, you could see -- 'cause they don't want us --

5    you know, we're not supposed to pursue them.  But we

6    just stay where we can see them.  So they don't want

7    us chasing people, technically.  They just want us to

8    continue to watch them so that we can tell police

9    where they are.

10          We can -- we give them -- we give them a

11    description over the radio as well.  And MCR will pick

12    up on them.  And MCR, they have cameras everywhere.

13    They'd know where you'd hide.

14      Q     So if the person took off running, you

15    weren't supposed to take off running?

16      A     Absolutely not.

17      Q     You were supposed to walk behind them?

18      A     And if they got out of sight, they got out

19    of sight.  You should give them a description.

20      Q     Anything else that you've had to do when you

21    were working the employee portal?

22      A     Just the bag searches.  And that was the --

23    that was where the issue came, was that 90 percent of

24    the time you were stuck with a chair.  And trying to

25    lean over and search a bag while it's on the chair is

Page 115

1    what -- you know, was one of the things that I was

2    asking for a taller table to get rid of that issue.

3         Q    Didn't you say, though, that they had a cart

4    that they brought in?

5         A    Yes.  But like I said, 90 percent of the

6    time, that was the Maltos guy got it.  'Cause they

7    only had one cart.  And then you were just stuck

8    dealing with the chair.  And most of the time you

9    would be like, if it was not busy, then Maltos guy

10   would do it.  If we got busy, you had to help out or

11   you had to line back up.  And so you would have to get

12   a chair.  The chair typically you were just sitting on

13   waiting for somebody to come through.  When it gets

14   busy, you would have to put the bag in that folding

15   chair you were sitting on and search it.

16        Q    What is Maltos?

17        A    Maltos is the contract security agents.

18   They are now Allied.

19        Q    Okay.  So I'm trying to understand.  Was

20   that just you and one Maltos security person at each

21   portal?

22        A    Yes.

23        Q    And the Maltos guy or gal was supposed to be

24   the one that was looking through the bags primarily?

25        A    Yes.

1     Q    And you would only do that if they were

2   backed up and you needed to assist?

3     A    We would do it, you know, basically

4   friendly.  You know, like, "Hey, I'll take it.  I'll

5   do the bag searches and you, you know, can do this or

6   go work the scanner."  And so, I mean, we rotate.

7   You'd compromise.  You'd work with this person, do

8   that.  You'd work with this person, they had a way

9   they wanted to do it.  And so as long as you got the

10   job done, the job was done.  That's all that mattered.

11     Q    So it would only be sometimes that you had

12   to put the bags on the chairs.

13     A    When it got busy, which is most of the

14   portals, especially in the morning between, you know,

15   from like 4:30 till 6 when you got off shift or 7,

16   when they worked tens.  It would be slammed.  You

17   would be getting, you know, a line of people and you

18   were always helping out.  'Cause those people, if you

19   didn't, they would complain, because they're going to

20   do labor work.

21     Q    So when there was a table, you could use the

22   table if the Maltos person wasn't using the table?

23     A    Correct.

24     Q    Anything else that you did when you worked

25   the employee portals?

Page 117

1      A   The other issue was the one when you were at

2   the front before they came into the portals, when it

3   was a no bag portal.  Originally you would, you know,

4   if somebody came up you would be like, "Hey, no

5   problem.  Let me see your badge," blah-blah-blah, and

6   you'd stay seated.  It wasn't an issue.  And then they

7   changed it saying, oh, you got to stand because it's

8   professional.

9         Well, when you're at night, you get a guy

10  who comes and then you get one person done.  And then

11  you sit down and then immediately here comes another

12  one.  You got to stand back up.  Another person.  They

13  don't just come in a line and, like -- for 30 minutes

14  or for shift change.  So you're working at portal from

15  9 or 10 all the way till 4:30 and you're getting one,

16  two, one every couple minutes, another one, another

17  one, another one.

18        And I was just like, I can't constantly up,

19  down, up, down, up, down, up down, up, down.  Like,

20  can I just sit down?  That's another request, was not

21  to have to stand for every face-to-face interaction.

22     Q   Okay.  So I appreciate you telling me that.

23  Thank you.  Right now I'm not trying to -- I'm not

24  asking about your accommodation requests.  I'm just

25  asking about what the job duties were at those various

Page 118

1    positions.

2       A    Okay.

3       Q    Okay.  So that was one of the job duties.

4    You had to be outside of the portal, and you had to

5    look at people and verify their badges before they

6    came in?

7       A    Correct.

8       Q    Okay.  And that required standing and

9    sitting?

10      A    Yes.

11      Q    Okay.  Anything else that you would do if

12   you were assigned to an employee portal?

13      A    That was it.

14      Q    Okay.  Thank you.  What about Skylink

15   stations?  What would you do when you were assigned to

16   a Skylink station?

17      A    You didn't get assigned to a Skylink

18   station.  It was just part of your patrol when you're

19   on the secured side.  You would just go through the

20   Skylink station, same thing just like any other area.

21   You were looking for bags, seeing if passengers needed

22   any assistance.  So just the entire terminal, all of

23   those little separate baggage areas.  All that and

24   just -- just observing.  Looking for unattended bags,

25   suspicious activities.  People who were lost.  So --

Page 119

1        Q    So that would be more part of what you were
2    doing if you were patrolling on foot?
3        A    Yes, that's our foot patrol.
4        Q    Okay.  And same thing, then, with baggage
5    claim.  That was part of a foot patrol?
6        A    Yes.  Yes.  They did require -- we had to do
7    -- for each shift, we had to do a sweep of the sterile
8    and a sweep of the public side.  So that was it.
9    After that, if you did more than that, good.  But they
10   only mandated that you had to do one and one.
11       Q    So what else would you do when you were on a
12   foot patrol shift?
13       A    That's it.  Check the doors, walk around for
14   unattended bags, talk to the passengers.
15       Q    And that was either an eight-or-ten-hour
16   shift?
17       A    Correct.
18       Q    And so in an eight-or-ten-hour shift, you
19   only had to sweep the interior and the exterior once
20   each?
21       A    Yes.
22       Q    So what would you do the rest of the time?
23       A    Keep doing it.  Just keep walking and
24   checking on the passengers.  And, you know, oftentimes
25   you get the ones that are stranded overnight.  They

Page 120

1    don't want to sleep in the chairs, so you go try to

2    chase down a customer experience person so you can get

3    a cot for them.  Do all that kind of stuff.

4         And, you know, just sit down and talk to

5    them.  Basically, be a person, just, you know, "I'm

6    stuck here.  You're stuck here.  Let's have a

7    conversation."  You know, let's just be friendly and

8    just let the -- let the time pass by.  And, you know,

9    show them that, hey, if you get up on Google you can

10   put in your flight number to tell you what gate, what

11   time.

12        And you want to -- especially for American,

13   they like to change the flights like an hour prior to

14   the departure time and they don't let you know.  So

15   you're sitting at one gate and then you find out, oh,

16   it's at the other terminal.  And I used to -- you

17   know, so I would always sit down and be like, "Hey, I

18   know your flight.  Yeah.  It's still from this gate."

19   So I'm checking by that hour prior.

20        So just -- yeah.  Got to do some customer

21   experience, customer service as well as security.

22        Q    Did you do anything with regard to the

23   parking garages when you --

24        A    No.

25        Q    -- were on foot patrol?

Page 121

1      A     Absolutely not.  We were not allowed to go

2   to the parking garages, nor were we allowed to use the

3   stairwells, the fire exit stairwells, or go down to

4   the DART station.

5      Q     Okay.  So with regard to Exhibit No. 3, item

6   number 2, where it says, "Perform security patrols,"

7   one of the items listed is parking garages.  Are you

8   saying that you never patrolled the parking --

9      A     We were not allowed to because of the

10  homeless.

11             THE REPORTER:  I'm sorry, sir.  I'm

12  sorry.  I didn't hear his answer.  Mr. King, I know

13  you know where she's going with her questions.  But

14  I'm going to have to ask you to just allow her to

15  finish, because there's a delay on my end and I'm

16  getting a little overlap.  So --

17             THE WITNESS:  I apologize.

18             THE REPORTER:  Okay.  I'm sorry.  I

19  didn't hear your -- I heard that you said,

20  "Absolutely.  We were not allowed to use the parking

21  garages, use the stairwells, the fire exit, and then

22  or go down in dark --" and I didn't hear the rest.

23             THE WITNESS:  The DART Rail.  It's

24  where the Dart Rail connects to the terminal.

25             THE REPORTER:  DART.  DART Rail.  Thank

Page 122

1      you.  Okay.  Sorry, counsel.  I just want to make sure

2      I get you a good record here.

3                 MS. HARRISON:  I appreciate that.

4      Thank you.

5                  THE REPORTER:  Thank you.

6                  MS. HARRISON:  Are you ready to

7      proceed?

8                  THE REPORTER:  Yes, ma'am.

9                  MS. HARRISON:  Okay.

10     BY MS. HARRISON:

11        Q    So it's your testimony that you never

12     patrolled the parking garages.

13        A     Absolutely.

14        Q    Is that for the entire time that you

15     worked --

16        A     Never.  Not even once.

17        Q    Okay.  Make sure you let me finish first

18     before you answer.  Okay.

19                 THE REPORTER:  Thank you.

20     BY MS. HARRISON:

21        Q    The next item listed is curbside and

22     terminal ramp areas.  Did you patrol curbside areas?

23        A     Yes.

24        Q    Okay.  And that would be part of your

25     walking foot patrol?

FOR READING & SIGNING ONLY

EXHIBIT X              214

Page 123

1      A     Correct.

2      Q     And what about terminal ramps?  Would you

3   patrol that while you were on your walking foot

4   patrol?

5      A     We went to curbside or -- 'cause we didn't

6   ever go into the jetways, which might be the ramp.

7   That's -- we did go down into the airline areas.  But

8   we never actually would go out into the tarmac where

9   the aircraft were, 'cause we didn't have any need to

10  be out there.  So --

11     Q     Okay.  Were you done?  Sorry.

12     A     Yeah.  Sorry.  Yeah.

13     Q     And what you just described, would that be

14  the same for all CSOs?

15     A     Correct.

16     Q     I want to look at number 3 on Exhibit 3.

17  This is, "Performing roving security patrols of areas

18  including but not limited to AOA fence line and gates,

19  cargo and hangar areas, airport Board buildings, and

20  critical infrastructure sites."  Do you see that?

21     A     Yes.

22     Q     Is that something that you would do on foot

23  or in a vehicle?

24     A     That's in a vehicle.

25     Q     Okay.  Explain to me what you would do when

Page 124

1    you were on a shift that involved number 3.

2        A    You would take one of the vehicle -- DFW ASD

3    vehicles, and you would either -- you know, if you

4    were on perimeter, then you would drive the perimeter.

5    But inside or outside of the fence to ensure that the

6    fence is intact and that there wasn't any issues that

7    needed to be fixed.  And then we would check to make

8    sure all that gates that weren't being in operation

9    were locked and secured.  And for perimeter, that was

10   all you did.

11            You drove around that, you check all the

12   gates around both sides of the airport.  Sometimes you

13   would get half and half because they would have extra

14   people.  So they would have an east side and a west

15   side, and so you'd only do half of the airport.  And

16   then after that, you pretty much would just go do

17   whatever you wanted.  As long as you didn't leave the

18   airport property.

19        Q    So you'd have an eight-or-ten-hour shift

20   where you were assigned to do the perimeter in the

21   vehicle.  Is that right?

22        A    Correct.

23        Q    And how many times would you drive the

24   perimeter in that shift?

25        A    You would only do it once.

800-567-8658                                                  973-410-4098

EXHIBIT X                       216

Page 125

1      Q    And what would you do the rest of your
2    shift?
3      A    You would go by and see your friends at some
4    of the gates, you'd go to the terminals, see your
5    friends at the terminals, you would go use the
6    computer.  So it was pretty much you wouldn't really
7    do much at all.  You -- it was maybe an hour and a
8    half, two hours to do it.  And that's if you had both
9    sides.  And then after that, you just -- you know,
10   they just told you don't leave the airport.
11     Q    So you just got to do whatever you wanted
12   the rest of that shift?  Okay.  When you were doing
13   the perimeter, you mentioned having to make sure that
14   gates were locked.  Did that involve getting out of
15   the vehicle?
16     A    If it was difficult to see.  Because
17   typically you could pull up to it and hit your
18   spotlight and you could see it.  But if you couldn't
19   visually confirm it, then, yeah, you would get out and
20   go over there and actually shake the lock or whatever.
21   So -- but a lot of them, they were obvious, because
22   they had a metal bar going across and they'd have the
23   big padlock right there and you could tell it was
24   definitely secure.  You would just back up and go to
25   the next one.

Page 126

1      Q    Was there anything you had to get out of the

2  vehicle for on a consistent basis when you were on one

3  of those shifts?

4      A    If you were doing the -- the rover, the

5  gopher, then you would get out and go check every

6  gate.  Be like, "Hey, do you need anything?  Do you

7  need a bathroom break?  Do you want to go to the

8  terminal and walk around and stretch your legs?"  Or

9  whatever.  And then, you know, so that was -- I would

10  check the gates every two to three hours and do a

11  whole swing.  It'd normally take me about half an hour

12  to hit all of them.  And then I'd go sit -- go to the

13  -- the old HQ, when it was back where HR is.

14           And go over there and talk to the

15  supervisors or at, you know, the new DFW and would go

16  talk to the supervisors there.  We'd go hang out with

17  a friend at one of the gates and help them do the

18  gate.

19      Q    That's when you were doing a rover shift?

20      A    Yes.

21      Q    Okay.  When you were just doing a vehicle

22  patrol shift, is that different from a rover shift?

23      A    Yes.  The perimeter does the fence line, and

24  then they're done.  The rovers have to constantly go

25  around and check on every gate to make sure they have

1    everything they need.  They don't need, like -- you

2    know, they don't need toilet paper in the bathrooms,

3    they don't need hand sanitizer, or anything like that.

4    And just, you know, the want to do a bathroom break --

5              'Cause originally, they had Porta Potties.

6    And not everybody wanted to use the Porta Potties, so

7    you'd say, "Hey, take the vehicle and go to the

8    terminal and use it."

9         Q    Where are these people stationed?  Were they

10   outside?  Is that what you're talking about, people

11   with the Porta Potty access?

12        A    They're at the actual AOA gates.

13        Q    Okay.  So how often would you be assigned to

14   a shift where you were doing perimeter?

15        A    Same amount as like the vendor screening.

16   You didn't get it very often.  Two to three times a

17   week -- two -- two -- or once every two to three

18   weeks.  Because, you know, you got added in.  It was

19   like 30-something, like 27 total to post.  And so you

20   got to rotate that through every month.

21        Q    All right.  So when you were doing a rover

22   shift, how often would you be assigned to a rover

23   shift?

24        A    The same.

25        Q    Okay.  So when you say there were 27 posts,

EXHIBIT X                    219

Page 128

1    does that take into account that there were -- we

2    talked earlier about being assigned to the gates.  So

3    there would be a different, one or two gates at every

4    terminal.  Is that part of the 27 posts, for example?

5         A    There's -- you got one, two, three, four --

6    there's only four of them at the terminals.  And then

7    you would go outside.  We had -- west freight and we

8    had Southwest freight.  So you'd have like six or

9    seven depending.  Sometimes we'd open an extra gate.

10   Like if we're -- sometimes they would open Baker South

11   and they'd have Charlie -- you know, when Charlie

12   South closed, we had to open up an extra gate, 'cause

13   it was the main gate.

14        So they had east, south was open for a

15   little while.  But I'm just guesstimating.  But

16   there's about a total of, you know, when you include

17   portals, the terminals, and each gate, there's about

18   20-something, 27, almost 30 different posts you could

19   have that's just randomly given out to people.

20        Q    Okay.  And that's what I was trying to

21   understand.  Is there might be an AOA gate on one

22   terminal and if there was, sounds like you were

23   describing, maybe five to eight different gate

24   assignments you could have.  But that's all part of

25   the 27 to 30 posts that there might be.

Page 129

1    A    Correct.

2    Q    And then as part of that 27 to 30 posts,

3    there's also multiple different locations you could be

4    on employee screening.  Is that right?

5    A    Right.

6    Q    And then you might be on a rover one shift

7    where you might be on perimeter or patrol.  Is that

8    right?

9    A    Correct.

10    Q    Okay.  And every CSO was assigned just a

11    rotation of some kind among all those shifts.  There

12    wasn't anybody that just did one of those duties.  Is

13    that right?

14    A    Correct.

15    Q    I want to go back to number 3.  This says

16    that you were doing patrols of AOA fence line and

17    gates.  I think we talked about that.  Cargo and

18    hangar areas.  What would you be inspecting in cargo

19    and hangar areas?

20    A    You'd look to make sure they're not having a

21    -- a straight through from the public side into the

22    AOA.  Because the cargo buildings have the cargo doors

23    on both sides, and you got to make sure that they

24    don't have one that's open to the public at the same

25    as one that's open to the other side without being

EXHIBIT X                          221

Page 130

1  watched.  And so basically, you'd drive through the

2  cargo areas, you look for an open door.  And if you

3  see an open door, then you'd basically stop, get out.

4  And you'd look inside the cargo area and see, A, is

5  there another door open today, or, B, if there is, is

6  there somebody watching this door or stopping you?

7           And if you see that there's access to the

8  AOA, then you are supposed to start walking to the AOA

9  and see if anybody stops you.  And if you make it to

10  the AOA, then that's a violation.  And you call

11  police, and they have to do a report.

12      Q    So would that just involve getting out of

13  the car and walking?

14      A    Yes.

15      Q    Any other physical activity that might

16  involve?

17      A    No.

18      Q    How often would you have to do that on a

19  shift?

20      A    It wasn't very often.  It was, you know,

21  they'd get fined every time.  Like, 10,000 is the

22  minimum.  So they -- they pretty much don't do it very

23  often.  I've -- I think all together, I mean, I've

24  probably done it maybe two dozen times the entire time

25  I was there.

Page 131

1        Q    And was that part of your perimeter patrol?

2        A    Correct.

3        Q    And then the next item listed in number 3 is

4    airport Board buildings.  What would you do with

5    regard to inspecting airport Board buildings?

6        A    Drove around the -- the DFW HQ.  Just drove

7    around the outside of it and would go.  That was it.

8        Q    And what were you looking for when you did

9    that?

10       A    Anybody standing around.  If any doors were

11    broken or anything like that.

12       Q    And if you saw somebody standing around,

13    what were you supposed to do?

14       A    See what they were doing.

15       Q    Like get out of the car and talk to them

16    or --

17       A    Roll up.  "Hey, man.  How are you doing?

18    You all right?  You need any help?"  And it's a lot of

19    the times, "Oh, I just got off work."  "Okay.  Cool."

20    You know, they're not trying to break in.  It's public

21    property.  Public area, they can do whatever they

22    want.

23       Q    Okay.  And then critical infrastructure

24    sites.  What were you looking for when you drove past

25    one of those?

Page 132

1        A     That was the oncourse sites, which are like

2    the -- the Transformers.  The big -- they're fenced

3    in.  They have all the power systems and stuff.  We

4    used to check those.  And it's just basically making

5    sure that the fences are -- or there's, you know,

6    nobody snuck into them or cut open the fence to try to

7    get in to sabotage them or whatever.  It's critical

8    infrastructure for power for the airport.

9             So we used to do that, but then they took it

10   off because they -- we found out it wasn't something

11   we were supposed to be doing anymore.  They canceled

12   it like a year ago and they just never told us.  So --

13        Q     Would that just be a vehicle inspection --

14        A     Yes.

15        Q     -- from the vehicle?

16        A     Yes.  It's basically like checking the AOA

17   gates.  Drive up, hit the spotlight, is the padlock

18   there?  Okay.  We're done.

19        Q     Okay.  Number 11 on Exhibit 3 says,

20   "Coordinates with police services and other Board

21   departments on traffic management at terminals and

22   emergent areas through the airport."  Is that

23   something that you would do on a specific shift?

24        A     As needed.  Like, depends.  You'd get there

25   and sometimes traffic would be backed up 'cause they

Page 133

1  scheduled all their flights to land at the same time.
2  And you basically just go out there and just try to
3  tell people you can't stop into lane number 2.  You
4  have to go into the parking garage to park, and then
5  you can pick up your passenger.  And basically just,
6  you know -- basically tell them to keep moving, keep
7  moving.  And then stopping people so they can let
8  people off the curb to get into the flow of traffic
9  and stuff like that.
10           It didn't happen very often, but when it
11  did, I mean, the rushes last like 10, 15 minutes and
12  that's it.
13      Q    What type of shift assignment would that be
14  where you might have to do traffic management?
15      A    Terminals.
16      Q    Okay.  This next part says, "And emergent
17  areas throughout the airport."  Do you know what that
18  means?
19      A    I'm assuming if there's any type of
20  emergency.  Like, even if it's, like, unfortunately,
21  you know, one of the things we have to think about
22  being at the airport is an airplane crash.  And at
23  that point, we run the assembly area for all the
24  emergency response vehicles.
25      Q    Number 15 we talked about a little bit

1    earlier.  But the one thing I want to ask about this

2    is, this says, "Provides a variety of additional

3    duties within the Department of Public Safety," and

4    then it lists a couple things.  One of them is

5    emergency response.  What types of things would you

6    have to do if you were providing emergency response?

7         A     It was just like I mentioned before where if

8    there was an airplane accident then we would set up

9    the assembly area for all the fire trucks and police

10   and ambulances.  They all go there first.  They don't

11   just go straight to the scene 'cause that's how you

12   get accidents like in San Francisco where you run

13   somebody over.

14              The fire trucks obviously go in first.  But

15   all the other outside responders that come in from

16   Grapevine and whatever, they all go to the assembly

17   area where they are logged in.  Then the fire chief or

18   the -- the incident commander will say, "Send in this

19   vehicle."  Then we would go out there and tell them

20   go.  And then we'd give them -- we'd have cards that

21   we gave and stuff like that.

22        Q     What's involved in setting that up?

23        A     Just a board with a bunch of pockets on a

24   board.  Like a -- like an easel, but it's got pockets

25   on it where we put the paper.  And we just write it

Page 135

1    down to that.  Put it in the pocket under whatever it

2    was, and they we'd go to the vehicle, and come back

3    in.  And we'd kind of guide the vehicle and tell them

4    where to park.  That's about it.  So it's just

5    basically parking lot organization.

6         Q    Okay.  What about special events security

7    and support?  What would that involve?

8         A    No idea.  Never had it.

9         Q    Okay.  I want to look now at the third page

10   of Exhibit 3 that says efforts.  Bullet point number 2

11   says, "Climbs into, out of, and searches under

12   vehicles."  Did we talk about that with regard --

13   well, let me restart that question.  Is that something

14   that you would have done primarily when you were

15   working gates?

16        A    Yes.

17        Q    Is there any other shift where you would

18   have been climbing into or out of or searching

19   vehicles?

20        A    No.  That's the only time we ever deal with

21   vehicles is at the AOA gates.

22        Q    Perhaps, say, when you were on a rover

23   shift?

24        A    You would never deal with a vehicle unless

25   you were stopped to help somebody that was working the

Page 136

1    gate.

2         Q    So when you were doing a rover shift, would

3    you ever relieve anyone at a gate for a break?

4         A    Yes.

5         Q    Okay.  So that might be --

6         A    Yes.

7         Q    -- time when that might happen.  The third

8    bullet point is, "Works in awkward positions such as

9    kneeling, stooping, or squatting."  Do you see that?

10        A    Yes.

11        Q    Is that something that you would do

12   intermittently throughout a shift?

13        A    Correct.

14        Q    Okay.  When would you be kneeling on a

15   shift?

16        A    I don't think I've ever actually kneeled.  I

17   can't think of a single time I actually got down on a

18   knee.

19        Q    Okay.  Is it potentially something you'd

20   need to do with regard to a vehicle inspection?

21        A    No.  You just walk a little farther back,

22   you can look completely under the vehicle.  I can't

23   think of any time -- I mean, I wouldn't get my knees

24   dirty.

25        Q    Okay.  Is it something that you ever saw

Page 137

1    anybody do with regard to a vehicle inspection?

2         A    No, I can't.  I can't recall ever seeing

3    anybody do it.

4         Q    Okay.  What about stooping?  Is that

5    something you would do to pick up a bag, perhaps, or

6    do a pat down of an employee at an employee portal?

7         A    It depends on if he was short.  Because you

8    would only do pat downs on pocket areas, because

9    that's where you can typically have stuff.  So it's

10   going to be mostly around the waist, if not, over.

11   Because that's where people are going to carry stuff.

12   And then, again, we didn't pick up bags.  I let them

13   do that.

14              We'd typically try to do as much hands off

15   on the bags as possible.  The only time, really, as

16   far as -- would be the leaning over to look into the

17   bag.  Never.  That's -- that's probably the only time.

18   I mean, other than just the kind of leaning over to

19   look under the vehicle when you're backed up from it

20   to check underneath.

21        Q    So when you would pat somebody down, you

22   would never pat down their leg, go down to their

23   ankle?

24        A    No.  It wasn't a full pat down.  The scanner

25   detects the abnormalities on the body where there is

1    something that shouldn't be.  And it's automatically

2    programmed to ignore, like, wallet-size things and

3    keys or cell phones.  So it wouldn't -- we'd be

4    searching, got to do pat downs on everybody.  And then

5    basically, just be like, "Hey, I'm going to -- I'm

6    just going to -- okay.  Yeah.  That's --" and then

7    most times they just pull it out.  "It's this."  "Oh,

8    it's -- your key.  Okay.  Cool.  You're good."  So --

9        Q    Okay.  What about squatting?  Did you ever

10   squat?

11       A    Same with kneeling, no.

12       Q    What about if you had to pick something up?

13       A    Kind of lean over and get it.  I mean, I

14   wouldn't squat because that's uncomfortable.  So --

15       Q    Okay.  So that's not --

16       A    It would be uncomfortable.

17       Q    It's no lifting technique that you would use

18   to lift --

19       A    We don't lift anything heavy.  So if I was

20   leaning, I would be picking up, like, ID or something,

21   keys, or something like that.

22       Q    Another bullet point on this is, "Sits for

23   extended periods of time."  Is that something that you

24   did?

25       A    Oh, yes.

EXHIBIT X                    230

Page 139

1      Q    Okay.  And, "Walks for extended periods of
2    time."  Same thing?  Something you did?
3      A    Yeah.  Like I said, I could walk an entire
4    terminal sweep in about 30 to 40 minutes.
5      Q    I want to turn now to talking about your
6    discrimination allegation.  Your complaint says that
7    you were discriminated against because of your
8    disability.  What is your disability?
9      A    I have bad back, bad hips, bad knees.
10   That's the simple one thing.  But I have sciatic
11   nerves in both hips.  I have arthritis in both hips,
12   both knees.  I have arthritis in my spine.  I have two
13   bulging discs in my lower back.
14     Q    When did your back, the conditions you said
15   with regard to your back, start?
16     A    When I was in the military.
17     Q    But they weren't conditions that resulted in
18   you asking for any kind of accommodation until 2020.
19   Is that right?
20     A    Correct.  Well, in 2019 I did take FMLA and
21   short-term disability, and they said I needed to
22   because I aggravated myself of doing the portals.
23     Q    And was that intermittent FMLA or was
24   that --
25     A    Yes.  It's intermittent.  As well as I did

EXHIBIT X                          231

1    two stints of physical therapy in that period, which

2    was short-term disability.  I missed a total of 19 and

3    a half weeks in 2019.

4        Q    And the condition with regard to your hips,

5    is that something that started before you worked at

6    the airport?

7        A    Everything -- everything I named is

8    something from the military, which means it started

9    before I was out.

10       Q    So the two bulging discs, you had that since

11   before you started at the airport?

12       A    Yes.

13       Q    And the arthritis, you had that before you

14   started at the airport?

15       A    Correct.

16       Q    And the sciatic nerve?

17       A    Yes.

18       Q    Anything else, any other disability that we

19   haven't talked about?

20       A    I have other disabilities that aren't --

21   need to be accommodated.  Like I have arthritis in my

22   elbows.  I also have issues with my triceps, because I

23   tore two out of the three tendons while I was in the

24   army on both arms.  I also have flat feet.

25       Q    Okay.  And those are not conditions that you

Page 141

1     ever asked for an accommodation, though?

2           A     Right.

3           Q     I'm going to hand you what I'm going to mark

4     as Exhibit 4.  These are responses to interrogatories

5     that were served in this lawsuit.  Have you seen these

6     before?

7                        (Exhibit 4 was marked for

8                        identification.)

9           A     I haven't seen this.  I do believe we

10    discussed it on the phone.

11          Q     Okay.  Let's look at interrogatory number 1,

12    which is on page 3 of 7.  Do you see that

13    interrogatory?

14          A     Correct.

15          Q     And did you draft the answer to this?

16          A     Yes.  This is the information that I gave.

17          Q     Are you the one that wrote this?

18          A     No.

19          Q     Did you review this in its final form before

20    it was sent over to me?

21          A     I did not.

22          Q     In this interrogatory, we asked you to

23    describe any leaves of absence you took.  Do you see

24    that?

25          A     Yes.

Page 142

1      Q    Okay.  You've listed a short-term disability

2   leave that began February 19th of 2019 and returned to

3   work April 8th of 2019.  Do you see that?

4      A    Yes.

5      Q    And then you have listed intermittent leave

6   as item number 2.  Is that the intermittent leave that

7   you were just referring to a minute ago?

8      A    Yes.

9      Q    And then item number 3 is a short-term

10  disability leave that November 9th of 2019, return to

11  work January 8 of 2020.  Do you see that?

12     A    Yes.

13     Q    You told me a little bit ago that you think

14  you were out for 19 weeks in 2019.  Is that right?

15     A    Yes.

16     Q    And was that part of the short-term

17  disability and intermittent leave that you mentioned?

18     A    Yes.

19     Q    And then in 2020, do you know how much you

20  were out?  Well, the third short-term disability

21  leave, that spend 2019 and 2020.  So when you said you

22  were out for 19 weeks in 2019, is part of that this

23  short-term disability leave in number 3?

24     A    No.  That's off of my -- my last pay stub

25  that was, like, dated December 20-something.

Page 143

1         Q     December --

2         A     For 2019.  So it was my total hours missed

3    from 2019 up until the last week of December.

4         Q     Of 2019?

5         A     Correct.

6         Q     Okay.  So some of that could have been the

7    short-term disability leave in number 3?

8         A     Yes.  Part of it was that, yes.

9         Q     Okay.  What was the short-term disability

10   leave in item number 3 for?

11        A     Both of those were for physical therapy.

12        Q     Both of what?

13        A     The short-term disabilities.

14        Q     Both of the short-term disabilities that are

15   listed in response to interrogatory number 1?

16        A     Correct.

17        Q     And they were for what again?

18        A     Physical therapy.

19        Q     Physical therapy.  Okay.  And that was

20   related to your back, hips, and knees?

21        A     Yes.

22        Q     Was it related to all of them or was there

23   one specific ailment that was --

24        A     They were focused mostly on my -- my back

25   and my hips.  Because those were the issues.  Those

Page 144

1    were the ones that were giving me the most issue.

2         Q    And in each of these, well number 2 and

3    number 3, it says that you spoke to supervisor Sol

4    Ruder and Kai or is it Kai?

5         A    Kai.

6         Q    Kai Hardin.  What did you speak to Sol Ruder

7    about with regard to this?

8         A    About my disabilities.

9         Q    Okay.  Was that multiple conversations that

10   you would have had with him or just one or --

11        A    Yes.  Multiple, multiple times.

12        Q    Okay.  What were those conversations about?

13        A    Basically that my hips -- you know, that I

14   had problems with my hips and my back.  And that, you

15   know, when I'm posted at the portals, I'm constantly

16   getting these conditions aggravated and it's forcing

17   me to most likely take the time -- take the next day

18   off.  Or just, you know, sometimes I've even had to

19   leave early because I'm not allowed to take my pain

20   meds while I'm there.

21             And if it gets to the point where I can't

22   tolerate the pain, I have to leave.  And I've had that

23   happen a few times where I was there for, like, half a

24   day.  Where, you know, six or seven hours and then I

25   had to leave because I could not continue.  And, you

Page 145

1   know, discussed that.  I discussed, you know, my
2   condition, my military stuff that I did that caused
3   the aggravations, that caused the injuries and
4   everything.
5       Q    And was that the same conversations you
6   would have been having with Kai Hardin?
7       A    Occasionally.  Most of the time it was just
8   at shift briefing.  She would kind of say, "Hey, I got
9   your form."  I was like, "Yeah, you know, my back was
10  bothering me," or whatever.  Sol was the one who would
11  always come out and see us at the gate.  He was one of
12  the very few supervisors.  Him and Sam Jones were one
13  of the only ones that would come by and just -- every
14  day, if not, every other day, and check on everybody
15  at every post to make sure you're doing all right and
16  sit down and have a talk with you.
17      Q    So he's the one you spoke to often about it?
18      A    Yes.
19      Q    With regard to your return to work January
20  of 2020, did you talk to Sol about that?
21      A    No.
22      Q    Did you talk to Kai Hardin about that?
23      A    When I returned, I ahead to talk to him
24  about it.  But I didn't -- I wasn't there.  And like I
25  said, I don't have Sol's number.  And Kai won't answer

Page 146

1   the phone at work -- unless she's at work.  It was --

2   for the return to work form, it was mostly just

3   talking to Karina.  But then when I got back, I had to

4   discuss everything with Sol and Kai.  And they came by

5   and visited me at the -- the dock.  Mostly Sol, but

6   Kai, I think, came out once or twice to see what I was

7   up to.

8       Q    And Karina is somebody that works for

9   Matrix.

10      A    Correct.

11      Q    With regard to your return to work and your

12  request for modified duty when you returned in

13  January of 2020, did you only speak to Matrix about

14  that?

15      A    Yes.

16      Q    So you didn't talk to Sol about it until

17  after you had already come back to work?

18      A    Correct.

19      Q    And same thing with Kai.

20      A    Yes.

21      Q    Okay.  I want to look at interrogatory

22  number 2 now.  And that, we asked you to identify the

23  accommodations that you were requesting and your

24  alleged disability.  I wanted to make sure that we've

25  covered all of your alleged disabilities first,

Page 147

1    because I think that there's a couple on here that you

2    didn't mention when I asked you a few minutes ago.

3    But let me just ask about them.

4            So one of them is spinal lumbar stenosis.

5    What is that?

6        A    That's the bulging discs.

7        Q    Okay.  And then chronic low back pain.   I

8    think you mentioned that already.  Lumbar

9    radiculopathy.  What's that?

10       A    That's the sciatic nerve.

11       Q    And then pes planus?

12       A    Flat feet.

13       Q    And that's something you never asked for an

14   accommodation about, though; right?

15       A    Correct.

16       Q    Okay.  And then gait abnormality?

17       A    That's just from the hips and the abnormal

18   walking that I do.  It kind of looks -- it's just

19   whenever it's in pain, I'll start kind of lumbering.

20       Q    Okay.  And other than the flat feet, is this

21   an accurate list?  Have you now listed all of the

22   disabilities that you think were the basis of your

23   discrimination?

24       A    Yes.

25       Q    When did the spinal lumbar stenosis begin?

Page 148

1      A    That was something I had before I got out of

2  the military.

3      Q    Do you remember when it began?

4      A    I just remember my back was giving my a hard

5  time.  Probably 2002, 2003 before we got our second

6  deployment.

7      Q    And was that something that was continuous

8  or was it sporadic?

9      A    It's been sporadic.

10      Q    Is it something that you requested an

11  accommodation for when you were in the military?

12      A    They don't do that.

13      Q    They don't do accommodation?

14      A    No.

15      Q    So you never requested an accommodation?

16      A    No.

17      Q    What are the symptoms?  How does it impact

18  your daily life?  Those are really two different

19  questions.  So let me restate that.  What are the

20  symptoms of the spinal lumbar stenosis?

21      A    Extreme pain in the lower back.  It makes it

22  extremely painful.  And sometimes it makes it to where

23  it's completely unbearable.  You can't stand up.  And

24  definitely can't walk.  And those are on the worst

25  days, which, luckily don't happen very often unless

Page 149

1    you do something to aggravate it.  Like, if I -- for

2    an example, like, if I were to do the yard, I can't do

3    the edging with our weedwhacker and mow it on the same

4    day.  I have to break them apart because it's too much

5    to do both of them on one day.

6         Q    And is that a permanent condition?

7         A    Yes.

8         Q    And in 2020, how did that affect your

9    everyday activities?

10        A    Most of the time I sit.  You know, moderate

11   level of pain.  And then, you know, it makes me really

12   -- like I said, with doing the yard work, I have to be

13   really cognitive of what I'm doing to make sure that

14   I'm not pushing my boundaries too far and that I'm

15   going to do something that's going to put me -- you

16   know, put me under.  You know, make myself have to

17   take my pain meds and just lay down and -- and be

18   gone, basically vegged out for about 12 hours.

19        Q    How did it impact your work?

20        A    It -- it made it very difficult towards the

21   end.  I mean, every -- the only thing that ever gave

22   me any problems was the portals.  And that's where I

23   focused on my request.  But that -- there -- probably

24   almost every day I did the portals, and it was a day I

25   went home, and my back was killing me.

Page 150

1     Q     How does it impact your everyday activities

2     now?

3     A     It's just something I got to be cognitive

4     about.  You know, I can't -- I can't go on long hikes

5     now because that would, you know -- when I go on

6     family trips, and my dad lives in Colorado Springs, I

7     go up to visit him.  And I basically -- I got to stop

8     every, like, hour and a half to two hours so I don't

9     get back pain and start getting back spasms.

10            So I'll get out and walk around the rest

11    stop or park -- get into the parking lot and just kind

12    of walk around and just stretch my back a little bit

13    just to walk.  And so it's just something that I have

14    to be considerate of any time I plan to do anything.

15    So I've always got to keep in mind that, hey, you

16    don't want to push too hard because, you know, you may

17    be able to tolerate it now, but tomorrow you're not

18    going to be very happy.

19          Q     When did your chronic low back pain begin?

20          A     2002, 2003.

21          Q     Is that related to your spinal lumbar

22    stenosis, or do you think it's something different?

23          A     It's the same.

24          Q     It's the same.  Okay.  What about the lumbar

25    radiculopathy?  When did that begin?

Page 151

1      A     Same.   It's the narrowing of the channels

2    that the nerves go through from your hips down into

3    your legs.  As it narrows down, it's touching the

4    nerve.  And so if you do a lot of activity and you can

5    get -- sometimes you can get to the point where you

6    aggravate that nerve, 'cause it'll end up touching,

7    and it'll get inflamed.  And then it's basically --

8    it's a shooting, throbbing pain down your legs.

9             And it's been getting farther and farther

10   as, you know, I'm aging.  So it gets farther and

11   farther.  Right now, now when it gets bad, it's down

12   below my kneecaps.  And then, you know -- the worst --

13   you know, when it gets real bad, people have had it go

14   all the way down to their feet.  So --

15      Q     Is that something, when it began, was it

16   continuous or intermittent?

17      A     Everything is intermittent.

18      Q     Okay.  So even today it's still

19   intermittent?

20      A     Yes.

21      Q     And how did that affect your everyday

22   activities in 2020?

23      A     The same like I said for my lower back.

24   It's you got to be cognitive.  You got to -- you got

25   to know, hey, I can push myself so far.  But then I

Page 152

1    know it's going to end up kind of coming back to bite

2    me.

3        Q    And how did it impact your work?

4        A    Most of the time I just dealt with the pain

5    and tried to tough it out until it was the end of the

6    shift.  And that's why originally when I was on the

7    intermittent leave, is that I took so many days,

8    because I would just bear through the whole shift.

9    Well, then I'd get up the next morning and I couldn't

10   feel my legs.  I can't get out of bed.

11             And I'd be like, I got to call in.  I can't

12   -- I can't go in.  I mean I -- I can't get out of

13   bed.  You know, if I do walk, you know, I'm barely

14   struggling.  Like, almost falling down.  My wife is

15   having to support me going to the bathroom.  So, you

16   know, I just kind of -- you know, you have that day if

17   you push too hard and you just ignore the pain for so

18   long, it's going to hurt real on your next day.

19        Q    Okay.  And then the pes planus, we don't

20   need to talk about that because you never -- you're

21   not claiming that that was a disability that's part of

22   this lawsuit; correct?

23        A    Correct.

24        Q    Okay.  And then the gait abnormality, is

25   that something that you requested an accommodation

Page 153

1   for?

2       A    That's -- the gait abnormality is the result

3   of when I'm starting to start feeling pain.  'Cause

4   you start -- like, if my right leg is hurting, well,

5   then I'm going to start putting more weight on my

6   left.  I'm going to start kind of having a small limp.

7   As in, just trying to put in a little bit of weight

8   and use, you know, right leg as little as possible.

9   And then it's just -- and then it ends up now the left

10  leg is bothering me.  Just kind of -- it's kind of

11  funny.

12      Q    And when did that begin?

13      A    Same.  2002, 2003.

14      Q    Is there something that happened in 2002 or

15  2003 that started all of these?  Like your back pain

16  and --

17      A    Six years in the army.

18      Q    Okay.  It wasn't necessarily like one

19  incident that happened?

20      A    I was one of those gung-ho soldiers that

21  wanted to go special forces and everything.  And I was

22  -- I ran like the wind.  I ran.  I tried to always --

23  I tore my triceps doing pushups.  So I tore two out of

24  the three twice in each arm on separate occasions,

25  just 'cause I don't -- I wouldn't quit.  I just keep

Page 154

1    going and then end up tearing -- tearing the muscle.
2    So --
3         Q    So if I was to ask you about how your gait
4    abnormality impacts your everyday life, is that a
5    different answer than what you've already told me?
6         A    No.  It's all -- all goes together.
7         Q    Would that be the same as to how it impacted
8    your work?
9         A    Yes.
10        Q    What about your right hip pain?  When did
11   that begin?
12        A    It's all the same.
13        Q    Okay.  And how did that impact everyday
14   activities?
15        A    Same.
16        Q    And would that be with regard to your work
17   activities, also the same?
18        A    Yes.
19        Q    Is it accurate to say that you're alleging
20   you were discriminated against based on all of your
21   disabilities as opposed to one individual disability?
22   Is that what you're claiming?
23        A    Yes, because they all go hand in hand.  You
24   know, they're all issues that I have that get
25   aggravated by doing certain things at work.

Page 155

1     Q    Okay.  In your complaint, you've alleged

2    that you were discriminated against when defendant

3    refused to reassign you to any of the positions you

4    applied for in August, September, and November of 2020

5    before you were terminated.  Is that correct?

6     A    Yes.

7     Q    What makes you think that you were not

8    reassigned because of your disabilities?

9     A    Because I applied for positions that I knew

10   I was qualified for and that were open according to

11   the vacancy list that is provided by the airport.  And

12   every time I was told they found better candidates.

13   And they actually -- I requested on November 6th for

14   all SD3, SD4, MP3, MP4 open positions, which is a

15   total of 41.  And that was at 6:41 p.m. on Friday.

16   And he responded to me at 8:30 p.m. Friday

17   saying, "No.  They found better candidates for every

18   one of those."

19    Q    Who responded to you?

20    A    That's Mark Young.  No.  Carl Young.  Carl

21   Young.  Too many Youngs.  It's Carl Young, my HR rep.

22    Q    Is there anything that Carl said that made

23   you think you didn't get any of those positions

24   because of your disabilities?

25    A    The fact that he claimed that he talked to

Page 156

1  41 -- inquired about 41 open jobs in two hours on a

2  Friday night really indicated that.

3      Q    Anything else?

4      A    And he also was not answering my e-mails for

5  weeks at a time when he was supposed to be providing

6  me with information.  I was constantly having to check

7  in with him to get him to give me stuff and give him

8  -- and constantly ask for stuff.  And he only one time

9  gave me a list of job openings and it wasn't even a

10  complete list because I had access to the complete

11  list.  So he was obviously, purposely, withholding

12  information and not cooperating with me in my attempt

13  to get reassigned.

14      Q    So this is based on your assumption, not

15  something specific he said about your disabilities?

16      A    I mean, that or just -- just insane

17  incompetence.  And I would hope to think that that's

18  not the case.

19      Q    Okay.  How many jobs did you apply for

20  between August, September, and November of 2020?

21      A    Just under 50.

22      Q    Okay.  Take a look for me at Exhibit No. 2,

23  please.

24      A    Okay.  The online portal thing?

25      Q    The online portal.

Page 157

1      A     My request for reassignment was not done

2   online.  It was done directly through originally Mark

3   Young, and then through Carl Young, as directed in the

4   original accommodations teleconference on August 25th.

5   I requested who was my point of contact, I was told

6   Mark Young.  When Mark Young didn't have any answers,

7   he referred me to Carl Young.

8      Q     So you didn't apply for any positions via

9   the portal between November of 2015 and December 27th

10  of 2020.  Is that right?

11     A     Correct.

12     Q     Okay.  In your complaint, and if you want to

13  look at it, it's Exhibit 1, paragraph 25.  I'm sorry.

14  It's paragraph 26.  The last sentence, it says that,

15  "The defendant was aware that he could only be on

16  disability leave according to company policy for 180

17  days and deliberately withheld reassignment so that

18  his 180 days would run and he would have to be fired."

19  Do you see that?

20     A     Yes.

21     Q     Do you agree that you accrued more than 180

22  days of leave in 2020?

23     A     Yes.

24     Q     Okay.  When do you think that that 180 days

25  accrued?

Page 158

1       A    I do believe it would probably be right

2   around the time that I was given my termination

3   letter.  December 12th or the 14th.

4       Q    Okay.  Do you know how many days that you

5   missed before August 25th?

6       A    Through only a year -- I have no idea.

7       Q    Okay.  So you're not saying that you didn't

8   miss 180 days in 2020?

9       A    I'm saying the majority of it at the last

10   half was involuntary, yes.

11       Q    What do you mean it was involuntary?

12       A    I was not wanting to be on short-term

13   disability.  I wanted to return to my job.

14       Q    And you understand that you were under

15   restrictions, though, that didn't allow you to perform

16   the functions of your job; correct?

17       A    Other than needing a taller table and a

18   chair with a back, it absolutely did.

19       Q    Are you saying that that's the only

20   accommodation you requested?

21       A    Absolutely.  Those were the only

22   accommodations that applied to the essential functions

23   of the job.

24       Q    And, Mr. King, are you an expert on what

25   essential functions of the job are?

Page 159

1      A     If it's not listed on the job description,
2    it's not an essential function.  So it's not very
3    difficult to ascertain what's an essential function.
4      Q     So everything listed on the job description
5    would be an essential function.
6      A     Exactly.
7      Q     Okay.  What jobs are you saying that you
8    applied for the 41 positions?  Do you have a list
9    somewhere of the jobs that you applied for?
10     A     Yes, I do.  Paragraph 41 in Exhibit 1.
11     Q     I think you must mean paragraph 20?
12     A     Sorry.  Yeah.  I said number 41.  Yes, it
13   was paragraph 20.
14     Q     Okay.  You said here that you possessed the
15   appropriate qualifications for each of these 41
16   positions.  Is that right?
17     A     As far as I'm aware, yes.
18     Q     Did you look at the job description for each
19   of these positions?
20     A     Job -- job descriptions were not available
21   to me and were not provided to me when requested.
22     Q     For every single one of these?
23     A     Absolutely.  Every single one.
24     Q     Okay.  Let me finish before you answer.
25     A     Sorry.

EXHIBIT X                    251

Page 160

1      Q    When you looked on the portal where you saw

2   the posting for the jobs, are you saying that the job

3   descriptions were not available on the portal?

4      A    They're not listed in the portal.  They're

5   listed in the DFW vacancy list.

6      Q    Okay.  And where is that located?

7      A    It's located on the airport server.  That --

8   that managers have access to.  It's about 80-something

9   pages long.  It lists every job position with a

10  position number, supervisors, what the pay grade is,

11  everything.  And I was -- I had access to that.

12  That's how I know there were 41 positions that I

13  applied for.  When I requested SD3, SD4, MP3, and MP4.

14  All of these were vacancies listed under the airport's

15  vacancy list.  They're not listed on the portal.

16     Q    Okay.  What's the difference between the

17  portal and the airport vacancy list, as far as you

18  understand?

19     A    The portal is open for outside applicants.

20     Q    And the vacancy list is open for --

21     A    Any internal applicants.

22     Q    Okay.  Have you ever applied -- other than

23  this period of time in August to November of 2020,

24  have you applied for any other positions using that

25  employee vacancy list?

Page 161

1    A    No.

2    Q    Did you talk to Carl Young about whether you

3    could apply for positions using the employee vacancy

4    list?

5    A    As the official vacancy list published by

6    DFW, and I wasn't made aware of it until at least

7    September when I was -- when my wife made it available

8    to me.

9    Q    Okay.   Thank you.   But my question was, did

10   you talk to Carl Young about that list?

11   A    Absolutely.   I even shared with him, copy

12   and pasted from it, a list of, you know, every job of

13   the -- of the -- position with the job number with the

14   supervisor with the thing that said vacant with the

15   paygrade and everything.   And I provided that to him

16   in an e-mail.   And I said I would like to apply for

17   this.   And he said, "Those aren't vacant."   And I

18   said, "I'm looking at the vacancy report.   It is

19   vacant.   I would like to apply for this."

20   Q    So how do you know that those positions were

21   actually to be filled?

22   A    Because they were listed on the vacancy list

23   as vacant.

24   Q    Okay.   So we're talking about August to

25   November of 2020; right?

1      A     Correct.

2      Q     Okay.  Do you know if there was anything

3   going on that might have caused DFW not to be able to

4   or not be wanting to fill those vacant positions at

5   that time?

6      A     None that they made aware.

7      Q     None that who made aware?

8      A     The airport.

9      Q     How would the -- you're not in HR; right?

10     A     Correct.

11     Q     You're not a recruiter; correct?

12     A     Correct.

13     Q     You were just looking at this vacant list

14  assuming that all of those positions could be filled.

15  Is that right?

16     A     All of the -- everything listed on the

17  vacancy list is funded for that year.

18     Q     And how do you know that?

19     A     Because it's in the annual -- annual budget

20  report that's put out.

21     Q     Okay.

22     A     It states that 2 percent of all jobs would

23  be for turnover, and approximately 43 jobs are funded,

24  but vacant.  And that's in the first few pages of the

25  annual timings report -- for the year report.  That's

Page 163

1    published on their website underneath business.

2          Q    What year was that that you're referring to?

3          A    2020.

4          Q    And when was that published?  At the

5    beginning of 2020?

6          A    No, at the end.

7          Q    Like in December?

8          A    It was -- no.  It was -- it was published in

9    the end of September, but I had access to it at the

10   beginning of September.

11         Q    How did you have access to it?

12         A    Bathyaa knows people.

13         Q    Okay.  So Bathyaa got you some access to

14   this list --

15         A    Correct.

16         Q    -- that wasn't yet public.

17         A    Correct.

18         Q    All right.  Let's talk about the individual

19   positions here.

20         A    Okay.

21         Q    You said that you never got job descriptions

22   for these positions.  Is that right?

23         A    Correct.

24         Q    Because these positions were not posted on

25   the portal where people could apply for the job.

Page 164

1        A     Right.

2        Q     What's the process for applying for a job

3    that's on that employee vacancy list?

4        A     Requesting to be assigned or requesting to

5    apply for that position.

6        Q     Who do you send that request to?

7        A     Your supervisor.  And then your assistant

8    manager has to approve it.  And then you have to fill

9    out a form to -- you have to get them to sign a form

10   that they approve of you being transferred to another

11   -- another department.

12       Q     And did you follow that process for any of

13   these 41 positions you had listed?

14       A     Negative.  Because I was out with a

15   reassignment for ADA, which means I don't have to do

16   that method.

17       Q     And who told you that you didn't have to

18   follow regular procedures for applying for a job?

19       A     Mark Young, Carl Young, and Tim Richardson

20   for Matrix in the August 25th conference.

21       Q     So if they said that, that's going to be in

22   the recording of the August 25th conference?

23       A     Absolutely.

24       Q     Okay.  So let's talk about the 41 positions.

25   The first one listed is terminal experience

Page 165

1    supervisor.  What makes you believe that you had the

2    qualifications for that position?

3        A    Because I have been with the airport for

4    five years.  I have a business degree, military

5    experience, and am extremely good with customers.  So

6    I have supervisory experience as well for working at

7    Alamo.  I have every -- I check off every box on that.

8        Q    Okay.  And did you see the job description

9    for that position?

10       A    Yes, I did.  Because that's what my friend

11   Sam Jones does.

12       Q    Okay.  Did you see the written job

13   description for that position?

14       A    Yes.  He provided me a copy of it.

15       Q    Okay.  And how did you apply for that

16   position?

17       A    By telling Mark Young originally, and then

18   Carl Young, that I would like to apply for that.

19       Q    And what did they tell you in response to

20   that?

21       A    They went with better -- with stronger --

22   stronger candidates.

23       Q    They didn't tell you, you needed to apply

24   through the regular channels?

25       A    No.

Page 166

1     Q    They never told you that?

2     A    They did eventually in, like, November or

3  December.

4     Q    And once they told you that, did you start

5  applying through the regular channels?

6     A    No, because the original instructions were

7  to apply through them.

8     Q    Okay.  So what is it that a terminal

9  experience supervisor does?

10     A    They supervise the customer experience

11  personnel and basically doing counseling, they do

12  inventory, they do training.  It's multiple things.  I

13  don't have it in front of me to recall.  But it's

14  basically typical supervisor job.

15     Q    Did you ever talk to the person who was

16  hiring for the terminal experience supervisor?

17     A    He would not tell me who it was when I

18  requested it.

19     Q    He who?

20     A    Carl Young.  I requested that if he's not

21  going to be giving me information, can you please put

22  me in contact with the recruiter, never responded.

23     Q    Do you know who the hiring manager was for

24  that position?

25     A    No.

Page 167

1      Q      The next job listed is tactical
2    telecommunicator.  Did you see the job description for
3    that?
4      A      No.
5      Q      Do you have an understanding of what that
6    role is?
7      A      Yes, because I applied for that at Arlington
8    PD.  I think that was before I was working at Mouser.
9      Q      What do you understand that role to me?
10     A      You're -- you're a 911 operator.
11     Q      Okay.  And what do you think your
12   qualifications are to do that job?
13     A      I was a communications specialist that
14   worked in the -- I had call center similar experience.
15   Plus I had a degree.  Plus I have a minor in criminal
16   justice.  And I am also good with computers.  And I
17   did extremely well on the test for APD, but I did not
18   accept the job.
19     Q      Did you get offered the job at APD?
20     A      Yes.  This was 2014, 2015.  No, I'm sorry.
21   It'd be 2009, '08 or '09.  Because I took Mouser
22   instead because I needed a job that didn't require me
23   to be focused on the job when I got off the job,
24   because I wanted to focus on school.
25     Q      And that was for a tactical

Page 168

1    telecommunicator?

2        A    Yes.

3        Q    How did you apply for the tactical

4    telecommunicator job at DFW?

5        A    I applied by sending an e-mail to Carl

6    Young.

7        Q    Okay.  Is that the only way you applied for

8    that job?

9        A    Yes.

10       Q    The next one listed is parking guest

11   contract services supervisor.  Did you see a job

12   description for that?

13       A    No.

14       Q    What made you think that you were qualified

15   for that position?

16       A    Same as most supervisor jobs.  They're

17   pretty much -- the majority of it is the same -- same

18   work which I've done as a manager down at Alamo and

19   as my time in the military supervising.

20       Q    How did you apply for that position?

21       A    That was, again, when I told them I wanted

22   to apply for all positions, SD3, SD4, MP3, MP4.

23       Q    So did you tell him specifically you wanted

24   to apply for the parking guest contract services

25   supervisor or did you tell him you wanted to apply for

Page 169

1    every position that was --

2         A    Yes, I told him -- I think I told him I

3    wanted to apply for all of those positions.

4         Q    Okay.  So you didn't specifically say, "I

5    want to apply for parking guest contract services

6    supervisor."

7         A    No.  Because at this point, it had gotten to

8    where I was frustrated with him because he wasn't

9    giving me the information that I requested, and I knew

10   that my time was running out.  And so I was like, just

11   apply for everything and see if maybe he'll find one

12   that I'm a candidate that's good enough.

13        Q    Do you remember when that was?

14        A    November 6th.  That was the one he responded

15   to less than two hours later and said, "Oh, we found

16   stronger candidates for every one of those."  On a

17   Friday night.  6:40 I e-mailed him.  He responded at

18   8:30 Friday night and said, "We found stronger

19   candidates for every one of those."

20        Q    Okay.  The next job is multimedia

21   specialist.  Did you ever see the job description for

22   that?

23        A    That one I did.  And that one I was really

24   excited about because it's basically social media and

25   then doing -- you know, doing presentations and

Page 170

1    basically being their -- their internet, the world

2    wide web, you know, spokesperson.  That one I think I

3    actually applied for back in -- years ago.  I remember

4    I was like, "Oh, that one looks fun," 'cause you get

5    to do YouTube and everything else.

6            Q    How did you apply for that position?

7            A    Same one.  Same e-mail on November 6th.

8            Q    That was part of November 6th e-mail.  So

9    you didn't specifically apply for multimedia

10   specialist, that was part of applying for all of those

11   positions?

12           A    I do believe it was on one that I sent prior

13   to that.  There was one that I sent that had four of

14   them listed, and that was one of them specifically

15   that was directly listed that he never got back to me

16   on.  And that's when November 6th I was just like,

17   apply me for everything.

18           Q    Okay.  The next one is concessions

19   compliance analyst.  Did you ever see the job

20   description?

21           A    No.

22           Q    And did you apply specifically for this

23   position?

24           A    November 6th still.

25           Q    November 6th.  Okay.  Access DFW trusted

Page 171

1    agent.  Did you ever see the job description for that?

2         A    Yes, I have.  And I know a few people that

3    worked it.  A couple people went from CSO to that job.

4    And it's actually easier to get that job than the

5    CSO's requirements.

6         Q    What is that job?  What does --

7         A    SIDA background checks.

8         Q    I'm sorry?

9         A    They do the background checks for the SIDA

10   badges.

11        Q    Okay.  And did you apply specifically for

12   that job or was it part of the November 6th e-mail?

13        A    I applied specifically for that job numerous

14   times because, like I said, I knew people that have

15   done it.  It's a 100 percent desk job.  You -- you sit

16   there, and you run backgrounds on people, and you take

17   their picture, and you give them a SIDA badge.

18        Q    And did you apply for that in August,

19   September, November of 2020 or was it some other time

20   when you applied for it?

21        A    It was during that time period.

22        Q    And you applied specifically for that job?

23        A    That's the one that I actually copy and

24   pasted four open vacant positions off of the vacancy

25   list with everything.  Supervisor, the job position

Page 172

1  number, the SD3, and I copy and pasted it into the

2  e-mail and I sent it to him and said these four jobs.

3  And he said, "Those aren't open."  I said, "I'm

4  looking at the vacancy list right now.  They are

5  open."  "No they're not."  And that's when I was like,

6  fine.

7      Q    So those weren't on the portal that anybody

8  could apply for, those were on the vacancy list?

9      A    Correct.

10     Q    And how did you know specifically that those

11 were open?  Just because they were on the vacancy

12 list?

13     A    Yes.

14     Q    Okay.  Airfield operations agent.  Did you

15 see the job description for that?

16     A    Yes.

17     Q    And what does that person do?

18     A    They're the people that go out and drive

19 around the AOA and they can escort construction.  We

20 worked with them when I was a CSO.  They did -- they

21 escorted all of the construction contractors into the

22 AOA.  We just -- we just manned the gates.  They also

23 clear the runways, they do escorts for aircraft.

24 Basically, they're just -- a whole lot of stuff that

25 they do just exclusively on the AOA dealing with

Page 173

1    people coming and going on the AOA and -- and

2    enforcing the AOA.  They're the ones that are going to

3    drive the ramp and look for people who don't have

4    badges and stuff like that.

5         Q    And so is that pretty much constantly

6    driving a vehicle?

7         A    It's just driving till you see someone and

8    get out.  It's not like, you know, the airport is not

9    big enough to be constantly driving the vehicle

10   anywhere.  Like I said, to do the entire perimeter

11   around the entire airport, you can do it under two

12   hours.  The entire, all the way around, check every

13   gate, both east and west side.

14        Q    And do you know how long an airfield

15   operations agent spend in a vehicle each day?

16        A    I would say probably four to six hours,

17   'cause I know they do other stuff.  I don't know

18   exactly what they do other than what I've seen them

19   do.  Which, majority of that is sitting in the -- in

20   the vehicle, watching the construction workers to make

21   sure they don't leave the area they're supposed to.

22        Q    And how did you apply for that job?

23        A    Via the e-mail on November 6th as well as

24   specifically stating that that was one of the first

25   jobs I told him I would like to apply for.

Page 174

1      Q    All right.  Business specialist.  Did you
2    see the job description for that?
3      A    No.
4      Q    And how did you apply for that job?
5      A    Same.  November 6th e-mail.
6      Q    And do you know what a business specialist
7    does?
8      A    I have a degree in business management.  I'm
9    willing that's similar to that.
10     Q    But do you know specifically what a business
11   specialist does?
12     A    No.
13     Q    Okay.  So no idea if you were qualified to
14   be a business specialist?
15     A    I'd have to have the job description to know
16   for sure.
17     Q    Right.  And you didn't see the job
18   description; right?
19     A    Correct.
20     Q    Develop and leasing administrator.  Did you
21   see the job description for that?
22     A    No.
23     Q    Do you know what that person does?
24     A    It's pretty self-descripting.
25     Q    You don't know what that person does,

Page 175

1    though, other than just assuming it has something to

2    do with leasing administration?

3        A    Correct.  You know, when I'm not provided

4    the job description, I can only go on what the title

5    is.  And if the title looks like something that I'm

6    qualified for, I have to go on that.

7        Q    How do you know that you would be qualified

8    to be a develop and leasing administrator?

9        A    Because administrators typically do

10   paperwork and they're somewhat similar to a

11   supervisor, of which I've got tons of experience in

12   both.

13       Q    Okay.  So if it had to do with paperwork or

14   being a supervisor, you think you would have been

15   qualified for the job?

16       A    Absolutely.

17       Q    And how did you apply for that job?

18       A    November 6th e-mail.

19       Q    Okay.  Communications and marketing

20   specialist.  Did you ever see a job description for

21   that?

22       A    Negative.

23       Q    And what makes you believe that you're

24   qualified to be a communication and marketing

25   specialist?

Page 176

1    A    Because I have a business degree that

2    actually required me to take marketing courses.

3    Q    So you took marketing courses?

4    A    Correct.

5    Q    Do you have a degree in marketing?

6    A    I have a degree in business management,

7    which is basically an umbrella over all the different

8    business criteria, which is marketing as well.

9    Q    So do you have any idea if a degree in

10   marketing was required for this job?

11   A    I do not.  But almost -- does -- you know,

12   does say that other equal to equal experience or

13   education.

14   Q    And how did you apply for this job?

15   A    November 6th.

16   Q    The next one is multimedia coordinator.  Did

17   you ever see a job description for that?

18   A    It's the same thing as the multimedia

19   specialist, basically.

20   Q    Did you ever see a job description for it?

21   A    No.

22   Q    And how did you apply for that job?

23   A    November 6th.

24   Q    Airport customer experience specialist.  Did

25   you ever see a job description for that?

Page 177

1       A    Yes.

2       Q    Okay.  And what does that person do?

3       A    They walk around and do checks for lights

4    and outlets and basically interact with the customers

5    and to serve a liaison on how to help people find the

6    gate they're looking for, what kind of restaurant.

7    That kind of stuff.  It's almost all interacting with

8    the customer and giving them information.

9           And then in the meantime doing that, while

10   you're walking around trying to help the customer, you

11   are also checking the actual infrastructure to make

12   sure all the power outlets work, make sure the lights

13   are on, and then you put a maintenance request for

14   that.

15      Q    And how did you apply for that?

16      A    November 6th.

17      Q    The next one is customer programs trainer.

18   Did you see a job description for that?

19      A    No, did not.

20      Q    And do you have any idea what a customer

21   programs trainer does?

22      A    Trains people on whatever the programs that

23   they're implementing for the airport for different --

24   different activities they're doing around the airport.

25   Like, hey, we're going to do a program with -- we're

EXHIBIT X                    269

Page 178

1    focusing on getting people from different backgrounds

2    to come to our airport and interact and come to our

3    restaurants or fly -- fly our airline or come and

4    visit this.

5            And then as a trainer, which I had tons of

6    training experience.  When I was in the army, that was

7    one of my main things.  I'd do training on how to use

8    the radio, training on how to use the equipment.  And

9    I also had to train people at my job at Alamo.  I also

10   trained the supervisor when I was at Mouser because I

11   didn't want to be a supervisor, so they had me

12   training supervisors.

13       Q    How do you know that's what this person does

14   if you never saw a job description?

15       A    You can only guess because you have to go on

16   what the title is, which I would think has something

17   to do with the actual job.

18       Q    Okay.  So that's an assumption based on what

19   you can --

20       A    Common sense, yes.

21       Q    What you can glean from the title because

22   you never saw a job description.

23       A    Yes.

24       Q    And how did you apply for that job?

25       A    November 6th.

Page 179

```
1        Q    The next one is market research analyst.
2    Did you ever see a job description for that?
3        A    No, I did not.
4        Q    And how do you believe you are qualified to
5    be a market research analyst.
6        A    Based on my degree.
7        Q    Based on your business degree?
8        A    Correct.
9        Q    And how did you apply for that job?
10       A    Same.  November 6th.
11       Q    Okay.  Survey technician.  Did you ever see
12   a job description for that?
13       A    No, I did not.
14       Q    How do you know that you're qualified to be
15   a survey technician?
16       A    It's an ST3 position, which is one that's a
17   trainee.  And that's for surveying.
18       Q    And how does that tell us that you're
19   qualified for that position?
20       A    Because they train you how to do the
21   surveying.  So you don't even actually have to
22   experience.  It's a bottom, entry level position that
23   doesn't require any experience.
24       Q    And how did you apply for that position?
25       A    Same way.  November 6th.
```

EXHIBIT X                    271

Page 180

1    Q    And did you see a job description for that?

2    A    I read one a couple years ago, which is

3    where I saw it's a trainee position.  But I didn't

4    necessarily want to have a job that I was going to be

5    standing out in the field all day, but --

6    Q    Okay.  The next one is construction

7    inspector.  Did you see a job description for that?

8    A    I did not.

9    Q    How do you know that you're qualified to be

10   a construction inspector?

11   A    Because my wife does similar work.  And

12   she's a compliance analyst.  They go out and they have

13   to verify blueprints and check to make sure that the

14   side -- where they need to be.  And she basically kind

15   of laid out, this is kind of what you do, shouldn't be

16   that hard for you.

17   Q    And how did you apply for that job?

18   A    Same way.  November 6th.

19   Q    The next one is plans examiner/inspector.

20   Did you see a job description for this?

21   A    That's similar to what my wife does with her

22   compliance analyst.

23   Q    So you did not see a job description?

24   A    Correct.

25   Q    And you're assuming that it's the same thing

Page 181

1    that your wife does?

2          A    It's similar to.

3          Q    Okay.  And how did you apply for that?

4          A    Same way.  November 6th.

5          Q    Quality control technician.  Did you see a

6    job description for that?

7          A    No, I did not.

8          Q    And what makes you believe that you are

9    qualified to be a quality control technician?

10          A    Because I had to do that when I was at

11   Alamo.

12          Q    You had a title of quality control

13   technician at Alamo?

14          A    I was the one that had to verify the quality

15   of everything that went out the door that I shipped.

16          Q    Do you know that that's the same thing that

17   this position does at DFW?

18          A    Based on the title, yes.

19          Q    Okay.  Not based on the job description.

20          A    Correct, because I was never provided that.

21          Q    And how did you apply for that job?

22          A    November 6th.

23          Q    The next one is systems performance analyst.

24   Did you see a job description for that?

25          A    No, I did not.

Page 182

1      Q    What makes you think you're qualified for
2    that role?
3      A    Because I have experience working on
4    electronics in the military.
5      Q    Okay.  Any idea if the systems performance
6    analyst at DFW works on the same kind of technology
7    that you were working on in the military?
8      A    Electronics are electronics.  Schematics are
9    all you need to know.  So as long as there's
10   schematics, you can still work on it.
11     Q    Do you know if the system performance
12   analyst was working on that type of equipment or if
13   they were more of a general IT employee?
14     A    I didn't apply for any IT positions.
15     Q    Okay.  How do you know that this systems
16   performance analyst is not an IT position?
17     A    Because all IT positions are IT in the -- in
18   the pay grade.
19     Q    Okay.  How did you apply for this position?
20     A    November 6th.
21     Q    Automotive technician.  Did you ever see a
22   job description for that?
23     A    No, but I got a pretty good idea.  I worked
24   at an automotive performance shop, Alamo Autosports.
25     Q    Did you do automotive technician duties when

Page 183

1    you were working at Alamo Autosports?

2         A    Yes, I did work on cars and my own car and

3    my boss' car.

4         Q    Okay.  And how did you apply for that job?

5         A    November 6th.

6         Q    The next one is lead automotive technician.

7    Did you see a job description on that?

8         A    Negative.  But that's a pretty standardized

9    automotive job, which that was what I did.  Basically,

10   it's the shop manager is what that is.

11        Q    Okay.  And you believe you were qualified

12   for that why?

13        A    'Cause that's what I did at Alamo

14   Autosports.

15        Q    And how did you apply for that position?

16        A    November 6th.

17        Q    The next one is radio and mobile electrician

18   system technician.  Did you see a job description for

19   that?

20        A    No.

21        Q    What makes you think that you're qualified

22   for that position?

23        A    That's what I did for almost nine years in

24   the army.

25        Q    And how did you apply for that position?

Page 184

1          A    November 6th.

2          Q    Electrician 2.  Did you see a job

3     description for that?

4          A    No.

5          Q    What makes you think you're qualified for

6     that?

7          A    Electricians are pretty standardized job,

8     which I did much of that when I was in the military.

9          Q    Do you have a certification as an

10    electrician?

11         A    No, I do not.

12         Q    Do you know if that was a requirement for

13    that position?

14         A    I would have to see the job description.

15         Q    Which you didn't see; right?

16         A    Correct.

17         Q    And how did you apply for that job?

18         A    November 6th.

19         Q    Signs and marketing technician.  Did you see

20    a job description for that?

21         A    I think applied for it on the -- yes.

22         Q    All right.

23         A    I think it's on this list.

24         Q    Did you see the job description before you

25    applied for it?

Page 185

1      A    Yes.

2      Q    When did you apply for this position on, I

3  think you were referring to, Exhibit 2?

4      A    There we go.  Instrument and controls

5  technician.  So, similar, but not the same job.  I'm

6  sorry.

7      Q    Okay.  So did you see a job description for

8  signs and marketing technician?

9      A    No.

10      Q    And what makes you think that you're

11  qualified for that role?

12      A    Based on the name, it sounds pretty

13  straightforward.  It's printing signs and maintaining

14  signs and installing signs, all of which I should be

15  qualified to do.

16      Q    And how did you apply for that job?

17      A    November 6th.

18      Q    The next one is electronics technician lead.

19  Did you see a job description for that?

20      A    Negative.

21      Q    And what makes you think that you're

22  qualified to do that?

23      A    It's pretty much the same thing it is in the

24  army.  Maintaining radios, troubleshooting radios,

25  repairing radios.

Page 186

```
1        Q    And how do you know that the electronics
2    technician does that with radios?
3        A    That's pretty much what an electronics
4    technician does, is they prepare components to
5    electronics.
6        Q    Okay.  So it might have been more than
7    radios?
8        A    It's all the same.  Schematics is all you
9    need to know.
10       Q    Okay.  How did you apply for that role?
11       A    November 6th.
12       Q    The next one is lead electronics technician.
13   Did you ever see a job description for that?
14       A    No.
15       Q    And why do you think you're qualified to do
16   that?  Is that the same as the answer you just gave
17   me?
18       A    Correct.
19       Q    And how did you apply for that role?
20       A    Same way.  November 6th.
21       Q    Environmental analyst.  Did you see a job
22   description for that?
23       A    No, I did not.
24       Q    What makes you think you're qualified to be
25   an environmental analyst?
```

1      A    Like I said, another SD3, which -- which has

2    the training built into it.  And I looked online, and

3    the training courses are approximately two weeks to

4    get your start on it.

5      Q    And how did you apply for that?

6      A    November 6th.

7      Q    So that was part of the November 6th e-mail

8    where you told Carl Young that you wanted to apply for

9    every position that had a certain category?

10     A    Correct.

11     Q    Okay.  The next one is waste recycling

12    technician.  Did you see a job description for that?

13     A    No, I did not.

14     Q    And what makes you think that you're

15    qualified to be a waste recycling technician?

16     A    Because that's what my ex-wife does.  She

17    does it for the City of Dallas.

18     Q    Okay.

19     A    And so I'm very familiar with the work in

20    the waste treatment plant down by Trinity Lake.  And

21    it's basically doing quality samples.

22     Q    And do you know that that's what this person

23    did for DFW Airport?

24     A    Based on the title, that was the only thing

25    I could think of that would be.

Page 188

1    Q    And how did you apply for that job?

2    A    Again, November 6th.

3    Q    The November 6th e-mail to Carl Young?

4    A    Correct.

5    Q    The next one is talent acquisition

6    specialist.  Did you see a job description for that?

7    A    No, did not.

8    Q    What qualifies you to be a talent

9    acquisition specialist?

10   A    My business degree.

11   Q    And have you ever worked as a talent

12   acquisition specialist?

13   A    No, but I'm a quick learner.

14   Q    And how did you apply for that job?

15   A    November 6th.

16   Q    The next one is AOC communications

17   specialist.  Did you ever see a job description for

18   that?

19   A    No, I did not.

20   Q    What makes you think you're qualified for

21   that role?

22   A    Because it's almost the same as the 911

23   dispatcher, of which, when I was in the army, I worked

24   in the Talk, which is the communications center.  And

25   I had to monitor all the radios as well as maintain

1    them, which would be -- the AOC would basically be a

2    watered-down version of the 911 operator.

3         Q     Do you know for sure that's what this role

4    does?

5         A     Just from talking to people that -- yes.

6         Q     You talked to people that did --

7         A     Just from wandering around, yeah.

8         Q     You talked to people that did work in the

9    AOC communications specialist role?

10        A     Yes.  At the operations center that I talked

11   to on the radio whenever I needed.

12        Q     How did you apply for this?

13        A     November 6th.

14        Q     The next one is airfield operations officer.

15   Did you ever see a job description for that?

16        A     Yes, I did.

17        Q     And when did you see that job description?

18        A     That and the following one, assistant

19   airfield ops is one that I applied for immediately

20   when I was reassigned.  The same AOA stuff.

21        Q     And how did you see that job description?

22   Because it was posted on the portal?

23        A     I've looked at it previously because that

24   was a job that I really wanted to do to transfer in.

25   That the CSO transfers over pretty easily, because

EXHIBIT X                    281

Page 190

1    it's a lot of AOA stuff.  And one of the main

2    qualifications is that you are at a large -- in an

3    airport and have experience working on the AOA.  And

4    the CSO position is one of the very few that transfer

5    directly over to.

6         Q    Did you ever apply through the normal

7    application channels to transfer over to that

8    position?

9         A    No.  It was just something that if I decided

10   I wanted to move on, that's something else that's what

11   my plan was.

12        Q    Okay.  And how did you apply for this role?

13        A    This was one of the very first ones I sent

14   him and this was also on November 6th.

15        Q    Okay.  And assistant airfields operation

16   officer.  You said you did see the job description for

17   that?

18        A    Yes, that's the same thing.  It's just the

19   airfield operations officer is like almost like a

20   supervisor.  And then the assistant is a new -- new

21   hire who is just getting familiarized and then they

22   will promote you into the airfield op.

23        Q    And how did you apply for that?

24        A    Directly on one of the first.  That's what I

25   said, I wanted to be in airfield ops.  And then again

EXHIBIT X                          282

Page 191

1    on November 6th.

2         Q    When you say directly at first, do you mean

3    you sent that to Carl Young?

4         A    August 26th.

5         Q    Okay.  So that's one of the ones you

6    specifically told Carl Young you wanted to apply for.

7         A    Correct.

8         Q    And then again on November 6th.

9         A    Correct.

10        Q    Okay.  Corporate aviation rep.  Did you see

11   the job description for that?

12        A    Yes.  And I've talked to them, too.  Because

13   we used to go over there and have to open the gate for

14   them when it's late at night and they got planes that

15   came in late and they need to be able to get out of

16   the gate.  We had to open it up for them.

17        Q    So you did see the job description for that?

18        A    Yes.

19        Q    Did you see the job description for that

20   before you applied for this role?

21        A    Yes.  That's another one of those little

22   jobs that I was like, that'd be cool to do.

23        Q    And what makes you think you're qualified

24   for that role?

25        A    It's -- it's just being there to check bags

Page 192

1      for when they fly out on private jets.  And then bring

2      them in, because I worked for AMR Services before I

3      worked for Evergreen.  And I worked at terminal 2W

4      before it was terminal B.  And I used to work where

5      they would contract AMR Services, the parent company

6      of American, and we used to bring in the jets over

7      terminal B.  When they had the A340 coming in.

8            And so I've done -- already done that.  Kind

9      of experienced bringing in planes and unloading

10     planes, loading planes, cleaning planes.

11     Q     And how did you apply for this role?

12     A     November 6th.

13     Q     The next one is transportation business

14     specialist.  Did you see the job description for that?

15     A     No, I did not.

16     Q     And what makes you believe that you're

17     qualified for that role?

18     A     My experience in automotive industry as well

19     as my business degree.  Just based on the title.

20     Q     And how did you apply for that?

21     A     November 6th.

22     Q     The next one is contract services quality

23     agent.  Did you see a job description for that?

24     A     No, I did not.

25     Q     What makes you think that you're qualified

Page 193

1   for that role?

2        A    Contract services.  It falls under what

3   typically would happen in a business.  So I figured I

4   should -- I could qualify for that for my business

5   degree.

6        Q    And how did you apply for that?

7        A    November 6th.

8        Q    Contract administrator.  Did you see a job

9   description for that?

10       A    No, I did not.

11       Q    What makes you think that you're qualified

12  to do that role?

13       A    Because I have a business degree.

14       Q    And how did you apply for that?

15       A    November 6th.

16       Q    Civilian detention officer.  Did you see a

17  job description for that?

18       A    No, I did not.  Same one for APD, but not

19  for DFW.

20       Q    And what makes you think that you're

21  qualified to do that?

22       A    Because it's just being the jailer.  And I

23  easily meet all that.

24       Q    And how did you apply for that role?

25       A    November 6th.

Page 194

1    Q    Access DFW trusted agent.  Did you see a job

2  description for that?

3    A    Yes, I did.

4    Q    Okay.  Was that before you applied for it?

5    A    Yes.  That was the one that -- same one

6  that's listed up -- I guess it's listed twice.  Access

7  DFW, yeah.

8    Q    Okay.  How did you apply for that?

9    A    That's one that I copied and pasted off the

10  vacancy list that had four openings and I said I

11  wanted to apply for one of those.

12    Q    Okay.  And the next one is research and

13  analytics specialist and risk analyst.  Did you see a

14  job description for that?

15    A    No, I did not.

16    Q    What makes you think you were qualified for

17  that role?

18    A    Because I've done plenty of risk analysis

19  when I was in the military as well as research and I

20  have a business degree.  So, I figured, all my strong

21  attributes would apply very well to that job.

22    Q    And how did you apply for that job?

23    A    November 6th.

24    Q    Okay.  I think that we're probably at a

25  stopping point.

Page 195

1        A    Is it 2:30 yet?

2        Q    It's 2:44.

3        A    Oh, my wife's probably out there waiting.

4    Okay.

5                  MS. HARRISON:   We'll go off the record.

6                  THE REPORTER:   Okay.   Please stand by.

7    The time now is 2:44 p.m. and we are off the record.

8                  (Off the record.)

9                  THE REPORTER:   The time now is

10   3:45 p.m.   We are back on the record.

11   BY MS. HARRISON:

12       Q    Mr. King, are you alleging that DFW Airport

13   deliberately withheld reassignment?

14       A    Yes.

15       Q    And what is that based on?

16       A    It's based on all of the e-mails and the

17   lack of response in a timely manner, as well as a lack

18   of response for any information until repeatedly

19   asking for it as well as the continual denying when it

20   was blatantly obvious that he never actually inquired.

21   As I mentioned before, November 6th, he had less than

22   two hours on a Friday night to make a determination on

23   41 job positions that I applied, of which he said

24   stronger candidates for all of them.

25       Q    And when you say he, you're talking about

Page 196

1    Carl Young?

2         A    Correct.

3         Q    Is there a specific position you think you

4    should have been reassigned to?

5         A    I think I should have been kept in my job

6    that I was originally employed there for.

7         Q    And you think that you were qualified to do

8    your job based on the restrictions that your doctor

9    gave you?

10        A    Absolutely.

11        Q    How do you think you could have done your

12   job based on the accommodations you requested?

13        A    All they had to do was provide me with a

14   taller table.  Chairs with backs was already standard

15   out at every post.  So that was listed, but that

16   wasn't even a requirement because it was already met.

17   Other than that, all the other ones either covered a

18   marginal function or applied for a completely

19   different job.  Because I was told to prepare it in a

20   manner that in case I got reassigned, it should cover

21   every possible job.

22        Q    Who told you that?

23        A    Tim Richardson.

24        Q    When did you talk to Tim Richardson where he

25   told you that?

Page 197

1          A     June 2020.

2          Q     June of 2020.  And was that a phone call?

3          A     It was an e-mail.

4          Q     So is it your testimony that the

5     restrictions that your doctor provided in the request

6     for accommodation were not applicable to the CSO

7     position?

8          A     The majority of them, absolutely.

9          Q     They absolutely were not?

10         A     They were not applicable to the job that I

11    was doing.  They were applicable to other positions of

12    which I might be reassigned.

13         Q     So you think that the limitation with regard

14    to sitting was not applicable to CSO position?

15         A     What limitation required to sit?

16         Q     Well, let's go ahead and talk about the

17    specific accommodations that you requested.  If you

18    look at -- I'm going to hand you what we're going to

19    mark as Exhibit 5.  Do you know what this is?

20                    (Exhibit 5 was marked for

21                     identification.)

22         A     Yes, I do.

23         Q     All right.  Tell me what this is.

24         A     This is my reasonable accommodations form

25    that I submitted that we discussed in the August 25th

Page 198

1   teleconference.

2       Q    Okay.  And in this, this is something that

3   you filled out.  Is that correct?

4       A    It was something that I said I want the

5   doctor, and we filled it out together.

6       Q    Okay.  And what's that doctor's name?

7       A    That would be Dr. Derrick.

8       Q    And do you have notes that you took when you

9   were talking to him when you filled this out?

10      A    No.

11      Q    Were you literally typing this when you were

12  talking to him?

13      A    Yes.  It was on a -- the notes application.

14  The notes on the tablet.  It's just like Post-It Notes

15  but it's on the -- the tablet.

16      Q    On your tablet?

17      A    Yes, on my tablet.  And so I just -- I put

18  it in there, we discussed them.  And then when I was

19  finished with it, I put it all on this.  I deleted the

20  note because I transferred all of it onto this.

21      Q    Okay.  So on page 1 of Exhibit 5, there's a

22  section called limitations.  Do you see that?

23      A    Correct.

24      Q    And it says here, 1, "Unable to operate/ride

25  in a vehicle greater than two hours due to required

Page 199

1   safe sitting position."  Do you see that?

2        A    Yes.

3        Q    And it says, "Prevents doing constant

4   vehicle patrols/rover."

5        A    Correct.

6        Q    And this is something that you submitted;

7   correct?

8        A    Correct.

9        Q    So this says that you are unable to ride in

10  a vehicle for greater than two hours.  How did that --

11  are you saying that that was not something that was

12  intended to be an accommodation request for the CSO

13  position?

14       A    Absolutely.  That's an accommodation request

15  for the parking person that drives around that does

16  scanning for all the licenses plates in the parking

17  lot.  They are required to be constantly driving.  And

18  there is constant vehicle patrols that no -- CSOs do

19  not do constant patrols at all.  Constant being

20  nonstop.  At any time I can get stop and get out,

21  stretch my legs, and get back in.

22            And even sitting in the vehicle, safe

23  sitting position means as long as I can recline the

24  seat back for a couple minutes, I'm good to go.  It's

25  the safe seating position, meaning, you are able to

Page 200

1   hit -- see all your mirrors and sit in a position to

2   where you are safe where the airbag goes.

3        Q    So I'm not understanding your answer to that

4   question.  Are you saying that this restriction number

5   1 was not aimed at something you were doing as a CSO?

6        A    Absolutely.  It applied for a job that was

7   -- I had just mentioned.  That was the parking people

8   who drive around through the parking lots and scanning

9   for parking fees, all the vehicles parked in the

10  parking lots.  That was a possible reassignment

11  positions.  Because, like I said, they are doing

12  constant vehicle patrol.  The CSO does not do any

13  constant vehicle patrol.

14        Especially not greater than two hours,

15  because you could drive the entire airport in under

16  two hours.

17        Q    Okay.  Number 2.  "Unable to repeatedly .

18  stand up from a seated position.  Prevents standing

19  for all face-to-face interactions."

20        A    Correct.

21        Q    That is something that applied to the CSO

22  position.

23        A    Yes, it applies specifically to the portals.

24  But there is no mention of standing as an essential

25  function on the list -- on the job description.

Page 201

1    Therefore, it's not an essential function.  It's a
2    marginal function.
3        Q    It goes on to say -- I think that's actually
4    supposed to be a return there in front of 3.
5        A    It's just I had to do it that way because it
6    would wrap around and wouldn't be -- I tried to space
7    it so that it would all show up on the allotted space
8    on the form.
9        Q    So you do agree, though, that sitting is an
10   essential function of the job?
11       A    Absolutely.
12       Q    And this says that you're unable to
13   repeatedly stand up from a seated position and it
14   prevents standing for all face-to-face interactions.
15       A    Yes.  And face-to-face interactions is what
16   we call these interactions at the portal.  That's
17   specifically listed in the policy that that's a face-
18   to-face interaction.  And that was specifically chosen
19   because they told us we need to stand for all face-to-
20   face interactions in the portal because it looks more
21   professional.
22       Q    So you think that this moving from a seated
23   to standing position is not an essential function of
24   the job?
25       A    That is correct.

1     Q   All right.  Number 3.  "Unable to repeatedly

2  bend, squat, or stoop."  And it says, "Prevents

3  inspecting items/bags on a table while standing."

4     A   Correct.  This is an essential function that

5  has the solution of a taller table.  And it

6  specifically states prevents inspecting bags at a

7  table while standing, which is portals.

8     Q   Okay.  So you agree that number 3

9  definitely relates to the CSO position.

10     A   Yes.  That's an essential function of which

11  I had a reasonable accommodation of a taller table to

12  satisfy that.

13     Q   And where does it say that on this document?

14     A   Page 2 underneath reasonable accommodations

15  requested.  They are numbered specifically in

16  accordance with the numbers that I gave on page 1.

17  You'll see number 1, "30 minutes out of vehicle every

18  two hours."  That's for the parking.  "No sitting to

19  standing greater than five times per 30 minutes,"

20  which is not an essential function.  It's a marginal

21  function.  And, number 3, "High tables for

22  inspections."  That's the reasonable accommodation

23  we're requesting for that essential function.

24     Q   And you understand, though, that DFW

25  couldn't just go in and pick and choose which of these

1   limitations they wanted to address; right?

2        A   I don't understand the question.

3        Q   So when you present to your employer

4   multiple different limitations and ask for multiple

5   different accommodations, you understand that they

6   can't just go in and say, "Oh, he's only asked for a

7   high table inspection, check, we can do that for him.

8   We don't have to talk about the interactive process

9   anymore."

10       A   I explained that to them, to Carl Young, in

11   an e-mail several times.  He -- I asked for him to

12   explain how he applied my limitations to the essential

13   functions and he gave me a list.  And I corrected him

14   and said no, that doesn't apply, that doesn't apply,

15   that doesn't apply.  And I put a summary on it saying

16   basically I'm requesting taller tables and chairs with

17   backs.  Otherwise, everything I'm asking for is a

18   marginal function, therefore you don't have undue

19   hardship you can claim.

20          It's something that doesn't have to do with

21   the job, therefore you don't have -- you don't have

22   the option of not accommodating that.  Because it's

23   not an essential function, therefore it has to be

24   done.

25       Q   I think that was an e-mail exchange with

Page 204

1    Mark Young, not Carl Young.

2         A    It might have been Mark Young.  It's two

3    Youngs.  Yes.  It was a very long e-mail where I went

4    back and forth.  And then he just didn't ever respond

5    when I summarized it and said I need a taller table on

6    that.

7         Q    I believe in that e-mail he also asked you

8    if your doctor had changed or amended your limitations

9    and you said he had not.

10        A    Right.  Because I said -- I said in there,

11   "If you have any corrections you would like to make,

12   let me know."  And he assumed that to mean my

13   accommodations, not my explanation of those

14   accommodations to him, which is what the question was

15   referring to.

16        Q    So what I'm saying is, Exhibit 5, right,

17   it's not just your requests that you typed in.  It's

18   also pages from your doctor that your doctor wrote.

19   Do you see that?

20        A    Yes.

21        Q    And so when a doctor says, "Here's the

22   limits for -- here's the physical limitations the

23   employee can't do.  Unable to operate or ride in a

24   vehicle for greater than two hours."

25        A    Yes.  He -- he repeated exactly what I put

Page 205

1    on.

2         Q    Okay.  So you understand when a doctor puts

3    these limitations in place, that a company can't just

4    take the employee's word for it that those limitations

5    don't apply anymore?

6         A    It's on the same form.  I don't understand

7    how that would be difficult.

8         Q    It's on what same form?

9         A    It's on the exact same form.  This is all

10   one form.  This is the typed-out version of what he

11   wrote.

12        Q    Yes.  And what I'm saying is, your doctor

13   and you both gave all of these limitations and

14   presented them to DFW Airport and said these are the

15   things he can't do; correct?

16        A    For all jobs.  Not just the one I was in,

17   correct.

18        Q    Yes.  And so you understand that you just

19   saying, "All I need for this job is a taller table,"

20   DFW doesn't get to just say, "Okay.  Well, we're just

21   going to listen to you instead of what your doctor

22   wrote here."

23        A    Exactly what I said confirms -- coincides

24   exactly what's on this paper.  If it's read correctly

25   and applied to the essential functions of the job and

1   used the actual phrases that I used, that I

2   specifically picked, to ensure that they applied to

3   only certain areas.  That's why I put prevents.  I

4   narrowed the focus of every limitation that I had to

5   exactly what it needed to help me with.

6       Q    So you're the one that came up with these

7   restrictions.

8       A    Yes, with my doctor.  I'm the one that knows

9   my injuries.  I'm the one that knows my job.  I'm the

10  only one that's going to be able to make that

11  decision, and the doctor confirmed that, yes, he

12  agreed with that determination.

13      Q    All right.  So is it your testimony that --

14  you testified earlier that when you were doing the

15  vehicle patrol it was only an hour to an hour and a

16  half job and you got to do whatever you wanted the

17  rest of that shift.

18      A    Correct.

19      Q    So you're saying that this prohibition for

20  driving in a vehicle for greater than two hours didn't

21  prevent you from doing car patrols?

22      A    Because it wasn't a constant.  Like I said,

23  I stopped and turned on the spotlight.  That gives me

24  the opportunity to get out, to stretch my legs, to

25  lean the seat back.  Constant means I'm never

EXHIBIT X              298

Page 207

```
1    stopping.  Constantly, like, a lot of the times the
2    parking people, they have to constantly drive through
3    the parking lots the entire night and scan license
4    plates.  They are only allowed to stop and get out of
5    the vehicle for their lunch break for half an hour.
6         Q    So you picked the word constant?
7         A    Yes.  I specifically picked the word
8    constant, because that was exactly what I couldn't do
9    was drive nonstop with no opportunity to adjust myself
10   for two hours.  It's like I mentioned, when I go on
11   family trips to go visit my dad.  I have to stop at a
12   rest stop at two hours because I got to get out and
13   stretch my legs because it's a longer trip than two
14   hours.  So it's not constant over two hours.  But the
15   drive up to two hours is constant because you're on
16   the interstate driving nonstop.
17             So, yes, I narrowed it down.  That's exactly
18   why I worded it exactly that way.  Because prevents
19   focused it down to one specific thing.  Because I know
20   what bothers me, I know where I get aggravated, and I
21   know what I need to prevent it from happening, and
22   that's what I wrote to enable me to do my job and to
23   do the -- and to request the minimum amount from the
24   airport.  Because I figured that was the best way to
25   keep my job and do the thing that I loved.
```

Page 208

1    Q    So number 3 says, "Unable to repeatedly

2    bend, squat, or stoop.  And it prevents inspecting

3    items/bags on a table while standing."

4    A    Correct.

5    Q    You'll agree with me that that language

6    appears to prohibit you from inspecting bags on a

7    table while standing.  There's no caveat there; right?

8    A    Exactly.  It says inspecting bags --

9    items/bags on a table while standing, which is

10   specifically the only time that ever happens is on the

11   portal.  And then -- and then, yes.  So that is an

12   actual essential function that I wrote, exact

13   copy/pasted right off of the essential functions.

14        And then I stated, this is the narrowing

15   down.  It's not any other time.  It's not working on a

16   gate.  It's not working in the terminal --

17   Q    It doesn't -- does it?

18   A    It does say prevents -- it doesn't say

19   prevents me from doing vehicle inspections because

20   that is not an issue.  And then if you go to page 2,

21   it specifically states on number 3, I need high tables

22   for inspections.  That will satisfy that limitation.

23   Q    It doesn't say high tables for inspections

24   satisfies --

25   A    Number 3.

EXHIBIT X

1      Q    It doesn't say that.

2      A    That's what it says.  It says right here.

3  Reasonable accommodations requested.  That's what I

4  requested, is a higher table.  That satisfies that

5  limitation.  If I had anything else I needed, would

6  have had to put it down under requested.  I could not

7  allow the airport to just assume that I need, you

8  know, something when I don't.  I need to be very

9  specific with it and make sure everything I'm laying

10  out is very specific and that way there wouldn't be

11  any confusion, but somehow there was.

12      Q    Well, this doesn't say that high tables was

13  going to resolve preventing you from inspecting items

14  or bags on a table while standing.

15      A    It -- it's a reasonable accommodation to

16  allow me to do that.

17      Q    Okay.  But it doesn't say that.  You'll

18  agree that it doesn't say that.

19      A    That's exactly how you interpret the paper

20  the way it's intended.  That is exactly what it says.

21  Here is my problem, here is a solution.  That's pretty

22  much how this form is laid out.  That's why it says

23  here's my limitation, here's my requested

24  accommodation.  Problem, solution.  It's very

25  specific.  I did it specifically so there wouldn't be

EXHIBIT X                          301

Page 210

1   this confusion.  And the fact that the airport thought

2   that me telling them that, being the actual person

3   with the disability is telling them this is all that I

4   need, and not taking that verbatim and just assuming

5   that it didn't apply to anything else is another

6   mistake the airport made.

7        Q    Sir, you weren't just asking for a high

8   table, though.  You were asking for all of these

9   things.  And there is nothing on here that says number

10  1 only applied to a future job that I might want to

11  apply for.  It doesn't say that, does it?

12       A    Tim Richardson should have explained that to

13  everybody else that this was for not just one job.

14       Q    No.  No.  I'm asking you what the form says.

15  Does the form say that?

16       A    The form is for no specific job at all.

17  It's for any job.  Where does it says civilian

18  security officer?  Okay.  It says it right there,

19  position/title.  But it's for -- I was also told to

20  fill it out for any other reassignment job.  I was

21  told that it needed to be able to cover everything,

22  not just the position you're in.  Because a part of

23  reasonable accommodations is being reassigned.

24       Q    Who told you part of reasonable

25  accommodations is being reassigned?

Page 211

1        A    Tim Richardson, the Matrix representative

2    for their ADA.

3        Q    And is that in writing?

4        A    Absolutely.  I have it in an e-mail.

5        Q    In an e-mail from Tim that says --

6        A    Absolutely.  I have it in an e-mail telling

7    him that --

8              THE REPORTER:  Mr. King, I'm sorry.

9    Mr. King, I'm sorry.  I know you're anxious to give

10   your response, but I can't hear you both talking at

11   the same time.

12             THE WITNESS:  I do apologize.

13             THE REPORTER:  Would you please allow

14   counsel to finish?  Thank you, sir.  Thank you.  Okay.

15             THE WITNESS:  Thank you.

16   BY MS. HARRISON:

17        Q    What's the date of the e-mail that Tim

18   Richardson told you that part of an accommodation is

19   being reassigned?

20        A    Middle of June.  It was when I was telling

21   him that I was getting this form completed, and I had

22   -- I didn't have it scanned in yet.  And I just typed

23   in what I had and I said I wrote it up just like you

24   said to be inclusive of any job in case I get

25   reassigned.

Page 212

1      Q     So that's something you said, not something

2   he said.

3      A     That's something I confirmed to him in the

4   e-mail to basically verify that this is what we had

5   discussed.

6      Q     And is that an e-mail that you've produced?

7      A     Yes.

8      Q     Item number 4 on Exhibit 5 is, "Unable to

9   repeatedly lift/carry over 70 pounds.  Prevents moving

10  of heavy items."  Did this apply to the CSO position?

11     A     No, it does not.

12     Q     What position did it apply to?

13     A     Any administrative position that typically

14  has a lifting capacity requirement.

15     Q     Number 5.  "Unable to walk more than 45

16  minutes.  Prevents doing constant terminal patrols."

17  Is that related to CSO position?

18     A     It's a marginal function because walking for

19  an extended period of time does not designate the

20  actual -- what extended definition is.  And looking on

21  DOL's workforce labor rates -- labor rating system,

22  walking six hours out of every eight hours is

23  considered light duty, and medium duty, and heavy

24  duty.  Not construction.  Construction is the highest.

25  And 45 minutes every hour is six hours in an eight

EXHIBIT X                    304

Page 213

1    hour shift.  So I comply with the DOL requirements for

2    job difficulties.

3         Q    You agree, though, that part of your job

4    description and essential function is walking for

5    extended periods of time.

6         A    Yes, and extended is a vague term.  And I

7    quantified by saying 45 minutes, which in my mind is

8    definitely an extended period of time.  If you look on

9    exercise websites, walking or running for 30 to 40

10   minutes is considered running for an extended period

11   of time.

12        Q    So you told me about a shift earlier where

13   you constantly walk the terminal.

14        A    Right.

15        Q    And this says that this prevents doing

16   constant terminal patrols.

17        A    I also mentioned that I stopped to check

18   doors.  I stopped and talked to customers.  I stopped

19   to sit on unattended bags.  It isn't a constant walk.

20   You are stopping constantly.  Just as I mentioned

21   before, the supervisors told us, "Walk till you're

22   tired, sit.  Start walking again when you're rested."

23   So I --

24        Q    So you picked -- I'm sorry.  Go ahead and

25   finish.

Page 214

```
 1        A    So I picked 45 minutes because that met the
 2   DOL standard.  That six hours out of every eight hour
 3   shift is what they consider light duty, and medium
 4   duty, and heavy duty as far as workload goes.
 5        Q    So did you pick the word constant in this
 6   doing constant terminal patrols?
 7        A    Yes.  Because every time I stop to talk to
 8   somebody, that is no longer constant.  So it gives me
 9   -- because after 45 minutes walking constantly, which
10   I know from doing my exercise on my own, that after
11   about 45 minutes it hurts.  So I don't want to walk
12   constantly for 45 minutes.
13        Q    So what job was this intended to apply to?
14        A    Any other job.  I was just listing out one
15   limitation that I knew specifically that it was
16   something that I couldn't do, which was walking more
17   than 45 minutes.  And in case there was a job that had
18   that, like landscaping, 'cause that's considered
19   construction, there's no limitation.  So at that
20   point, if they tried to transfer me to landscaping, I
21   would have that accommodation.
22        Q    Number 6.  "Unable to stand greater than 20
23   minutes.  Prevents standing at posts."  What job was
24   that intended to apply to?
25        A    The -- the curbside.  I don't remember their
```

Page 215

1   official title.  But they got curbside parking where

2   they have to stand out at the curb and do -- do the

3   valet parking and do the taxi cab stands.  And they

4   stand for constant.  But the CSO job description does

5   not include the word stand at all.  So it's not an

6   essential function.  It's a marginal function.

7        Q    You do agree that you did do a great deal of

8   standing as a CSO, though.

9        A    It's still not listed as an essential --

10       Q    Sir, that's not my question.  Did you do a

11  great deal of standing as a CSO?

12       A    Not extremely.  Most of the time you were

13  either sitting or you're walking.  So the only time

14  you would do the standing is if you were holding a

15  badge, looking at it, turn around, scan it, and give

16  it back.

17       Q    So most of the time you were sitting or

18  walking.

19       A    Correct.

20       Q    Which are essential functions of the job.

21       A    Yes.

22       Q    Number 7 says, "Unable to use stairs over 25

23  steps.  Prevents using stairs to ascend/descend over

24  two stories."  What job was that intended to apply to?

25       A    That was in case they reimplemented the

Page 216

1    stairwell checks for CSOs.  But at no point is there

2    any more than two -- two -- there's been more than two

3    stories to descend or ascend because all the terminals

4    are only three stories.  And even then, it says per

5    every two hours.  If you look at number 7.  Use

6    elevator, which is available on every DFW building.

7    And/or stair use limit to once per two hours.

8            So I can still do more than two flights of

9    stairs, but it's got to be separated -- separated by

10   two hours.  So that could apply to any job that's got

11   to walk around the terminal, CSE, the CSE supervisor.

12   It just means use an elevator, or if you're going to

13   use the stairs, don't do it more than once every two

14   hours.

15       Q    When you had your accommodation phone call

16   on August 25th --

17       A    Correct.

18       Q    -- did you tell them at that point that

19   these restrictions, these limitations, were not

20   intended to apply to the CSO position?

21       A    I disagreed on several occasions.  But I was

22   talking to my senior manager.  I was trying to be

23   polite, so I disagreed.  And he came back and

24   disagreed with me, and I let it go.  All I could do

25   was make sure I that I voiced my disagreement with his

Page 217

1   analysis.

2         Q     Disagreed about what?

3         A     How he was characterizing what we did.

4   Because he has no experience doing that job.  He had

5   only been on the job for a few months.  I had been

6   doing it for years every day.  And he tried to tell me

7   that he knew what I did every day, and I disagreed

8   with him on numerous occasions.  But I wasn't going to

9   be rude.  I figured I was going to have to go back and

10  work for this guy.  I wanted to do it the nicest way.

11        So I did what I did.  I made sure I -- I

12  disagreed with him.  And then I wasn't going to

13  continue arguing with him.  I let it slide.  I made my

14  statement saying I disagreed.  He don't agree with it,

15  then I'm not going to make this a big argument because

16  you're my boss and this is just what -- not how you

17  keep a job.

18        Q     So if I'm understanding correctly, what you

19  disagreed with him about is whether these limitations

20  applied to things you did every day as a CSO.

21        A     Correct.

22        Q     Did you say in that meeting, "These

23  limitations aren't for the CSO position.  They are for

24  any position I might apply for"?

25        A     Any time he mentioned something that he

1   said, "You won't be able to do this," I corrected him

2   saying, "Well, that's not how we do that."  We would,

3   you know, like he mentioned at the construction gate.

4   "Well, the construction gate, I saw that they never

5   took time to sit down."  And I said, "When I worked

6   construction gates, we sat down.  One person would do

7   the vehicles, the other person would do the escort

8   list.  When you're doing the escort list, you would

9   sit down.  You divvy up the work that way.  We've been

10  doing it at the matter of being courteous to each

11  other and, you know, working together."

12          And he's like, "Well, I've never seen them

13  do it that way."  And I left it at that.  So I

14  disagreed when he made statements that were

15  incongruent to the job I do every day.  So when he is

16  saying, "I watched this gate for an hour," okay.  Well

17  I worked that gate for ten hours for four years.  So

18  yeah.  And that's why I referred to Bathyaa and Sam

19  Jones, two of the most senior people in the

20  department, when I -- when I came up with this.  To

21  make sure that they thought, yes, you narrowed it down

22  perfectly.  That should not be a problem.

23              MS. HARRISON:  Okay.  Objection.

24  Nonresponsive.

25  BY MS. HARRISON:

Page 219

1      Q    I want to focus in some more on some of

2   these restrictions and the things that you said you

3   were having difficulty doing just in the CSO --

4      A    Okay.

5      Q    Were you asking to be excused from having to

6   stand for all face-to-face interactions?

7      A    No.   I would -- I could stand for five of

8   them every 30 minutes.

9      Q    Okay.   How many do you think that you would

10  do in 30 minutes?

11     A    I mean sometimes I'd get none.   Sometimes I

12  might get six, seven, eight.   It depends.   You know,

13  it depends on how busy the gate is -- or how busy the

14  portal is.

15     Q    So if you could only do five in 30 minutes,

16  who was going to do the rest of those?

17     A    You don't have to stand up to check IDs.

18     Q    Did you tell me earlier you also have to

19  look a person in the face and look between their eyes

20  and their nose?

21     A    No.   I look at their gap between their eyes.

22  And, I mean, I'm sitting down right now.   I can look

23  at your eyes and your nose.   There is no difference in

24  that from doing it at the portal.   You can still look

25  at somebody's face and hold an ID.   You don't have to

Page 220

1    stand up.  There's no point.  I can still perform the

2    essential function, which is the verification of the

3    ID, while sitting.

4        Q    Okay.  So you weren't asking for somebody

5    else to do that.  You were asking to be allowed to

6    continue sitting?

7        A    Absolutely.

8        Q    And one of your restrictions, though, is

9    unable -- never mind.  And with regard to being unable

10   to repeatedly bend, squat, or stoop, are you saying

11   that that only had to do with baggage inspections?

12       A    Correct, at the portal.  Only had to do it

13   at the portal.

14       Q    And so that, you don't believe, had any

15   impact on your ability to inspect a vehicle at the

16   gates?

17       A    No.  Absolutely not.  Like I said, you back

18   up, you barely have to turn your head to look under a

19   vehicle.

20       Q    Did you ever have to lift people's bags?

21       A    No.  We were told not to handle them if we

22   could help it.

23       Q    If you could help it.  But did you ever have

24   to lift people's bags?

25       A    No.  I didn't touch their bags.  Most people

Page 221

1     didn't ask me.  We've had cockroaches come out of

2     their bags, crawl up people's arms.

3         Q    In response to interrogatories, which is

4     Exhibit 4, interrogatory number 2, this asks you to

5     identify and describe every accommodation that you

6     requested related to your alleged disability.  And

7     you've listed four accommodations that you requested.

8             The first one is in January of 2020.  And it

9     lists some restrictions that you had.  And said that

10    you requested accommodation.  And as a result of that

11    accommodation request, isn't it true that you were

12    assigned to light duty on E dock?

13        A    Yes.  I was put under modified duty policy

14    on E dock.

15        Q    Okay.  And so you're not saying that this

16    accommodation was refused, are you?

17        A    That's correct.

18        Q    Okay.  Then the next one is you said that

19    January 28, 2020 accommodation requested an admin role

20    with the limitations previously mentioned.  And then

21    you say disability same, reason for request feeling

22    unproductive in current position.  Do you see that?

23        A    Yes.

24        Q    So are you saying that there was a medical

25    reason for requesting the move to admin role from E

```
 1   dock?
 2        A    It was a personal and professional reason.
 3   Because I felt that I should be earning my check, not
 4   just sitting down in the break room holding the chair
 5   down.
 6        Q    Okay.  But not a medical reason for that
 7   request?
 8        A    Correct.  What I was asking for was already
 9   within my restrictions.
10        Q    Okay.  And then number 3, July 13, 2020
11   accommodation request.  I think that's the one that
12   we've been talking about; is that correct?
13        A    That's correct.
14        Q    And you are saying that that one was denied.
15        A    Yes.
16        Q    And number 4, August 25, 2020 accommodation
17   request to be reassigned to another position in the
18   company with the aforementioned limitations.  And
19   you're saying that that was denied.
20        A    Correct.
21        Q    Who did you specifically ask to be
22   reassigned?
23        A    I asked the entire group on the
24   teleconference, which was senior manager Bear
25   Stevens, Tim Richardson from Matrix, and both the
```

Page 223

1    Youngs.

2         Q    Okay.  Do you think Tim Richardson has any

3    authority to reassign you?

4         A    He actually said that he didn't want to

5    participate in it.  That the airport needs to have

6    their own policy for it.  Then there's the entire

7    discussion between Mark Young and Carl Young on how

8    are we going to do this, we don't have a policy for

9    it, let's take good notes because, you know, we're

10   going to have to probably make a policy out of this.

11   And let's work with him to get him reassigned.

12        Q    So you're not aware of an existing policy

13   about reassignment for medical reasons?  You're saying

14   there is no policy?

15        A    There is no policy.  The reasonable

16   accommodations policy DFW has does not cover anything

17   about reassignment.

18        Q    And so are you saying that Carl Young said

19   that they were going to reassign you?

20        A    Yes.  Absolutely.

21        Q    Did Mark Young say they were going to

22   reassign you?

23        A    I have to look at the transcript.  But, yes,

24   one of them said specifically they were going to

25   reassign me.  And I'd like to add that the original

Page 224

1    one that was modified duty isn't reasonable

2    accommodations because there's a termination date.

3    There's an expiration.  ADA requires that there cannot

4    be an expiration to it.  It can be changed, but it

5    can't be stipulated in the policy that it expires.

6              So -- and the fact that you have to wait six

7    months to be able to get -- shouldn't be under

8    modified duty, which means it's an FMLA program.  Not

9    a reasonable accommodation.

10        Q    Okay.  I don't think I asked you a question

11   about that.

12        A    I was clarifying the question before.

13        Q    The question I like multiple questions

14   before, about modified duty?

15        A    The one on number -- for number -- yes.  The

16   one on modified duty for number 1.

17        Q    So are you saying that that --

18        A    That you're misclassifying it because

19   calling it reasonable accommodations.  Because the

20   policy does not abide by ADA requirements.  And it has

21   to be available immediately upon hiring and even

22   before hiring, during the interview process and cannot

23   have an expiration date.  And any changes must be done

24   while having to interact or process the employee to

25   discuss the changes, which never happened.  I was told

Page 225

1    it's canceled, you're going to go on short-term.

2         Q    Was part of your business degree a course on

3    the ADA?

4         A    I did a lot of reading on the EEOC website.

5         Q    So no.   The answer to that is no.

6         A    All you do is -- just read.   So reading, you

7    know.

8         Q    You did not have a course on the ADA,

9    though, in school.

10        A    Not necessary.   You can find everything you

11   want on the internet.

12        Q    So we're going to get through this a lot

13   faster if you'll just answer my questions.   Because

14   I'm asking you questions, and you're adding a lot of

15   extra stuff.   And that's fine.   Like, we can sit here

16   a lot longer.   That's absolutely fine.

17             We've covered this before, but I want to

18   make sure I understand.   You did not apply for any

19   positions through the normal process after that August

20   28th [sic] meeting and before your termination?

21             MR. DAUPHINOT:   Objection.   Form.

22             MS. HARRISON:   Let me restate that.

23   BY MS. HARRISON:

24        Q    Did you apply for any jobs via the employee

25   portal -- no.   Let me start that again.   Between

1    August 25th when you had that meeting and your

2    termination date, did you submit applications through

3    the online portal for DFW for any positions?

4         A    No.   I was following the directions that was

5    given during that teleconference meeting, whom which

6    they said my point of contact was Mark Young.   I

7    specifically asked, "Who should I send my request for

8    reassignment to?"  And they said Mark Young.  And then

9    Mark Young, when he didn't have the answers to the

10   questions, he referred me to Carl Young.

11            And Carl Young originally was giving me the

12   information, albeit slow and delayed weeks.  And the

13   months goes by before I sent him another e-mail to get

14   a response.  Until he finally in late November just

15   said, "You should get online and check.  They are all

16   listed."  Which is directly contradictory to what was

17   discussed in the meeting.

18            MS. HARRISON:  Kimberly, are we on

19   Exhibit 6?

20            THE REPORTER:  We are on Exhibit 5,

21   counsel.  Unless I missed one.

22            MS. HARRISON:  I think we marked

23   something as Exhibit 5 already, the application for

24   reasonable accommodation.

25            THE REPORTER:  Okay.

Page 227

1          MS. HARRISON:  So I think we are on 6.

2     BY MS. HARRISON:

3          Q     Have you seen this before, Mr. King?

4                (Exhibit 6 was marked for

5                identification.)

6          A     Yes, I have.

7          Q     Okay.  I want to direct your attention, the

8     first e-mail in this string is from August 26, 2020.

9     It's from you to Mark Young.  Do you see that?

10         A     Yes.

11         Q     And you say, "M. Young, I have found two

12    positions that I am qualified for.  Terminal

13    experience supervisor is listed on internal job site.

14    There is also an open MCR spot that is open should be

15    posting soon.  B. Stevens is aware of it.  I have also

16    attached my resume."  Did I read that correctly?

17         A     Yes.

18         Q     And then Mr. Young replies on September 9th

19    and he says, "You need to apply for these through the

20    normal process."  Do you see that?

21         A     Yes.

22         Q     And in response to that, you said, "I also

23    need to get a list of the positions that are currently

24    open under the 2 percent vacancy rate, as well as the

25    122 positions that are budgeted to remain vacant in

Page 228

1    2021.  I need this information in order to determine

2    which vacant positions I am qualified for.  If you do

3    not have this information, please let me know who I

4    need to contact to get this information."  Do you see

5    that?

6         A    Yes.

7         Q    Okay.  You did not say in response to this

8    e-mail, "Hang on a minute.  That's not what you told

9    me in our August 25 meeting."

10        A    If you look at the first page, same date,

11   two hours later I did cover that.  I said, "I was told

12   I would get information regarding the open positions

13   so I could determine which ones I qualify for in order

14   to facilitate a reassignment."

15        Q    So that's not an e-mail with Mark Young,

16   though.  That's an e-mail with Carl Young; right?

17        A    That's correct.

18        Q    So Mr. Young tells you on September 9th, you

19   need to apply for these through the normal process;

20   correct?

21        A    Correct.

22        Q    So did you think after he said that, that he

23   had submitted your applications for these two

24   positions that you listed in your e-mail?

25        A    I don't know.  He didn't say he did.

Page 229

1      Q    Did you understand from that that you needed

2  to start applying through the normal process for these

3  jobs?

4      A    That wasn't what was told to me in the ADA

5  meeting for the teleconference.  So he -- you know, he

6  didn't say he changed it.  He just said the normal

7  process was -- now the normal process for me was using

8  him.  Because that's what we discussed in the ADA

9  briefing was I was supposed to contact him.  So for me

10 that is the normal process because we're talking about

11 ADA reassignment, not application for a job from a new

12 hire.  I was following the directions they were giving

13 me in that briefing.

14      So as far as the normal process, what is the

15 normal process for reasonable accommodations

16 reassignment?  There isn't one.  I had to go on what

17 was told in the teleconference.

18      Q    All right.  So the e-mail that you wanted to

19 talk about a second ago, the exchange with Carl Young.

20 Carl gets looped into this because Mark says he is not

21 privy to the information that you asked for on

22 September 11th at 6:11 p.m.; correct?

23      A    Correct.

24      Q    So he is including Carl Young.  And then you

25 write an e-mail to Carl Young that says you are

1   requesting the information concerning all of the

2   positions at DFW.  And you said, "I requested

3   reassignment under ADA when my accommodations for my

4   current position were denied.  I was told I would get

5   information regarding the open positions so I could

6   determine which ones I qualified for in order to

7   facilitate a reassignment.  I would also like to apply

8   for the following two positions that I am already

9   aware of."

10          And you say they are not listed on

11  Connected.  Is Connected the online system that anyone

12  can apply for a job in?

13      A    Yes.  That's the portal.

14      Q    Okay.  And then you go on to say you've

15  attached your resume and you are requesting certain

16  information.  Same information you had asked earlier

17  of Mark; correct?

18      A    Yes.

19      Q    And then Carl does reply.  He replies that

20  same evening at 7:20 p.m.  He says, "Here is a listing

21  of open jobs.  Some of them may not be posted mainly

22  because they are in the interview process.  If the

23  people that are being interviewed are not successful,

24  they may repost the job."  Did you see that?

25      A    Yes.

Page 231

1        Q    What did you understand that to mean when he

2    said it?

3        A    That they are not going to be listed on the

4    portal.

5        Q    Did you understand that those jobs might not

6    actually be available for you?

7        A    Yes.   They said they are interviewing

8    people, yes.

9        Q    Okay.  And then he says, "I will pass your

10   resume along for the terminal experience manager."  Do

11   you see that?

12       A    Correct.

13       Q    So he doesn't say he is passing your resume

14   along for the MCR operator; right -- for the terminal

15   experience manager.

16       A    I found out later on the MCR was rolled into

17   the technical telecommunicator.  So that was probably

18   why he wasn't familiar, because I didn't know MCR was

19   being -- operator was being phased out.  That it was

20   being combined with the telecommunicator.

21       Q    So just so I understand, you believe that

22   the normal process for applying for a job that Mark

23   Young was referring to was for you to submit your

24   resumes to Carl Young?

25       A    That's what I was told in the teleconference

Page 232

1   was to make sure to submit your resume -- my point of

2   contact was Mark Young, and then I submit a resume.

3   But then when I e-mailed Mark Young on the 26th of

4   August and he decided to respond on September 11,

5   almost two weeks later, and he told me that, I was

6   asking for more information.  I was like, that's not

7   you giving me the information.

8          So then I quoted the annual business report

9   that I had access to that showed they had a 2 percent

10  vacancy rate, approximately 42 vacant positions.

11  That's a copy and paste from the business report that

12  was released.  So that's how I knew a starting round

13  of how many positions were going to be open that I

14  should be able to apply for.  And then -- but this is

15  before I discovered there's actually an airport

16  vacancy report.  And that was never provided to me,

17  which should have been to me from the outset so I knew

18  which jobs were open and which ones I could look into

19  and ask for the actual job descriptions from.

20         But Carl Young, I admit, was excellent on

21  this first -- I e-mailed him, bam, he e-mailed back

22  the same day.  I was like, wow, that's impressive

23  considering it took two weeks for the last guy.  But

24  then he falls into the same pattern.  So there is one

25  that is two weeks.

Page 233

1    And I had to message him, "Hey, what's going

2 on?" Another one, I let it go for a month waiting.

3 "Hey," you know, I'm trying not to pester the guy. I

4 want him to be able to do his job. I understand he's

5 got a lot on his plate, but I know my time is running

6 out. Because I know short-term disability's got a

7 limited window. It's only got --

8    So I'm like, come on. We need to -- you

9 know, and I'm getting more and more frustrated with

10 the statement as it goes on because it's just plainly

11 obvious, you know, just delayed. Counting my days

12 down until I'm out of time. And then you just wash

13 your hands and think it's over.

14    Q    Let's talk about that August 25th meeting.

15 Was there a meeting scheduled before that, that you

16 missed?

17    A    I was not invited to it.

18    Q    What do you mean?

19    A    That was a meeting for only the -- the

20 manager and the other people that were in the meeting

21 to predetermine what they were going to say in the

22 meeting with me.

23    Q    How do you know that that -- I don't

24 understand. I just asked was there a meeting that was

25 scheduled to discuss your accommodations before the

Page 234

1   August 25th, that you missed?

2       A    Yes.  Because the title of my meeting was

3   meeting number 2.

4       Q    Are you making an assumption about that?

5       A    You don't number a meeting unless you had a

6   first one.

7       Q    Okay.  So you don't --

8       A    And considering they did the same thing to

9   my wife with requesting some -- right now where they

10  did a meeting with her boss and Mark Young and -- not

11  Carl Young, but the new guy.  And they actually not

12  only included my wife on it, even though she denied

13  it.

14           So I know they had a meeting beforehand

15  because they did it on the -- and as a good manager, I

16  would want to discuss the options first before I had

17  the sit down.  So it would be good policy to do it

18  that way anyways.  But the fact that they already

19  determined -- they had already behaved like they came

20  to a predetermined conclusion before ever talking to

21  me is where it becomes a problem.

22      Q    Who was present at that meeting?  The

23  meeting on August 25th.

24      A    The one that I was in?

25      Q    Yes, sir.

Page 235

```
 1        A    Tim Richardson, Carl Young, Mark Young, and
 2    Bear  Stevens, and then myself.
 3        Q    And you understand that Tim Richardson is
 4    not a DFW employee; right?
 5        A    Yes.
 6        Q    And your wife was also present at that
 7    meeting?
 8        A    She was in the room with me, yes.
 9        Q    Okay.  And you recorded the conversation?
10        A    Yes.
11        Q    What did you record it on?
12        A    My tablet.
13        Q    And why did you record it?
14        A    To cover myself.
15        Q    Meaning what?
16        A    Same reason I kept all the e-mails.  Because
17    it didn't seem like people were dealing with me
18    straight up.  And it's my word against theirs.  But if
19    I have your voice recorded, it's your word against
20    yours.
21        Q    I'm going to hand you what we're going to
22    mark as Exhibit 7.  Can you tell me what this is?
23                   (Exhibit 7 was marked for
24                    identification.)
25        A    That is the transcript I worked three days
```

Page 236

1    on to write.

2         Q    So did you type this?

3         A    Yes -- online service, but none of them

4    would do it correctly.  So I had to go and do it

5    myself.

6              THE REPORTER:  I'm sorry, Mr. King.

7    You were muffled.  I couldn't understand you.

8              THE WITNESS:  I said that I tried to

9    use an online service to do it, but they couldn't get

10   it right.  So I had to do it myself.

11             THE REPORTER:  Okay.  Thank you.

12   BY MS. HARRISON:

13        Q    Do you have other versions of this that were

14   created by an online service?

15        A    Not that I -- I mean, it was just most of

16   the stuff they couldn't understand.  It came out with,

17   like, saying stuff that wasn't even close to what was

18   really said.  So because some of it is lower volume,

19   so I had to edit audio later to go in and take out

20   some of the background noise to be able to do it.

21        Q    Is the version of the recording that you

22   produced in this lawsuit the version that was changed

23   with an audio editor?

24        A    You mean the actual audio file?

25        Q    Yes.

Page 237

```
 1        A     No.   That is the raw version of the file.   I
 2    did not do any -- all I did was open it in the audio
 3    editor and then messed with it.   But I did not do
 4    anything to the actual file.   That's the original
 5    file.
 6        Q     Okay.   And you typed this document that is
 7    Exhibit 7?
 8        A     Yes.
 9        Q     Did you record any other phone calls with
10    DFW employees?
11        A     No.
12        Q     Was anyone in the room besides Ms. Miller?
13        A     No.
14        Q     Did your wife record phone calls with DFW
15    employees?
16        A     No.
17        Q     Your complaint alleges that you were
18    retaliated against for requesting a reasonable
19    accommodation when DFW Airport refused to consider you
20    for any positions you applied for in August,
21    September, and November of 2020.   Is that right?
22        A     Yes.
23        Q     And you're also stating that you were
24    terminated in retaliation for requesting a reasonable
25    accommodation.   Is that right?
```

Page 238

1      A    Correct.

2      Q    So are you saying that DFW refused to

3  consider you for any of the other positions you

4  applied for and that was retaliation for requesting

5  your reasonable accommodation?

6      A    The retaliation was when they terminated me

7  rather than finding me a new assignment.

8      Q    I see.  So in this case, I believe you've

9  told me that there are two accommodations that you

10 requested.  One is the specific physical limitations

11 that were discussed in the August 25th meeting;

12 correct?

13     A    Correct.

14     Q    And the other one is reassignment.  Is that

15 right?

16     A    Correct.

17     Q    And so which one of those do you believe you

18 were retaliated against for?

19     A    Both of them.

20     Q    Did you happen to tell anyone that you were

21 recording the August 25th meeting during that meeting?

22     A    No.  It's a single-party state.  I don't

23 have to.

24     Q    Do you know if DFW has any policies about

25 recording?

FOR READING & SIGNING ONLY

Page 239

1      A    Yes, I do.

2      Q    What is their policy?

3      A    You're not allowed to.

4      Q    Okay.  So why did you do that?  Why did you

5   record when you knew that policy?

6      A    Because I wanted to have it on record.

7      Q    Were you ever written up while you were

8   employed by the DFW airport?

9      A    Yes.  One time.

10     Q    Okay.  I'm going to hand you what we're

11  going to mark as Exhibit 8.  Do you recognize this as

12  the writeup that we just discussed?

13                (Exhibit 8 was marked for

14                identification.)

15     A    Yes.

16     Q    And you refused to sign this.  Is that

17  correct?

18     A    Correct.

19     Q    Why did you refuse to sign this?

20     A    Because it was mostly false.  It had several

21  lies on it, which I sent a complain in to HR.  And

22  they, rather than investigating it, threw it out.

23     Q    So you appealed this; right?

24     A    Yes.

25     Q    And the appeal did not find in your favor?

Page 240

1        A     Correct.

2        Q     Which part of this are you saying is

3    untruthful?

4        A     Let's take it from the beginning.  Let's

5    see.  It's stated right here.  "Acted outside the

6    duties and responsibilities of --"

7        Q     Wait.  Hang on.  I'm sorry.  Can you tell me

8    where you are pointing and then don't talk so fast,

9    because she really has to type.

10       A     Yes.  You're correct.  On page 2, first

11   paragraph.  Statement of issue description.  It says

12   that, "At approximately 0340 hours, Officer Nathaniel

13   King took it upon himself to act outside the duties

14   and responsibilities of a civilian security officer."

15       Q     Slow down just a little.  I'm sure she's

16   very good, but I bet she can't type that fast.

17       A     I'm going to read that again and go slow

18   this time.  "On 5/7/2018, at approximately 0340 hours,

19   Officer Nathaniel King took it upon himself to act

20   outside the duties and responsibilities of a civilian

21   security officer."  That was incorrect.  I had several

22   officers sign an affidavit stating that we were told

23   by supervisors on numerous briefings that if we hear

24   something on the radio for police, we need to head

25   that way in case we need to assist.  And that's all

1    that I was doing, was following that instruction by

2    supervisors.  And I included this in my appeal when I

3    filed the complaint against the assistant manager for

4    the false statements made in here, which are in

5    violation of the DFW code of ethics is lying on a

6    formal form.

7            And it was dismissed without even

8    considering it.  And then they say, "He did this by

9    interfering in a police pursuit of a vehicle on

10   airport property after hearing the radio traffic on

11   TAC-4."  Again, you hear it on the radio, head that

12   way in case they need assistance.  What we were

13   instructed to do.  And in no way did I interfere.  I

14   talked to the officer after the fact and he said that

15   I wasn't interfering, that I moved out of the way.

16           So -- and you also -- I also requested

17   through open records a copy of the dash cam video that

18   clearly shows me pulling onto the shoulder as he

19   approaches me and then driving past me.  And that is

20   not interference.  They're claiming that me turning on

21   the vehicle lights was interfering, which it's not.

22   It's merely identifying myself to the police officer

23   and then moving it out of the way.

24           Basically a warning, letting him know I'm

25   right here, I'm getting out of your way.  And at the

1    same time, I was on the phone with police dispatch

2    saying, "What should I do?  Do I need to do anything?"

3    And when they didn't tell me to do anything, they were

4    asking their supervisor, "Well, he's in front of the

5    pursuit.  What does he need to do?"  I moved over,

6    they went by.  And they were like, "Well, we don't

7    know what you can do."  I'm like, "Well, doesn't

8    matter.  They already passed me."

9            So I went back to doing my patrol.  So,

10   again, a false statement.  I placed -- "Officer King

11   placed himself, DFW PD officers and airport property

12   in harm's way by attempting to assist in the police

13   chase."  I did not in any way attempt to assist in the

14   police chase.  I didn't place anybody in harm.  I was

15   on the shoulder of the road when they went by on

16   International Boulevard right on the other side, if

17   you're going southbound International, right by

18   terminal F.

19           So -- and then, it says right here I turned

20   on my emergency lights.  Yes.  Because I was on the

21   phone, and I was telling them I was in front of him.

22   And they said, "Where in front of him?"  And so I

23   turned on my lights so the officer would be aware that

24   there's a vehicle in front of him.  And then, "After

25   realizing and confirming that an airport security

EXHIBIT X                        334

Page 243

1   officer was interfering with a police department

2   operation, Officer King was directed by police to turn

3   off his emergency light bar and pull over."

4        And when this was put out on the radio, I

5   was already on the side of the road as shown by the

6   dash cam video that I have from open records.  "At no

7   time was Officer King or any airport security unit

8   requested to assist by the incident commander or

9   police involved."  I was told by the supervisor that I

10  needed to put myself in a position to be there to

11  assist as best as necessary.  And at that point, I had

12  already headed the other direction.  I was heading

13  south on International.  The pursuit was heading

14  north.

15       And they turned around in north express

16  parking and came up behind me.  I had nothing to do

17  with it.  I was going my own way and he came up behind

18  me.  It's not like I went and got in front of him.  I

19  was already heading south when he made the U-turn and

20  came south behind me.  And that's when I called

21  dispatch saying, "He's behind me.  Do I need to do

22  anything?  What should I do?"

23       And they're like, "We don't know.  Hold on.

24  We'll go get it."  But, okay, you're going 100-

25  something miles an hour.  It takes 20 seconds and

Page 244

1   you're fine and they hadn't had -- and I was on the

2   side of the road.  And I was like, well, I tried.  I

3   did what I was told to do.  And I put all that in, and

4   you should have a copy of it in my personal file and

5   I'm sure you will be able to review.

6          And I completely laid out exactly what

7   actually happened, and it was completely disregarded.

8   And his absolute lie was taken for truth.

9       Q    His lie.  Who is he?

10      A    Burton.  John Burton, the assistant manager.

11      Q    So you said in regard to the statement, "It

12  should be noted that at no time was Officer King or

13  any airport security unit requested to assist by the

14  incident commander or police unit involved in the

15  pursuit."  And you said that was incorrect.  Are you

16  saying that for this specific incident you were

17  requested to assist?

18      A    No.  I'm saying that prior to this I was

19  told by my supervisor, which was actually Boston, when

20  he was a supervisor before he was an AO, he put out

21  everybody in briefing, "If you hear something on the

22  radio, head that way so you can see if you can

23  assist."  I was there not at my own decision.  I was

24  randomly there because he made a U-turn.  And I called

25  PD because you don't call your supervisor when you got

Page 245

1    a PD chase.  You call PD because I have a radio with

2    them to ask firsthand, "Hey, what do I need to do?  Do

3    I need to help you?"

4         Because if I call a supervisor, if I was

5    able to assist, it would have been impossible because

6    I would have to call -- so I called the people who

7    were involved and said, "Hey, do you need anything?"

8    And in the meantime, I moved completely off the road

9    and parked.  And they went by.  And I said, okay,

10   well, I did what my supervisor told me to do.

11        Q    So if you don't think that you violated

12   policy, why do you think you got written up?

13        A    I have no idea.  Just -- I mean, I could

14   make personal assumptions about the assistant manager,

15   but I don't think that's relevant.

16        Q    Okay.  And you received a two-day suspension

17   as a result of this; right?

18        A    Yes, I did.

19        Q    And you understood this was a final written

20   warning.

21        A    Correct.

22        Q    I'm going to hand you what we're going to

23   mark as Exhibit 9.  Do you know what this is?  Have

24   you seen this before?

25        //

Page 246

1              (Exhibit 9 was marked for
2              identification.)
3     A    No, I have not.
4     Q    Okay.  So this is a document that is
5  presented by each side called a rule 26 disclosure
6  where parties list out people, like for number A, for
7  example, name and address, telephone number of anyone
8  who might have information about the lawsuit.  And
9  then here your attorney has listed a few people.
10             And I want to make sure that we talked about
11  the people.  I'm going to skip past your attorney.  So
12  I'm going to go to number 9, which is on page 2.
13  Bathyaa, is that the person we've been talking about
14  earlier?  Okay.
15             THE REPORTER:  I didn't catch that.  Is
16  that Bathyaa?
17             THE WITNESS:  Bathyaa, yes.
18             MS. HARRISON:  Bathyaa, yeah.
19             THE REPORTER:  Bathyaa, okay.  Thank
20  you.  I'm sorry.  The audio went out.
21             MS. HARRISON:  That's okay.  I probably
22  said it differently also.
23  BY MS. HARRISON:
24     Q    How long have you known him?
25     A    Since I began working at DFW.  I also sort

Page 247

1    of met him -- he was my manager when I worked for

2    Evergeen doing the inner terminal baggage transfer.

3    But I never actually met him.  He just was working at

4    the same as me.  And he remembered me, but I never met

5    him.  He just knew my name from papers.

6         Q    And we've already talked about Sam Jones.

7    Who is Amanda Tregoning.  Tregnoning?

8         A    Tregoning.

9         Q    Tregoning.

10        A    She is a friend of my wife's who she

11   referred her to ASD and she got the job.  And she was

12   also one of the admin security people before she quit

13   and moved to Washington state to take care of her

14   mother.

15        Q    Did you know her before she started working

16   at DFW?

17        A    No.

18        Q    When did she leave and go to Washington

19   state?

20        A    I have no idea.

21        Q    Was she still working at DFW when you

22   requested your accommodation?

23        A    Yes.

24        Q    When was the last time you spoke with her?

25        A    When I was working there and I saw her at

Page 248

```
 1    work.  She is an associate of mine.  She does -- she
 2    does artwork online.  And that's how my -- and my wife
 3    knows her.  They do -- buy artwork off of her.  So she
 4    just happened to find out she was in the area and she
 5    was looking for a job and so she was like, "Hey."  So
 6    they're not close friends.  They had never met,
 7    either, before they -- she started working at -- not
 8    in person until they worked at -- until she had come
 9    to ASD.
10         Q     Have you discussed this lawsuit with her?
11         A     I have not.
12         Q     Do you intend to call her to testify?
13         A     Yes.
14         Q     And what knowledge does she have about this
15    lawsuit?
16         A     She was one of the admin security officers.
17    She was the one who knew -- could verify that Cruz was
18    not there.  Can verify that other backups were being
19    used in his stay instead.  And she can also verify
20    when he returned to work the following January.
21         Q     Have you asked for her to come to Texas to
22    testify?
23         A     I did not.  My wife did.
24         Q     And has she said she will?
25         A     Yes.
```

Page 249

1    Q    This says that this document, Exhibit 7,

2    says that she has knowledge about availability of

3    accommodations and your medical disability.  What

4    information does she have about your medical

5    disability?

6    A    She knows what my medical disabilities are.

7    I talk to everybody about it.  It's pretty much just

8    normal conversation.  When you meet me, one of the

9    first things I'm going to tell you is that I'm a

10   disabled military vet.  I have these issues.  For me,

11   it's not a secret.  It's just something.  It's a

12   conversation thing for me.

13        You know, almost anybody who worked with me,

14   that's one of the things.  That's like one of our

15   initial -- first thing when we work together.  That's

16   what we kind of bring up is talk about that kind of

17   stuff.

18   Q    So she has knowledge of your disabilities

19   because you've told her?

20   A    Correct.

21   Q    When do you think you told her about your

22   disabilities?

23   A    That would be -- 'cause when she originally

24   started, she was on our shift.  But she only did that

25   for, like, I think a month.  And I think the random

Page 250

1    shifts, when it's two-person gates, it's random who

2    you are going to be with.  You don't pick and choose

3    who you are going to be with.  And I think I was only

4    with her like once or twice until she moved into the

5    -- spots.  So, like I said, for me, it's just typical

6    conversation when I'm meeting someone at the gate.

7            When you're sitting there with each other

8    for eight to ten hours, you talk about pretty much

9    everything.  You know, life stories are laid out

10   pretty quick.

11       Q    When do you think you started telling people

12   about your disabilities at the airport?

13       A    The day I started.

14       Q    So these are disabilities that you had

15   already with the day you started; correct?

16       A    Absolutely, yes.

17       Q    But they weren't disabilities that you are

18   claiming were causing you any limitations in

19   performing your job at that point.

20       A    We weren't doing the portals when I started.

21   Never had any --

22            THE REPORTER:  Repeat that, sir.

23            THE WITNESS:  We were not doing portals

24   when I started.  Absolutely nothing in the job gave me

25   any issues up until we started doing portals.

Page 251

1    BY MS. HARRISON:

2        Q    What knowledge do you think she has about

3    availability of accommodations?

4        A    She worked in the admin position, so she

5    knew when Cruz was gone.  She also knew -- she was one

6    of the four.

7        Q    And Cruz was coming back; correct?

8        A    No given date.  But, yeah, he was supposed

9    to eventually come back.

10       Q    And when you say he was in D.C., was he

11   deployed because he was military reserved?

12       A    Correct.

13       Q    And you know that if somebody is deployed

14   because they are in the military, you have to keep

15   their job open for them; correct?

16       A    Right.  Their job open, but not a specific

17   position.  That law only qualifies -- means you can't

18   -- he can stay a CSO, but any position that can be

19   based upon seniority can be changed as long as he

20   doesn't lose his job as a CSO.  And since that was a

21   seniority job, and I had more seniority on him, I

22   could take his spot and he could still come in and be

23   a CSO.  You don't hold that exact slot, you hold his

24   job open.

25       Q    Does DFW decide who gets jobs based on

Page 252

1    seniority?

2         A    Yes.  You do bids based on seniority.  And I

3    -- and I bid for his spot on the July 15th bid.  And

4    they told me I couldn't bid because there wasn't a

5    return date coming up yet.

6         Q    Explain to me when you would bid for jobs.

7         A    Every six months they do a bid where

8    everybody gets to select what shift they are going to

9    work and what days off they get.  And night shift, or

10   A shift, I've been there long enough that I get to be

11   -- I get the -- had the weekends off, since everybody

12   -- I don't typically take the weekends, 'cause

13   weekends don't make anything special for me.  So I

14   leave it open for my coworkers to get.

15        Q    When you say July 15th, do you mean July 15

16   of 2020?

17        A    Correct.  I don't remember when the bid was,

18   but it went into effect on July 15th.  And when I

19   tried to bid, I was told I wasn't allowed to bid

20   because I did not yet have a return date.  And they

21   didn't want to prevent somebody else from taking that

22   slot in case I didn't come back.  But at the same

23   time, they said that if I did come back, they would

24   give me the slot that I wanted and just create it to

25   give it to me since they had already given -- paid out

Page 253

1    to someone else.  It was an agreement that Bryan --

2    assistant manager Bryan gave to me.

3         Q    What is Bryan's last name?

4         A    Oh, that's his last name.  I wonder what his

5    first name -- Daniel.  Daniel Bryan.  No.  Bryan

6    Daniels.  That's right.  Bryan Daniels.

7         Q    So is Bryan Daniels the person who told you

8    you couldn't bid for that job?

9         A    Yes.

10         Q    And Bryan Daniels is the person who you say

11    said that he would give you that job when you came

12    back?

13         A    He would give me that -- that bid slot if I

14    was -- when I did come back.  He said even if somebody

15    took it, because I wasn't going to bid, so obviously

16    someone is going to want to take those days.  And he

17    said that if it comes up to you coming back to this

18    job, we'll just go ahead and make an extra slot and

19    put you on for the days you want instead of messing up

20    everybody's bid.

21         Q    So you're talking about bidding for a

22    specific shift; right?

23         A    It's a shift and days off, correct.

24         Q    Okay.  But the administrative security

25    position that Cruz was in, that's not just a different

Page 254

1     shift, that's a different role, isn't it?

2          A     But it's still based on B and C shift.  It's

3     still on B shift.  He would merely work at HQ.  And at

4     C shift, he would work as HQ.  You wouldn't rotate

5     into the gates with everybody else.

6          Q     So that wouldn't really be the same as

7     bidding for his job.  You were actually asking to be

8     put into a different role on July 15th?

9          A     You can call it that.  It's still a CSO.

10    It's not like a different -- they have a different job

11    function.  Instead of working the gates, they work the

12    security cameras in the DPS.

13         Q     And that is more of a permanent assignment.

14         A     No.  It's still bid on.

15         Q     The shift is bid on, but the actual

16    assignment of being an admin security officer is

17    something that Cruz was -- he didn't have to bid for

18    that; he was already in admin security; correct?

19         A     Everybody who is a CSO can qualify for that

20    job.  You just have to request it.  And then when you

21    request it, you have to wait for the bid to open.  And

22    when the bid opens, you can say, "I want to do that."

23    And that's what I did.  I said I wanted to bid for the

24    admin spots.  And then they were like, "Well, you're

25    not going to be able to bid because you're not -- you

Page 255

1  don't have a return date."

2       Q    So are you saying that Bryan Daniels told

3  you that he was just going to put you into the admin

4  security spot or he was going to keep your shift?

5       A    He just said he would create a slot,

6  whichever one I wanted, and put me in.  So I don't

7  know if Virginia informed him I was trying to do the

8  -- do the admin spot, not the regular shift.  Because

9  I originally was talking to her.  And when I called in

10 to do the bid, 'cause I told her I was going to do

11 that, and when I called in for the bid, they didn't

12 answer my phone call.

13       And instead, right after I hung up, Bryan

14 called and said, "Hey, we're not going to let you bid

15 because you don't have a return to work date.  And so

16 whatever bid you want, you know, if you get a return

17 to work date, when you come back, we'll just create a

18 spot and put you in it."

19       Q    If you look at Exhibit, I believe it's 4,

20 the interrogatories.  I want to look at number 7.  It

21 asked you to identify by name and job title each

22 employee of Defendant that you talked about your

23 disability.  There is a list of people in this

24 response.  I know that we've talked about some of

25 these people already.  Tell me, is Stephanie Lane the

Page 256

1    Ms. Lane that you were referring to earlier that was

2    at that meeting in February?

3         A    Yes, she was the acting AVP.

4         Q    Okay.  I understood from earlier that she

5    was not in the part of the meeting where you discussed

6    wanting to be assigned to admin security.  Did I

7    remember that correctly?

8         A    She came in right at the end of it.

9         Q    Is there any other time you would have

10   discussed your disability with her?

11        A    No.  I never -- that was the only time I

12   ever actually talked to her.  And I sent her one

13   e-mail just regarding -- actually, she sent me an

14   e-mail saying that I'm going to attend that meeting

15   with Bear.  Other than that, I have never talked to

16   her.

17        Q    And what did you tell her about your

18   disability in that meeting?

19        A    I don't remember at what point she walked

20   in.  But like I said, she was running late.  So we

21   went ahead and started without her.  And then towards

22   the end she came in and sat down.  And then after I

23   finished up what I was talking -- I don't remember.

24   She might have been there the last five minutes ago.

25   Five, maybe ten.  And then at that point is when I got

Page 257

1    into bringing up the different complaints that some of

2    the officers had and stuff.  And then I brought up the

3    fact that, you know --

4         'Cause she was like, "Well, why are you

5    bring this to us?  Why aren't they are here?"  I'm

6    like, "'Cause a lot of them, you know, they're afraid

7    of repercussions and being targeted and all this other

8    stuff, and so they come to me and, you know, they --

9    you know, and I'll take it to management because I'm

10   all right with talking to management.  I don't get

11   intimidated by people."

12        So that's what I would do.  I mean, I did it

13   to my supervisors all the time where people would come

14   to me, you know, we'd get done with the briefing, and

15   they'd be like, "Oh, I don't like this, I don't like

16   that."  And I took it upon myself to voice their

17   complaints.  And even as I explained to them, I don't

18   even agree with them.  Like, a lot of them were saying

19   they want to go back to eight hours.  I love the ten

20   hours, 'cause you get three days off.

21        I would've rather have had, like, Wednesday

22   off.  You know, work Monday, Tuesday, Wednesday off,

23   Thursday, Friday.  So you'd always just work two days

24   in a row.  But they wouldn't do the shift that way.

25   But people were complaining they wanted eight hours.

1    And I was like, I don't agree with that.  I love the

2    tens.  But some people were telling me, they're like,

3    it's interfering with their schedules.  You know, it

4    makes it difficult 'cause you work ten hours one day

5    so you got to go pick up your kid and blah-blah-blah.

6              And it's just me, you know -- I'm just, you

7    know, that type of person.  You know, I take care of

8    people.  People are going to, you know, make

9    complaints and they're too scared to take it

10   themselves.  I mean, there's no reason to be scared of

11   another person.  So I'll go up there and I'll explain

12   it to them, even if it's not something I agree with.

13   It's still --

14             You know, and that's why I said I treat it

15   like a union rep.  And that's when she said, "Well, we

16   should probably make you to do that."

17        Q    So the only time that you potentially talked

18   to her about your disability would have been in that

19   February meeting.

20        A    Correct.

21        Q    And you don't remember what she may have

22   heard or not heard, because you're not sure when she

23   came in.

24        A    Correct.

25        Q    The next person that you list that I don't

EXHIBIT X                          350

Page 259

1    think we've talked about is Caroling Chane.  Who is

2    that?

3        A    She is -- she was the supervisor for B shift

4    when I started there.  And she is -- she's -- she was

5    an interim assistant manager while I was in the dock.

6    She actually, her and John Burton, are the ones that

7    came to visit me for the first time other than Sol and

8    Sam Jones.  That's the only time that an actual

9    assistant manager actually came out to see what I was

10   doing.  And that was like, I think the 18th or 19th of

11   April is when they did it.

12       Q    So what do you think you talked to Caroline

13   Chane about?

14       A    Oh, just like I said, I've talked to

15   everybody about my disabilities.  It's just

16   conversation.  You know, and you used to sit there

17   after shift was over.  If you were doing driver

18   position, you'd have to turn the vehicle in and turn

19   the vehicle keys in to the supervisor.  And typically

20   I'd sit there and talk to them for a little while and

21   ask them if they needed anybody to stay over, 'cause

22   somebody called off and they didn't have enough

23   people.

24            'Cause I would typically, after my shift I

25   go to the gym that's right on the airport, and work

1    out.  And so I would be like, "Hey, if you need me to

2    stay, it's not a problem."  And so occasionally, you

3    know, there was one time I actually was at the gym and

4    I had just gotten to my first set and they called

5    saying, "Hey, we need Charlie South."  Like, "Cool."

6              So her and Scott were the two supervisors

7    for B shift.  So -- but I mean, I talk to everybody

8    about it.  For me, that's just who I am.  You know,

9    I'm a disabled vet.  You know, I got issues, but I'm

10   here.

11        Q    What do you do when you work out at the gym?

12        A    Light weight.  So -- I can't -- since I tore

13   the tendons in my triceps, so I can't bulk up.  It's

14   they just start getting hurt and swell up.  So I do

15   light weight.  Just trying to keep myself in shape.

16   So I was working and I wanted to be, you know, wanted

17   to fit in the uniform but not look like I do now where

18   I put on 30 pounds since I lost my job.  Just, you

19   know, just wanted to stay in shape because, you know,

20   I -- I get credit for every time I go to the gym, too.

21   For the live well.

22             If you go 40 times in a year per visit, if

23   you scan your badge, if you scan your tag in -- if you

24   go 40 times or -- do you remember how much it?  I

25   don't remember how many times you had to visit.  But

1    you get a full-day's pay for an apple.  And you can

2    get up to three apples a year.  It's the online

3    courses.  You have to do six of those, which, I mean,

4    you can do six of them in five minutes.  They're so

5    easy.  It's like a three-minute video and then Google

6    one answer, oh, there's one.  And then you do that six

7    times and you're done.

8           But then you do the visits, the other one

9    with the doctor.  You know, get the dental or an eye

10   exam and the doctors, they say you send that to the

11   airport.  It's just so they can keep their insurance

12   costs low.

13   Q    How often did you go to the gym after work?

14   A    Nearly every day.

15   Q    And would you do cardio at the gym?

16   A    I didn't have anywhere to run.  I can't

17   run, really, anyways.  Because running for too long is

18   just going to hurt.  I try to do, like even at home

19   I've got a recumbent bike with the back, 'cause I got

20   to have back support.  And I'll bike while watching

21   TV.  But at the gym, it's just basically light weight.

22   Just doing bench presses, curls, that kind of stuff,

23   ab works, you know, just trying to build my core.  You

24   know, what I can work.

25   Q    You also have Keith Alderman listed.  Who is

Page 262

```
1    Keith Alderman?

2         A     That was my FTO from when -- I don't

3    remember his name.  Sibley.  Sibley, he was my trainer

4    in the army.  But Keith Alderman was originally an

5    officer, just like -- he was my FTO.  He was my third

6    FTO.  And he was the one I was working David South

7    with when Sibley told out to tell me I didn't qualify

8    for short-term disability or FMLA because I hadn't

9    been there for long enough.

10             And so he had been an officer for a while,

11   and then he got promoted to supervisor.  And he was my

12   direct supervisor when I did come back in January.  He

13   was one of the supervisors when I came back in

14   January.  'Cause it was him and Kai for my two

15   directs.  And then Sol was on the shift, but not my

16   direct.  But, you know, they all, depending on what

17   day they were on and I was off, they all three kind of

18   played the role.

19        Q     So Keith Alderman was one of your

20   supervisors when you came back in January of 2020?

21        A     Correct.

22        Q     And did you talk to him about your

23   disability?

24        A     Yeah, talked to him.  Like I said, we worked

25   at posts together.  I was with him for over two weeks
```

1   at FTO every day.  And we talked about everything.

2   So, I mean, he was a -- he's a -- he's an army and an

3   air force vet.  Got a dishonorable discharge, but he

4   was a medic.  He actually -- you know, I mean, that

5   was with over two weeks we got to know each other

6   pretty well.

7       Q    And who is Scott Turner?

8       A    That's Scott.  That's the person that worked

9   with Caroline as the B shift supervisor.  He's the one

10  -- he actually knew my dad, 'cause my dad, when he was

11  working at Delta, he worked in the terminal tower when

12  he was -- he was third seniority in Delta DFW.  And so

13  he was in the tower doing -- controlling maintenance

14  ops in the tower for the Delta terminal, which is

15  terminal E now.

16           And he worked -- and Scott was one of the

17  other airlines that was a sister company to Delta, one

18  of the regional air -- like, ASA or whatever.  And

19  they worked together.  Which is kind of cool because

20  when I was doing training for the academy, I was

21  talking about my dad, he goes, "Oh, really what's he

22  -- Charlie King, that sounds familiar."  I showed him

23  a picture.  He's like, "Oh, yeah.  I used to work with

24  your dad."

25           So that was kind of cool.  But, I mean, we

EXHIBIT X                    355

1    talked -- I talked to him anytime he was there.  I'd

2    be like, "Hey, do you need me to cover anybody's

3    shift?  Anybody call off?"  Blah-blah-blah.

4        Q    What about Michael Buckley?  Who is he?

5        A    He is another officer that got promoted to

6    supervisor.  He is the one that I was -- I actually

7    had to get him kind of involved to give the some

8    information on the admin spot and try to get other

9    information that I'd like send in an e-mail and I

10   wouldn't get a response.  And so I'd be like, "Hey,

11   Buckley, can you ask Alderman or see what's going on

12   with this?"

13            We had an assistant manager that was there

14   during that time.  I don't remember his name, but he

15   wasn't there for like three weeks and then he quit.

16   But he was the one that approved me when I came back.

17   He was the one that signed off saying I could come

18   back in --

19       Q    In January?

20       A    January, correct.  And so he --

21       Q    Buckley was?

22       A    No.  Buckley is the one who is kind of my

23   intermediate.  When I couldn't get any reply, I'd say,

24   "Hey, can you ask them about this?  I'm not getting

25   any answers."  And then he would e-mail them and

Page 265

1    they'd respond to him.

2         Q    And so who is it that responded to you about

3    your return to work in January?

4         A    I don't remember his name.  It was some --

5    it was an assistant manager that wasn't there.  Maybe

6    a couple weeks before he quit.  But it was just right

7    there at the beginning of January when he was there.

8    But Michael Buckley was the one that was kind of

9    getting me to get information from Alderman when

10   Alderman wasn't responding.

11        Again, I worked with him at the gates, too.

12   So we had the same -- this is -- he was a retired

13   police officer or Dallas County -- no, that's not him.

14   He was a retired law enforcement officer.

15        Q    Okay.  Tell me about your job search

16   efforts.

17        A    After I got the termination letter, stewed a

18   little bit.  Just trying to figure out what was going

19   on and what happened.  And then I started to apply for

20   other jobs at the airport, 'cause this is the place

21   where -- I mean, the airport is awesome.  There is no

22   ifs, ands, or buts about it.  I love being there.  I

23   love being around there.  So I was trying to just get

24   me another job there.  I want to work there.  I want

25   to work there.

1         And then I was applying and applying.  And

2 then I finally got an e-mail that said that you're not

3 available -- you're not considered for rehire.  And

4 then at that point, I was like, wow, that's crazy.

5 'Cause what did I do?  You know, I mean, these

6 positions I could easily do even with my disability.

7 Why am I suddenly marked as, you know, non-rehire-

8 able?

9         And so at that point, I applied for a few

10 other places.  Like, I applied for Summit Racing,

11 which is similar to Alamo Autosports.  But Summit is

12 more of a warehouse, and Alamo was actually a service

13 shop where we did work and we ordered parts from

14 Summit.  And I tried to do that, and I didn't get the

15 -- I didn't get the e-mail in time to do the

16 teleconference with them.

17         He sent an e-mail, like, Friday night at

18 like seven o'clock saying, "Hey, we're going to do

19 teleconference on Monday at, like -- at eight

20 o'clock."  Well, that weekend I was helping my friend

21 who got evicted move.  So I didn't check my e-mail the

22 whole time.  And I got up at like ten o'clock on

23 Monday and found out I missed it already.  And I

24 e-mailed him back going, "Hey, hey."

25         And he never responded, which it's

Page 267

1    understandable.  If you can't be there for the
2    interview, then you're not going to be a quality
3    candidate, you know.  So I figured, you know, I shot
4    myself in the foot on the a one.  And then I applied
5    for other security jobs, like the Texas Health and
6    Human Services.  That's because an old officer that
7    worked with me at the airport who moved out there --
8    who got hired on by them, she is three houses down
9    from the new house we bought.
10            And we just were walking the dogs, like,
11   "Hey, what's going on?  You know, you should go work
12   for us."  And so we were going through all that and
13   trying to get that.  But I haven't been able to -- I
14   did the interview and they're waiting on HR, their
15   recruiter, to do all the paperwork so I can actually
16   get started on the job.
17         Q    Is that with Texas Health and Human --
18         A    Yes, Texas Health.  And then I also applied
19   at Allied Universal 'cause they're taking over a lot
20   of our jobs at DFW.  They're going to start working
21   the gates and everything like that as far as the
22   portals and -- they're taking over everything Maltos
23   was doing, which was the dock and the portals.  And
24   they're expanding into the gates.
25            And so I was going to apply for that since I

Page 268

1    worked there for four years.  And I applied for the

2    supervisor job.  And my wife talked to the -- the rep,

3    the hiring guy at DFW DPS headquarters.  And he

4    swinging to give me a date to come in to do an

5    interview.  He only has Tuesdays he can do it.  And

6    it's only certain Tuesdays.  So I'm still waiting to

7    hear back on him for when I can go in to do an

8    interview for him.

9         Q    So have you been offered a job at Texas

10   Health and Human Services?

11        A    Not yet.

12        Q    Okay.  Is it your understanding that you're

13   going to be offered a job there?

14        A    I have been talking with my friends who, you

15   know -- Landers is her name, the one that lives down

16   the street.  And talking to sergeant, Sergeant

17   Armstrong.  And he's trying to get the HR guy to stop,

18   you know, sitting on applications -- 'cause he did the

19   interview and everything.  And he's like, you know,

20   "We need you to come in because they are doubling the

21   amount of people at each hospital because of that

22   shooting up in north Dallas.  And so they need people

23   and they need them now."

24             He's like, "We want you to come in."  But

25   I'm just waiting to hear back from him.  So I did get

Page 269

1    an e-mail that says they're going to probably call

2    tomorrow around 9:30.  So hopefully that's going to be

3    good.

4         Q    Is that with Texas Health Resources or Texas

5    Health and Human Services?

6         A    It's Texas Health -- it's Texas Health and

7    Human Services is the Texas Health hospitals.

8         Q    Oh, okay.  Have you applied for any other

9    jobs other than these three you listed in response to

10   interrogatory number 6?

11        A    That would be it.

12        Q    And the ones you applied for at DFW that I

13   think we saw on Exhibit 2.

14        A    Correct.

15        Q    Who was it that told you that you weren't

16   eligible for rehire at DFW?

17        A    Pretty sure that was Mora, again.

18        Q    Mora?

19        A    Yes.

20        Q    Do you know when that was?

21        A    Not off the top of my head.  December,

22   January.

23        Q    So January of 2020?  I'm sorry.  December --

24        A    That was a few days after my last

25   application.  With my indication -- when you don't go

Page 270

1   into work, you don't even know what day of the week it

2   is -- what day of the month.

3        Q    So it looks like the last thing you applied

4   for was October 31st of 2022.

5        A    I'm pretty sure it's probably -- would have

6   been closer to December.

7        Q    Okay.  Did you ask Mora why you weren't

8   eligible for rehire?

9        A    No.  They're not going to tell you.  You're

10  just wasting your e-mail, wasting your time.

11       Q    Did you withdraw an application for parking

12  operations specialist in one of 2021?

13       A    I did not.  I was doing the interview with

14  -- she used to be our HR rep for CSO.  And she -- she

15  actually didn't know who I was, even though I was on

16  my application and my resume.  She didn't know any of

17  my education background, didn't know nothing.  She

18  called up saying, "Hey," blah-blah-blah, "Just letting

19  you know that this job is starting at, like 15-

20  something an hour."  And I said, "Well, I need, like,

21  17.50."

22            And she's like, "Well, we can't do 17.50

23  because, well, you know, the people here earning

24  17.50, they've all been working here for like four,

25  five years."  I'm like, "That's great, because I've

Page 271

1    worked at the airport for almost five years.  So I'm

2    right there."  "Well, they also have associate's

3    degrees."  "Oh, well, good.  I have a bachelor's

4    degree.  So maybe I should ask for more, but I won't.

5    I'll just take 17.50.  I'll let you know that my

6    previous job is a CSO and you know me from this job, I

7    was earning almost 20 an hour.  So I'm only asking for

8    17.50."

9              And she's like, "Well, do you have any

10   experience in a call center?"  And I was like,

11   "Absolutely.  I worked in the Talk as a communications

12   specialist and I had to monitor four to six radios at

13   a time all by myself constantly chattering, including

14   while in Iraq getting, you know, doing patrols in an

15   active combat zone.  And so you can consider that a

16   pretty high pressure call zone."

17             She's like, "Oh, okay.  Great.  But are you

18   willing to work, for like, $15 or 15.50 an hour."  I

19   said, "No.  I told you I need 17.50.  And according to

20   you, I should be asking for more, but I'm not because

21   I just want to have this job."  And she's like, "Well,

22   we're not going to continue this interview if you're

23   not going to be willing to work for 15.50."

24             And I told her, "Well, if you're not willing

25   to pay me the 17.50 that you say you pay everybody

EXHIBIT X                    363

Page 272

1    else at the exact same time at the airport and less

2    education, then I don't see why we're talking.  But

3    you can keep my application for if you decide you

4    can't fill this spot and you want somebody that's

5    going to do a good job.  Then you can call me back."

6    And that's when she was like, "Well, I probably won't

7    call you back."  I was like, "Okay."

8        Q    Okay.  Interrogatory number 10 asked you to

9    list the damages that you are looking for in this

10   lawsuit.

11       A    Okay.

12       Q    Okay.  You said lost wages beginning on

13   April 27th of 2020.  Why is that the date that you

14   start your lost wages?

15       A    Because my last day of actual work was the

16   24th of April, a Friday.  And then the 27th was the

17   day I started my short-term disability, and at which

18   point I was on a reduced pay.  I think it was 40

19   percent.  So there -- and then that didn't even

20   continue for the entire time while I was on short-term

21   while I was on -- before I was terminated in December.

22   Because they only paid me for the 180 days.

23            But I had to appeal originally when I

24   applied for my short-term disability and they denied

25   it because I didn't have -- I wasn't currently

Page 273

1   undergoing medical treatment with my doctor.  And I

2   had to file an appeal to explain to them that it's

3   COVID.  These are elective procedures.  You don't get

4   to see a doctor.  And so they agreed with my appeal,

5   and my appeal went through.

6           And then the very next day is when they

7   mailed out my termination letter.  But that actually

8   gave me a couple more days over 180 of which I wasn't

9   paid for that period.  So I don't remember exactly

10  when the cutoff was.  But I think it was sometime in

11  October that they paid me up until as far as the 40

12  percent.  That'd be something that accounting/payroll

13  would know more than anybody else.

14       Q    And your salary was 40,600 a year?

15       A    Correct.

16       Q    Was that a salary or were you paid on an

17  hourly basis?

18       A    It was an hourly basis, but when they talked

19  about it, it was always described in -- and so it was

20  like 19.96 an hour or something like that was when

21  they talked about -- even when I was offered the job,

22  they told me I was going to start at 36, 5 but it was

23  actually like 18.20 an hour or something when that --

24  you know, when I actually got the contract for it.

25           So when they told -- when I got my pay raise

Page 274

1    for that year, it was 40,600.  And then they broke it

2    down to being like 19.96 per hour.

3         Q    And did you ever work overtime?

4         A    Very rarely, because I didn't -- I live

5    within my means, and a lot of officers might to try to

6    make their bills.  I don't want to take that from

7    them.

8         Q    It looks like you're also asking for an

9    annual bonus.  You said you typically received an

10   annual bonus of 5 percent of your income.

11        A    It's -- it's the accrued bonus, the

12   performance bonus that they give every year.

13   Typically I get around, you know, 2.75 to 2.95.  And

14   then the middle of 2021, they also -- at the beginning

15   of 2021, they gave a 3 percent flat raise to everyone

16   that was hourly, not salary.  So anybody that's

17   managerial did not get the pay raise.

18             And then on top of that, in the middle of

19   the year, 2021, they added a 5 percent raise to

20   everybody that was salary.  And then, of course, the

21   normal performance raise is anywhere from 2.75, 2.85,

22   depending on your eval.

23        Q    I'm asking about the bonus the you say --

24        A    That's -- sorry.  That's the bonus I'm

25   referring to.  It's just the annual pay raises.

Page 275

1       Q    Oh, so it's not a bonus.  It's a pay raise.

2       A    Correct.  It also includes the apples that I

3   was referring to, of which I do two every year.  I

4   never do the medical one because trying to get an

5   appointment with the VA, good luck with that.

6       Q    So you're not saying that you got a 5

7   percent bonus every year.  You're saying that they

8   were raises.

9       A    Correct.  Those are just the raises that

10  were given to the DFW employees during the period that

11  I was not employed.

12      Q    And there was also a longevity bonus?

13      A    Yes.

14      Q    And what was the longevity bonus for?

15      A    For every year you got -- for every year you

16  were working there, you would get an extra bonus for

17  being an employee.  Just longevity with the company.

18      Q    When was that paid?

19      A    Same time as the apple.

20      Q    Do you remember when that was?

21      A    Typically -- 'cause the fiscal year ends in

22  October.  So it was typically like November or early

23  December.

24      Q    Did you receive that in November of 2020?

25      A    No.

Page 276

1    Q    You were still employed at that point,
2    though; right?
3    A    Yes.  But they never -- they were still -- I
4    don't -- I think it's that you don't qualify for it if
5    you're on short-term disability, I believe.  But I
6    never got paid for that.  I knew that much.
7    Q    And are you asking for your salary going
8    forward as damages in this lawsuit?
9    A    Yes.
10   Q    How many years do you think that you should
11   be entitled to your salary going forward?
12   A    Three to five.
13   Q    And why do you say three to five?  What do
14   you base that on?
15   A    Because that's --
16              THE REPORTER:  I'm sorry, Mr. King.
17   I'm losing the audio.  I'm sorry.  I lost the audio.
18   I'm sorry.  If you guys can hear me, I lost the audio.
19   I'm going to get us off the record.  The time now is
20   5:31 p.m. and we are off the record.
21              (Off the record.)
22              THE REPORTER:  The time now is
23   5:36 p.m.  We are back on the record.
24   BY MS. HARRISON:
25   Q    So you're asking for three to five years of

Page 277

1    your salary as damages going forward.  Is that
2    correct?
3         A    Yes.  I think we just decided on three
4    years.
5         Q    Okay.  And what are you basing that on?
6         A    Just the fact that I was hoping to work with
7    the airport for many years to come.
8         Q    And you're also asking for damages for
9    emotional pain and suffering.  Is that right?
10        A    Yes.
11        Q    And what is the basis for those damages?
12        A    The depression, the lack of enthusiasm, the
13   inability to focus.  Just, it came as a big shock to
14   me.  Like I said, I thought I had -- so I could
15   continue working, doing the job that I love.  Instead,
16   I lost that opportunity.  And it just, you know, it's
17   not very often that you get to say you're working your
18   dream job.  And so, you know, it's really destroying
19   my confidence for sure.
20             And taking that I would work for this -- for
21   a company for almost five years and they would just
22   throw me to the side like that and just -- you know,
23   it just makes it -- makes it really hard to, you know,
24   deal with that.  Because, you know, I've always
25   worked.  I mean, I've worked since I was 14.  I lied

Page 278

```
1    on my application when I applied to work when I was 14
2    and said I was 16.  You know, working is just, it's
3    who I am.  And not being able to work is just -- it's
4    -- it's just disheartening.
5            You know, like I said, it's -- it's, you
6    know, very -- sorry.  Sorry, it's just, I mean, it's
7    made everything difficult since, you know, now I'm at
8    home and my wife points out that I'm a lot easier to
9    set off, you know, as far as getting me upset.  And
10   normally I'm easy going.  And I almost never yell.
11   And just everything that's been, you know, real short.
12   And it's made our relationship very difficult because
13   it's hard to know who I am when I don't have a job.
14           And it's hard to want to go and get a job
15   somewhere else when you know you had the best job you
16   could ever imagine.  And that's why I kept trying to
17   apply at the airport.  Like, I'll just get back in the
18   door somewhere.  And -- and be able to get back to
19   this and go back to the airport and do what I enjoy
20   and be around things that I enjoy.  And so when they
21   told me I wasn't up for rehire, I mean, that was --
22           My wife came home, and I was crying, and she
23   was like, "What's wrong?"  And I was like, "They won't
24   rehire me.  They said I can't rehire."  And, you know,
25   she just sat there and, you know, let me cry.  And --
```

Page 279

1   sorry.  You know, I tried to do the other jobs and I
2   just screwed up on the Racing, Summit Racing.  You
3   know, that probably would have been something that's
4   another interest.  Not my life dream, but it was
5   something.

6           But now, Texas Health, they're having a hard
7   time working through that.  Trying to get something.
8   Get back to being who I am.  And just, it's -- it's
9   hard to deal with.  And it's --

10       Q    Have you seen a mental health professional?
11       A    I have one scheduled.  It's for April 14th.
12   Unfortunately, like I said, a month late for the VA to
13   get in.  But I did -- during my divorce, I had a very
14   hard time with that.  And I did a lot of counseling,
15   group sessions and, you know, you rely on a lot of
16   that to, you know, as far as coping mechanisms and
17   stuff like that.  So I was fairly prepared.  But you
18   can't control everything.  You can't keep it all
19   inside forever.

20           And unfortunately, it's -- my wife has been
21   great dealing with it.  But I know it's been difficult
22   for her too.  And the fact that she goes into work
23   every day and knows I'm not there, it's very hard for
24   her too.

25       Q    Are you taking any medications to help you

EXHIBIT X                    371

Page 280

1    with your feelings?

2         A    No.  Because they have to -- they can't

3    start a medication plan until I've had an actual visit

4    with the psychiatrist, which is on the 14th of April.

5    So we're going to go over a medication plan.  I mean,

6    it's something I got to do.  I don't like relying on

7    meds, but, you know, you got to do what you got to do.

8    If anything, to help my wife out so she doesn't have

9    to worry about me, you know, getting upset over the

10   littlest things.

11        And not having -- I mean, it's -- it's so

12   hard to keep focused.  I probably bought 67 different

13   -- 60, 70 games on Steam to play on my gaming

14   computer.  And I haven't turned it on in over a year.

15   I keep buying games, "Oh, I'm going to play this one,"

16   and I never get motivated to do it.  And I've been

17   trying to find games that I had interest in before

18   that just --

19        Like, I was playing Assassin's Creed

20   Odyssey, which is amazing graphics.  It's about

21   ancient Greece.  And the first time I bought it and

22   played it, I played -- 'cause it logs it on the

23   PlayStation how many hours you played.  I've played,

24   like, 470, 480 hours of it.  And then the -- last

25   months of just playing it, just constantly.

Page 281

1        And I went to restart it thinking, oh, I

2   haven't -- haven't played in the last two weeks.  And

3   so, like, I can't.  I'm just bored.  So I downloaded

4   another game, and another game, and another game.  And

5   I'm back to Skyrim, which I haven't played since 2015.

6   So it's just trying to find something to keep me

7   interested so I'm not just staring at the wall

8   thinking about what's going on with this.

9        You know, it's just -- you know, I stare at

10  -- I see all these chores I need to do, and I just

11  can't get motivated to do them.  I should have mowed

12  the yard like two weeks ago.  And I never managed to

13  do it.  I had recycling that I was supposed to -- I

14  had boxes 'cause I ordered stuff off Amazon, that are

15  still sitting in the living room for like a month and

16  a half now.  Should put them out every Thursday.

17       I never have to -- it's just hard to keep

18  them from -- it's just hard to get motivated.  It's

19  hard to sleep at the same time.  And I'm tired all the

20  time, yet I can't go to sleep.  Like, I had to buy a

21  bottle of melatonin just so I could get to sleep.  And

22  then, you know, the other times I actually get -- when

23  I take pain meds.  Because I did something that maybe

24  I shouldn't have.

25       Like I decided, you know what, I can mow.

EXHIBIT X

Page 282

```
 1   And I can do a little bit of edging.  Or I can go

 2   outside and pull the weeds in the front yard.  And

 3   that didn't work out too well.  So --

 4        Q    Okay.  Thank you for sharing that.  Is there

 5   any other category of damages that you're asking for

 6   in this lawsuit?  I do want to ask for that attorneys'

 7   fees.

 8        A    Oh, yes.  The attorney fees.  Michael

 9   Fallings.  With him was 7,500.  The one in Florida, he

10   didn't charge me anything.  And then the 10,000

11   retainer with my current attorney.

12        Q    And have you used all of that retainer so

13   far?

14        A    Pretty much.  I think -- yeah.  I had like

15   barely 1,000 at the end of last month.  So --

16        Q    Are you going to be required to pay another

17   retainer?

18        A    No.

19        Q    Okay.  What is your arrangement for paying

20   attorneys' fees going forward?

21        A    I'm not going to have any attorneys' fees.

22   The 10,000 and then 20 percent of whatever the

23   settlement is.

24        Q    Have you seen a job description for the

25   security position that you've applied for at Texas
```

FOR READING & SIGNING ONLY

Page 283

1    Health?

2        A    Yes.

3        Q    And can you do that job physically?

4        A    Yes.

5        Q    Is it a different job description than the

6    CSO?

7        A    Yes.  It's much more -- I guess you would

8    call it more intensive security.  You're wearing body

9    armor.  You'll have mace.  You're going to have a

10   different type of -- so I have to have a level 2

11   within 14 days, which they provide the training.  And

12   then the 60 days, I have to get my level 3.  Level 3

13   is armed, but they don't do armed.  But you have to be

14   level 3 armed to use a taser.

15           And so a taser and pepper spray and body

16   armor.  Which none of that was at the airport.  You

17   didn't get anything like that.

18       Q    Okay.  Did you apply for long-term

19   disability?

20       A    I did.  I got it for, like, one month.  But

21   it required me to do constant updates with the VA,

22   which with the VA, that was during the last half of

23   the COVID pandemic.  You can't get appointments with

24   the VA.  And so I couldn't keep it updated.  And so I

25   just let it slide.  I was just like, I can't -- I

Veritext Legal Solutions

EXHIBIT X                      375

Page 284

1    mean, I would have to go to sleep at the VA clinic

2    every day and sit there over 12 hours a day to be

3    there when they open till they closed to get the

4    paperwork done.  I mean, dealing with the VA, it makes

5    it very difficult for trying to get medical

6    information.

7        Q    So you got long-term disability through DFW

8    Airport's insurance carrier for one month?

9        A    Correct.  A month or something like that,

10   yes.

11       Q    And then did they tell you that the

12   requirement was that you had to have monthly updates

13   on --

14       A    Yes.  They told me that I have to do every

15   month.  I think it was every six weeks I had to

16   resubmit the paperwork.  So it was sort of like

17   short-term disability.  But short-term disability was

18   every four weeks.  And that was really difficult

19   because I spent basically any day I wanted to work at

20   the VA waiting because they don't do third-party.  You

21   can't.

22            You'll do the paperwork to do -- open to

23   allow medical access to your medical records, but the

24   VA doesn't care about that.  You have to do it

25   yourself.  They will not hand anything over to a

Page 285

1   third-party.  They won't fax anything to anybody.
2   They won't.  If they get a fax, they throw it in the
3   trash.  I have to hand deliver the paperwork, they
4   will fill it out, and then I will take it, scan it in,
5   and then I will e-mail it.  That's how I had to do it
6   for my short-term and my FMLA.
7         Q    Are you still under the same limitations
8   that your doctor wrote in your request for
9   accommodations?
10        A    Yes.
11              MS. HARRISON:  I think I'm done.  If we
12   can take a quick break.
13              MR. DAUPHINOT:  That's fine.
14              THE REPORTER:  Okay.  The time now is
15   5:49 p.m. and we are off the record.
16              (Off the record.)
17              THE REPORTER:  The time now is
18   5:51 p.m.  We are back on the record.
19   BY MS. HARRISON:
20        Q    Mr. King, are you contending that you
21   haven't been rehired at DFW Airport because of your
22   disabilities?
23        A    Yes.
24        Q    And why do you think that?
25        A    Because I've applied for positions that I

Page 286

1    completely qualify for.  And I actually can read the
2    job descriptions from the portal.  And there's
3    absolutely no reason I should not have been considered
4    for those positions or at least called in for an
5    interview.  I should have been a prime candidate,
6    especially with experience, my degree, experience
7    already working there.
8         Q    Is there anything you'd like to supplement
9    regarding your testimony today?
10                   MR. DAUPHINOT:  Objection to form.  You
11   can answer.
12        A    None that I can think of.
13        Q    Have you understood my questions?
14        A    Yes.
15        Q    If you didn't understand, did you ask me to
16   clarify?
17        A    Yes, I did.
18                   MS. HARRISON:  That's all I have.  Pass
19   the witness.
20                   MR. DAUPHINOT:  Pass the witness.
21                   THE REPORTER:  Mr. Dauphinot, did you
22   pass the witness as well?
23                   MR. DAUPHINOT:  I did, yes.
24                   THE REPORTER:  Okay.  And Ms. Carlisle?
25                   MS. CARLISLE:  Yes.  No questions from

Page 287

1    me.

2              THE REPORTER:   Thank you.   No questions

3    as well.   Thank you.

4              .    The time now is 5:52 p.m. and we are

5    off the record.

6                   (Signature reserved.)

7                   (Whereupon, at 5:52 p.m., the

8                   proceeding was concluded.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 288

1        CERTIFICATE OF DEPOSITION OFFICER

2              I, KIMBERLY HOLTON, the officer before whom

3    the foregoing proceedings were taken, do hereby

4    certify that any witness(es) in the foregoing

5    proceedings, prior to testifying, were duly sworn;

6    that the proceedings were recorded by me and

7    thereafter reduced to typewriting by a qualified

8    transcriptionist; that said digital audio recording of

9    said proceedings are a true and accurate record to the

10   best of my knowledge, skills, and ability; that I am

11   neither counsel for, related to, nor employed by any

12   of the parties to the action in which this was taken;

13   and, further, that I am not a relative or employee of

14   any counsel or attorney employed by the parties

15   hereto, nor financially or otherwise interested in the

16   outcome of this action.

17

18

19   _Kimberly Y. Holton_

     KIMBERLY HOLTON

20   Notary Public in and for the

     State of Texas

21   [X] Review of the transcript was requested.

22

23

24

25

EXHIBIT X                    380

Page 289

1              CERTIFICATE OF TRANSCRIBER

2          I, ALEXANDRA SUTPHIN, do hereby certify that

3    this transcript was prepared from the digital audio

4    recording of the foregoing proceeding, that said

5    transcript is a true and accurate record of the

6    proceedings to the best of my knowledge, skills, and

7    ability; that I am neither counsel for, related to,

8    nor employed by any of the parties to the action in

9    which this was taken; and, further, that I am not a

10   relative or employee of any counsel or attorney

11   employed by the parties hereto, nor financially or

12   otherwise interested in the outcome of this action.

13

14

15   ALEXANDRA SUTPHIN

16

17

18

19

20

21

22

23

24

25

382